1

1                   UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )   Case No. 2:16-cr-046-GMN-PAL
5                   Plaintiff,        )
                                     )   Las Vegas, Nevada
6           vs.                       )   Monday, April 10, 2017
                                     )   8:38 a.m., Courtroom 7C
7   ERIC PARKER, O. SCOTT            )
    DREXLER, RICKY LOVELIEN,         )   JURY TRIAL DAY TWENTY-SEVEN
8   STEVEN STEWART, TODD ENGEL       )
    and GREGORY BURLESON,            )
9                                     )
                    Defendants.       )
10                                    )   C E R T I F I E D   C O P Y

11

12               REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

      BEFORE:        THE HONORABLE GLORIA M. NAVARRO,
14               UNITED STATES DISTRICT JUDGE, CHIEF

15

16

17

18   APPEARANCES:

19          See next page

20   COURT REPORTER:

21          Heather K. Newman, RPR, CRR, CCR #774
            United States District Court
22          333 Las Vegas Boulevard South, Room 1334
            Las Vegas, Nevada  89101
23          (702) 471-0002

24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

2

1    APPEARANCES:

2    For the Plaintiff:

3            UNITED STATES ATTORNEY'S OFFICE
             BY:  STEVEN W. MYHRE
4                 ERIN M. CREEGAN
                  NADIA JANJUA AHMED
5                 NICHOLAS D. DICKINSON
             501 Las Vegas Boulevard South, Suite 1100
6            Las Vegas, Nevada 89101
             (702) 388-6336
7
     For Defendant Parker:
8
             LAW OFFICE OF JESS R. MARCHESE
9            BY:  JESS R. MARCHESE
             601 South Las Vegas Boulevard
10           Las Vegas, NV  89101
             (702) 385-5377
11
     For Defendant Drexler:
12
             LEVENTHAL AND ASSOCIATES
13           BY:  TODD M. LEVENTHAL
             626 South Third Street
14           Las Vegas, NV  89101
             (702) 472-8686
15
     For Defendant Lovelien:
16
             LAW OFFICE OF SHAWN R. PEREZ
17           BY:  SHAWN R. PEREZ
             626 South Third Street
18           Las Vegas, NV  89101
             (702) 485-3977
19
     For Defendant Stewart:
20
             TANASI LAW OFFICES
21           RICHARD E. TANASI
             601 South Seventh Street, 2nd Floor
22           Las Vegas, NV  89101
             (702) 906-2411
23

24

25

3

1    <u>APPEARANCES (Con't):</u>

2    For Defendant Engel:

3            JOHN G. GEORGE, Standby Counsel
             600 South Eighth Street
4            Las Vegas, NV  89101
             (702) 625-1183

5    For Defendant Burleson:

6
             LAW OFFICE OF TERRANCE M. JACKSON
7            BY:  TERRENCE M. JACKSON
             624 South Ninth Street
8            Las Vegas, NV  89101
             (702) 386-0001

9

10   Also present:

11           Gwen Wilson
             Bryan Ginn
12           Christine Abbott

13

14

15

16

17

18

19

20

21

22

23

24

25

4

I N D E X

WITNESSES:                                                    PAGE

Eric Parker        Cross-Examination by Dickinson   -   24
                   Redirect Examination by Marchese -   75
                   Recross-Examination by Dickinson -   94

E X H I B I T S

                                                     RECEIVED
                                                        IN
EXHIBIT NO:                                          EVIDENCE

    472                                                 28

    473                                                 30

    474                                                 31

    475                                                 65

    476                                                 60

    477                                                 61

    478                                                 66

    480                                                 69

1          LAS VEGAS, NEVADA; MONDAY, APRIL 10, 2017; 8:38 A.M.

2                              --oOo--

3                      P R O C E E D I N G S

4          (Outside the presence of the jury at 11:27 a.m.:)

5               COURTROOM ADMINISTRATOR:  All rise.

6               THE COURT:  Thank you.  You may be seated.

7               COURTROOM ADMINISTRATOR:  This is the time set for

8   Jury Trial Day Twenty-Seven in Case Number 2:16-cr-046-GMN-PAL,

9   United States of America vs. Eric Parker, O. Scott Drexler,

10  Ricky Lovelien, Steven Stewart, Todd Engel, and Gregory

11  Burleson.

12              Counsel, please make your appearances for the record.

13              MR. MYHRE:  Good morning, Your Honor.

14              Steve Mhyre, Erin Creegan, Nadia Ahmed, and

15  Nick Dickinson on behalf of the United States.

16              THE COURT:  Good morning.

17              MR. TANASI:  Good morning, Your Honor.

18              Rich Tanasi for Steven Stewart.  Also with us at

19  counsel table is Gwen Wilson and Bryan Ginn.

20              Thank you.

21              MR. MARCHESE:  Good morning, Your Honor.

22              Jess Marchese on behalf of Eric Parker and when we're

23  done with appearances, I have one thing outside the presence.

24              THE COURT:  Thank you.

25              MR. LEVENTHAL:  Good morning, Your Honor.

1          Todd Leventhal on behalf of Mr. Drexler.

2          THE COURT:  Good morning.

3          MR. GEORGE:  Good morning.  John George on behalf of

4    Todd Engel.

5          MR. PEREZ:  Good morning, Your Honor.

6          Shawn Perez on behalf of Ricky Lovelien.

7          MR. JACKSON:  Good morning, Your Honor.

8          Terrance Jackson on behalf of Greg Burleson.  Also

9    with me is Christine Abbott.

10          THE COURT:  Good morning.

11          All right.  Before we begin, and we're going to just

12    make sure everyone has a chance to come on in and sit down.

13          So I need to remind everyone, preliminarily, of the

14    expectations about how court will be conducted.  This is a

15    courtroom; it is not a sporting event.  So it is never

16    appropriate for people to make any expressions of their

17    opinions, either verbally or through body language, no matter

18    how much you may agree or disagree with what is being said.  So

19    please be advised that the U.S. marshals who are here today

20    have been authorized to remove from the courtroom anyone who

21    makes any inappropriate expressions.

22          In addition, people may not speak out of turn.  The

23    defendants are represented by counsel and any outbursts made by

24    any of the defendants or any displays of distracting or

25    inappropriate body language will mean that they will have to be

1    returned to the holding cell where we do have an audio feed so

2    that they may continue to hear the remainder of the day's

3    activities, but they will not be permitted to be present in the

4    courtroom.

5           The same holds true for anyone who disregards the

6    rules.  If you can't obey the rules while you're in the

7    courtroom, you will be removed but we will continue with the

8    hearing.

9           Also, please, everyone, make sure that you do not

10   have any cell phones or iPads, laptops, any kind of electronic

11   devices.  They are not permitted in federal court.  Even if

12   they are turned off or in vibrate mode or private mode, they

13   are not permitted.

14          The defendants and the defense attorneys are

15   permitted to have electronic devices with them so that they may

16   review the evidence and their notes as well as to enable them

17   to be able to present evidence here in court, but they are not

18   permitted to record any of the proceedings.  There are no audio

19   recordings or video recordings which are permitted in federal

20   court.

21          Tables are equipped with microphones; I call them

22   long necks.  So if you would prefer to stay at your table,

23   you're permitted to do so or if you want to come up to the

24   podium, that's available as well and we've turned that towards

25   the witness so we can continue with examinations.

8

1             Now, Mr. Marchese, you said there was something that

2    you wanted to state on the record before we bring in the jury?

3             MR. MARCHESE:  Yes, Your Honor.

4             It's my understanding that on the cross-examination

5    of Mr. Parker the Government intends to elicit some information

6    in reference to the Idaho 3 Percenters.  It's our position that

7    based on the prior court order, I believe it was 1543, that

8    that information was not to be elicited during the Government's

9    case-in-chief and only on cross-examination should the defense

10   open the door to that.  It's our position we have not done so.

11   Mr. Parker joined, started, whatever you want to call it, the 3

12   Percenters after the fact.  The only things I talked about

13   after the April 12th incident on direct examination were three

14   things; Long Bow, which was -- there was never anything

15   elicited about 3 Percenters; a Facebook post referencing

16   Mr. Stewart, once again, nothing about the 3 Percenters; and

17   then a very brief colloquy in reference to the day that

18   Mr. Parker was arrested.  So, at this point, I haven't seen how

19   I've opened the door.  I never asked him anything specifically

20   about the 3 Percenters.  So it's my position that anything in

21   reference to the 3 Percenters should not be brought up on

22   cross-examination.

23             THE COURT:  All right.

24             Mr. Dickinson?

25             MR. DICKINSON:  Yes, Your Honor.

1         I believe Mr. Marchese's referring to some pictures

2    and some posts from Mr. Parker's Facebook page.  First, the

3    Government does not intend to elicit anything about the "Idaho

4    3 Percent;" that Mr. Parker was a member of the Idaho 3

5    Percent; that he had any involvement with the Idaho 3 Percent

6    from here, from whenever he started with Idaho 3 Percent.  The

7    Government does intend to introduce, through Mr. Parker, posts

8    from his Facebook account that are still, to this day, as of

9    last night, publicly available.  One is June 11th.  It is a

10   picture of him on the bridge with a gun and it says, "You give

11   peace a chance, I'll cover you," and it does have the little --

12   I'll present these to the Court after I describe them.  It does

13   have a little 3 Percent down below.  The Government believes

14   that's not overly prejudicial.  It doesn't say "Idaho 3

15   Percent."  3 Percent's been mentioned.  Mr. Parker, in his

16   Long Bow video, testified that he's with the militia, although

17   he was not part of the militia and that all these groups joined

18   together.

19            THE COURT:  Is that exhibit marked?

20            MR. DICKINSON:  Yes.  475, Your Honor.

21            THE COURT:  Thank you.

22            MR. DICKINSON:  And there's . . . one other one.  On

23   February 17th, 2016, he posts what appears to be a caricature

24   that I believe someone else did that's Mr. Parker -- appears to

25   be Mr. Parker, representing him proned out on the bridge that

1  says "resist" and that says "3 Percent."  Again, don't intend

2  to elicit anything about his personal involvement in the 3

3  Percent in Idaho, or anything else he may or may not have done

4  with the 3 Percent in Idaho, which we conceded we would not get

5  into, unless Mr. Marchese opened the door or somebody opened

6  the door and we don't think that happened, so . . . and I can

7  present these to the Court, just . . .

8              THE COURT:  Yeah.  Let me take a look at them.

9         (Brief pause in proceedings.)

10             THE COURT:  So, Mr. Marchese, are you asking that

11  Exhibits 475 and 480 not be admitted or are you asking for

12  redaction of those two to eliminate the reference to 3 Percent?

13             MR. MARCHESE:  Well, there's also another issue in

14  reference to 480, but I don't want anything in reference to 3

15  Percent.  That's the short and sweet answer.

16             In reference to 480, too, another important point,

17  Mr. Parker didn't even post this.  He's been in custody for 14

18  months.  Someone else did this.  Someone else has access to his

19  Facebook account.  I'm sure the Government knows it has

20  actually been -- the Facebook account is still active.  So, if

21  Mr. Parker didn't do it and he's been in custody, I think

22  there's a real, a), authentication problem and b), relevance

23  problem.

24             MR. DICKINSON:  I believe . . .  What's the date on

25  that?  I apologize for interrupting you.

1          What's the date on that, Your Honor?

2          MR. MARCHESE:  It says February 17th.

3          THE COURT:  February 17th, 2016.

4          MR. DICKINSON:  Yeah, Your Honor.  They were not --

5     Mr. Parker was not arrested until March.

6          The Government thinks this is relevant because it

7     shows his continual -- it does not disavow his involvement in

8     the conspiracy.  It's not just that he left Bunkerville on the

9     12th and happened to do the Long Bow video and that's the end

10    of it; he continues to glorify the conspiracy all the way up

11    until just before he is arrested.

12         MR. MARCHESE:  And actually, Your Honor, I apologize.

13    I misspoke on that.  He -- the Government is correct.  I

14    thought he was in custody at that time.  But regardless, the

15    Court was clear in its order.  Unless we opened the door in

16    reference to the 3 Percent, it doesn't come in and now we have

17    these exhibits, which I believe are going to be published to

18    the jury.  I just don't see how the Government gets around the

19    order.

20         THE COURT:  So, Mr. Dickinson, you're saying they're

21    evidence of his failure to disavow.  Was there a claim of

22    disavowance made on direct examination?

23         MR. DICKINSON:  Well, Your Honor, it -- we're left

24    with the impression, and we've heard all through the trial,

25    they left on the 12th; they were only there for 14 days [sic]

12

1    and Mr. Parker's continued -- there's other pictures as well --

2    they just don't have 3 Percent on them -- from his Facebook

3    posting.  He's continually talking about promoting the

4    conspiracy, which has been the Government's theory all along.

5    These defendants continued to promote the conspiracy to get the

6    word out so people won't go back to Bundy ranch, et cetera, et

7    cetera.  It's an ongoing conspiracy until they're arrested.

8              THE COURT:  Let me see if I'm clear on this.

9              So the . . . okay.  Because the motion was to -- it

10   was the defendants' motion as to 3 Percenters, mention of 3

11   Percenters --

12             MR. DICKINSON:  Correct.

13             THE COURT:  -- to exclude outright and find that it

14   was not to be used.  The Government said that they did not plan

15   to use it in their case-in-chief, and I think that the --

16   the -- the argument was that it is not 404(b) evidence because

17   it would only come in for impeachment on rebuttal?  Is that --

18   on cross-examination?  I'm not --

19             MR. DICKINSON:  The 3 -- the 3 -- the Government's

20   not intending to get into the 3 Percent, he was a member of the

21   3 Percent, but he stated in his Long Bow video that he -- I

22   believe in the militia, all these militia came together.  Now

23   the 12th is over.  He's associating -- or the jury can take

24   what it wants -- you know, he gave a tearful testimony about

25   how his -- his emotions were on the bridge.  He's trying to

1    establish self-defense.  This -- this -- the Government would

2    argue goes contrary to any self-defense arrangement; that he's

3    glorifying his actions on the bridge on April 12th close to two

4    years later.

5                THE COURT:  All right.  So what -- my recollection

6    was that the argument was whether or not membership in the 3

7    Percenters was a bad act under 404(b), but I think the

8    appropriate way to handle this is to redact the -- the 3

9    Percent in the middle of the bottom of Government's Exhibit 475

10   and on Government's Exhibit 480, on the bottom where it has in

11   cursive, 3 Percent, to redact that, in an abundance of caution,

12   because it could be unfairly prejudicial, since you are not

13   seeking to admit any evidence that he was a member --

14               MR. DICKINSON:  Okay.

15               THE COURT:  -- or joined up with a group called the 3

16   Percenters, but merely what your intent is to demonstrate that

17   he has not disavowed and that he continues to . . . the conduct

18   of the conspiracy.  I think that's -- that's the best way to go

19   about it.

20               MR. DICKINSON:  We will do that, Your Honor.

21               THE COURT:  So I think the defendant's motion is

22   granted in part, denied in part.

23               Anything else?

24               MR. LEVENTHAL:  Your Honor, I just would have an

25   issue on 4 -- I haven't seen these.  This is the first time.

14

```
1   There's 476 that has a picture of what I assume to be
2   Mr. Parker, Mr. Drexler, and somebody in the middle that I
3   don't recognize or know and I -- I don't -- all it says is
4   "Eric EJ Parker, July 12th, 2015."  I don't know where this is
5   from.  My client is on this picture and, you know, the
6   prejudicial effect, but more so than that one, not only the
7   authenticity of whatever that picture is, more so is 477 that
8   has something to do with -- I have no idea what it means, "In
9   the hallowed halls of Valhalla, where the brave shall live
10  forever" and has a picture of my client.  Clearly he had
11  nothing do with that.  It's a picture of him.  It doesn't even
12  show what Facebook this is on, who wrote that, who said that,
13  and I think the prejudicial effect on my client, who did not
14  take the stand as of yet, that should not come in.  It's too --
15  it's overly prejudicial and it's -- there's zero probative
16  value to it whatsoever and I don't see how that's even relevant
17  to my client.  Whether or not that was on Mr. Parker's website,
18  I don't know how that has to do with Mr. Drexler and what was
19  written underneath it.  I understand that they're claiming
20  there's a conspiracy, but all of this stuff could have come in
21  in their case-in-chief.  Now, all of a sudden, Mr. Parker takes
22  the stand and now my client is the spillover and the
23  prejudicial effect because Mr. Parker chose to take the stand.
24  So if it does come in, it only comes in, I guess, for
25  Mr. Parker and not for Mr. Drexler, but I would ask that at
```

1    least these two pictures do not come in as having zero

2    relevancy to what Mr. Parker testified on the stand in our

3    case.

4            They could have done it in their case; they chose not

5    to.

6            THE COURT:  Well, if they could have done it in their

7    case, then there's no prejudice to it coming in on cross.  I

8    think the question really is the relevance.  476 is the photo

9    of -- is that . . . Drexler's?

10           MR. DICKINSON:  476 is a picture of Mr. Parker and

11   Mr. Drexler with another individual.  They're, you know, taking

12   the picture.  It's clearly on the bridge on the 12th.  It's

13   from Mr. Parker's Facebook page.  He posted it a year later on

14   July 12th, 2015.  Mr. Parker is smiling, which, again, goes

15   against his direct testimony of how upset he was on the bridge,

16   that his interview with Mr. Flynn was just him being cocky.

17           The other one, November 12th, 2015, Mr. Parker

18   is writing -- he posts a picture -- and this is Government

19   477 -- November 20th, 2015 -- now we're a year and a half

20   later, "Our ongoing weekly tribute to the men and women who

21   showed up that day and were not me."  And it's a picture of

22   Mr. Drexler on the bridge and on the picture it's written, "Lo,

23   do they call to me, they bid me to take my place among them, in

24   the hallowed halls of Valhalla, where the brave shall live

25   forever."

1          So it's, once again, Mr. Parker glorifying the

2     conspiracy.  He posted multiple of these on a weekly basis of

3     other people that were there besides him.  And it's not overly

4     prejudicial; it's a conspiracy.  He traveled there with

5     Mr. Drexler.

6          THE COURT:  All right.  Well, it appears both 476 and

7     477, 476 is photograph from -- taken on the date of the event,

8     477 posted after the event, but an ongoing tribute to those

9     members of the conspiracy who were participating in the event.

10    So that would seem to be relevant.

11         MR. LEVENTHAL:  I still don't see how we get over the

12    authenticity stage of this.  We've had -- we've had an FBI

13    agent -- I mean, we've had not a lot of authenticity, I get it,

14    but how -- I mean, we had an FBI agent that came in that said

15    that as of yesterday, she saw this on his website.  How do we

16    even get here, now, where it just has a picture with some

17    stuff?  How, over the weekend, do we get here (indicating)?  I

18    mean, this was clearly --

19         THE COURT:  So your objection is as to foundation it

20    sounds like.

21         MR. LEVENTHAL:  I'm going to go foundation, I'm going

22    to say relevancy, I'm going to say prejudicial.  I mean, I

23    don't even know how we get here after the fact, just because he

24    decided to take the stand.

25         THE COURT:  Okay.  Well, that will be something

17

1    Mr. Dickinson will have to figure out.

2            Let's talk about the prejudice.  What is the argument

3    for prejudice?

4            MR. LEVENTHAL:  Well, clearly my client had -- I

5    understand that there's a picture here.  I don't know who took

6    it and I don't even know what "Valhalla, where the brave

7    shall" -- what is the relevance of what Valhalla and where the

8    brave shall live forever?  I don't know what it means, but

9    it -- I -- I don't -- the prejudicial effect and the spillover

10   effect on my client with his picture sitting there, that has no

11   authenticity to, is clearly just designed to do that.  It's

12   clearly designed just so that -- and, you know, I understand

13   that they're saying the conspiracy, but it's designed just to

14   prejudice, not only Mr. Parker, but now bring in my client for

15   some reason that he had nothing to do with.  If they brought

16   in -- they brought in his Facebooks [sic].  They brought in his

17   posts.  They showed, I think, we got two pages of Mr. Drexler's

18   posts.  What other people post about him or a picture with him

19   with a saying, I think it's not relevant.

20           THE COURT:  Can I see Exhibit 477?

21           MR. DICKINSON:  Yes, Your Honor.

22      (Brief pause in proceedings.)

23           THE COURT:  And, Mr. Dickinson, is 477 offered only

24   as to Mr. Parker or evidence of the conspiracy?

25           MR. DICKINSON:  Evidence of the ongoing conspiracy,

1    Your Honor.  We already have something similar posted by

2    Mr. Burleson about wanting to go to the halls of Valhalla that

3    was -- that was introduced against everybody.

4            Mr. Parker took the stand and this goes contrary to

5    his testimony of, well, I just sort of left on the 12th and it

6    was all a big confusing thing and I didn't really know what was

7    going on.

8            THE COURT:  Okay.  And I agree that it's clear on

9    this exhibit that the post is from the Facebook page of Parker

10   on November 20, 2015, and states that the ongoing -- "our

11   ongoing weekly tribute to the men and women who showed up that

12   day that were not me."  So it does refer to the day.  It

13   appears to be a picture of that day, with a member that was

14   present holding a rifle.  As long as it's clear that the words

15   that are underneath the picture are not to be -- I mean, I

16   don't -- it's -- it's -- I guess you'll have to lay the

17   foundation for where this came from, but -- it's obviously not

18   offered for the truth of the matter asserted, that -- but

19   rather to indicate the continuing . . .

20           MR. LEVENTHAL:  But it is, Your Honor.  The --

21   clearly Mr. Dickinson just indicated that it's offered for the

22   conspiracy, which is the truth of the matter asserted.  So it's

23   hearsay.  It's inadmissible, and that's exactly what he said

24   it's for, is to show the ongoing conspiracy.  So it is being

25   offered for the truth.

1          THE COURT:  It's the agreement between two

2   individuals, which is why I was thinking of redacting the --

3   his face, but that wouldn't be appropriate because it's

4   evidence of the conspiracy --

5          MR. LEVENTHAL:  It's hearsay.

6          THE COURT:  -- and the agreement and the

7   continuing --

8          MR. DICKINSON:  Correct, Your Honor.

9          THE COURT:  -- participation in the conspiracy.

10          MR. DICKINSON:  There's no hearsay.  We're not

11   offering the call to Valhalla.

12          And what Mr. Parker wrote on the weekly tribute is

13   his own statement.

14          THE COURT:  Yeah.  I don't -- I don't see that

15   there's any prejudice in 476 or 477 that outweighs its

16   probative value.  The foundational problem will be one that

17   we'll have to cross when we get there.

18          MR. TANASI:  Your Honor, if I may, just for the

19   record, join in Mr. Leventhal's objection.

20          THE COURT:  Yes.

21          MR. TANASI:  Thank you.  Stewart.

22          MR. LEVENTHAL:  Are we going to have to now explain

23   what Valhalla is?  Because I don't know what Valhalla is until

24   I was just told now, but I can imagine that the jury has no

25   clue what "in the hallowed halls of Valhalla" means.  Again,

1     that sounds to me like it's somewhat prejudicial, but I don't

2     know what it is and if I don't know what it is, I can imagine

3     that the jury is going to sit there, Is that some reference to

4     some ISIS or Muslim calling?  I have no idea what it is.  And

5     so, just to have it there it absolutely ridiculous.  I think

6     now we're getting into explaining what the "halls of Valhalla"

7     mean.

8               MR. DICKINSON:  It's already in evidence, Your Honor.

9               THE COURT:  It's already -- yeah.  It's already in

10    evidence with Mr. Burleson's Facebook page.

11              MR. DICKINSON:  It's not ICE -- it's not ISIS or

12    terrorism.  It's Norse mythology, but I'm sure the Court knows.

13              THE COURT:  Right.  And the fact that different

14    individuals are using the same unique terminology is more

15    evidence of conspiracy than not.  So I -- I don't know -- is

16    there a plan to explain what it is or . . .

17              MR. DICKINSON:  I don't think I was really planning

18    on having Mr. --

19              THE COURT:  Yeah.  That would make it --

20              MR. DICKINSON:  It's from a movie as well, a movie

21    called *The 13th Warrior,* but I wasn't planing on taking up the

22    Court's time.

23              THE COURT:  Yeah.

24              Mr. Marchese.

25              MR. MARCHESE:  I had another issue, so I was just

 1    waiting for this to be over.

 2              THE COURT:  Okay.  Go ahead.

 3              MR. MARCHESE:  It's also -- I've received a new

 4    exhibit today, Government's Exhibit 435.  It believe it to be a

 5    portion of a 302 from a Gregory Johnson, one of the BLM agents

 6    that testified earlier during the Government's case-in-chief.

 7    I don't know what the relevant -- well, I know what the

 8    relevance or what the -- at least what they're trying to get

 9    at, but in looking at it, if they're going to plan to elicit

10    this testimony or bring in this exhibit, I'm going to just

11    lodge a hearsay objection from the start on that.

12              MR. DICKINSON:  Your Honor, this was already

13    admitted.  It was admitted under Rule 611 when Mr. Marchese

14    impeached Mr. Johnson.  Sort of didn't realize that he actually

15    had that in his 302, so we put it in under that rule and the

16    Court admitted it, as long as we redacted it.  We were just

17    catching up on everything.

18              MR. MARCHESE:  Okay.

19              MR. DICKINSON:  We didn't get around -- a chance to

20    get around to redacting it.  So, if Mr. Marchese has a problem

21    with the redaction, we're happy to try to work that out.

22              MR. MARCHESE:  No.  That's fine.  I just didn't -- it

23    was so long ago, I don't even remember.  Plus, I think there's

24    another Ranger Johnson so, sometimes I get the two mixed up.

25              MR. DICKINSON:  My bad.  It just took me awhile to

22

1  get that off my list, Your Honor, so . . .

2           THE COURT:  Okay.  All right.  Anything else?

3           Let's go ahead and call in the jury.

4           MR. DICKINSON:  Do we need Mr. Parker on the stand,

5  Your Honor?

6           THE COURT:  Yes.

7           Mr. Parker, come on up and take the stand.

8           I can see the top of the water bottle, but I can't

9  tell -- it's full, right?  Okay.  It's not the empty one from

10  yesterday?

11           Okay.  Go ahead.

12      (Brief pause in proceedings.)

13           THE COURT:  And Mr. Dickinson, Mr. Parker, try not to

14  speak over each other today.

15           MR. DICKINSON:  Yes, Your Honor.

16           THE WITNESS:  Yes, Your Honor.

17      (Brief pause in proceedings.)

18           COURTROOM ADMINISTRATOR:  All rise.

19      (Jury returned to courtroom at 9:05 a.m.)

20           THE COURT:  All right.  Everyone may be seated.

21           Good morning.  We're joined by the jury, and we have

22  Mr. Parker back on the stand.

23           Mr. Dickinson, you may continue with your

24  cross-examination.

25           MR. DICKINSON:  Do you want the parties to make their

1     appearances, Your Honor?

2              THE COURT:  I think the jury probably knows who

3     everybody is by now.  If you want to -- if you want to make

4     your appearances, I'd be happy to allow you to keep doing that.

5              MR. DICKINSON:  It's what we've normally been doing.

6     I didn't want to --

7              THE COURT:  Yeah.  Go ahead.  Government can make its

8     appearance and we'll let the defense make its appearance.

9              MR. DICKINSON:  Good morning.

10             Nicholas Dickinson, Steven Myhre, Erin Creegan, and

11    Nadia Ahmed for the United States.

12             MR. TANASI:  Thank you, Your Honor.

13             Good morning, folks.  Rich Tanasi for Steven Stewart.

14    Also with us at counsel table is Gwen Wilson and Bryan Ginn.

15             Thank you.

16             MR. MARCHESE:  Good morning, everyone.

17             Jess Marchese on behalf of Eric Parker.

18             MR. LEVENTHAL:  Good morning, everyone.

19             Todd Leventhal on behalf of Mr. Drexler.

20             MR. GEORGE:  Good morning.

21             John George on behalf of Todd Engel.

22             MR. PEREZ:  Good morning, everybody.

23             Shawn Perez on behalf of Ricky Lovelien.

24             MR. JACKSON:  Good morning, everyone.

25             Terrence Jackson for Greg Burleson and also with me

24

1    is Christine Abbott.

2          THE COURT:  Good morning, everybody.  Thank you.

3          Go ahead.

4          MR. DICKINSON:  Thank you.

5

6               FURTHER CROSS-EXAMINATION OF ERIC PARKER

7    BY MR. DICKINSON:

8    Q.   Good morning, Mr. Parker.

9    A.   Good morning.

10   Q.   I want to start discussing your time on the northbound

11   bridge on April 12th, 2014.  Okay?

12   A.   Yep.

13          MR. DICKINSON:  If we could bring up 457-16.

14       (Government Exhibit 457-16 published.)

15          MR. DICKINSON:  I apologize.  457-19.

16          Well, let's keep it here.

17   BY MR. DICKINSON:

18   Q.   This was before you got onto the northbound bridge;

19   correct?

20          THE COURT:  Just -- this -- when you say "this," we

21   are looking at Exhibit 457 --

22   BY MR. DICKINSON:

23   Q.   This picture, this is you (indicating); correct?

24          THE COURT:  -- 16.

25          THE WITNESS:  Yes, sir.

25

```
 1   BY MR. DICKINSON:
 2   Q.   And this is before you got onto the northbound bridge?
 3   A.   Yes, it is, sir.
 4   Q.   And are you holding your -- you're holding your firearm in
 5   this picture?
 6   A.   I am.
 7   Q.   And you're wearing your vest with plates?
 8   A.   I am.
 9   Q.   And you're wearing your black hat with the white insignia?
10   A.   Yes, sir.
11            MR. DICKINSON:  If we could go to 457-19.
12        (Government Exhibit 457-19 published.)
13   BY MR. DICKINSON:
14   Q.   That's you (indicating)?
15   A.   It is, sir.
16   Q.   And you're walking onto the northbound bridge?
17   A.   I am.
18   Q.   And you're holding your weapon?
19   A.   Yes, sir.
20   Q.   And you're wearing your vest with plates?
21   A.   Yes, sir.
22   Q.   And you're wearing a black hat with the white insignia?
23   A.   I am, sir.
24   Q.   And that's Mr. Engel (indicating)?
25   A.   It appears to be, sir, yes.
```

26

```
1    Q.   And he has his weapon?

2    A.   Yes, sir.

3    Q.   And he appears to be looking at his phone or taking a

4    picture?

5    A.   That's what it looks like, sir.

6              MR. DICKINSON:  If we could play Government's Exhibit

7    76, starting at about 35 seconds.

8         (Government Exhibit 76 published.)

9    BY MR. DICKINSON:

10   Q.   That gentleman just yelled, "Your court order does not

11   apply"; correct?

12   A.   I believe he was talking about the highway, sir.

13   Q.   My question is, that gentlemen just yelled, "Your court

14   order does not apply"; correct?

15   A.   Yes, sir.

16             MR. DICKINSON:  Continue to play.

17        (Government Exhibit 76 published.)

18             MR. DICKINSON:  If we could move to Government

19   Exhibit 77 and play it from the beginning.

20        (Government Exhibit 77 published.)

21             MR. DICKINSON:  If we could pause it.

22   BY MR. DICKINSON:

23   Q.   At 16 seconds, these are the horses that are now coming

24   under the northbound bridge; correct?

25   A.   Yes, sir.
```

27

1   Q.   The same horses that you saw up at the rally area earlier

2   that day?

3   A.   I believe so, sir.

4   Q.   Same flags?

5   A.   I believe so, sir.  Yeah.

6            MR. DICKINSON:  Continue to play.

7        (Government Exhibit 77 published.)

8            MR. DICKINSON:  Pause it.

9   BY MR. DICKINSON:

10  Q.   Now, the horses have -- some of the horses have made their

11  way through under the northbound bridge; correct?

12  A.   Yes, sir.

13  Q.   And they're continuing to move forward; correct?

14  A.   Yes, sir, to the center of the wash there.

15           MR. DICKINSON:  Play it.

16       (Government Exhibit 77 published.)

17           MR. DICKINSON:  Go back a little bit.  Go back to,

18  like, 1:05.

19       (Government Exhibit 77 published.)

20  BY MR. DICKINSON:

21  Q.   Appear to see people waving people into the wash?

22  A.   Yeah.  Yeah, I think that's what was -- yes, sir.

23  Q.   And the people are moving up with the horses to the middle

24  of the wash; correct?

25  A.   Yes, sir.

1          MR. DICKINSON:  Keep playing.

2      (Government Exhibit 77 published.)

3          MR. DICKINSON:  Stop at 2:22.

4  BY MR. DICKINSON:

5  Q.   We're pausing this at 2:22.

6          Do you see that, Mr. Parker?

7  A.   See what, sir?

8  Q.   Do you see what's on the screen if we pause it at 2:22?

9  A.   Yes, sir.

10          MR. DICKINSON:  If we could bring up Government's

11  Exhibit 472 just for the Court and parties and Mr. Parker.

12      (Government Exhibit 472 published to witness.)

13  BY MR. DICKINSON:

14  Q.   Mr. Parker, does this appear to be a screenshot of what we

15  just saw at 2:22?

16  A.   Yes, sir.

17          MR. DICKINSON:  I'd move for the admission of

18  Government's Exhibit 472.

19          THE COURT:  Any objection?

20          MR. MARCHESE:  No objection Parker.

21          THE COURT:  472 will be admitted.

22      (Government Exhibit 472 received.)

23          MR. DICKINSON:  Permission to publish?

24          THE COURT:  Yes.

25      (Government Exhibit 472 published.)

29

1    BY MR. DICKINSON:

2    Q.   So now, at this time in the wash, Mr. Parker, the

3    horses -- you see horses; correct?

4    A.   Yes, sir.

5    Q.   Horses.

6              And you see people; correct?

7    A.   Yes, sir.

8    Q.   And they've moved up into the middle of the wash; correct?

9    A.   Yes, sir.

10   Q.   And the law enforcement officers are on the other side of

11   the gate; correct?

12   A.   Yes.

13   Q.   And nobody from over here (indicating) has moved up to the

14   gate; correct?

15   A.   No, sir.

16             MR. DICKINSON:  If we could go forward.  473.  If we

17   could go forward back -- if we could go back to 77.  And stop

18   it at 2:24.

19        (Government Exhibit 77 published.)

20   BY MR. DICKINSON:

21   Q.   And you see now what we've stopped here at 2:24?

22   A.   Yes, sir.

23             MR. DICKINSON:  And if we could bring up 473 for the

24   witness and the parties.

25        (Government Exhibit 473 published to witness.)

1    BY MR. DICKINSON:

2    Q.   Mr. Parker, does this appear to be a screenshot of what

3    you just saw stopped at 2:24?

4    A.   Yes, sir.

5          MR. DICKINSON:  Move for the admission of Government

6    473.

7          THE COURT:  Any objection to 473?

8          MR. MARCHESE:  No objection Parker.

9          THE COURT:  All right.  473 will be admitted.

10        (Government Exhibit 473 received.)

11         MR. DICKINSON:  Permission to publish?

12         THE COURT:  Yes, you may.

13   BY MR. DICKINSON:

14   Q.   And this is just a few seconds later, Mr. Parker, and

15   there's no one in this area (indicating) between the people on

16   the horses and the law enforcement; correct?

17   A.   No -- no, sir.

18   Q.   And do you see this individual down here (indicating)?

19   A.   Yes.  I do now.

20   Q.   And he has a gun?

21   A.   It appears that way, yes, sir.

22         MR. DICKINSON:  And if we could go back to and

23   continue to play 77 and stop it at 2:27.

24        (Government Exhibit 77 published.)

25   ///

1  BY MR. DICKINSON:

2  Q.   Do you see what we see here on the screen, Mr. Parker,

3  where it's paused at 2:27 on the Exhibit 77?

4  A.   Yes, sir.

5            MR. DICKINSON:  If we could bring up Exhibit 474 for

6  the Court and Mr. Parker and the parties.

7       (Government Exhibit 474 published to witness.)

8  BY MR. DICKINSON:

9  Q.   Does this appear to be a screenshot from 2:27 of what we

10  were just looking at?

11  A.   Yes, sir.

12            MR. DICKINSON:  Government moves for the admission of

13  Government's Exhibit 474.

14            THE COURT:  Any objection?

15            MR. LEVENTHAL:  No, Your Honor.

16            MR. MARCHESE:  No, Your Honor.

17            MR. TANASI:  None from Stewart, Your Honor.

18            THE COURT:  474 will be admitted.

19       (Government Exhibit 474 received.)

20            THE COURT:  You may publish.

21       (Government Exhibit 474 published.)

22  BY MR. DICKINSON:

23  Q.   Mr. Parker, this individual (indicating) is dressed in a

24  tan uniform; correct?

25  A.   Yes, sir.

1    Q.    Appears to have a patch on his shoulder; correct?

2    A.    I -- I can't tell that, but yes, I see he's in a tan . . .

3    Q.    This individual (indicating) is in a tan uniform; correct?

4    A.    Yes, sir.

5    Q.    Tan hat?

6    A.    Brown, but yeah.

7    Q.    Brown hat?

8    A.    Yes, sir.

9    Q.    This individual (indicating), same, brown hat?

10   A.    Yes, sir.

11   Q.    Same with this individual right here (indicating)?

12   A.    Yeah.  Some sort of boonie cap or brimmed.

13   Q.    And you see "ranger" written on this truck right there

14   (indicating)?

15   A.    I do now, sir, yes.

16   Q.    And you see "ranger" written on this right here

17   (indicating) with a badge?

18   A.    Yes.  Yes, sir.

19   Q.    And the people here in the green (indicating), they're in

20   between these two ranger vehicles; correct?

21   A.    The ones pointing guns at people, sir?

22   Q.    These people in the green, they're standing in between two

23   ranger vehicles; correct?

24   A.    Yes, sir.

25   Q.    And at this time you're on the northbound bridge; correct?

1    A.   Yeah.   About 150 yards away, sir.

2    Q.   My answer [sic] was you're on the northbound bridge.   Is

3    that a yes?

4    A.   I answered it.

5    Q.   And you have your firearm, your long gun; correct?

6    A.   Yes, sir.

7    Q.   And you're wearing your vest with your plates, right?

8    A.   Yes, sir.

9    Q.   You're wearing your black hat with the white emblem;

10   correct?

11   A.   Yes, sir.

12   Q.   And each of these trucks, that's a light bar (indicating)

13   on top of that truck; correct?

14   A.   Yes, sir.

15   Q.   And that's a light bar (indicating) on top truck of that

16   truck; correct?

17   A.   Yes, sir.

18   Q.   And that's a light bar (indicating) on top of that truck;

19   correct?

20   A.   Yes, sir.

21   Q.   So when you were standing on that bridge, you knew there

22   were BLM officers in the wash; correct?

23   A.   I didn't say that, sir.

24   Q.   You didn't know there were BLM officers in the wash?

25   A.   No.   I -- I never said that, sir.

34

1          MR. DICKINSON:  If we could go back to 77 and

2     continue playing.

3          (Government Exhibit 77 published.)

4          MR. DICKINSON:  Pause it.

5     BY MR. DICKINSON:

6     Q.   Now, the crowd is yelling, "Open that gate"?

7     A.   It would appear so, sir, yes.

8     Q.   Is that a yes?

9     A.   Yes.  Yes, sir.

10         MR. DICKINSON:  Continue playing.

11         (Government Exhibit 77 published.)

12     BY MR. DICKINSON:

13     Q.   Now, the crowd was yelling, "Open that gate."  When you

14     were on the northbound bridge, you were on for a while;

15     correct?

16     A.   Yeah.  Yes, sir.

17     Q.   And you heard the BLM make announcements to disperse?

18     A.   Yeah.  That's fair enough, yes.

19     Q.   And you heard BLM make announcements referencing court

20     orders; correct?

21     A.   Yeah.  Yes, sir.

22     Q.   All right.

23         MR. DICKINSON:  If we could go to Government's

24     Exhibit 472.

25         Oh, I'm sorry.  We've already -- I apologize.  If we

1  could go to 365 and publish.

2      (Government Exhibit 365 published.)

3          MR. DICKINSON:  Pause it.  Pause it.

4          If we could go back, Nicole, to blue shirt.

5      (Government Exhibit 365 published.)

6  BY MR. DICKINSON:

7  Q.   The gentleman in the blue shirt is holding a long gun;

8  correct?

9  A.   Yes, sir.

10 Q.   Same individual we saw before with a long gun; correct?

11 A.   Yes, sir.

12         MR. DICKINSON:  Can you continue playing.

13     (Government Exhibit 365 published.)

14         MR. DICKINSON:  Pause it.

15 BY MR. DICKINSON:

16 Q.   The gentleman in the red shirt (indicating), long gun;

17 correct?

18 A.   Yeah -- yes, sir.

19         MR. DICKINSON:  Continue playing.

20     (Government Exhibit 365 published.)

21         MR. DICKINSON:  Pause it.  Pause it.

22         What's the time?  28 seconds.

23 BY MR. DICKINSON:

24 Q.   That (indicating) appears to be an underage girl; correct?

25 A.   I can't tell how old she is.  I don't know what you mean

1    by "underage," I guess, sir.

2    Q.   A child?

3    A.   Yeah.  I could guess that.  Children.

4              MR. DICKINSON:  Continue to play.

5         (Government Exhibit 365 published.)

6              MR. DICKINSON:  If you could pause it.

7              Time, please?

8              55 seconds.

9    BY MR. DICKINSON:

10   Q.   Do you see that individual (indicating) in the desert

11   fatigues?

12   A.   Yes -- yes, sir.

13             MR. DICKINSON:  Continue to play.

14        (Government Exhibit 365 published.)

15             MR. DICKINSON:  Go back just a little bit, Nicole.

16   If we could go back just a few seconds.  I apologize.

17             A little bit more.  A little bit more.

18             You can play it there and then stop it.

19        (Government Exhibit 365 published.)

20             MR. DICKINSON:  Do you see that -- can you just bring

21   it back -- keep playing.

22             If you could go back like 10 seconds.  I apologize.

23             If you can pause it there.  Perfect.

24   BY MR. DICKINSON:

25   Q.   Do you see these two individuals (indicating) in desert

1    fatigues, this one (indicating) and this one (indicating)?

2    A.   Yes, sir, I do now.

3    Q.   This one appears to have -- this one does have a long gun?

4    A.   Looks like it, sir, yes.

5              MR. DICKINSON:  Continue to play.

6         (Government Exhibit 365 published.)

7    BY MR. DICKINSON:

8    Q.   At the end of this (indicating), the horses and the people

9    are still in the line; correct?

10   A.   Yes, sir.

11   Q.   And these two people (indicating) have moved forward;

12   correct?

13   A.   It would appear so, sir.

14   Q.   And you're still on the northbound bridge?

15   A.   Yes, sir.

16   Q.   With your weapon?

17   A.   Yes, sir.

18   Q.   And your black vest with the plates?

19   A.   Yes, sir.

20   Q.   And your black hat with the white insignia?

21   A.   Yes, sir.

22   Q.   And at this point no one's been shot?

23   A.   No, sir.

24   Q.   And no one's been gassed?

25   A.   No, sir.

38

1          MR. DICKINSON:  If we could go to 457-32.

2     (Government Exhibit 457-32 published.)

3  BY MR. DICKINSON:

4  Q.   Here's a person (indicating) wear -- in a prone position;

5  correct?

6  A.   Yes -- yes, sir.  He's laying down.

7  Q.   He's wearing desert fatigues?

8  A.   Some sort of camouflage, yes.  Yes, sir.

9  Q.   You can see the end of a long gun right there

10  (indicating)?

11  A.   I do, sir.

12  Q.   And he's facing towards the law enforcement officers;

13  correct?

14  A.   He's looking in that direction, yes, sir.

15  Q.   And he's under the northbound bridge; correct?

16  A.   Yes, sir.

17          MR. DICKINSON:  If we could go to 457-36.

18     (Government Exhibit 457-36 published.)

19  BY MR. DICKINSON:

20  Q.   That's Greg Burleson in the wash (indicating); correct?

21  A.   Yes, sir.

22  Q.   He has a long gun?

23  A.   Yes, sir.

24  Q.   There's someone next to him wearing desert fatigues?

25  A.   Yes, sir.

39

1    Q.   And he has a long gun; correct?

2    A.   Yes, sir.

3         MR. DICKINSON:  If we could go to 46.

4         (Government Exhibit 46 published.)

5    BY MR. DICKINSON:

6    Q.   That's you, Mr. Parker (indicating)?

7    A.   Yes, it is, sir.

8    Q.   On the northbound bridge?

9    A.   Yes, sir.

10   Q.   Appear to be kneeling?

11   A.   I do.

12   Q.   And you can see the top, the butt of your long gun right

13   there (indicating)?

14   A.   Yes, sir.

15   Q.   And your black hat with the white insignia?

16   A.   Yes, sir.

17        MR. DICKINSON:  If we could go to the next slide,

18   457-47.

19   BY MR. DICKINSON:

20   Q.   We'll start with this.  This person, (indicating) sitting

21   under the northbound bridge?  This person sitting under the

22   northbound bridge that I circled?

23   A.   Are you asking if I can see him or --

24   Q.   Can you see him -- in this picture he's sitting under the

25   northbound bridge.

40

```
1   A.   Yes, sir.

2   Q.   He's wearing desert fatigues?

3   A.   Yes, sir.  Some sort of camouflage.

4   Q.   You can see the end of a long gun (indicating); correct?

5   A.   I -- I can't say that that's what that is, but I'll take

6   your word for it.

7   Q.   He's facing towards the law enforcement on the other side

8   of the gate; correct?

9   A.   Yeah.  He's looking in that direction, sir.

10  Q.   This individual (indicating), sitting under the northbound

11  bridge?

12  A.   Yes, sir.

13  Q.   Wearing desert fatigue?

14  A.   Yes, sir.  Some sort of camouflage, sir.

15  Q.   And looking in the same way towards law enforcement

16  officers?

17  A.   He kind of looks like he's looking at the crowd a little

18  more to me, sir, but I'll take your word for it.

19            MR. DICKINSON:  If we could go to 457-48.

20       (Government Exhibit 457-48 published.)

21  BY MR. DICKINSON:

22  Q.   Again, this is you; correct?

23  A.   Yes, sir.

24  Q.   On the northbound bridge?

25  A.   Yes, sir.
```

41

1   Q.   It's a little blurry, but can you tell -- can you see your

2   long gun here?

3   A.   You can see the butt of it.

4   Q.   And we can see your hat with the white insignia?

5   A.   It's a little blurry, but yes, sir, I am wearing a black

6   hat with a white insignia.

7            MR. DICKINSON:  Could I have one second, Your Honor?

8            THE COURT:  Yes.

9        (Counsel conferring.)

10            MR. DICKINSON:  Thank you, Your Honor.

11   BY MR. DICKINSON:

12   Q.   Now, at some point, Mr. Parker, did you see a man, from

13   the other side of the gate where the law enforcement was,

14   approach the gate wearing a vest that said "police"?

15   A.   I saw a few people approach the gate, sir.

16   Q.   Specifically, did you see a man approach the gate with a

17   vest that said "police"?

18   A.   No, sir.

19   Q.   You did not see that?

20   A.   I did not see his vest that said "police," sir.

21            MR. DICKINSON:  If we could go to 457-53.

22        (Government Exhibit 457-53 published.)

23   BY MR. DICKINSON:

24   Q.   And this is you, Mr. Parker; correct?

25   A.   Yes, sir.

1   Q.   And now you're standing up?

2   A.   Yes, sir.

3   Q.   And your weapon, your long gun's visible?

4   A.   Yes, sir.

5   Q.   Above the barrier?

6   A.   Yes, sir.

7   Q.   You're wearing your black vest with the plates; correct?

8   A.   Yes, sir.

9   Q.   And your white hat -- I mean, your black hat with the

10  white insignia?

11  A.   Yes, sir.

12          MR. DICKINSON:  And if we could go to Defense Exhibit

13  5020.  Start with A.

14      (Defense Exhibit 5020A published.)

15  BY MR. DICKINSON:

16  Q.   You testified about this exhibit on direct examination;

17  correct, Mr. Parker?

18  A.   Yes.  I believe so, sir.

19  Q.   And that's you (indicating)?

20  A.   Yes, sir.

21  Q.   And you're kneeling down; correct?

22  A.   I am, sir.

23  Q.   And in all these pictures you're wearing your black hat

24  with the white insignia facing forward; correct?

25  A.   I never changed, sir.

43

1            MR. DICKINSON:  If we could go to B.

2        (Defense Exhibit 5020B published.)

3    BY MR. DICKINSON:

4    Q.   Again, you're standing up here (indicating) and your long

5    gun -- your weapon, long gun is visible?

6    A.   Some of it, sir, yes.

7    Q.   Some of it's visible above the barrier?

8    A.   Yes, sir.

9            MR. DICKINSON:  If we could go to the next slide, C.

10       (Defense Exhibit 5020C published.)

11   BY MR. DICKINSON:

12   Q.   Same thing.  Standing up (indicating)?

13   A.   Yes, sir.

14   Q.   And your long gun is visible above the barrier?

15   A.   Yes, sir.

16   Q.   On the northbound bridge?

17   A.   Yes, sir.

18           MR. DICKINSON:  If we could go to D.

19       (Defense Exhibit 5020D published.)

20   BY MR. DICKINSON:

21   Q.   Same thing.  Standing up, that's you (indicating)?

22   A.   Yes, sir.

23   Q.   You're standing up?

24   A.   Yes, sir.

25   Q.   And your gun is visible above the barrier?

44

1    A.   Yes, sir.

2    Q.   On the northbound bridge?

3    A.   Yes, sir.

4              MR. DICKINSON:  Is there E?

5              That's the last one.  Okay.

6    BY MR. DICKINSON:

7    Q.   Okay.  Again, this is you, northbound bridge; correct?

8    A.   Yes, sir.

9    Q.   Standing up (indicating)?

10   A.   Yes, sir.

11   Q.   And your gun is visible?

12   A.   Yes, sir.

13   Q.   Now, you testified on direct about some of the things you

14   heard the BLM make announcements on the loud speaker, but at

15   some point you also heard the BLM say they were going to

16   disperse gas or they were going to gas the crowd?

17   A.   Yes.  Chemicals I think they said, sir.

18   Q.   So you thought -- you thought the BLM said they were going

19   to use chemicals on the crowd?

20   A.   Yes, sir.

21   Q.   And was that before or after you thought they were going

22   to shoot the crowd?

23   A.   Before.

24             MR. DICKINSON:  If we could go to 457, slide 54.

25             (Government Exhibit 457-54 published.)

45

1   BY MR. DICKINSON:

2   Q.   Now, we see the crowd and the horses moving forward

3   towards the gate (indicating); correct?

4   A.   Yeah.  Some of them, sir, yes.

5           MR. DICKINSON:  And if we could go to 457-57.

6       (Government Exhibit 457-57 published.)

7   BY MR. DICKINSON:

8   Q.   Now, we see a fair amount of people have moved up against

9   the gate (indicating); correct?

10  A.   Yes, sir.

11  Q.   And horses (indicating)?

12  A.   Yes, sir.

13  Q.   And some of the horses are still back here (indicating);

14  correct?

15  A.   They are, sir.

16  Q.   And Mr. Burleson's right there (indicating); correct?

17          MR. JACKSON:  I'm going to object, Your Honor.  He's

18  asking for a conclusion he's not competent to make.  He didn't

19  know Mr. Burleson and he's just looking at an arrow that's

20  pointed with Greg Burleson's name.  I don't think this witness

21  is competent to make that determination.

22          THE WITNESS:  I can't see him anyway, sir.

23          THE COURT:  Sustained.

24          MR. JACKSON:  What?

25          THE WITNESS:  I can't see him anyway, sir.  He's --

1  whoever the arrow is pointing out, there's a guy with a white

2  shirt there and then somebody behind --

3          THE COURT:  Mr. Parker, there's no question.  I

4  sustained the objection.

5          THE WITNESS:  Oh, sorry.  Sorry, Your Honor.

6  BY MR. DICKINSON:

7  Q.  And at this point you're still on the northbound bridge;

8  correct?

9  A.  Yes, sir.

10 Q.  With your weapon?

11 A.  Yes, sir.

12 Q.  And your black vest with the plates?

13 A.  Yes, sir.

14 Q.  And your hat?

15 A.  Yes, sir.

16 Q.  And no one's been shot?

17 A.  No, sir.

18 Q.  And no one's been gassed?

19 A.  No, sir.

20          MR. DICKINSON:  If we could go to 457-60.

21      (Government Exhibit 457-60 published.)

22 BY MR. DICKINSON:

23 Q.  This is you (indicating); correct?

24 A.  Yes, sir.

25 Q.  Proned out laying in a proned position on the northbound

47

1   bridge; correct?

2   A.   Yes, sir.

3   Q.   And your firearm is pointed through the gap (indicating);

4   correct?

5   A.   Yeah.   It's placed in the gap, sir.

6   Q.   Towards the law enforcement?

7   A.   Yes, sir.

8           MR. DICKINSON:   And could we go to 457-67.

9       (Government Exhibit 457-67 published.)

10  BY MR. DICKINSON:

11  Q.   This is you (indicating), Mr. Parker; correct?

12  A.   Yes, sir.

13  Q.   On the northbound bridge?

14  A.   Yes, sir.

15  Q.   And you're lying in a prone position; correct?

16  A.   Yes, sir.

17  Q.   Your feet are over the yellow line (indicating); correct?

18  A.   Yes, sir.

19  Q.   You're wearing your black vest with the plates; correct?

20  A.   Yes, sir.

21  Q.   You're wearing your hat forward with the white insignia;

22  correct?

23  A.   Yes, sir.

24  Q.   Your left hand is underneath your right elbow

25  (indicating); correct?

48

1    A.   Yes, sir.

2    Q.   Providing you support; correct?  From the concrete?

3    A.   The concrete -- the gravel was rough.  I don't -- it was

4    more of a smooth spot to put my elbow, sir.

5    Q.   You've got your cheek up against your long gun

6    (indicating); correct?

7    A.   It's more my ear.  I'm kind of -- I was looking at the

8    lady, talking to her, the reporter.

9    Q.   You were looking forward through your iron sights;

10   correct?

11   A.   No, sir.

12   Q.   You're not looking forward through your iron sites here?

13   A.   No.  I'm not trying to argue with you, sir.  I was looking

14   over at the ground.  I had just got done talking to the

15   reporter, as I recall, sir.

16   Q.   And your finger's here (indicating), right by the trigger;

17   correct?

18   A.   Above on the frame of the rifle, sir?

19   Q.   Correct.

20   A.   Yes.

21   Q.   You can see it right there, not on the trigger, but it's

22   right by the trigger; correct?

23   A.   Yes, sir.

24   Q.   And the barrel of your gun is in the gap; correct?

25   A.   Yes, sir.

49

1    Q.    Towards the BLM and law enforcement agents on the other

2    side of the gate; correct?

3    A.    They were in that direction, sir, yes.

4    Q.    So at this point on the bridge, you're no longer confused;

5    correct?

6    A.    Oh, I'm still very confused, sir.

7    Q.    You're still very confused right here?

8    A.    As far as who is over there threatening to shoot women and

9    children, sir, yes.

10            MR. DICKINSON:  Can we go to 457-71.

11        (Government Exhibit 457-71 published.)

12    BY MR. DICKINSON:

13    Q.    Again, you're in the same position; correct?

14    A.    Yes, sir.

15    Q.    Proned out on the freeway; correct?

16    A.    Yes, sir.

17    Q.    Your hat's facing forward?

18    A.    It is.

19    Q.    And your long gun is through the gap; correct?

20    A.    Yes, sir.

21    Q.    Towards the BLM officers on the other side?

22    A.    Yes.  They were in that direction, sir.

23    Q.    Did you have any idea who that person (indicating) was?

24    A.    I did not.

25    Q.    And he has a long gun; correct?

1   A.   Yeah.  It looks like it, sir.

2            MR. DICKINSON:  If we could go to 121.

3        (Government Exhibit 121 published.)

4   BY MR. DICKINSON:

5   Q.   Again, same position; correct?  Proned out on the freeway?

6   A.   Yes, sir.

7   Q.   Your hat's forward; correct?

8   A.   It is, sir.

9   Q.   And your long gun is through the Jersey barrier, the gap

10  here; correct?

11  A.   It -- it's - it's resting in the -- in the Jersey barrier.

12  It's not through.  There was -- it wasn't protruding through.

13  I just want to be clear.

14  Q.   It's in the gap; correct?

15  A.   It's setting in the first section of that gap, yes, sir,

16  about four inches.

17  Q.   Towards the law enforcement on the other side of the gate;

18  correct?

19  A.   They are in that direction, sir, yes.

20            MR. DICKINSON:  457-74.

21        (Government Exhibit 457-74 published.)

22  BY MR. DICKINSON:

23  Q.   Now, you're in a different position here; correct?

24  A.   No.  Not --

25  Q.   Well, you're still in a proned position on the bridge;

51

1   correct?

2   A.   I'm still laying on the bridge, sir, yes.

3   Q.   But now, your left elbow -- your left hand is not under

4   your right elbow here; correct?

5   A.   Yeah.  No.  It's not, sir.

6   Q.   Your right elbow is resting on a backpack; correct?

7   A.   Yes, sir.

8   Q.   Mr. Stewart's backpack; correct?

9   A.   It's my backpack actually, sir.

10           MR. DICKINSON:  Can we go back to -- Mr. Stewart

11   brought you the backpack; correct?

12           THE WITNESS:  He -- I asked for it and he brought it

13   over.  He was -- he went to go get water and my backpack.

14   BY MR. DICKINSON:

15   Q.   So, when he went to go get water, you asked him to bring

16   your backpack?

17   A.   Water was in the backpack, sir.

18   Q.   But now, you're using the backpack to rest your right

19   elbow; correct?

20   A.   Yes.  I asked him for my backpack, sir.

21   Q.   And now, your hat is backwards; correct?

22   A.   Yes, sir.

23   Q.   So, you moved positions from before; correct?

24   A.   Yeah.  Yes, sir.  I --

25           MR. DICKINSON:  If we could go to 79.

52

1          (Government Exhibit 79 published.)

2     BY MR. DICKINSON:

3     Q.   That's you (indicating) down there; correct?

4     A.   Yes, sir.

5     Q.   Still laying on the freeway; correct?

6     A.   Yes, sir.

7     Q.   Your gun is still facing this way (indicating); correct?

8     A.   Yes, sir.

9     Q.   And it appears you're looking down towards where

10    Mr. Stewart and Mr. Drexler are; correct?

11    A.   Yes, sir.  It appears that way.

12    Q.   And Mr. Stewart is carrying his long gun; correct?

13    A.   Yes, sir.

14    Q.   And it's above the Jersey barrier; correct?

15    A.   Yes, sir.  Most of it.

16    Q.   Now, at a certain point you get out of this position and

17    you stand up and don't get back down into a prone position;

18    correct?

19    A.   Yes, sir.

20          MR. DICKINSON:  If we could bring up Exhibit 84.

21          (Government Exhibit 84 published.)

22          MR. DICKINSON:  Stop it, please.

23          Can we get a time?

24    BY MR. DICKINSON:

25    Q.   So at 12 seconds, these people (indicating) on the

53

1   northbound bridge are hanging this sign; correct?

2   A.   Yes, sir.

3   Q.   And the sign says "The West Has Now Been Won"; correct?

4   A.   That's what it looks like, sir.

5        MR. DICKINSON:   Continue playing.

6        (Government Exhibit 84 published.)

7        MR. DICKINSON:   Pause it.

8   BY MR. DICKINSON:

9   Q.   That's you (indicating); correct?

10  A.   Yes, sir.

11  Q.   And Mr. Lovelien (indicating); correct?

12  A.   Yeah.   It looks like it, sir.

13  Q.   Mr. Drexler (indicating)?

14  A.   Yes.   It looks like it, sir.

15  Q.   Mr. Stewart (indicating)?

16  A.   Yes, sir.

17  Q.   And now you're up out of the prone position; correct?

18  A.   Yes, sir.

19  Q.   And that's because the officers -- the most -- the BLM

20  officers that were closest to the gate had backed up; correct?

21  A.   I -- I believe so, yes.   At that time they had moved back

22  to the other officers at the second group.

23       MR. DICKINSON:   If we could go to Exhibit 238.

24       (Government Exhibit 238 published.)

25       MR. DICKINSON:   Bring up from here (indicating) down,

54

1    Nicole.

2    BY MR. DICKINSON:

3    Q.   This is your Facebook page; correct?

4    A.   Yes, sir.  Like I said, the warrant return kind of --

5    confuses me.

6    Q.   This is your Facebook page; right?

7    A.   Well, it's a bunch of words on it.  It confuses me the --

8    yes, I -- it's a warrant return, I guess.

9    Q.   4 -- this is 4-12-2014; correct?

10   A.   Yes, sir.

11   Q.   At 11 o'clock.  And someone is -- this person is sending

12   you a message that said, "Feds got scared when you got there

13   and backed off?  LOL"; correct?

14   A.   Yes, sir.

15   Q.   You reply, you, with a thumbs up; correct?

16   A.   Yes.

17   Q.   Later on that day.

18          MR. DICKINSON:  If we could go down to the bottom,

19   Nicole.

20   BY MR. DICKINSON:

21   Q.   And then you send another message to this person saying,

22   "It took a standoff"; correct?

23   A.   Yes, sir.

24          MR. DICKINSON:  If we could go to Exhibit 246.

25          COURTROOM ADMINISTRATOR:  What was that number?

1          MR. DICKINSON:  Exhibit 246.

2          (Government Exhibit 246 published.)

3     BY MR. DICKINSON:

4     Q.   This is you writing a message to this person (indicating);

5     correct?

6     A.   Yeah.  Answering his -- yes, sir.

7     Q.   Up here he asked you, "Any news?  All my live feeds are

8     F'd up"; correct?

9     A.   Yes, sir.

10    Q.   And you reply back, "It's over.  We won"; correct?

11    A.   Yes, sir.

12    Q.   Now, you testified you had no idea who was behind that

13    gate until, what, the BLM pulled out?  When all the cars pulled

14    out in the caravan?

15    A.   No.  I assumed there was BLM agents back there.

16    Q.   Back behind the gate?

17    A.   Well, back in the impoundment area somewhere.

18    Q.   In fact, you thought the green people with the helmets,

19    that they were contractors; correct?

20    A.   That was a possibility.

21    Q.   Blackwater government contractors; correct?

22    A.   I'm trying to answer, sir, yes.  I thought that was a

23    possibility, sir.  I -- if I had to guess, I would -- I was --

24    Q.   As we established, the green people were standing in

25    between the two BLM vehicles; correct?

1   A.   Yes, sir.

2   Q.   Behind the gate; correct?

3   A.   Yes, sir.

4   Q.   Where other people, you assumed, were BLM people --

5   officials were; correct?

6   A.   Not necessarily right there, sir.

7   Q.   Behind the gate somewhere?

8   A.   Somewhere, sir, yes.

9   Q.   And where the cows were behind the gate; correct?

10  A.   I -- I assumed.  I never saw the cows.

11  Q.   But, based on everything you saw, you assumed the cows

12  were behind the gate?

13  A.   Somewhere back there, yes.

14  Q.   Because as we heard, the crowd was yelling, open that

15  gate?

16  A.   Yeah.  I just assumed that they -- that that was the

17  impoundment area and the cows were -- not because they were

18  yelling.

19  Q.   And that's where all the people up at the rally site,

20  where they all came down to; correct?

21  A.   At the rally site?

22  Q.   On the stage earlier in the day.

23  A.   They -- most went to the parking lot as I understood it at

24  the time.

25  Q.   A lot of people came down to the wash; correct?

57

1    A.    Yeah.  I found that out later.

2    Q.    And a lot of people came to the northbound bridge;

3    correct?

4    A.    Yes, after the parking lot.

5    Q.    Including yourself?

6    A.    Yes, sir.

7    Q.    With your long gun; correct?

8    A.    Yes.  After I heard they were pointing guns at people.

9    Q.    And your vest; correct?

10   A.    Yes, sir.

11   Q.    And your plates; correct?

12   A.    Yes, sir.

13   Q.    Wearing your black hat with the white insignia; correct?

14   A.    Yes, sir.

15   Q.    Now, you gave . . . I believe shortly after, either

16   when -- right when you left Bundy ranch or when you got home,

17   you told a story where you went onto Siri on your iPhone and

18   said, "When's the last time the federal government backed

19   down"; correct?

20   A.    I didn't, sir.  Somebody else that was there at the -- at

21   the camp.

22           MR. MARCHESE:  Objection.  Hearsay.

23   BY MR. DICKINSON:

24   Q.    You never said that?

25           MR. MARCHESE:  Objection.  Hearsay.

1          THE COURT:  Well, it wouldn't be hearsay if he said

2     it.

3          MR. MARCHESE:  Well, he's saying that someone else

4     said it.  So therefore, it's hearsay.

5          MR. DICKINSON:  It's a question.  So it's not

6     hearsay.

7          MR. MARCHESE:  Well, he's trying to elicit hearsay as

8     a response.

9          THE COURT:  It's not offered for the truth of the

10    mattered asserted, is it?

11         MR. DICKINSON:  No.  It wouldn't be.

12         THE COURT:  It's overruled.

13    BY MR. DICKINSON:

14    Q.   Were you standing next to someone that asked Siri, "When's

15    the last time the federal government backed down"?

16    A.   Yes.  At the camp.

17    Q.   And what came up on Siri?

18    A.   A picture of me.

19    Q.   Now, Mr. Marchese asked you some questions about the

20    interview you gave to Mr. Flynn after -- well, you gave the

21    interview to Mr. Flynn after "The West Has Now Been Won" sign

22    was put down; correct?  It was after that point in time;

23    correct?

24    A.   I -- I can't be sure of that, sir.  I don't know.

25    Q.   But you gave it on the bridge; correct?

59

```
 1   A.   Yes, sir.

 2   Q.   And you said you were momentarily being cocky; correct?

 3   A.   I was -- I was still pretty angry, yes, sir.

 4   Q.   All right.  Do you see this (indicating), Mr. Parker?

 5   A.   Yes, sir.

 6   Q.   And is this a picture you posted onto Facebook on

 7   July 12th, 2015?

 8   A.   I don't know if I posted it or if I just shared it.

 9   It's -- it was somebody else's picture.

10   Q.   On your Facebook page, on July 12th, 2015?

11   A.   Yeah.

12   Q.   And it appears to be -- do you remember this?  You

13   standing in front of -- you on the northbound bridge?

14   A.   I remember it, sir, yes.

15             MR. DICKINSON:  All right.  I'd move for the

16   admission of Government 476.

17             THE COURT:  Any objection?

18             MR. LEVENTHAL:  Objection as to foundation.

19             MR. TANASI:  Stewart joins.

20             THE COURT:  He just laid the foundation.

21             Any other objection?

22             MR. LEVENTHAL:  Relevance.

23             THE COURT:  What was the exhibit number,

24   Mr. Dickinson?

25             MR. DICKINSON:  476, Your Honor.
```

```
 1              MR. JACKSON:  Objection as to relevance.
 2              THE COURT:  Any other objection?
 3              All right.  Exhibit 476 will be admitted.
 4         (Government Exhibit 476 received.)
 5              MR. DICKINSON:  Permission to publish?
 6              THE COURT:  Yes.
 7         (Government Exhibit 476 published.)
 8    BY MR. DICKINSON:
 9    Q.   This is you, Mr. Parker (indicating); correct?
10    A.   Yes, sir.
11    Q.   Mr. Drexler (indicating); correct?
12    A.   Yes, sir.
13    Q.   You're both posing with your long guns; correct?
14    A.   Yes, sir.
15    Q.   With this gentleman (indicating)?
16    A.   Yes.  That's Luca Zanna.
17    Q.   And you met him that day; correct?
18    A.   I did, sir.
19    Q.   And you're on the northbound bridge; correct?
20    A.   Yes, sir.
21    Q.   It appears most of the people are in the wash?  This was
22    later in the day, after the BLM had left?
23    A.   Yes.  Yes, sir.
24              MR. DICKINSON:  One second, Your Honor.
25         (Counsel conferring.)
```

1    BY MR. DICKINSON:

2    Q.   Do you recognize this (indicating), Mr. Parker?

3    A.   Yes, I do.

4    Q.   This was -- you posted this on your Facebook page on

5    November 20th, 2015?

6    A.   Yes, I did.

7              MR. DICKINSON:  I'd move for the admission of

8    Government's Exhibit 477.

9              THE COURT:  Any objection to 477, other than what's

10   already been addressed?

11             MR. MARCHESE:  Just the same objection as before from

12   Parker, Your Honor.

13             THE COURT:  All right.

14             MR. TANASI:  Same objection from Stewart, Your Honor.

15             MR. LEVENTHAL:  I would add that -- relevance and

16   foundation.

17             THE COURT:  All right.  Same ruling.

18             Exhibit 477 will be admitted.

19      (Government Exhibit 477 received.)

20             MR. DICKINSON:  Permission to publish?

21             THE COURT:  Yes, you may.

22      (Government Exhibit 477 published.)

23   BY MR. DICKINSON:

24   Q.   So, your Facebook page; correct?

25   A.   Yes, sir.

1  Q.   November 20th, 2015?

2  A.   Yes, sir.

3  Q.   And you wrote, "Our ongoing weekly tribute to the men and

4  women who showed up that day who were not me"; correct?

5  A.   Yes.  I wrote that, sir.

6  Q.   And by that day, you meant April 12th, 2014; correct?

7  A.   Yes, sir.

8  Q.   And then you posted a picture of Mr. Drexler; correct?

9  A.   Yes, sir.

10  Q.   With the language that's there; correct?

11  A.   Yes.  It's an old Norwegian prayer.

12  Q.   "Lo, do they call to me, they bid me to take my place

13  among them, in the hallowed halls of Valhalla, where the brave

14  shall live forever"; correct?

15  A.   Yes, sir.  I found it on -- yes, sir.

16          MR. DICKINSON:  Your Honor, based on the Court's

17  previous ruling, I just need a few minutes to get those if

18  we're close to the break.

19          THE COURT:  All right.

20          Let's go ahead and take our morning bathroom break

21  then.

22          Please remember, members of the jury, you are not to

23  discuss this case with anyone nor permit anyone to discuss it

24  with you.  If anyone should attempt to discuss this case with

25  you, you're required to tell the Court right away and if you

1    inadvertently hear anything about the case, likewise, please,

2    remember you are ordered to tell the Court right away.

3              Do not read, or listen to, or view anything that

4    touches upon this case in any way, and do not attempt to

5    perform any independent research or investigation regarding

6    issues touching upon this case and do not form any opinion.

7              It's 9:55.  We'll try to be back here by 10:15.

8              Let's go ahead and stand for the jury.

9         (Jury excused from courtroom.)

10             THE COURT:  And Mr. Parker, after they've exited,

11   then you can take your morning bathroom break as well.  We just

12   need you back here by 10:15.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  All right.  Off record.

15        (Recess was taken at 9:56 a.m.)

16        (Outside the presence of the jury at 10:18 a.m.:)

17             LAW CLERK:  All rise.

18             THE COURT:  You want to go ahead and get the jury,

19   please.

20             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

21             Mr. Dickinson, did you have enough time?

22             MR. DICKINSON:  Yes, Your Honor.  We did it.

23             THE COURT:  Okay.  Just wanted to make sure you had

24   time before I brought them in.

25             MR. DICKINSON:  Mr. Marchese has agreed with how

64

1  we're going to proceed with this.  We'll make it look nice for

2  the jury on the official exhibit.

3          (Brief pause in proceedings.)

4          COURTROOM ADMINISTRATOR:  All rise.

5      (Jury returned to courtroom at 10:20 a.m.)

6          THE COURT:  All right.  Everyone may be seated.

7          We're joined by the jury.  Mr. Parker is back on the

8  witness stand, and Mr. Dickinson, you may continue with your

9  cross-examination.

10          MR. DICKINSON:  Thank you, Your Honor.

11

12          <u>FURTHER CROSS-EXAMINATION OF ERIC PARKER</u>

13  BY MR. DICKINSON:

14  Q.   Mr. Parker, I'm going to show you what's been marked as

15  Government's Exhibit 475.

16          Do you recognize this as a photo you posted to your

17  Facebook account?

18  A.   Yes, sir.

19  Q.   On June 11th, 2015?

20  A.   Yes, sir.

21          MR. DICKINSON:  Your Honor, Government moves to admit

22  Government's Exhibit 475.

23          THE COURT:  Any objection to 475?

24          MR. MARCHESE:  Same objection Parker.

25          MR. TANASI:  Same objection Stewart, Your Honor.

65

1          THE COURT:  All right.  Same ruling.

2          Exhibit 475 will be admitted.

3      (Government Exhibit 475 received.)

4          MR. DICKINSON:  Permission to publish?

5          THE COURT:  Yes.

6      (Government Exhibit 475 published.)

7   BY MR. DICKINSON:

8   Q.   So again, this is your Facebook account; correct?

9   A.   Yes, sir.

10  Q.   June 11, 2015; correct?

11  A.   Yes, sir.

12  Q.   You added this photo; correct?

13  A.   I did.

14  Q.   This is a picture of you proned on the northbound bridge

15  on April 12th, 2014; correct?

16  A.   Taking cover, sir.  Yes.

17  Q.   And it says, "You'll give peace a chance, I'll cover you";

18  correct?  That's what the picture says?

19  A.   It says, "You give peace a chance, I'll cover you."

20  Q.   "You give peace a chance."

21          I'm going to show you what's been marked as

22  Government's Exhibit 478, two pages.

23      (Government Exhibit 478 published to witness.)

24  BY MR. DICKINSON:

25  Q.   Here's Page 1.

1          Do you recognize this as a picture you posted on

2  February 5th, 2016?

3  A.   Yes, sir.

4  Q.   And then going to Page -- going to Page 2, there's some

5  comments and two of the comments are from yourself?

6  A.   Yes, sir.

7  Q.   Right there (indicating)?

8          MR. DICKINSON:  Your Honor, I move to admit

9  Government's Exhibit 478.

10         THE COURT:  Any objection to 478?

11         MR. MARCHESE:  No new objections Parker, Your Honor.

12         MR. TANASI:  Stewart joins, Your Honor.

13         THE COURT:  All right.  Exhibit 478 will be admitted.

14     (Government Exhibit 478 received.)

15         THE COURT:  You may publish it to the jury.

16     (Government Exhibit 478 published.)

17  BY MR. DICKINSON:

18  Q.   Again, your Facebook page; correct, Mr. Parker?

19  A.   Yes, sir.

20  Q.   February 5th, 2016?

21  A.   Yes, sir.

22  Q.   You posted this picture?

23  A.   Yes, sir.

24  Q.   It says, "The reason Nevada went so well, the dicks were

25  there when we got there"; correct?

```
 1   A.   Yes, sir.

 2   Q.   And there's law enforcement circled with the word "dicks"

 3   written with arrows in three different places?

 4   A.   I -- I did not know that that's --

 5   Q.   My question is, does the picture have "dicks" written in

 6   three different places; correct?

 7   A.   Yes, it does.

 8   Q.   One, two, three (indicating), law -- groups of law

 9   enforcement officers are circled in three different places;

10   correct?

11   A.   I wasn't sure who that was.

12   Q.   You weren't sure who that was on February 5th, 2016?

13   A.   I still don't necessarily believe at this moment sitting

14   here, right now.

15   Q.   Sitting here, after sitting through the trial, you don't

16   believe those are federal law enforcement officers?  Is that

17   your testimony?

18   A.   I don't know who that is.  I've -- I've heard from some

19   federal law enforcement officers, but I don't necessarily know

20   who's in that picture, sir.

21   Q.   And you -- this person commented, "Yes.  Always let your

22   opponents take the field first.  That's one of the arts of

23   war"; correct?  That person wrote that on February 5th, 2016,

24   Don Knott?

25   A.   Knight.
```

1   Q.   Knight.  In reply to that picture?

2   A.   Yeah.  He's quoting Sun Tzu, sir.

3   Q.   *The Art of War*?

4   A.   I believe so.

5   Q.   And you respond, "Same idea.  I just wrote down a little

6   different"; correct?

7   A.   Yes, sir.

8   Q.   And then Jeff Albridge writes, "I always thought one would

9   want to pick the ground they fight from"; correct?

10  A.   Yes.  He's -- he's --

11  Q.   That's what he wrote; correct?

12  A.   That is what he wrote, sir.

13  Q.   And you respond, "That's the hard part.  Pick the

14  battlefield, but let them take it first"; correct?

15  A.   Yeah.  We're debating Sun Tzu, sir.

16  Q.   And by "them," you're referring to these federal law

17  enforcement officers (indicating); correct?

18  A.   No.  No necessarily, sir.  We were just debating Sun Tzu.

19  Q.   No?

20        Now, take you back to that -- take you back to your

21  interview with Mr. Flynn on the bridge.

22        MR. DICKINSON:  If we could bring up Government's

23  Exhibit 83 and publish it.

24     (Government Exhibit 83 published.)

25        MR. DICKINSON:  Actually, I apologize.  I had one

1    other Government's Exhibit -- before we get to Mr. Flynn's

2    video, I want to show you what's been marked as Government's

3    Exhibit 480.

4              COURTROOM ADMINISTRATOR:  Mr. Dickinson, can you turn

5    that?

6              Thank you.

7         (Government Exhibit 480 published to witness.)

8    BY MR. DICKINSON:

9    Q.   Do you recognize that as what you updated your Facebook

10   cover photo on February 16th, 2016?

11   A.   Yes.  It's a picture of a shirt that somebody made, sir.

12   Q.   But you posted this onto your Facebook page; correct?

13   A.   Yes, sir.

14   Q.   And made it your cover photo; correct?

15   A.   Yes, sir.

16             MR. DICKINSON:  I'd move for the admission of

17   Government's Exhibit 480, Your Honor.

18             THE COURT:  Any objection, other than the objections

19   already been addressed, to Exhibit 480?

20             MR. MARCHESE:  None, Parker.

21             MR. TANASI:  Nothing new Stewart, Your Honor.

22             THE COURT:  All right.  Exhibit 480 will be admitted.

23        (Government Exhibit 480 received.)

24             THE COURT:  You may publish it to the jury.

25        (Government Exhibit 480 published.)

1    BY MR. DICKINSON:

2    Q.   Again, your Facebook page; correct?

3    A.   Yes, sir.

4    Q.   February 6th, 2016; correct?

5    A.   17 -- no.  Yeah.  February 17th [sic], 2016.

6    Q.   2016?

7    A.   Yes, sir.

8    Q.   This appears to be a caricature of you; correct?

9    A.   Yes, sir.

10   Q.   Pointing your long gun; correct?

11   A.   Fair enough, sir.

12   Q.   And it says "resist"; correct?

13   A.   Yes, it does, sir.

14            MR. DICKINSON:  Now, if we could publish Government

15   Exhibit 83.

16       (Government Exhibit 83 published.)

17   BY MR. DICKINSON:

18   Q.   You just said, "We need to keep matching a show of force";

19   correct?

20   A.   Yeah.  Keep showing up for things.

21   Q.   You just said, "We need to keep matching a show of force";

22   yes or no?

23   A.   As in we, the people?  The people in the United States,

24   sir?

25   Q.   You just said, "We need to keep matching a show of force,"

71

1    Mr. Parker.  Can you answer my question; yes or no?

2    A.   Yes, sir.

3            MR. DICKINSON:  Keep playing.

4        (Government Exhibit 83 published.)

5    BY MR. DICKINSON:

6    Q.   Now you're talking about a Texas -- a rancher in Texas

7    right now under threat from the BLM; correct?

8    A.   Yeah.  He had -- he had 90,000 --

9    Q.   I'd just asking you, that's what you said; correct?

10   A.   Yes, sir.

11           MR. DICKINSON:  Keep playing.

12       (Government Exhibit 83 published.)

13   BY MR. DICKINSON:

14   Q.   Now, you're encouraging people to go to Texas and get on a

15   bridge and show 'em force; correct?

16   A.   Show of force.

17   Q.   Show 'em or show of?

18   A.   Of.

19   Q.   Show of force?

20   A.   Yes, sir.

21   Q.   Because you had just shown force on a bridge in Nevada;

22   correct?

23   A.   No, sir.

24   Q.   You didn't show force on a bridge in Nevada?

25   A.   Well, I don't think you're -- I think you're trying to

1  imply something else.

2  Q.   Did you show force on a bridge in Nevada; yes or no?

3  A.   By showing up with my body, sir, yes.

4  Q.   And that day, after you showed up with your body and your

5  long gun, the cattle were released; correct?

6  A.   Because I showed up with my body and my long gun?

7  Q.   You showed up on that bridge with yourself and your long

8  gun; correct?

9  A.   Yes, sir.

10  Q.   And later that day, the cattle were released; correct?

11  A.   Yes, sir.

12  Q.   Just like Cliven Bundy told you to do; correct?

13  A.   Nobody told me to do anything, sir.

14        MR. DICKINSON:  Could we keep playing.

15       (Government Exhibit 83 published.)

16  BY MR. DICKINSON:

17  Q.   You just said, "They threatened to shoot chemicals into

18  that crowd"; correct?

19  A.   That's what I said, sir.

20  Q.   You didn't say they threatened to shoot bullets into the

21  crowd; correct?

22  A.   Not while he was recording, sir.

23  Q.   And you thought having the women and children down there

24  was the only thing that kept the people from getting gassed;

25  correct?

73

1    A.   I said it might have been, sir.

2              MR. DICKINSON:  Keep playing.

3         (Government Exhibit 83 published.)

4    BY MR. DICKINSON:

5    Q.   So you absolutely thought it was a good idea to have

6    children down there; correct?

7    A.   He was asking everybody that question, sir.

8    Q.   I'm not asking about everybody; I'm asking about you.  You

9    thought it was a good idea to have children in the wash on

10   April 12th, 2014; correct?

11   A.   I think it was . . .  I mean, right now?

12   Q.   I'm not talking about right now; I'm talking right here in

13   this video you stated --

14   A.   I'm -- I'm being ornery.

15   Q.   -- he asked you, "Do you think it was good to have kids

16   down there?"  That's what he asked you; right?

17   A.   If it was a good idea.

18   Q.   And you said, "Absolutely"; right?

19   A.   Yeah.  I was -- I was being pretty ornery.

20   Q.   You said, "Absolutely"; right?

21   A.   Yes -- yes, sir.  I said yes.

22   Q.   And then you -- he had said, "Do you think this could have

23   potentially turned violent?" and you said, "Absolutely";

24   correct?

25   A.   On their part, sir.

74

1   Q.   You said, "Absolutely"; correct?

2   A.   I absolutely still think it could have turned violent on

3   their part.

4   Q.   You said, "Absolutely"; correct?

5   A.   I said, "Absolutely."

6   Q.   And last week, when you testified on Thursday, it appeared

7   you got -- you were getting emotional and were crying about

8   your time on the bridge; correct?

9   A.   Yeah.  It -- yes, sir.

10  Q.   You're not crying in this video, are you?

11  A.   No.  I'm angry.

12  Q.   And you're not -- Mr. Stewart's not crying in this video

13  either; correct?

14  A.   I can't say one way -- no, I don't think so.

15  Q.   Because you testified he was --

16  A.   Hitting on girls.

17  Q.   -- hitting on girls; correct?

18  A.   Yes, sir.

19  Q.   All right.

20          MR. DICKINSON:  May I have a second, Your Honor?

21          THE COURT:  Yes.

22      (Counsel conferring.)

23          MR. DICKINSON:  Thank you, Your Honor.  I'll pass the

24  witness.

25          THE COURT:  All right.

75

1          Mr. Marchese?

2          MR. MARCHESE:  Thank you, Your Honor.

3          THE COURT:  Redirect?

4

5          REDIRECT EXAMINATION OF ERIC PARKER

6    BY MR. MARCHESE:

7    Q.   Good morning, Eric.

8    A.   Good morning.

9    Q.   Just briefly, describe to the jury what "discovery" is.

10   What's your belief?  What's your definition of "discovery"?

11   A.   Of "discovery"?

12   Q.   Yes.

13          MR. DICKINSON:  Relevance, Your Honor?

14          THE WITNESS:  All the --

15          MR. MARCHESE:  Just foundational, Your Honor.  I can

16   lead if he wants.

17          THE COURT:  Go ahead and lead instead.

18   BY MR. MARCHESE:

19   Q.   Okay.  You received discovery in this case; right?

20   A.   Yes, sir.

21   Q.   And that's just a fancy word for the reports and the

22   videos and anything that was collected as evidence in this

23   case; right?

24   A.   Yeah.  I believe it was like 1.7 gigabytes or trigabytes

25   [sic] or something.  It was very big.

76

1   Q.   All right.  And you reviewed all that discovery; correct?

2   A.   Yes.

3   Q.   Okay.  Now, when did this event occur that -- this

4   standoff or whatever you want to call it?  What is the date on

5   that?

6   A.   Of the actual day of the incident?

7   Q.   Sure.

8   A.   April 12th, 2014.

9   Q.   Okay.  And how long after the event have we been in trial?

10  A.   We're going on three years now.

11  Q.   Okay.  What is your recollection -- do you have a

12  different recollection now of what occurred -- or perception I

13  should say -- excuse me.  Strike that.

14         Do you have a different perception of what occurred

15  now and what occurred on the date and time on April 12th, 2014?

16  A.   Yes, sir.

17  Q.   Okay.  And why is that?

18  A.   I've -- I've watched a lot of video of situations where I

19  may have been present, but I wasn't listening 100 percent of

20  the time or paying attention necessarily to every word and

21  where I've had the chance now to go back and actually listen to

22  every word over and over.

23  Q.   Now, on direct -- on both direct and cross-examination you

24  received some questions in reference to the Cliven Bundy

25  speeches.

1          Do you remember those?

2    A.   Yes, sir.

3    Q.   Now, in reference to your perception, then versus now, do

4    you have a different perception today as opposed to three years

5    ago?

6    A.   Yeah.  A little bit, sir.

7    Q.   And what would that little bit consist of?

8    A.   Well, I -- I never did hear him -- the sheriff

9    specifically say . . . that he was going to release the cows,

10   or that they were releasing the cows.  It was my . . . I

11   perceived at the time that that's what was being talked about

12   when he said that that would have to be safely discussed, how

13   it was going to occur, and I just thought that that meant like

14   the actual logistics of how the cowboys were going to get them,

15   whether that was trucks or drive them back out on to the range

16   or whatever.

17   Q.   Okay.  Now, you were obviously up on the bridge.  We have

18   numerous portions of testimony about that; correct?

19   A.   Yes, sir.

20   Q.   And there's been numerous portions of testimony in

21   reference to the loudspeaker; correct?

22   A.   Yes, sir.

23   Q.   Okay.  And you've testified in reference to what you heard

24   off of the loudspeaker; correct?

25   A.   Yes.

1    Q.   Okay.  Now, in reference to perception of then -- as in

2    three years ago -- and now -- after hearing all this testimony

3    and reading the discovery and hearing all the discovery and all

4    that -- do you have a different perception then versus now?

5    A.   Yes, sir.

6    Q.   Okay.  And what would that perception -- the differing

7    perception be?

8    A.   Um . . . at the time you guys -- everybody's heard.  At

9    the time, it was hard to understand exactly what they were

10   saying.  It was very choppy and muffled.  The wind was blowing.

11   It was hard to understand what -- what -- what exactly they

12   were saying over the -- over the loudspeaker.

13   Q.   Three years ago did you believe that you heard the term

14   "lethal force"?

15   A.   Oh, absolutely.

16   Q.   Would you agree with that statement now in -- after

17   hearing the discovery, hearing the testimony, and all the other

18   factors in the last three years?

19   A.   Uh, I haven't heard it on any of the videos I've watched.

20   I hear a "less than lethal" a few times where that could have

21   been . . . so, you know, I would have to say that I didn't hear

22   it, no, on the videos that I've watched since then.  I heard

23   what I heard on that bridge that day.  I heard them -- you

24   know, numerous times, I heard "will be shot," and I heard

25   "we've been authorized to use lethal force if you take another

1    step."  That's the words I remember.

2    Q.    Okay.

3    A.    That's when I took cover.

4    Q.    Now, on cross-examination you were asked some questions in

5    reference to your research that you did prior to going to

6    Bunkerville.

7          Do you remember those questions?

8    A.    Yes, sir.

9    Q.    Okay.  And you were asked some specific questions in

10   reference to "you can't tell what's real and what is not real

11   on the Internet."

12         Do you remember that?

13   A.    Yes, sir.

14   Q.    Okay.  How, if at all, were you able to ascertain what was

15   real and what was not real?

16   A.    A couple of different ways.  Video is video, first of all.

17   They say video doesn't lie.  I didn't think anybody was editing

18   video or anything like that.  It seemed real.  The . . .

19   Governor Sandoval's statement was real.  I believed that.  The

20   things that he was saying in his statement, I believed those to

21   be true representation of what was happening, and then the last

22   ways is to go there and find out yourself, to -- to -- I was --

23   a part of the reason for going was to find out what was true

24   and what wasn't.

25   Q.    On cross-examination you were asked some questions in

80

1   reference to some Facebook posts, particularly about the "range

2   war."

3           Do you remember those particular questions?

4   A.   Yeah, somewhat.

5   Q.   Okay.  Now, as to a "range war," at that time, three years

6   ago, what was your definition?  What did you think a "range

7   war" was?

8   A.   I thought he was just using it as a phrase.  You know,

9   he's -- there's some puffery there, I would imagine.  You know,

10  they use that phrase for numerous things.  The war on drugs.

11  The war on poverty.  The war on obesity.  The term is used a

12  lot.  I didn't necessarily think that they were going to start

13  a war or, like a shooting war.

14  Q.   Okay.  How about you personally?  Did you want to start a

15  shooting war?

16  A.   No, sir.

17  Q.   You were also asked about Exhibit 243, which something

18  said to the effect of -- a Facebook post -- "What are you going

19  to do when the shooting starts?"

20          Do you remember that line of questioning?

21  A.   Yes, sir.

22  Q.   Why did you make that comment?

23  A.   At the time I had seen some stuff where they were claiming

24  that the snipers were all over the place around the ranch and

25  that they were seeing snipers and that the people were afraid

1  to come out of their house because they were in crosshairs

2  every time they came out of their house.  I -- I -- I read that

3  they were afraid to let the kids play in the front yard because

4  of the armed individuals above their ranch with sniper rifles.

5  That made me think about other situations where stuff like that

6  has occurred.  You know, Ruby Ridge, for instance.

7              MR. DICKINSON:  Objection, Your Honor.  Now we're

8  getting into 403 and relevance.

9              THE COURT:  Sustained.

10  BY MR. MARCHESE:

11  Q.   You saw that statement and it concerned you; correct?

12  A.   Yeah, it concerned me very much.  I thought that I was

13  going to wake up one day and see that -- that people in all

14  black, up on hilltops, shot kids.

15  Q.   On cross-examination you were asked some questions in

16  reference to the Margaret Houston video.

17              Do you remember those questions?

18  A.   Yes, sir.

19  Q.   Okay.

20              MR. MARCHESE:  And Bryan, can you get up 5000D, as in

21  dog.

22              COURTROOM ADMINISTRATOR:  And Mr. Marchese, that has

23  not been admitted.

24              MR. MARCHESE:  It has not?

25              COURTROOM ADMINISTRATOR:  No.

1          MR. MARCHESE:  Okay.  And can we then just publish it

2    just to Court, counsel, and the witness then.

3          (Defense Exhibit 5000D published to witness.)

4          MR. MARCHESE:  Do you have C, as in Charlie?

5          Aaron, I can't read my own handwriting.  5007D, is

6    that what -- he's saying it's in.

7          COURTROOM ADMINISTRATOR:  5007D was marked; also not

8    admitted.

9          MR. MARCHESE:  Okay.  Marked but not admitted.  Okay.

10         And then just play it for Eric and counsel and the

11   Court.

12         Eric (indicating).

13         (Defense Exhibit 5007D published to witness.)

14   BY MR. MARCHESE:

15   Q.   Eric, do you recognize this video?

16   A.   I do.

17   Q.   How do you recognize it?

18   A.   It's a -- how do I recognize it?  From the Internet.

19   Q.   Okay.  So you've previously seen this video?

20   A.   Yeah.  Before when I said that I saw two different views

21   of the 9th, this is the other one.

22   Q.   Okay.  And it fairly and accurately represents what you

23   saw prior to April 12th, 2014?

24   A.   Yes, sir.

25         MR. MARCHESE:  Defense moves for 5007D, as in dog, to

83

 1    be admitted.

 2              THE COURT:  All right.  You said he saw it

 3    April 12th, 2014?

 4              MR. MARCHESE:  I think I said prior to April --

 5              THE WITNESS:  Prior I saw it.  I believe it was

 6    around the 10th.

 7              THE COURT:  That's 5007?

 8              MR. MARCHESE:  D, like dog.

 9              THE COURT:  D.

10              Any objection?

11              MR. DICKINSON:  Yes, Your Honor.  The Government

12    objects.  The same reason as before.  Relevance and 403.

13              The banner says April 7th and also, it's beyond the

14    scope of cross.  I asked Mr. Parker whether he watched

15    Ms. Houston at the Moapa Cliven Bundy meeting, which was a post

16    on his Facebook page, which he said he had just posted and

17    hadn't watched.

18              MR. MARCHESE:  Actually, with all due respect, I

19    would respectfully disagree with Mr. Dickinson.  He had asked

20    some questions in reference to Ms. Houston allegedly standing

21    in front of the convoy before she was thrown down.  This is

22    basically a carbon copy of the video.  It's a little bit

23    shorter than the one we brought in on direct examination.  It

24    just gives a better angle as to Ms. Houston and what transpired

25    on the date in question.  So, I don't think it is beyond the

1  scope.  I believe Mr. Dickinson opened the door by asking those

2  particular questions on his cross to Mr. Parker and like I

3  said, it's basically the same video that we already brought in;

4  it's just a better vantage point to aid the jury and to see

5  what really happened.

6           MR. DICKINSON:  Actually, Your Honor, I questioned

7  about the --

8           THE COURT:  I don't see in my notes that Mr. Parker

9  was asked on cross-examination anything about Tasing.  I do see

10  the questioning about Ms. Houston.

11           MR. MARCHESE:  Correct.  And it's -- I don't believe

12  Mr. Dickinson did ask about Tasing, it was more about

13  Ms. Houston, and I don't believe that this video depicts any

14  Tasing.

15           MR. DICKINSON:  I asked about if Mr. Parker had seen

16  the Moapa Town meeting where Ms. Houston spoke and I was

17  speaking about her description of what had occurred.

18  Mr. Parker then denied seeing it; he had just posted it on his

19  Facebook page.  I was specifically referencing Ms. Houston's

20  own words.

21           MR. MARCHESE:  Well, in one way or another, I would

22  argue that by asking that particular question, that he did, in

23  fact, open the door.

24           THE COURT:  Yeah.  It does appear it's beyond the

25  scope of cross.

1              Motion to admit is denied.

2         (Counsel conferring.)

3              MR. MARCHESE:  Your Honor, are there any 5007

4    exhibits there are in?  Because we're all having something as

5    being -- as in.

6              COURTROOM ADMINISTRATOR:  No.

7              I believe I addressed this with Mr. Ginn, Bryan, the

8    other day, that none of the 5007s have been admitted.

9              MR. MARCHESE:  Because I know that there was one

10   admitted with Mr. Stover, Agent Stover.  There was one that was

11   played in court.  I know -- I remember.

12             COURTROOM ADMINISTRATOR:  5007D, the one that you

13   just played was --

14             MR. MARCHESE:  Oh.  Just any 5007s.

15             COURTROOM ADMINISTRATOR:  That's the only one that's

16   been marked.

17             MR. MARCHESE:  Okay.

18             COURTROOM ADMINISTRATOR:  It was marked with

19   Agent Stover, but was not admitted at the time.  That's the

20   only one I have.

21             MR. MARCHESE:  Okay.  I'll move on.

22   BY MR. MARCHESE:

23   Q.   On cross-examination you were asked some questions about

24   the Alex -- or the Alex Ellis/Michael Flynn video on the

25   bridge.

1          Do you remember that?

2     A.   Yes, sir.

3     Q.   That was the one where you said Steven was hitting on

4     girls or something along those lines?

5     A.   Yes, sir.

6     Q.   And you were asked a myriad of questions in reference to

7     "show of force."

8          Do you remember using that particular term?

9     A.   I do.

10    Q.   Okay.  What is your definition of "show of force"?

11    A.   Showing up, where . . . if enough people show up, I --

12    I -- I see that as a show of force, where enough people that

13    disagree with the -- the actions of -- or the militarized

14    presence or the misconduct, show up to voice their -- it's

15    about people showing up.

16    Q.   Okay.  Now, showing up, does that mean violence?

17    A.   No, sir.

18         MR. MARCHESE:  And Bryan, can we bring up

19    Government's Exhibit 478, please.

20         COURTROOM ADMINISTRATOR:  What was that number?

21         MR. MARCHESE:  478.  I think it was just admitted.

22    Hopefully.

23         And this is just the first page, for the record.

24       (Government Exhibit 478 published.)

25    ///

```
 1   BY MR. MARCHESE:
 2   Q.   And Eric, was this posted on your Facebook?
 3   A.   It was.
 4   Q.   How did it get on your Facebook?
 5   A.   I posted it.
 6   Q.   Okay.  Was it something that you made, or did you share
 7   it, or how did that work?
 8   A.   I put the circles and the comments on there.
 9   Q.   All right.  Now, when you say the comments, are you saying
10   the reason and the -- all that verbatim -- or verbiage?
11   A.   No.  The -- the -- the circle with the writing on there.
12   Q.   Okay.  So someone else did --
13   A.   Dicks.  I called them dicks.
14   Q.   Okay.  Why?
15   A.   Because they were pointing guns at women and children and
16   myself and they threatened to shoot people that day, who I felt
17   were just exercising their First Amendment right, who I felt
18   went there under context of what the sheriff had said.
19        They put out a press release saying that everybody
20   was going to be gone.  The sheriff told us -- you know, what
21   the sheriff didn't say was, you know, I'd like you guys to not
22   go over there because there's a bunch of people dressed in
23   combat gear sitting in foxholes waiting to shoot you.  I don't
24   think we would have went over there that day if that's what was
25   said at that stage.
```

1    Q.   On cross-examination the Government showed you numerous

2    videos from Michael Flynn.

3              Do you remember those videos?

4    A.   Yes, sir.

5    Q.   Okay.  Now, in those particular videos he showed you some

6    screenshots as well.

7              Do you remember those?

8    A.   Yes, sir.

9              MR. MARCHESE:  And for the record, this is

10   Government's Exhibit 472.

11        (Government Exhibit 472 published.)

12   BY MR. MARCHESE:

13   Q.   Do you remember seeing this screenshot?

14   A.   Yes, sir.

15   Q.   And do you remember, when he was playing the video for

16   you, there was some audio from Mr. Flynn?

17   A.   Yes, sir.

18   Q.   Okay.  And in this particular picture what is depicted?

19   Which way are these (indicating) particular individuals facing?

20   A.   Towards the impoundment site.

21   Q.   Okay.  And I'm going to circle a higher portion on the

22   screen (indicating).

23              Now this second circle, from your recollection of

24   everything, whether it be on the date of and watching the

25   video, what are these individuals facing?

1    A.   The crowd, and the -- and the people on the northbound

2    bridge and the southbound bridge.

3    Q.   Now, from the testimony and the video, was Mr. Flynn with

4    someone when he was filming this -- this portion?

5    A.   I've been led to believe that he was with Alex Ellis.

6    Q.   Okay.  And that's the young man that came in and testified

7    a couple months ago?

8    A.   Yes, sir.

9    Q.   Okay.  And on that particular video that was played in

10   court, towards the end, do you remember Mr. Flynn saying, "Get

11   ready to hit the dirt if there's firing?"  Do you remember

12   that?

13   A.   Yes, sir.

14   Q.   Okay.  And based upon what you've seen in this particular

15   screenshot, what did you take that to mean?

16           MR. DICKINSON:  Objection, Your Honor.  Unless he

17   heard it at the time.

18           THE COURT:  How is it relevant, Mr. Marchese?

19           MR. MARCHESE:  I'll move on, Your Honor.

20           THE COURT:  Okay.

21   BY MR. MARCHESE:

22   Q.   You were arrested in this particular case, Mr. Parker?

23   A.   Yes, sir.

24   Q.   Taken into custody in your hometown; correct?

25   A.   Yes, sir.

90

1  Q.   When you were taken into custody, you were driven by the

2  FBI to Boise; correct?

3  A.   Yes, sir.

4  Q.   And you spoke to the FBI; correct?

5  A.   I did.

6  Q.   And it was voluntarily you did that; right?

7  A.   Absolutely, sir.

8  Q.   The FBI, they followed all the proper procedures and

9  protocol, they read you your rights; correct?

10  A.   Yes, sir.

11  Q.   And when they read you your rights, you understood them;

12  correct?

13  A.   I did, sir.

14  Q.   All right.  But you wished to waive those rights; correct?

15  A.   I did.

16  Q.   You didn't ask for an attorney to be present; correct?

17  A.   No, sir.  I didn't feel like I needed one.

18  Q.   Okay.  So, when you spoke to the FBI, it was freely,

19  voluntarily, and knowingly; correct?

20  A.   It was, sir.

21  Q.   Okay.  And we've actually heard some of that interview

22  already here in court; right?

23  A.   Yes, sir.

24  Q.   Okay.  But you've heard the whole thing; right?

25  A.   Yes, in the discovery.

1          MR. DICKINSON:  Objection, Your Honor.

2          MR. MARCHESE:  I'm laying foundation.

3          MR. DICKINSON:  We know why there was only portions

4     played.

5          MR. MARCHESE:  Well, I'm just trying to lay a

6     foundation, Your Honor.  That's all.

7          THE COURT:  All right.  Lay a foundation.

8          MR. MARCHESE:  Okay.

9     BY MR. MARCHESE:

10    Q.   And you've heard the whole video; right?

11    A.   Yes, sir.

12    Q.   And when you heard the whole video, that video is a true

13    and accurate representation of that interview; right?

14    A.   It is, sir.

15    Q.   In no way do you feel that the FBI doctored it or twisted

16    your words around or anything like that; right?

17    A.   No.  Absolutely not, sir.

18    Q.   All right.  What you hear on the -- on the audio is, in

19    fact, what you said on that date; right?

20    A.   Yes, sir.

21    Q.   And what -- what date, if you remember, were you arrested

22    on?

23    A.   The . . . March 3rd, I believe, sir.

24    Q.   Okay.

25         MR. MARCHESE:  Your Honor, at this time defense

1    moves --

2              THE COURT:  It's still hearsay.

3              MR. MARCHESE:  It's a prior consistent statement,

4    Your Honor.  He is subject to -- under 801(d), he is subject to

5    cross-examination, obviously.  His statement is consistent with

6    the testimony that he has given on the stand, whether it be

7    last week or today, and we are using it for the sole purpose to

8    rebut the Government's assertion that he is fabricating the

9    testimony or he's using an improper motive when he's saying

10   what he's saying and we're simply using it for that purpose.

11   So, I believe that under 801(d)(1)(D) this testimony is, in

12   fact, admissible as a prior consistent statement.

13             THE COURT:  Mr. Dickinson?

14             MR. DICKINSON:  Your Honor, specific to rebut or

15   express an implied charge the defendant "recently" fabricated

16   and I don't think that was done on cross-examination and at the

17   point of his discussions with Mr. Seyler and being arrested

18   with the FBI, he already obviously had a motive to not tell the

19   complete truth as well.

20             MR. MARCHESE:  Well, if that's the case, Your Honor,

21   then I believe that the Government is making my argument for

22   me.

23             If you look at 801(1)(B)(i) -- or (i), there's three

24   portions.  Mr. Dickinson brings up that it was a recent

25   fabrication, that's one portion.  But he said something in

1   reference to his motive in testifying.  So that's the last

2   portion, and I believe Mr. Parker's post-arrest statement comes

3   in for that particular purpose.  And I would also -- I would

4   also argue that it goes under -- that it was recently

5   fabricated or it was a recent improper influence, but it comes

6   in under any of those three particular portions, Your Honor.

7   That's our position.

8            MR. DICKINSON:  I'm not sure I attacked Mr. Parker's

9   motive to testify.

10           THE COURT:  Has to be -- yeah.  It's not admissible.

11  Under Rule 801(d)(1)(B)(i), needs to be "to rebut an express or

12  implied charge that the declarant recently fabricated it or

13  acted from a recent improper influence or motive in so

14  testifying."  It's not attacked on other grounds.

15           MR. MARCHESE:  Well --

16           MR. DICKINSON:  I don't believe I impeached

17  Mr. Parker with any prior statements.

18           THE COURT:  Yeah.  So it's not admissible.

19           Motion to admit is denied.

20           MR. MARCHESE:  We have no further questions.

21           THE COURT:  Redirect [sic]?

22           MR. DICKINSON:  Can I just have one moment,

23  Your Honor?

24           THE COURT:  Yes.

25       (Counsel conferring.)

94

 1          MR. DICKINSON:  Just one or two questions,

 2    Mr. Parker.

 3

 4              RECROSS-EXAMINATION OF ERIC PARKER

 5    BY MR. DICKINSON:

 6    Q.   Mr. Marchese was discussing with you about discovery;

 7    correct?

 8    A.   Yes, sir.

 9    Q.   Now, some of the evidence at trial you've had an

10    opportunity to see every word; correct?

11          And in re -- in that line of questioning, it was

12    about what the sheriff had said on the stage; correct?

13    A.   Yes, sir.

14          MR. DICKINSON:  Can we bring up 235?  Government's

15    Exhibit 235?

16      (Government Exhibit 235 published.)

17    BY MR. DICKINSON:

18    Q.   And your Facebook post; correct?

19    A.   Yes, sir.

20    Q.   April 12th, 2014; correct?

21    A.   Yes, sir.

22    Q.   "Bundy gave the sheriff one hour to disarm the BLM.  He

23    did not reply.  We are now going to free the cattle by any

24    means.  The sheriff claimed the BLM is standing down, but

25    offered no proof.  This is when Mr. Bundy gave him the

1    'do-it-or-else.'  We will not be lied to."

2            You wrote that on April 12th, 2014, at 11:24 Nevada

3    time; correct?

4    A.   Yeah.  There's like three different statements --

5    Q.   That's what you wrote --

6    A.   -- right?

7    Q.   -- correct?

8    A.   I mean -- yes, sir.

9    Q.   This one right here (indicating)?

10   A.   You only want yes or no?  I'm sorry.  I didn't mean to --

11   yes -- yes, I did, sir.

12   Q.   All right.

13           MR. DICKINSON:  No further questions, Your Honor.

14           MR. MARCHESE:  Nothing based on that, Your Honor.

15           THE COURT:  All right.  Let's go ahead and take a

16   lunch break, so we've got a little bit of time.

17           Do you think, Aaron, 12:30 --

18           COURTROOM ADMINISTRATOR:  Yes, Your Honor.

19           THE COURT:  -- will be enough time?

20           All right.  We're going to go ahead and take a little

21   bit of a longer lunch today until 12:30.

22           During this time we do ask the jury to please

23   remember you are not to discuss this case with anyone nor

24   permit anyone to discuss it with you.

25           Please do not read, or listen to, or view anything

96

1    that touches upon this case in any way.

2             And please do not attempt to perform any research or

3    any independent investigation about the case, and do not form

4    any opinion.

5             We'll go ahead and stand for the jury and welcome

6    them back at 12:30.

7         (Jury excused from courtroom at 11:02 a.m.)

8             THE COURT:  All right.  The jury has left the

9    courtroom.

10            Mr. Parker, you can go ahead and take your seat.

11        (Witness excused.)

12            THE COURT:  Does defense plan to call any other

13   witnesses?

14            MR. TANASI:  None from Stewart, Your Honor.

15            MR. MARCHESE:  None from Parker.

16            MR. LEVENTHAL:  Not at this time, Your Honor, on

17   behalf of Mr. Drexler.

18            MR. PEREZ:  None from Lovelien.

19            THE COURT:  Well, at this time or any time?

20            MR. LEVENTHAL:  Any -- at this time.  We've spoken --

21            THE COURT:  All right.  You said "at this time."  I

22   didn't know if you had someone coming later.

23            MR. LEVENTHAL:  No.

24            THE COURT:  No.

25            MR. LEVENTHAL:  Unless he changes his mind in the

1   next two minutes, not at this time.

2         THE COURT:  Okay.

3         MR. LEVENTHAL:  No one else.

4         MR. GEORGE:  I'm sorry.  I missed the question.

5         THE COURT:  The question is, Do you have any other --

6   do you have any witness to call?

7         MR. GEORGE:  No.

8         MR. PEREZ:  None from Lovelien.

9         THE COURT:  All right.  So at this time it looks like

10  the defense is going to rest; is that right?

11        MR. PEREZ:  Yes, Your Honor.

12        MR. TANASI:  Yes, Your Honor.

13        MR. MARCHESE:  Yes, Your Honor.

14        THE COURT:  And does the Government have any rebuttal

15  witnesses it wishes to call?

16      (Counsel conferring.)

17        MR. MYHRE:  We don't anticipate any rebuttal,

18  Your Honor.  Based on that, I'd like a few minutes to think

19  about it, though, and then I should have a decision shortly

20  after the -- at the lunch break or after the lunch break.

21        THE COURT:  All right.  So, my next question was

22  going to be if we don't intend to have any more witnesses

23  coming in today, then does it make sense to excuse the jury,

24  have them come back tomorrow morning for closing?  I can give

25  you all afternoon to argue about the other jury instructions

1    that were left open for discussion and then I can give you my

2    ruling.

3              MR. MYHRE:  Yes, Your Honor.  I --

4              THE COURT:  And then that way you'll have the actual

5    language to use in your preparation for closing.

6              MR. MYHRE:  I have some thoughts on that.

7              THE COURT:  Do you want to do closing tomorrow or

8    next day?  I'm trying to make sure I don't give the wrong

9    information to the jury.

10             MR. MYHRE:  Thank you, Your Honor.

11             What we would propose, Your Honor, if -- I'm assuming

12    the Court's going to canvass the remaining defendants with

13    respect to their rights to testify and assuming that nothing

14    changes with respect to that, what the Government would propose

15    would be that we would hash out what remaining jury

16    instructions we have this afternoon and we would ask for a day

17    to prepare for closing given the -- you know, the defense case

18    and so forth that we've had to prepare for and we would ask to

19    do the summation and then the defense argument and rebuttal on

20    Wednesday.

21             THE COURT:  All right.  Anybody have an alternative

22    plan or any objection to that plan?

23             MR. TANASI:  No objection from Stewart, Your Honor.

24             MR. MARCHESE:  Whatever the Court -- whatever the

25    Court's pleasure.  Just not today.

99

1          THE COURT:  Okay.  No.  I wasn't going to make you do

2     it today.

3          MR. LEVENTHAL:  There's no objection on behalf of

4     Mr. Drexler.

5          MR. GEORGE:  No objection.

6          MR. JACKSON:  No objection, Your Honor.

7          MR. PEREZ:  No objection.

8          THE COURT:  All right.  So -- you all can sit down.

9          Let me go ahead and ask each of you -- each of the

10    defendants, just to clarify, whether anyone wishes to take the

11    stand.

12         So starting with Mr. Stewart, sir, you probably

13    remember me saying this before, but there's been so much going

14    on I'm going say it again anyway.  So there's quite a few

15    decisions that an attorney makes on your behalf, for strategic

16    purposes, with his experience and so forth and there are,

17    however, decisions that the defendant gets to make on his own,

18    you know, with -- with the advice of counsel, but it's

19    completely up to you whether or not you want to accept a plea

20    negotiation, whether or not you want to go to trial, whether or

21    not you want to testify, and whether or not you want to appeal.

22    So, at this point I'm asking you, have you made a decision as

23    to whether or not you would like to testify?

24         DEFENDANT STEWART:  Yes.

25         THE COURT:  And have you had sufficient time to

1   discuss that decision with your attorney?

2                DEFENDANT STEWART:  Yes.

3                THE COURT:  And so, do you wish to testify in this

4   case?

5                THE DEFENDANT:  No.

6                THE COURT:  All right.

7                And Mr. Drexler, same questions.

8                Have you made a decision as to whether you would like

9   to testify?

10               DEFENDANT DREXLER:  Yes.  I'm not going to testify.

11               THE COURT:  All right.  And did you have sufficient

12  time to discuss that with your attorney, Mr. Leventhal?

13               DEFENDANT DREXLER:  Yes.

14               THE COURT:  All right.

15               And Mr. Engel, have you had sufficient time to

16  discuss with Mr. George your decision whether or not to testify

17  today?

18               DEFENDANT ENGEL:  Yes, Your Honor.

19               THE COURT:  And do you wish to testify?

20               DEFENDANT ENGEL:  No, Your Honor.

21               THE COURT:  All right.

22               And Mr. Lovelien, did you have sufficient time to

23  discuss your decision with Mr. Perez?

24               DEFENDANT LOVELIEN:  Yes, Your Honor.

25               THE COURT:  And do you wish to testify in your case?

1          DEFENDANT LOVELIEN:  No, I don't.

2          THE COURT:  All right.

3          And Mr. Burleson, have you had sufficient time to

4    discuss with your attorney your right to testify in this case?

5          DEFENDANT BURLESON:  Yes, I have.

6          THE COURT:  And do you wish to testify, sir?

7          DEFENDANT BURLESON:  No, I don't.

8          THE COURT:  All right.

9          So it looks like we are done with the defense case,

10   according to both counsel and the defendants, and it sounds

11   like we can go ahead and let the jury know that they're welcome

12   to stay and have lunch, since it's already been ordered for

13   them because we didn't know otherwise, but then afterwards they

14   don't have to stay.  They can come back on Wednesday morning?

15         Does everyone agree that's a good plan?  I just want

16   to make sure, or did you still want some more time -- do you

17   want to come back after lunch and tell me for sure?

18         MR. MYHRE:  If I -- I'm sorry, Your Honor.  If we

19   could have, like, 15 minutes, I can wrap this up in terms of

20   your final decision --

21         THE COURT:  All right.

22         MR. MYHRE:  -- or final answer, if you will, on

23   rebuttal.

24         THE COURT:  Okay.  All right.  Well, I don't want to

25   rush you if we don't have to.  The jury is going to be here for

1   a while because their lunch is -- it wasn't already here;

2   right?  It was coming.  11:30?

3          COURTROOM ADMINISTRATOR:  It should be here in about

4   45 minutes.

5          THE COURT:  We just happened to get done with

6   Mr. Parker earlier than we thought that -- so the lunch is

7   probably not even still here for them.

8          So we can take about a 30 minute break and come back.

9          MR. MYHRE:  Thank you, Your Honor.

10         THE COURT:  All right.  Let's do that.  It's 11:08.

11  We'll come back at 11:38.

12         COURTROOM ADMINISTRATOR:  All rise.

13     (Recess was taken at 11:08 a.m.)

14     (Outside the presence of the jury at 11:45 a.m.:)

15         COURTROOM ADMINISTRATOR:  All rise.

16         THE COURT:  All right.  Thank you.  You may be

17  seated.

18         All right.  So Mr. Myhre, did you have sufficient

19  time to discuss and consider whether you want to exercise your

20  option to call rebuttal witnesses?

21         MR. MYHRE:  We did, Your Honor.  Thank you.  And the

22  Government will not be presenting rebuttal.

23         THE COURT:  All right.  Okay.  So everyone is still

24  in agreement that we should take a day off tomorrow and have

25  closing arguments on Wednesday; is that right?

1          MR. TANASI:  Yes, Your Honor.

2          MR. LEVENTHAL:  Yes, Your Honor.

3          MR. MARCHESE:  Yes, Your Honor.

4          THE COURT:  Okay.  So we can go ahead and tell the

5    jury to come back Wednesday morning at 8:30 and then everyone

6    else, the attorneys here, can take their lunch break and come

7    back at 1 o'clock so that we can address the remaining jury

8    instructions, and I actually have a couple of questions on the

9    jury instructions, even the ones that we've already settled,

10   for example, on the conspiracy.  I'll give you a little more

11   food for thought during lunch.

12          For conspiracy, there are findings that the jury must

13   make unanimously as to the overt act; right -- or no.  The

14   object of the conspiracy?

15          MR. MYHRE:  That's correct, Your Honor.

16          THE COURT:  So there should be an (a) and a (b) and

17   they need to find unanimously either for (a) or (b).  I'm not

18   asking them -- we're not giving them that option of (a) and

19   (b); right?  Because then they might get confused that they

20   can --

21          MR. LEVENTHAL:  I'm sorry.  Are you -- is the

22   Court --

23          THE COURT:  Just think about that one.

24          MR. LEVENTHAL:  -- on Page 33?  I -- just for my

25   reference.  Is that -- as to Count One, the elements?

1          THE COURT:  Right.  So it's the . . . let's see, I'd

2    have to go back to the other page.

3          MR. LEVENTHAL:  And again, I'm looking at Document

4    1426.

5          THE COURT:  So it's the conspiracy that can be

6    committed by either two objectives.  So it's Count Two.  There

7    can be two objectives of the conspiracy, (a) or (b), but the

8    jury must unanimously agree on whether it's (a) or (b).  So six

9    of them can't say it's (a) and six of them say that it's (b);

10   they have to all 12 unanimously decide that the object is

11   either (a) or (b).  And so my question was, on the verdict

12   form, we need to make that clear.

13         MR. MYHRE:  You know, I don't have the --

14         THE COURT:  So just think about it.  You don't have

15   to tell me right now.  But think about it at lunch and look it

16   up.

17         So Count Two has an (a) or (b) and the jury just

18   decide unanimously as to (a) or (b).  And so as far as the

19   verdict form goes, unanimously find (a), unanimously find (b),

20   and do you want to include unanimously find (a) or (b), so I'm

21   not sure.

22         And then . . . I don't think for the 924(c) counts

23   that we need to ask the jurors to find unanimously the type of

24   weapon because it sounds like the type of weapon is already the

25   one that's the least.  It's not a short-barreled shotgun or

1    such which would increase the penalties, so I don't think that

2    we need to unanimously have them find the type of weapon, but I

3    wanted to also verify with you if I'm missing or forgetting

4    something.

5           And then Count One also.  Does the jury need to find

6    which is the object under Count One?  That's just . . . the

7    other two.

8           So be back here at 1 o'clock and then we can start

9    hearing argument on the remaining jury instructions.

10          We can put this down.  I can't see Mr. Marchese.

11   Aaron, can you throw that down.

12          MR. MYHRE:  Your Honor, could I raise one more thing

13   on the jury instructions?

14          THE COURT:  Yes.  Please.

15          MR. MYHRE:  And I discussed with counsel previously,

16   but I just want to make sure the record is clear.  We do have

17   forfeiture counts, obviously.

18          THE COURT:  Right.

19          MR. MYHRE:  And my understanding is, is that the

20   defendants, to whom those counts apply, do -- do not wish to

21   exercise their right to have a jury hear the forfeiture in the

22   event there is a, you know, conviction in this case or a

23   verdict of guilty on any of those counts.  I just wanted that

24   to be clear on the record.  That way we won't have to cover a

25   forfeiture instruction for a --

 1            THE COURT:  Okay.

 2            MR. MYHRE:  -- forfeiture jury instruction.

 3            THE COURT:  Is that right, Mr. Tanasi?  You're not

 4    requesting a forfeiture instruction?  You're not asking the

 5    jury to find whether the forfeiture count --

 6            MR. TANASI:  That's correct, Your Honor.

 7            THE COURT:  Mr. Marchese?

 8            MR. LEVENTHAL:  As to -- I apologize.

 9            MR. MARCHESE:  Go ahead.

10            THE COURT:  Okay.

11            MR. LEVENTHAL:  As to the forfeiture as to what was

12    seized, we have no objection, but as to any other sort of

13    the -- you know, and because of the cows were -- have still not

14    gone back, or that Bundy in some way still owes 1 million

15    dollars, then I think that there's still an argument there, but

16    I -- my understanding is, is that it's only to what was seized

17    at the time of the arrest, i.e., the guns or ammunition and

18    things of that nature; is that correct?

19            MR. MYHRE:  Our position is that with respect to

20    money judgments or money losses, that's not a jury question;

21    that would be a question for the Court.  This only applies to

22    the physical property which would be the ammunition or weapons

23    that were seized on arrest.  I believe it would apply to

24    Mr. Parker, to Mr. Stewart, and to Mr. Engel.

25            THE COURT:  So it only applies to Parker, Stewart,

1   and Engel?

2           MR. MYHRE:  Yes, Your Honor.

3           THE COURT:  All right.

4           So, Mr. Engel or Mr. George, do you agree that you do

5   not wish to have the jury instructed on the forfeiture count?

6           MR. GEORGE:  Yes.

7           THE COURT:  Okay.  All right.

8           MR. MYHRE:  Thank you, Your Honor.

9           THE COURT:  Anything else?

10          Be back here at 1 o'clock.

11          COURTROOM ADMINISTRATOR:  All rise.

12          Off record.

13      (Recess was taken at 11:51 a.m.)

14      (Outside the presence of the jury at 1:16 p.m.:)

15          LAW CLERK:  All rise.

16          THE COURT:  Thank you.  You may be seated.

17          All right.  So I had a couple of questions before the

18   lunch break, and hopefully you had some time to consider that,

19   for the verdict form, in regards to Count One and Two, the two

20   conspiracy counts.

21          All right.  So starting with Count One, Conspiracy to

22   Commit an Offense, there are six different offenses which are

23   listed and the jury is instruction -- instructed that all of

24   them must agree as to the particular crime which the

25   conspirators agreed to commit.

1          So should that option be included on the verdict

2     form?

3          MS. CREEGAN:  Your Honor, we don't have an objection

4     to having a special verdict form that creates the options for

5     the jury to check each one that they have found.

6          THE COURT:  All right.  Defense have any objection or

7     alternative recommendation?

8          MR. TANASI:  I think that recommendation would solve

9     the problem.

10         THE COURT:  Okay.  Then we'll go ahead and add, on

11    the verdict form, each of the six alleged charges.

12         And then, for Count Two, Conspiracy to Impede or

13    Injure a Federal Officer, there are two options; one is a to

14    prevent by force, intimidation, or threats federal law

15    enforcement officers from discharging the duties of their

16    office under the United States or, second option is, number two

17    is, to induce by force, intimidation, or threats any federal

18    law enforcement officer of the United States to leave the place

19    where their duties were required to be performed, and they need

20    to agree unanimously.

21         We tell them, "You must find that there was a plan to

22    commit at least one of the alleged objects of the conspiracy

23    with all of you agreeing as to the particular object which the

24    conspirators agreed to commit."

25         So it seems that we need to give them that option as

1    well of one or two, but then my question was, do we also give

2    them the option of one and two and is -- I guess the

3    instruction is clear that it has to be unanimous.

4              MS. CREEGAN:  Your Honor, we would propose putting on

5    the verdict form that they can check each one that they've all

6    unanimously found, so they can check up to six for Count One

7    and up to two for Count Two.

8              THE COURT:  Okay.

9              MR. TANASI:  Your Honor, I know we moved on from one,

10   but if we can go back to it for a second.  I think it would be

11   also important for the jury to check which -- at least for

12   Count One, which crime they believe which defendant committed.

13   In other words, not -- not just that they found unanimously

14   assault, but, you know, was it unanimously that Steven Stewart

15   committed the assault and so on and so forth for each

16   defendant.

17             THE COURT:  For Count One you mean?

18             MR. TANASI:  Yes, Your Honor.  And I know we moved

19   past that and I apologize for going backwards.

20             THE COURT:  Does the Government agree?

21             MS. CREEGAN:  Well, as long as they're finding at

22   least one.  If not, they would have to acquit that person.  So

23   I'm not sure what it adds to say how many of the count -- the

24   different crimes that particular person conspired to,

25   especially since they'd be liable under *Pinkerton* liability.

1  So, I guess I'm not sure what that adds.

2          THE COURT:  Right.  Because first they're finding

3  whether or not a conspiracy exists to commit any of the crimes

4  charged, 1 through 6, and then -- because that's the first

5  element.  The second element is "the defendant became a member

6  of the conspiracy knowing of at least one of its objects and

7  intending to help accomplish it."  So I don't think it's

8  necessary to parse it out for each defendant so long as we have

9  those six options first and then the second element is which,

10  if any, of the defendants became a member.

11          MR. TANASI:  And I guess what I was getting at is by

12  committing which object, which underlying crime.

13          MS. CREEGAN:  Well, the underlying crimes are

14  separate counts.  This is whether they joined the conspiracy.

15  So first, the jury determines whether there's a conspiracy and

16  its objects and then it either finds guilty or acquits each

17  defendant of having meant to promote one of those objects, but

18  not necessarily all of them.

19          MR. JACKSON:  Your Honor, I -- excuse me.  I think

20  for appellate purposes it's important we know which one they

21  found the defendant to have conspired to have done.  Otherwise,

22  it would be impossible to determine whether, under *Jackson vs.*

23  *Virginia,* there was sufficient evidence that the person

24  actually conspired.  If -- for each defendant, there might be a

25  separate and distinct crime that they conspired to do.  I think

1    we should know from the jury what they determined.  It might be

2    a complex task for the jury to determine, but I think it's

3    necessary, especially when they lump these many different

4    possibilities before the jury.  They should have to ascertain

5    which one applies to which defendant.  It might be that for

6    some of the defendants they find that they didn't, in fact,

7    conspire to commit any of those crimes and therefore, they

8    should reach the conclusion that they're not guilty of

9    conspiracy at all, and that's our point.

10            THE COURT:  Well, there's only one conspiracy that

11    has six different allegations of -- of a crime, but there's

12    only one conspiracy.  So they each are either not guilty or

13    guilty of the one conspiracy.  The only reason we break down

14    the six options are so the jury realizes that they need to be

15    unanimous as to at least one of those options and they can't

16    have two people think that one of the options and three people

17    thinks it's the other option and four people think it's the

18    other option.  You knows, it has to be all 12 of them has to

19    agree on at least one of -- at least one of these six was

20    committed.  After that, then the second element is whether or

21    not the defendants were or were not a member of the conspiracy.

22    So I think that it's sufficient to just break up the six

23    options and we don't have to individually have the jury find

24    which one of those six options they think that the defendant

25    was agreeing to commit.  Because again, we have the aiding and

112

1    abetting at the back end as well.

2         All right.  And I think -- let me look at my little

3    yellow stickies here to see if there was another question that

4    I needed to ask you, too.

5         In the instruction relating to Count Eight,

6    Threatening a Federal Law Enforcement Officer, there's a couple

7    of definitions there at the end which are definition of

8    "impede," to "intimidate," "interfere with," to "retaliate"

9    that's not in the model instruction so I just want to make

10   sure, but you want me to include those anyway; is that right?

11        MS. CREEGAN:  We think it would help the jury to

12   understand the meaning of those terms.

13        THE COURT:  I don't disagree; I just wanted to make

14   sure that I was clear that that was what you had agreed on.

15        Okay.  And then what's my other one here?

16        Oh.  So then on Count Twelve, the Obstruction of

17   Justice, the model jury instruction has one last sentence that

18   is not included in the one that you all provided.  That last

19   sentence is, "The word 'corruptly'" -- in quotation marks --

20   "The word 'corruptly' as used in this instruction means that

21   the act must be done with the purpose of obstructing justice."

22        So, was that an oversight or is there reason we don't

23   want that in there?  Are they not charged with corruptly?

24   Because I think it was in the Superseding Indictment, that

25   corruptly was one of the manner -- different ways that the

1    offense can be committed.

2              MS. CREEGAN:  We don't have an objection to adding

3    that.

4              THE COURT:  I'm sorry.  I couldn't hear you.  You

5    don't have an objection to adding that?

6              MS. CREEGAN:  To adding that.

7              THE COURT:  And how about from the defense?

8              It's the last line of Count Twelve.  The instruction

9    in the model jury instructions includes the definition of

10   "corruptly" and for whatever reason it was not in the

11   stipulated instruction provided to the Court.  So I didn't know

12   if it was just an oversight or if there's a reason why you

13   don't want it to be defined that way.  Is there a case that I'm

14   not aware of that said that that's not the proper definition?

15   I couldn't figure it out, so I thought that I'd just ask you.

16   It sounds like it was just an oversight.  Keep it in there?

17             MR. TANASI:  I think it probably was, but just, for

18   the record, what is that last sentence?  I just don't have it

19   in front of me.

20             THE COURT:  It says, "The word 'corruptly'" -- and

21   then corruptly is in quotation marks -- "as used in this

22   instruction means that the act must be done with the purpose of

23   obstructing justice."

24             MR. TANASI:  I think that's probably just an

25   oversight then, Your Honor.  I don't --

1          THE COURT:  Yeah.  It's clearly the law but . . .

2          Okay.  So we'll go ahead and add that, even though

3     it's not in the stipulated.

4          (Brief pause in proceedings.)

5          Okay.  And then Count -- well, the instructions for

6     Counts Six, Nine, and Fifteen, the Using, Carrying, or

7     Brandishing a Firearm, I just want to be clear how you want

8     this stated because . . . first, the jury finds whether or not

9     the firearm was used or carried and then if they find that it

10    was used or carried, then they determine whether or not it was

11    brandished.  So the used or carried is like a precursor to even

12    getting to the brandished.  So it's not that they have three

13    options; it's that they have two options first and if they find

14    one of the two options, then they go to brandished, but the way

15    it's worded here starts with it being called "used, carrying,

16    or brandishing" as if there are three options.  But I think the

17    elements are clear.  So it's just really the first sentence of

18    it says, "The defendants are charged in Count Six, Nine, and

19    Fifteen of the Superseding Indictment with Using, Carrying, and

20    Brandishing a firearm during and in relation to."  I guess it's

21    technically correct that that's what they're charged with; I

22    just didn't know if that was misleading to make it sound like

23    there's three options when there's really only two and then the

24    brandishing is -- comes later.

25          Maybe I'm just being picky.  It just -- it just --

1    when I read it through, it seemed not as clear as it could be,

2    but maybe there's no way to clarify it.

3           MS. CREEGAN:  Just didn't want to fail to state that

4    we were also charging brandishing when we were giving them the

5    first instruction, but I would argue it's clear that at first

6    they have to find the use and carry and then they have to find

7    and it's also clear on the verdict form that they proceed from

8    one to the other.

9           THE COURT:  Right.  Because brandished isn't

10   mentioned as the second element.  The second element only

11   mentions use or carry so that brandish comes in at the end, if

12   you find that there's use or carry.

13          Oh.  And then it mentions -- here's another one.  So

14   the first element is "the defendant committed the underlying

15   crime as charged in Counts Five, Eight, and Fourteen."  Makes

16   it sound like you have to find all three.  Should that be an

17   "or"?

18          MS. CREEGAN:  Yes.  I think so, Your Honor.

19          THE COURT:  And then, again, at the -- at the end,

20   Line 7 there.  It says, "If you find a defendant guilty of

21   using or carrying a firearm during or in relation to the crime

22   of violence," it says "as charged in Counts Six, Nine," I guess

23   that would be "and Fifteen" because it's -- because they're

24   charged together.  They're all -- it's and -- no.  If you find

25   . . . I think that should be an "or" also.

1          MS. CREEGAN:  I think that should be an "or" as well,

2     Your Honor.  Thank you.

3          THE COURT:  Okay.

4          All right.  Any other issues with the current

5     stipulated or already ruled on jury instructions that you want

6     to bring to my attention before I finalize all the typos and

7     commas and things in there?

8          Okay.  Then let's move on to the next group of

9     instructions.  There were a few that I intentionally did not

10    give final rulings about because I wanted to see what the

11    defense evidence was and then during the interim there were

12    some other jury instructions that were proffered as well.  So,

13    let me tell you how I've organized them and we'll let you argue

14    if you'd like to.

15         So, the first one is the self-defense or defense of

16    others instruction which has two alternatives, one is the

17    mistaken identity under *Feola* and the second one is the

18    excessive force under *Span,* then there's a justification

19    defense, then there's the mere presence defense, and then there

20    were four new ones that were offered; the first one is a lesser

21    included offense that was offered -- proffered by Mr. Tanasi.

22    Then there's the involuntarily confessions and chain of custody

23    instruction proffered by Mr. Jackson, and finally, a

24    circumstantial evidence instruction that was proffered by

25    Mr. Perez.

1        So, does the defense want to go first, since these

2   are your proffered instructions?  Do you want to be heard on

3   any of these or just submit them?

4        MR. MARCHESE:  Which one would we be starting with,

5   Your Honor?

6        THE COURT:  Whichever one you want.  I just wanted to

7   make sure I have all of them that -- I listed all of them and I

8   didn't forget any that you've provided.

9        MR. MARCHESE:  I believe that is -- there weren't any

10  additional ones, no.

11       THE COURT:  Okay.  So we're all on the same page as

12  far as how many we have left to address.  So whichever one you

13  want to address is fine.  You don't have to address them all,

14  just whichever ones you want to address.

15       Mr. Tanasi, you want to go first?

16       MR. TANASI:  Oh.  Sure, Your Honor.

17       With respect to the self-defense, I think -- you

18  know, I think kind of the same arguments that we've proffered

19  in the past still hold true in that I think both -- I'd say

20  both instructions would be available at this time and, you

21  know, I certainly think, especially after Mr. Parker's

22  testimony, both are viable.

23       And again, you know, we've heard from Mr. Parker and

24  his testimony that he believed that they were Blackwater

25  contractors, something to that effect and so I think that

1    the -- that that triggers the *Span* instruction and then with

2    respect to the *Feola*, again, I think that that's still viable

3    even kind of alternatively, I guess.

4            So . . .

5            THE COURT:  You mean the Blackwater contractors

6    triggers *Feola*, the unknown?

7            MR. TANASI:  Right.

8            MR. MARCHESE:  Correct.  And I don't mean to step on

9    Mr. Tanasi's toes --

10           MR. TANASI:  Go ahead.

11           MR. MARCHESE:  -- but we had a conversation at lunch

12   in reference to this.

13           THE COURT:  Okay.

14           MR. MARCHESE:  We just don't want to be foreclosed

15   on -- if the jury finds that Mr. Parker or whichever

16   defendant's belief was unreasonable or -- in that the

17   individuals in the wash behind the fence, if the jury looks at

18   it and says no, they were, in fact, law enforcement, that's a

19   terrible argument, then we believe that we're just completely

20   foreclosed on arguing that.  So, first, we would ask for, you

21   know, the jury to make a finding that whether or not they were,

22   in fact, law enforcement -- excuse me -- the defendants thought

23   that they were, in fact, law enforcement and then, in the

24   alternative, if they find that no, that's not a credible

25   argument, we would still ask for the instruction that yes, they

1   were law enforcement and then the proper instruction that goes

2   along with that.

3          I hope I'm articulating that correctly.

4          THE COURT:  Okay.

5          All right.  And Mr. Tanasi, you also offered the

6   lesser included offense instruction.

7          MR. TANASI:  Yes, Your Honor.

8          Yeah.  And with respect to that, Your Honor, I -- I

9   constructed it as best I could consistent with the model

10  instruction.  The statute, 18 U.S.C. 111(a) does, in fact, have

11  two components; a misdemeanor component and a felony component.

12  I kind of coined the lesser included misdemeanor as the simple

13  assault to avoid the punishment issues and categorizing them in

14  an improper way, but basically it comes down to the jury's

15  decision whether or not the defendants have used a deadly

16  weapon or some bodily harm had occurred.  Those two questions,

17  if either of the answer -- if the answer to either of those

18  questions is yes, then it is the felony treatment of -- of the

19  assault as charged, but if the answer to those questions are

20  no, then it's misdemeanor treatment.  Again, simple assault for

21  purposes of the instruction.  So, again, I would think that

22  that's a jury instruction -- a jury decision rather to make

23  that determination.

24          And, you know, this isn't a new concept because,

25  again, it's contemplated by the model jury instructions, the

1   idea of a lesser included offense.

2          THE COURT:  All right.  Any other instructions that

3   you wanted to comment on?

4          MR. TANASI:  Mere presence, Your Honor, I still think

5   that would be a viable instruction, especially, again, given

6   Mr. Parker's testimony.  You know, the picture came up of the

7   gals that were in the interview in the back and, you know, he's

8   hitting on girls I think was the phrase.  You know, there's

9   clearly an argument to be made that my client was merely

10  present and not a member of any conspiracy.  Even with respect

11  to the one picture that the Government has of my client even

12  holding a weapon, he's pointing it straight up in the air and

13  again, it lends itself at least to be able to have the jury

14  ultimately decide whether there's merely present or if he's

15  part of this nefarious conspiracy.

16         THE COURT:  All right.

17         MR. TANASI:  I think that's -- those are the only

18  two, Your Honor, that I was going to address.  I know

19  Mr. Jackson had a couple he had offered and I think Mr. Perez

20  as well.

21         MR. JACKSON:  I'll just speak for the next.

22         THE COURT:  All right.  Go ahead.

23         MR. JACKSON:  The main one I offered was dealing with

24  confessions or statements of a defendant.  I think that there

25  are two issues basically; the Long Bow statements and the

1    statements my client made to Officer Caputo.  There's a very

2    generic simple instruction that was given that the jury should

3    consider the circumstances of any statement but doesn't go into

4    any detail that gives a jury any guidance.  That's, I think,

5    4.1 that the Court has given as an instruction, but I think the

6    jury has to understand that they should look at the totality of

7    circumstances and they have to look at whether a statement was

8    voluntary or whether it was the product of any kind of law

9    enforcement manipulation or law enforcement interaction that in

10    some way made the statement unreliable or maybe even

11    involuntary.

12           In this particular case my client, there was direct

13    evidence that he was given alcohol at Long Bow.  The quantity

14    is at least a couple of glasses of hard whiskey.  Whether he

15    had more than that is for the jury to determine from looking at

16    all the facts and circumstances.  There's also evidence that he

17    had a seizure disorder, which the Government was aware of at

18    the time that they gave him this.

19           There was also issues surrounding his statements he

20    made to Mr. Caputo about the relationship he had with

21    Mr. Caputo.  The jury has to consider all of those facts in

22    determining whether or not the statement was voluntary and how

23    much weight to give it.  So I think this instruction is

24    appropriate so that the jury can analyze carefully the evidence

25    before it in reaching a proper conclusion.

1          There are substantial studies in the Innocence

2    Project and other sources saying that the main -- one of the

3    main reasons for wrongful convictions is when confessions come

4    in that are involuntary or may be untrue.  The facts of this

5    case suggest that many of the things my client said don't match

6    the physical evidence.  That's why I think this instruction is

7    appropriate, so at least the jury can put my client's

8    statements in a proper context.  I think it might apply to some

9    of the other defendants that were interrogated at Long Bow.

10   That's for them to say, but I urge the Court to grant this

11   instruction or some variation of it.

12          The other instruction I had dealt with chain of

13   custody.  We had some issues regarding that.  I'll submit it on

14   just the instruction I prepared.

15          I would urge the Court also to consider the arguments

16   of counsel on the mere presence instructions and the other

17   instructions that he has suggested.

18          THE COURT:  All right.  Thank you, Mr. Jackson.

19          Mr. Perez?

20          MR. PEREZ:  Yes, Your Honor.

21          With respect to the circumstantial evidence

22   instruction, I think it clarifies and reconciles, I believe

23   it's 3.5 and 3.8, of reasonable doubt and circumstantial

24   evidence.  I think perhaps the most important paragraph of the

25   instruction is that if you've got two conclusions and they're

123

1    equal weight, I mean, it gives the jury direction to say, you

2    know, that's got to point to not guilty as opposed to guilty.

3    I mean, I think the instruction is pretty clear.  It's used

4    widely in California.  I don't know about here, but, you never

5    know.  It's worth a try.

6              MR. JACKSON:  Your Honor, I'm sorry.  There's one

7    other instruction I don't know if we've already dealt with.

8    That was a missing witness instruction I proposed that's

9    dealing with Mr. Love.  I've cited some case law for it and

10   federal jury practice instructions.  I think it's appropriate

11   particularly in this case.  I think I argued it once before and

12   that's why I didn't comment on it particularly, but Mr. Love, I

13   think, was central to this case and I think that we should at

14   least be allowed to argue that failure to call Mr. Love, that

15   the jury should be allowed to draw adverse inferences from his

16   non-appearance.  We weren't able to confront and cross-examine

17   him or to ask him questions about what exactly was his role in

18   this matter and I think that's important.

19             THE COURT:  All right.  Well, I already denied the

20   missing witness instruction.  That was the one --

21             MR. JACKSON:  I -- I understand that.

22             THE COURT:  -- where we made a point of making sure

23   that he was not unavailable and I asked Mr. Myhre wasn't that

24   true that you were going to keep him available and he said yes,

25   he's been available.  The problem was not his availability.

1          MR. JACKSON:  So, it's a complex question of law, but

2     just for the record, we wanted that -- the fact that we

3     proposed such instruction to the Court.  Maybe it's because he

4     was unavailable for other reasons, but we still think that it's

5     important that the jury be instructed that he was unavailable

6     and, you know, maybe corporal rule gets us on that, but we

7     would like it part of the record that we wanted that

8     instruction proposed.

9          THE COURT:  All right.  Same ruling.  That's denied.

10          Mr. Leventhal, did you want to make any other

11     additional argument?

12          MR. LEVENTHAL:  No, Your Honor.  I would just join in

13     the other arguments.

14          THE COURT:  All right.

15          And Mr. John George?

16          MR. LEVENTHAL:  I know we talked about whether it was

17     clear or not what I can say and -- and I can say anything about

18     the lack of Love and I think the comment, it was clear as mud,

19     and I think it still is.  You know, I don't plan on getting in,

20     obviously, the reasons why.  I -- I -- I'm able to comment on

21     closing -- I've never been not been able to comment on

22     closing -- on whether a witness is here or not, whether it's

23     Love or anyone else for that matter.  So, I know -- I

24     understand the Court's ruling on not having the jury

25     instruction, but I am going to be able to comment on it in

125

1    closing.

2              THE COURT:  Mr. John George, anything?

3              MR. GEORGE:  No.  We won't add anything new, but

4    we'll join in with the other arguments as well.

5              THE COURT:  All right.

6              And Mr. Marchese, did you have anything else?

7              MR. MARCHESE:  Other than what I brought up already,

8    no, Your Honor.

9              THE COURT:  All right.

10             And Ms. Creegan, are you arguing on behalf of the

11   Government?

12             MS. CREEGAN:  I am, Your Honor.

13             THE COURT:  Okay.

14             MS. CREEGAN:  And I'll do my best to take them in

15   reverse order.

16             As to Mr. Perez's requested instruction on

17   circumstantial evidence, this is the law of the state of

18   California.  The Ninth Circuit has a model jury instruction

19   which we've included in our stipulated instructions.  I don't

20   believe that this accurately states the federal law on the

21   point and that the model instruction does accurately state it.

22   So we would oppose the circumstantial evidence instruction.

23             Turning to the involuntary confessions proposal by

24   Mr. Jackson, this is also adequately covered by an on point

25   Ninth Circuit model jury instruction, 4.1, statement of

1   defendant.  As this is written, I think this is very

2   misleading.  It includes a sentence at the end, "The jury

3   should be cautioned that involuntary confessions or statements

4   has been a leading cause of wrongful convictions."  That would

5   be like putting at the end of the elements of the count most

6   people are convicted when charged with this.  It's very

7   suggestive and inappropriate to the jury.  We believe this is

8   more than adequately covered by rule -- by model instruction

9   4.1.

10          Mr. Jackson also proposed chain of custody.  I'm not

11  able to tell, maybe Mr. Jackson can explain what he sees this

12  as referring to.  Our witnesses that have come in have

13  testified that it fairly and accurately represents what they've

14  seen or they can identify the video by distinct

15  characteristics.  I don't believe we have any items that have

16  been submitted on chain of custody, so I'm not certain what he

17  means for that to refer to.

18          THE COURT:  Mr. Jackson, do you want to speak on

19  that?  Because there weren't any legal citations that were

20  provided for that chain of custody instruction and there is no

21  Ninth Circuit model jury instruction for chain of custody.

22          MR. JACKSON:  That's true.  There is no Ninth Circuit

23  citation on this, but we had an issue in this case concerning

24  the gaps in the chain of custody and it came up in the

25  questioning, I think it was of the Flynn video, and we had a

witness who didn't have it in his custody the whole time and

we -- he was cross-examined about it and when I raised that on

cross-examination, the Court said it was a matter that could be

raised in argument and I asked the Court to so instruct the

jury that this is the kind of thing that the jury can give

whatever weight it thinks is appropriate.

There wasn't a fully documented chain of custody on

this one exhibit and because of that, I think the jury should

give it whatever weight it thinks it deserves.  And I think I

can quote the Court's statement at the time when he was arguing

this as my authority for this instruction.  I don't have the

transcript in front of me, but I do remember that issue came up

when we were arguing the Flynn exhibit and I'll just submit it

with that.  It's an instruction I drafted to deal with the

situation as it arose during trial.

THE COURT:  All right.  I do remind -- I do remember

you arguing that issue and I believe my ruling was that this is

not a matter where chain of custody is an issue because it was

a video that the witness testified he was present during and

that it accurately and fairly depicted what he saw when he was

there and that there was no other indicia of unreliability, for

example, as in a case where we have a blood draw or a urine

draw or something like that where the chain of custody would be

essential to know about.  That's my recollection.

Ms. Creegan, did you want to add anything else on

1   that?

2            MS. CREEGAN:  Only that so far as I understand, if

3   this refers to the Flynn video, that was not submitted on chain

4   of custody.  Mr. Ellis is not a custodial witness.  Therefore,

5   we don't believe that instruction's appropriate.

6            MR. LEVENTHAL:  Your Honor, I would just add to that

7   argument that we also saw some, I guess, Channel 8 News and we

8   had someone come in and say that they watched it on TV and I

9   don't -- if the Court's going to base the decision on they were

10  there and, you know, they saw what they saw and it may not be,

11  we had someone come in from the FBI who just saw -- you know,

12  looked at news programs that clearly was not there on

13  April 12th, but yet was able to say that that's exactly what

14  they saw.  But it doesn't go to the bigger question on was

15  that -- was what they saw real or was it done to -- you know,

16  for the news, which is to make a profit and to, you know, put

17  news out there that may not be what it is.  And so I think

18  that's where we go -- where Mr. Jackson's going, but I would

19  suggest that that's -- validates his point.

20           MS. CREEGAN:  I believe that those videos -- those

21  pictures and images were authenticated by distinct

22  characteristics, which is comparing characteristics in them to

23  known photographs of April 12th, although defense is certainly

24  free to argue that those are not reliable for one reason or

25  another.  That would not be a chain of custody issue because

1    again, they were not brought into court through a chain of

2    custody of persons attesting to their authenticity.  That's not

3    the way in which they were authenticated.

4            THE COURT:  All right.

5            MS. CREEGAN:  And moving on to the lesser included

6    offense of simple assault, although the misdemeanor offense is

7    a lesser included offense, we don't believe it's appropriate to

8    instruct the jury in this case.

9            Looking at *United States vs. Rivera-Alonzo*, 584 F.3d

10   826 at 835, Ninth Circuit, 2009, that in a situation in which

11   the Government's theory is solely as to the top level charge

12   and there is no set of facts on which the jury can find the

13   lesser included, it's not appropriate to instruct.  We don't

14   have a situation where there is a factual dispute as to whether

15   the defendants had firearms or whether they committed an

16   assault in some other form.  If the jury doesn't find that

17   there was an assault with firearms, then they should acquit.

18   You know, to promote a compromised verdict on which there is no

19   evidence to advance for a theory that there was some lesser

20   form of assault would not be appropriate.

21           And I'm also looking it the *United States vs.*

22   *Gividen*, G-i-v-i-d-e-n, 468 Fed. Appx. 744 at 744, 745, Ninth

23   Circuit, 2012, in which a defendant drove a car at an officer

24   and tried to get a lesser included offense instruction.  The

25   Ninth Circuit found that because the assault occurred with a

1    vehicle, which is a deadly and dangerous weapon, there was no

2    factual basis on which to give a lesser included offense

3    instruction.

4         THE COURT:  All right.  And did you want to argue on

5    mere presence justification or self-defense, defense of others?

6         MS. CREEGAN:  I would, Your Honor.

7         My arguments on mere presence are not long, just to

8    reiterate, the Ninth Circuit, including the case which is cited

9    in the commentary on the jury instruction, their holding

10   consistently has been that if the Government presents more than

11   mere presence, then the instruction is not appropriate.  On

12   every defendant we have presented significant evidence of

13   pre-assault coordination, post-assault coordination explaining

14   their --

15        THE COURT:  Well, does it say it's not appropriate or

16   does it just say it's not required?  I think it just says it's

17   not required.

18        MS. CREEGAN:  It's unnecessary is the phrasing that I

19   think is in *Negrete-Gonzalez*.

20        THE COURT:  Unnecessary.  You're right.

21        MS. CREEGAN:  And this case we don't have any person

22   where we've simply said they're present.  In the cases where

23   the instruction is given, a person is present at a drug deal or

24   there's some argument that they must have been involved for

25   them to be present there, but in this case we don't have any

1    defendant where we've made an argument that simply because they

2    were on the bridge, or in the wash, they must have been

3    involved with the conspiracy.

4              THE COURT:  Justification?

5              MS. CREEGAN:  Yes, Your Honor.

6              Justification is an extremely limited defense.  It's

7    a very, very rarely given instruction.  It's usually given in

8    the context of a Felon in Possession of a Firearm who claims

9    that they took up the firearm for some immediate threat to

10   themselves.  Unlike self-defense, it is not phrased in terms of

11   a reasonable mistake.  In order to make a justification claim

12   you have to be right, that you actually are under an unlawful

13   and present threat of death.  That's the risk that you take in

14   this very limited defense.  You have to have no reasonable

15   legal alternative and you have to have not recklessly placed

16   yourself in the situation.

17             I believe that the defendants would fail all of these

18   tests.  They were not under unlawful threat of death.  Even if

19   they claim that they believed that at the time, they were not

20   under it.  There were -- there were law enforcement officers

21   that were asking people to disperse the area and ultimately

22   retreated.  The defendants recklessly placed themselves in the

23   situation even though Metro and NHP law enforcement was

24   present.  They did not avail themselves of those avenues of

25   potentially resolving the issue, and they absolutely had the

1   ability to do that and to seek a legal alternative.  And the

2   cases that deal with felon in possession all say that you have

3   to try to get the protection of law enforcement or you have to

4   reach out to law enforcement before you decide to arm yourself

5   as a felon in possession and defend yourself.  Here, we have

6   defendants essentially walking straight by police officers and

7   deciding to take up this course of action.  We don't believe

8   that under those circumstances they can avail themselves of a

9   justification defense.

10            THE COURT:  Okay.  And then self-defense or defense

11  of others under either the *Feola* or the *Span* instruction.

12            MS. CREEGAN:  Yes, Your Honor.

13            We'd like to reiterate again that these instructions

14  are both categorically unavailable to the defendants under the

15  facts -- the uncontradicted, contested facts of the case.

16            Even as Mr. Parker's testimony elicits, he saw a

17  large crowd, including horses; he, and people he knew with

18  firearms, were in overwatch position; observed that group of

19  people moving forward; and he claims that he heard first a

20  threat to use chemicals, which would be a reasonable way to try

21  to repel a large group descending on your position; they did

22  not leave; they moved forward; and then he claims that he heard

23  "you will be shot."  Again, attempting to try to dispel and

24  disperse the people.  He claims that he heard the word

25  "disperse."  Under -- even under the facts as Mr. Parker

testifies to them, the crowd is the aggressor in this situation
and Mr. Parker is covering the aggressor so that they can
continue to move forward and advance on a much smaller group of
people, even taking aside anything else about that situation.

Under that -- under those facts, the Ninth Circuit
has consistently held that the aggressor cannot avail
themselves of a self-defense theory and by taking a defense of
others position, Mr. Parker stands in the shoes of the person
that he's supposed to be protecting.  That person was advancing
on these people, ignoring the request to disperse, coming to
them with superior numbers with horses that could trample them,
and with at least, at a minimum, Mr. Parker would have the
knowledge, himself and his friends, with firearms in an
overwatch position.  Under those facts, even assuming the jury
believes everything that Mr. Parker has said, there is no
self-defense instruction available.

Moving on specifically to *Feola*, the requirement of a
reasonable mistake includes an objective requirement.  In
*Acosto-Sierra* the Ninth Circuit found that a person who
suffered from paranoid schizophrenia could not argue that
because they were afraid of the police officers and expected
that they would do something, that would be sufficient to find
that a reasonably objective person would make a mistake about
the need to use force.

Under the circumstances, we don't have a reasonable

mistake about the need to use force.  Although Mr. Parker has

testified that he wasn't aware of the affinities of these

people, he said that he knew what a BLM uniform looked like,

that it was tan, that it had a patch.  Individuals with that

uniform were present.  He said he knew that this was the

compound where the cattle were, where the BLM had been.  He

said he could see the patrol vehicles.  It's very, very clear

that there's no facts that support the argument that he was

mistaken as to who these were, and even less for the defendants

which haven't taken the stand.  There are no facts.

Mr. Parker's sole fact is his claim that he didn't know who

they were, but for the other defendants, there are no facts.

These are uniformed officers, besides patrol cars, in the area

where law enforcement is expected to be.  Under those facts,

there's not enough for a reasonable mistake of fact as to the

identities of these persons.

          And further, the defendant would have to believe that

the force was necessary to defend against an immediate and

unlawful use of force.  Again, law enforcement officers from

the state are available immediately.  Instead of availing

themselves of lawful interdiction of the situation, they

immediately resort to vigilante justice which would not be a

reasonable, least force necessary reaction to the situation.

          MR. LEVENTHAL:  Your Honor, I would note that Mr. --

Mr. Drexler did, in fact, I guess through his Long Bow, testify

1    to that same set of facts that Ms. Creegan indicates that

2    nobody else has.  He indicated on his Long Bow that he showed

3    up there and the sheriff told him they were leaving and for

4    whatever they thought they were and when he got out, he parked,

5    they were laughing and all of a sudden he heard what he heard

6    and they didn't know who was down there.  So, it's not just

7    Mr. Parker; it's Mr. Drexler who sort of says the same story

8    because that's what happened.  And so, based on those set of

9    facts, I believe a defense of others instruction should apply.

10            MS. CREEGAN:  Well, again, that would have to be the

11   least force necessary and it would have to be reasonable

12   mistakes of facts, not unreasonable mistakes of facts.  The

13   public policy favors protecting law enforcement officers from

14   being assaulted.  It's not the case that any person who

15   assaults a clearly marked officer can claim that they're

16   entitled to the instruction solely on the fact that they say

17   that they made a mistake.  The mistake has to be reasonable and

18   they have to have used the least force necessary to defend

19   themselves.

20            And moving on to the *Span* instruction, again, these

21   instructions should categorically not be available as

22   aggressors, but certainly the height of excessive force being

23   greater than normal force that you have a group of people

24   advancing, being warned repeatedly, being begged to disperse

25   and then first saying, we might deploy chemicals and then we

1    might -- you know, if you move forward, you'd be shot is the

2    movements of an aggressor onto a much smaller force as that

3    force attempts to dissuade them from coming forward.  That's

4    not excessive force.  If this was a 1983 action, it would be

5    dismissed immediately on summary judgment.  It's not

6    unreasonable for a small group of people, encountered with a

7    much larger numerically superior group, with horses, with

8    overwatch, to try to get them to leave, to tell them disperse

9    or else, we will, you know -- to point a gun at them, that

10   would be completely reasonable in this situation.

11          So, as a matter of law, the facts as the defense has

12   alleged them to be are not sufficient to make out a *Span*

13   instruction.

14          MR. LEVENTHAL:  And I see the factual -- the factual

15   allegations a little bit different in that the word "shoot" was

16   used -- "they will shoot" was used when Mr. Lynch was in the

17   wash and came back and told the protestors, the prayer group.

18   We have that on video and clearly nobody was on the freeways at

19   that point.  So, to suggest that, you know, the only reason

20   that the BLM said "we're going to shoot" is because the

21   protestors continued on -- advancing, that's completely wrong.

22   That's not what the facts came out and said.  The video shows

23   Flinch [sic] in the middle, nobody on the bridge, Flinch [sic]

24   going back to tell the prayer group that, in fact, they were

25   going to shoot, and then the word got back up and then you see

1   people starting to come in and starting to move in on the

2   bridge.  So, clearly, I think that's objectively and

3   subjectively reasonable that my client believed, before they --

4   that group even moved, that they were going to be shot.  And so

5   it wasn't the movement of the group; Flinch [sic] came back and

6   said they were going to be shot, and that was before that group

7   even moved, and that's on the video, on his video when he went

8   back, Your Honor.

9        So, I disagree with the Government's factual

10  allegations or how they -- and I understand what they're

11  saying, but it's not -- it's just not true.  It wasn't, okay,

12  you know, you're disobeying a court order and then the

13  movement; it was they're going to shoot and then the word got

14  back before anybody even moved, before the horses even got

15  there, before anybody got there the word "shoot," "you will" --

16  "they're going to shoot us," was mentioned over and over before

17  anybody made a movement towards the BLM.

18       MS. CREEGAN:  Those are mere words.  Words are not

19  use of force.  I assume the use of force that the defense is

20  talking about is the pointing of firearms, which there is no

21  evidence of that occurring until there are people in the wash

22  moving forward.

23       MR. LEVENTHAL:  There's -- I disagree.  Lynch's video

24  clearly has people pointing and I've pointed that out.  There

25  was at least two -- there was a stacking formation before

1    anybody got into the wash when Lynch was out there.  You see it

2    on his video before the horses got out there.  So, that's --

3    that's not true.  There was clearly pointing of BLM at the

4    prayer group before anybody even got on the bridge or

5    underneath, and that's in his video.  That's the facts.

6          MS. CREEGAN:  Well, I don't agree with that.  The

7    prayer group is the 11:36.  There's not evidence of any

8    pointing until 11:58.

9          MR. LEVENTHAL:  I disagree with that.

10         MS. CREEGAN:  But even so, it would still be a

11   numerically superior group, with overwatch positions, with

12   horses descending on a smaller group.

13         MR. LEVENTHAL:  Well, at the time that the BLM was

14   pointing at the prayer group, it was not a superior group.

15   There was nobody on a high point, except for the BLM which were

16   up on a mesa.  They were on the high point actually, and they

17   had far more superior power and they were pointing guns, in a

18   video that were watched, at a prayer group that were sitting.

19   And that's what's clear from Mr. Lynch's video, and not the

20   other way around.

21         MS. CREEGAN:  Even if that were to be the case, they

22   would have to -- that would mean that they would have had to

23   have broken off their assault of the officers as soon as those

24   facts changed.  They didn't.  They continued to assault them

25   until after 12:30, forcing them to leave as the group advanced

1   forward.  So, that's not the least force necessary if they

2   continue to assault them while this group is moving forward and

3   advancing on them.  That wouldn't be just a justification for

4   assaulting these officers for 40 minutes, 45 minutes.

5          THE COURT:  All right.  Anything else that anyone

6   wants to add on the record?

7          MR. TANASI:  Your Honor, if I may, just on the mere

8   presence and lesser included --

9          THE COURT:  Sure.

10         MR. TANASI:  -- go back to that quickly.

11         With respect to the mere presence, from what I

12  understand, the Government's position is that they've -- you

13  know, none of their case and nothing that they've presented

14  demonstrates that Mr. Stewart was merely present and there was

15  some, you know, pre-planning, some pre-planned assault.  And I

16  would say that Mr. Stewart's Facebook, which is Mr. Stewart's

17  voice essentially in this case, says nothing to that effect.

18  There's no pre-planned assault.  There's no pre-planning of any

19  kind of hostile takeover.  It's a pre-planned protest.  And so,

20  the mere presence instruction is a defense theory instruction

21  that I think is clearly available to Mr. Stewart in this case.

22         And then with respect to the lesser included, it's

23  not just that the Government has to prove that he was holding a

24  weapon; it's that he used a weapon.  And that's even what needs

25  to occur with respect to the 924(c) count.  When we -- we go

1  that far, where the Government actually has to prove in order

2  to get the 924(c) count, that he used or carried, and

3  potentially brandished in order to satisfy that count.  So, the

4  same theory and the same rationale applies to why the lesser

5  included instruction is viable in this case because it's not

6  just whether he held a gun.  In order for the simple assault to

7  go from simple misdemeanor assault to felony assault the

8  Government has to prove, through the elements of the statute as

9  outlined, that he used it.  He used it.  It's -- it's not just

10  held it.  And so, from that theory I think the lesser included

11  defense is viable as well.

12        MS. CREEGAN:  I think Mr. Tanasi is conflating the

13  elements of 924(c) and the elements of the assault, which are

14  separate.  In order to have an assault, it just has to create a

15  reasonable apprehension of the other person from a presence of

16  a deadly and dangerous weapon, which a firearm, by law, is

17  included in that definition.

18        And as to the argument there's nothing in his

19  Facebook describing the plan, Exhibit 269, Mr. Stewart posts on

20  April 12th, "First they said they were going to release

21  everything and leave.  Then they held the gates to Gold Butte

22  and threatened us with chemicals.  Then we pushed forward and

23  they had to back off.  They are releasing the cows now.  BLM is

24  leaving."

25        So, we have -- we do have statements, including

1    statements on the day, that show the presence of a plan.  We

2    moved forward.  They had to back off.

3             MR. TANASI:  And again, Your Honor, these are jury

4    questions.  A plan to push forward.  It's not a plan to push

5    forward and assault officers.  It's a plan to protest and push

6    forward.  Again, whether the jury believes that theory or not

7    is for the jury to decide and that's why I think the mere

8    presence is completely appropriate.  Because without having

9    that, it takes away that part of the defense theory.

10            MR. JACKSON:  Your Honor, could I be heard for just a

11   minute?

12            I mean, the whole issue in this case is whether you

13   can go to a protest with a gun and not be charged with

14   committing a crime of violence or assault against any police

15   officers or law enforcement agents that are there at the

16   protest.  The jury will have to decide, each person whether

17   they went there with the specific intent to commit a crime just

18   because they had a weapon.  I don't think -- you know, a lot of

19   the law enforcement officers testified that, no, that was the

20   case, they were in fear or that they believed that that was the

21   intent of the individuals that were there, but that will be a

22   jury question.  And I think our defense will be that's for the

23   jury to decide what the specific intent of each individual was.

24            Now, the jury's going to have to consider all the

25   evidence, but I think they should be properly instructed that

1    it's their decision, not just a presumption of guilt that

2    because they showed up at the demonstration site with weapons,

3    that they immediately should be found guilty of these charges.

4    And that's -- you know, if we structure the giving of

5    instructions a certain way, they'll almost be compelled to find

6    guilt.  If we give them fair instructions that don't presume

7    guilt, namely, that they can be merely present at the scene

8    with a weapon and that that doesn't mean that they're guilty, I

9    think that the jury will reach a proper decision; guilt or

10   innocence.  They will look at all the factors and decide

11   whether or not an individual had criminal intent when they went

12   forward, or when they went sideways, or when they pushed

13   forward, or when they did any act that might be considered an

14   assault.  That's all we're asking for.

15            THE COURT:  Anyone else?

16            All right.  Well, the standard in order to be

17   entitled to a instruction on a theory of the defense case is

18   that the theory has to be legally cognizable and there needs to

19   be evidence upon which the jury could rationally find for the

20   defendant.  This is pursuant to *United States v. Morton*, Ninth

21   Circuit, '93 case.  "A mere scintilla of evidence supporting

22   the defendant's theory, however, is not sufficient to warrant a

23   defense instruction," and there I'm quoting from *U.S. v.*

24   *Jackson*, Ninth Circuit, '84 case.

25            So, as to self-defense or defense of others, we do

have, as previously discussed in the context of Title 18,

United States Code, Section 111, two forms of self-defense

recognized by the Ninth Circuit; the first one is the -- what I

keep referring to as the *Feola* because it's based on *United*

*States v. Feola*, United States, 1975 case, which is the

ignorance of the official status of the person assaulted, and

then the second option for self-defense or defense of others is

*United States v. Span*, which is a Ninth Circuit, '96 case, and

that is for an excessive force defense.

In this case, the record belies the defendants'

And so, starting first with the *Feola* mistaken

identity defense.  "The defense is premised on the defendant's

honest mistake of fact or lack of knowledge that the victim was

a law enforcement officer," and I'm quoting from *United States*

*v. Morton*, Ninth Circuit, '93 case.  "The defense consists of,"

number one, "a mistake or lack of knowledge as to authority,"

and number two, "a reasonable belief that force was necessary

to defend against an immediate use of unlawful force," and

number three, "the use of no more force than appears necessary,

reasonably necessary."

In this case, the record belies the defendants'

contention that they did not know the identity of BLM or the

National Park agents or any other federal agents in the wash.

Reviewing the evidence to determine whether a mere scintilla of

evidence exists on this point, the Court finds that the

defendant had specific knowledge before the confrontation of

1   the BLM's presence through social media posts.

2          Moreover, the defendants confirmed in the Long Bow

3   interviews that they went to Nevada to stop federal government

4   overreach, and the statements are corroborated by the defense

5   witnesses Mr. Bushman and Ms. Arnett.  In the Long Bow

6   interviews, the defendants state that they went to Bunkerville

7   to stand up to the BLM, or for standing up to federal

8   overreach.

9          The defendants prepared to meet the BLM by arming and

10  donning battle-type gear, which, even a witness for the

11  defense, Mr. Bushman agreed was war-like, and even if not every

12  defendant was aware before their arrival of the BLM's presence,

13  the record demonstrates beyond a doubt that by the time the

14  defendants arrived in the wash, they were aware of the agents'

15  identity as federal law enforcement officers.

16         The crowds wore buttons which read "BLM" in black

17  letters on a white background with a red circle and a slash

18  going through it.

19         On the stage, at the April 12th rally, in the

20  morning, Cliven Bundy specifically referenced the National Park

21  Service to Sheriff Gillespie, among his conditions, was that

22  Gillespie discharge the police service -- the Park Service, and

23  Gillespie stated on stage that the next steps were for the BLM

24  to remove safely its remaining assets.

25         Furthermore, the agents identified themselves over a

1    loudspeaker and although a reasonable juror could doubt that

2    every individual in the wash heard this announcement, a

3    reasonable juror could not overlook the visible indicators of

4    the agents' identity.  The agents' vehicles included light

5    bars, consistent with law enforcement, and the National Park

6    Service had the Nevada Park Service emblem and the words

7    "ranger" in all caps on the side, visible to the individuals in

8    the wash.  The agents' gear included military-style helmets and

9    bullet resistant vests, which is not the garb of unidentified

10   assailants.

11           While the defendants have introduced some evidence of

12   confusion as to whether the agents were from the BLM or the

13   National Park Service or the United States military, the

14   instruction merely requires evidence demonstrating a mistake or

15   lack of knowledge as to authority; that the defendants may not

16   have known the exact federal agency from which the authority is

17   derived is immaterial.  As in the *United States v. Jackson*,

18   Ninth Circuit, 1984 case, noting that the witness' testimony,

19   that they heard "no police warning," is not evidence that the

20   officers did not identify themselves.

21           The only evidence here that I can perceive in favor

22   of this instruction is testimony that the witnesses were

23   confused because Gillespie said on the stage that the BLM had

24   left.  However, I do not find this belief reasonable because

25   Gillespie never said that the BLM had left.  He actually said

146

1    the BLM needed to safely evacuate its remaining assets.

2    Weighed against the overwhelming evidence to the contrary, this

3    testimony does not rise to more than a scintilla of evidence as

4    it is insufficient for the jury to rationally sustain this

5    defense, again, pursuant to *Jackson*, Ninth Circuit, 1984 case.

6            Viewing this evidence in the light most favorable to

7    the defendants, I am not persuaded that a reasonable jury could

8    harbor a reasonable doubt that the defendants did not know the

9    agents' identity.  I will therefore not provide the

10   instruction -- this jury instruction, as in the *U.S. v. Jackson*

11   case affirming the District Court's denial of the self-defense

12   instruction, where none of the testimony on which the defendant

13   relied was sufficient to support an inference that the

14   defendant was unaware of the identity of the officers.

15           As to excessive force, pursuant to *United States v.*

16   *Span*, Ninth Circuit, 1992 case, the Ninth Circuit recognized

17   that in rare cases an individual may make out an affirmative

18   defense of self-defense against a federal law enforcement

19   official who uses excessive force.  To do so, a defendant must

20   offer evidence to show, first, a reasonable belief that the use

21   of force was necessary to defend himself or another against the

22   immediate use of unlawful force, and number two, that the use

23   of no more force than was reasonably necessary in the

24   circumstances.

25           So preliminarily, I find that the record belies the

1   defendants' contention that the agents used excessive force and

2   are therefore not entitled to the instruction.

3          As in *Martinez-Garcia,* which the Ninth Circuit, 2013

4   case, there was not sufficient evidence from which the jury

5   could have concluded that the agent in that particular case

6   used excessive force and therefore the defendant was not

7   entitled to that defense instruction.

8          Here, the defendants do not clearly state their

9   argument for how the agents used excessive force.  As far as I

10   can gather, the defendants argue that the following actions by

11   the agents amount to excessive force:  Their militarization of

12   Bunkerville; their war-like garb; their weapons; and primarily

13   their raising of guns at the individuals in the wash.  However,

14   this evidence does not support any reasonable inference that

15   these actions constituted excessive force by the agents in this

16   particular situation under these circumstances.

17          Agent after agent testified that the BLM and the Park

18   Service had received threats regarding the impoundment of

19   cattle.  The agents testified that after a series of

20   contractors, who attempted to impound the cattle, were scared

21   off, the agents purpose leading up to April 12th was to protect

22   the contractors in their renewed attempt to impound the cattle.

23   Video and pictures of the protestors show them carrying a

24   shocking amount of weapons for a supposedly peaceful protest

25   and at various times pointing the weapons towards the agents.

1    In this tense atmosphere, a mere 30 agents were confronted by a

2    crowd of 400 angry and non-compliant and advancing individuals,

3    more than 60 of which were armed, 40 were on horseback, and at

4    least two snipers were concealed on surrounding bridges.

5          The defendants have not introduced any evidence that

6    would suggest that the agents' actions constituted an excessive

7    use of force in the circumstances.  This is particularly true

8    here where the agents made no contact with defendants.  The

9    agents did not even attempt to seize or arrest the protestors

10   and I therefore find that no reasonable jury could conclude

11   that the agents' actions constituted excessive force.

12         Even if I were to conclude otherwise, the defendants

13   have not introduced any evidence that their response to the

14   agents' actions was objectively reasonable under *Acosta-Sierra,*

15   Ninth Circuit, 2012.

16         To demonstrate the objective reasonableness of their

17   actions, the defendants have introduced evidence of the

18   protestors' fear in the wash and this testimony falls short of

19   showing objective reasonableness as the witnesses themselves

20   were not only not objective, but also biased.  Each witness

21   stated that they came to Bunkerville to support the Bundys or

22   to stop federal overreach, and in addition, while defendants

23   and those present may have feared for their lives during the

24   incident, that fear alone does not warrant a self-defense

25   instruction.  Fear, in response to law enforcement, is

1      commonplace, but does not entitle citizens to take up weapons

2      in response to agents in the lawful execution of their duties.

3              Defendants' theory that their actions were

4      objectively reasonable also appears premised on their claim

5      that they thought the BLM had left and therefore did not know

6      who the individuals pointing guns at them were.  And as I've

7      discussed previously, these beliefs were not reasonable in

8      light of the abundance of evidence that the defendants were

9      aware that, at a minimum, the agents were federal officers

10     impounding cattle as part of a federal operation.

11              Furthermore, the social media evidence and Long Bow

12     interviews demonstrate that the defendants entered the wash on

13     April 12th to confront the BLM.  The fact that defendants

14     donned battle dress and carried weapons to the wash is

15     inconsistent with their statement that they merely entered the

16     wash to watch the cows come home or to protect the unarmed

17     women and children.  Instead, the defendants' behaviors are

18     consistent with Cliven Bundy's call that the range war has

19     begun and his encouragement during the April 12th rally to

20     secure the cattle by any means necessary.

21              "An individual" -- and I'm quoting from *U.S. v.*

22     *Branch*, Fifth Circuit case from 1996 -- "An individual who

23     dresses for combat, retrieves an assault rifle, and proceeds to

24     confront government agents executing a lawful warrant is not

25     entitled to claim the benefits of self-defense when the

1  hoped-for confrontation with the agent occurs.  An individual

2  who is the attacker cannot make out a claim of self-defense as

3  a justification for an assault when there were other

4  non-violent remedies available."

5          The defendants have failed to introduce more than a

6  mere scintilla of evidence that their actions were objectively

7  reasonable and the Court therefore declines to give this

8  version of the self-defense instruction.

9          Moving on to justification.  "The defendants must

10  establish four elements in order to make out a justification

11  defense; number one, that he was under unlawful and present

12  threat of death or serious bodily injury; number two, that he

13  did not recklessly place himself in a situation where he would

14  be forced to engage in criminal conduct; number three, that he

15  had no reasonable legal alternative; and number four, that

16  there was a direct causal relationship between the criminal

17  action and the avoidance of the threatened harmed."  This is

18  under *U.S. v. Lemon,* Ninth Circuit, 1987.

19          Here, as explained previously, any threat to the

20  defendants was not unlawful.  Law enforcement officers were

21  executing their duties in good faith and cannot be unlawful.

22          For the second factor, there had been no evidence

23  that defendants did not recklessly place themselves in this

24  confrontational situation.  The only evidence presented

25  demonstrated that the BLM was guarding the compound, where they

had been for days, and at Cliven Bundy's rally on 4-12, he told
everyone present to go to the Toquop Wash and get his cows and
in response to this statement, defendants and the rest of the
mob went to Toquop Wash area, including the northbound I-15
bridge, and confronted the BLM and the National Park Service
officers stationed there guarding the compound.  Some of the
defendants already had their firearm and gear at the rally, but
the rest retrieved these items before getting to the wash area.
By going to the wash area, defendants recklessly placed
themselves in the situation negating Element 2.

          Further, defendants had reasonable legal alternatives
to take their firearms to the wash area to intimidate the
federal law enforcement officers and once there, they could
have left at any time and at no point was their egress option
limited.  As such, the Court finds that defendants have failed
to present any evidence to warrant the defense instruction of
justification.

          As to the mere presence defense, "If the Government's
case" -- and I'm citing here from *Negrete-Gonzalez,* Ninth
Circuit, '92 case, "If the Government's case is based on more
than just a defendant's presence and the jury is properly
instructed on all elements of the crime, then a mere presence
instruction is unnecessary."  And in that case the Ninth
Circuit's also citing to the *Chambers* case, which is an earlier
Ninth Circuit case from 1990.

1          Here, the Court finds the defendants are entitled to

2    this instruction.  The defendants' theory of the case rests on

3    the proposition that they were merely present during the

4    standoff.  The Court finds that defendants have presented more

5    than a scintilla of evidence that the Government's case against

6    the defendants could rest primarily on their presence and that

7    a reasonable juror could find as such.

8          So as to that point, while I agree that the

9    instruction is not required, it -- I don't agree that it's

10   inappropriate to give.  I think it is discretionary and the

11   Court does exercise its discretion in this case to provide that

12   instruction.

13         As to the lesser included offense, which is Number

14   1793 on the document -- on the docket, rather, "An instruction

15   on a lesser included offense is warranted if, number one, the

16   elements of the lesser offense are a subset of the elements of

17   the charged offense, and number two, if the evidence would

18   permit a jury, rationally, to find guilt of the lesser offense

19   and acquit of the greater," and that's citing from *Arnt*,

20   A-r-n-t, Ninth Circuit, 2007 case.

21         "Simple assault is a lesser included offense of

22   felony assault on a federal officer under Title 18 of the

23   United States Code, Section 111," citing to *Rivera-Alonzo*,

24   Ninth Circuit, 2009.  "The Ninth Circuit previously held that

25   Section 111 defines three separate offenses; number one,

assaults that do not involve physical contact" -- and those are

punishable for up to 1 year -- "number two, assaults that do

involve physical contact" -- and those are the ones that are

punishable up to 8 years -- "and then number three, assaults

that involve a deadly or dangerous weapon or bodily injury" --

and those are the ones that are punishable by up to 20 years,

and I'm citing from *Chapman*, Ninth Circuit, 2008.

In *Rivera-Alonzo*, in that case the Court found that

the defendant was not entitled to the lesser included offense

instruction under the circumstances of the case because the

jury could not have convicted a defendant of the lesser

included offense without finding the elements that would

convert the lesser offense to the greater.  "An assault coupled

with the presence of physical contact or similar aggravating

factor, such as the attempt to commit murder or a serious

felony, is not simple," cites *Chapman*.

Here, the assault, coupled with the deadly weapons,

makes it not a simple assault.  Based on the record, the Court

finds that no rational juror could convict defendants of

assault here and find that the defendants did not have a deadly

weapon.  As such, the Court finds that the defendants are not

entitled to the lesser included offense of simple assault.

As to the involuntary confession jury instruction

proposed, the cited cases on that instruction do not support

providing the involuntarily confession instruction.  *Crane v.*

1    *Kentucky* is the first one cited, which only discusses the

2    admissibility of evidence, not a jury instruction.  It

3    specifically states that evidence about the manner in which a

4    confession was obtained is relevant to its reliability and

5    credibility.  And so, the evidence of such evidence is

6    admissible as to its reliability and credibility.  It doesn't

7    mention -- it doesn't -- doesn't -- it's not in regard to the

8    voluntariness or whether a jury instruction of voluntariness

9    must be given and in this case the defense was able to ask

10   questions and elicit information regarding the manner in which

11   the confession was obtained so that the jury can determine its

12   reliability and credibility.

13          *Henry v. Kernan* was the other case that was cited and

14   it's also about admissibility of evidence, not jury

15   instructions, and the context of whether a confession which was

16   obtained in that case, in violation of *Miranda*, could it then

17   be used for impeachment when the defense took the stand.  The

18   Court found that it depended on whether or not the confession

19   was voluntary.  So the voluntariness of the confession was

20   determined by the Court, not by the jury, and the Court

21   determined that it was not voluntary and therefore not

22   admissible for impeachment.  But this was --- this case had

23   nothing to do with a jury instruction.

24          *Scheckloth v. Bustamonte* is the other case that's

25   cited and that's about a consent to search and does not seem to

1    apply in this case.  Certainly not about this jury instruction,

2    and then *United States v. Bautista-Avila* was the last case that

3    was cited on that proffered instruction, which affirmed the

4    admissibility of a confession, and again, did not discuss jury

5    instructions.

6         So the Court finds that the involuntary confession

7    instruction need not be given and the Court declines to give

8    that instruction.

9         The chain of custody instruction, no legal citations

10   were provided for that jury instruction, but there is no chain

11   of custody Ninth Circuit model jury instruction and

12   additionally, there do not appear to be any cases supporting

13   such an instruction.  For example, *United States v. Gaensel*,

14   G-a-e-n-s-e-l, Ninth Circuit, 1981 case, although only

15   mentioned briefly, "The Ninth Circuit upheld the District

16   Court's refusal to give the proposed chain of custody jury

17   instruction."

18        And then as to the circumstantial evidence

19   instruction proffered, first, there is no additional

20   circumstantial evidence or to a reasonable theory, Ninth

21   Circuit model jury instruction, other than the direct and

22   circumstantial evidence instruction that the Court has already

23   said that it is going to give.  The cited cases do not support

24   providing this proposed new jury instruction.

25        In *United States v. James*, the Ninth Circuit found

1    that the District Court gave a jury instruction on direct and

2    circumstantial evidence and another one on reasonable doubt and

3    so it was not necessary to give the defendant's desired

4    circumstantial evidence jury instruction.  *James* is Ninth

5    Circuit, 1978 case.  "Neither party, including a criminal

6    defendant, may insist on any particular language for this

7    defense."

8           And in *Hooper v. State,* which is a 1979 State of

9    Nevada case, the Nevada Supreme Court found that it was not

10   error to decline to give this instruction so long as reasonable

11   doubt instructions were given.  So it's not even a case that's

12   used in this state -- or not instruction used in this state.

13          In the *People v. Merkouris*, M-e-r-k-o-u-r-i-s -- this

14   was cited in the jury instruction.  It's a 1956 California

15   Supreme Court case.  There's no reason for the Court to follow

16   this particular California Supreme Court case and the Ninth

17   Circuit has neither adopted it nor committed -- commented on it

18   as being useful or necessary.

19          So that's the Court ruling on the instructions.  I

20   will provide to you probably -- it's only 2:30 -- probably

21   before the end of the day, the final jury instruction formatted

22   so that you can have that tomorrow while you prepare your

23   closing arguments and they'll be numbered so that you can have

24   that and be able to refer to them by either number or title,

25   but you'll have the exact -- if you want to blow it up or show

1    it on the monitor, you'll have that available to you.

2         Mr. Marchese, I did forget to ask you -- I got

3    confused because Mr. Leventhal was talking about forfeiture,

4    but actually Mr. Leventhal's client's not charged in the

5    forfeiture; it was Mr. Marchese's who's charged with the

6    forfeiture count.  So I just want to clarify and make sure on

7    the record that you did not want me to include an instruction

8    for the jury to find as to that forfeiture count.

9              MR. MARCHESE:  You do not have to, Your Honor.

10             THE COURT:  Okay.  Thank you.

11             All right.  So we've told the jury that they are to

12   return on Wednesday morning at 8:30 a.m.  At that time I will

13   read to them the jury instructions.  Depending how long that

14   takes, we might take a bathroom break after that and then we'll

15   go into summation, first by the Government, and then is there a

16   particular order for the defense that you want me to call or

17   are you going to --

18             MR. MARCHESE:  I think we're still working it out,

19   Your Honor --

20             THE COURT:  Okay.

21             MR. MARCHESE:  -- but we'll let Your Honor know

22   before the jury enters the room.

23             THE COURT:  Okay.  And . . . again, Mr. Engel, I've

24   stated that I'm going to allow you to argue for yourself.  Just

25   please be very careful.  I could -- cannot urge you enough

1    or -- or -- you know, many times, I could just -- I could argue

2    that this is probably a mistake, but I think that it's

3    appropriate to permit you to argue so long as you're aware that

4    there are certain things that can't be stated in closing

5    arguments and you need to go through that with Mr. John George

6    to make sure that you understand that, just as if you were an

7    attorney.  I cannot hold you to a different standard as an

8    attorney when it comes to those objections.

9            I also recommend that you have a Plan B so just in

10   case you do get befuddled and you cannot go forward and finish

11   closing argument on your own, that you at least can have

12   something that Mr. George can read for you, even if he has to

13   quickly reword it to make it appropriate.  I can only imagine

14   it would be easier for Mr. George, on an objection of phrasing,

15   that he could rephrase it so that at least the nuts and bolts

16   of what you're trying to say will at least be heard by the jury

17   if you're using inartful, inappropriate, objectionable

18   language.

19           All right.  So I think -- and so, I guess, you know,

20   on Thursday we'll just take the bathroom breaks as needed.

21   It's going to be long and I know that you all don't mean to be

22   repetitive, you have to say what you have to say, and even if

23   we see the same picture or document over and over again, if

24   that's what it needs to be, that's what it needs to be.  Let me

25   know if you think we're not taking enough bathroom breaks and

1    I'll take more breaks if that's what we need.  I know that

2    other Courts don't necessarily take the bathroom break but take

3    a stretch break so everyone can kind of stand up and then sit

4    back down again.  So if you want do that, that's fine too.  I'm

5    happy to go along with that as well just to make sure that

6    everybody's paying attention.

7              All right.  So with that, I think that concludes all

8    the information.  We'll go ahead and see you back here at

9    8:30 a.m.

10             Did you get a chance to go -- look through all the

11   evidence that's in the binders for the jury or do you still

12   need time?

13             MR. MYHRE:  Your Honor, that was one of my questions

14   and I also think, and the Court may have touched on this, I

15   just missed it.  We had discussed about filing separately a

16   redacted or sanitized version of the Indictment.

17             THE COURT:  Yes, and that was filed.

18             MR. MYHRE:  Yes.  So, is that acceptable to the

19   Court?  I believe --

20             THE COURT:  Yes.

21             MR. MYHRE:  Is this what the Court intends to submit?

22             THE COURT:  It was acceptable to me.

23             Does the defense have any objection to it?  It

24   redacted all the information that was objected to.

25             MR. LEVENTHAL:  No -- no objection.

1          MR. TANASI:  No objection, Your Honor.

2          MR. MYHRE:  And, Your Honor, in terms of the

3     exhibits, one exhibit that the Government has was 457.  There

4     was at -- during the testimony, we had, at slide 49,

5     interlineated to reflect Exhibit 366 as the source of that.  I

6     looked at the exhibit that was at the witness stand and that

7     was not interlineated.  I checked with defense counsel.  They

8     don't have an objection if we substitute in to correct that

9     reference to reflect Exhibit 366, by 79.  So I have new 457

10    copies for everyone so that they can see that that correction

11    is made.  So, I just wanted to be able to make that

12    substitution to that one slide.

13         THE COURT:  Is that right?  There's no objection to

14    that substitution?

15         MR. LEVENTHAL:  No objection.

16         MR. TANASI:  That's correct, Your Honor.  No

17    objection.

18         MR. LEVENTHAL:  Mr. Myhre went through that with us.

19         THE COURT:  Okay.

20         MR. MYHRE:  And then, Your Honor, just in terms of

21    general housekeeping.  Is it the Court's intention that the

22    exhibits in paper form are going back or are they going to be

23    in electronic form or how . . .

24         THE COURT:  The binders will go back.  I realize that

25    some of the binders have disks.

1          MR. MYHRE:  Yes, Your Honor.  Right.  We had -- we

2   had -- where we had introduced videos, we have those videos put

3   on to separate disks that were marked in the exhibit book as

4   well.  My understanding is, is after -- if the jury wishes to

5   see a video, it be played in open court is my understanding,

6   so . . .

7          THE COURT:  I think that's what we'll have to do.

8          MR. MYHRE:  Okay.

9          THE COURT:  We -- we do have a rolling player so that

10  they can watch it if they need to.  If you -- if the parties

11  agree to it, depending on what kind of statement it is.  If

12  it's a statement -- if -- if the video contains a statement by

13  the defense, then the defense has a right to be here while it's

14  played for the jury.  The defense can waive that presence if

15  they don't want to, but they have that right.  If the video

16  that they want to watch does not contain statements of the

17  defendant, then they can watch just like they can view any of

18  the photographs that -- that are in there, but any time that a

19  jury question comes -- you know, I instruct them about how to

20  ask a question, if they do have a question.  As soon as I get a

21  jury question, the courtroom deputy will contact you all

22  immediately and then that will give you some time to get here

23  and then we'll discuss it first before we respond so that if

24  there's three different choices on how to respond and we can't

25  get an agreement as to how to respond, you'll have at least an

1   opportunity to place that on the record.  And then usually, if

2   possible, if it's a short enough response, I'll just go ahead

3   and write the response in red on the jury note, make copies of

4   it so you all have it, and then that's sent back to the jury.

5   If the response is a little more complicated than that, then

6   sometimes we need to write it out and have them come in and

7   provide them with the instruction.  So, we'll know if they --

8   if they want to watch a video, one of the videos.

9           I guess, does that answer your question?

10          MR. MYHRE:  Yes, Your Honor.  I just wondered if we

11  had to do anything to change the present format of the disks as

12  they exist now in the binders.  I didn't know if they were

13  going to be allowed to go back to the jury -- in the jury

14  deliberation room or if they had to be segregated and separated

15  out.

16          THE COURT:  No.  We do -- we do have the juror

17  system.  We do believe that it's working properly now.  It

18  wasn't working a hundred percent properly before because it

19  wasn't able to record what was being played, which is a key

20  thing when you all have a large video but agree that only a

21  portion of it is admissible and that's the portion that you

22  play.  So, now we can record that and make a separate recording

23  of just what was played in court, which is the only piece

24  that's admissible, but we weren't sure we were going to have

25  that ready when the trial started.  So, we have not been

1    recording and the evidence that's in the books is what's being

2    provided to the jury, at least in this trial.

3            MR. MYHRE:  Understood, Your Honor.

4            THE COURT:  Until we're a little more comfortable

5    that everything is working properly with the juror system.

6            MR. MYHRE:  Those are all the points I had,

7    Your Honor.

8            THE COURT:  Okay.

9            MR. LEVENTHAL:  Your Honor --

10           THE COURT:  Yes.

11           MR. LEVENTHAL:  -- I have two things.  I apologize.

12   One, I assume that Mr. -- and all the defendants will be

13   transported here each and every day from here on out.  Is

14   that -- would that be correct to say?

15           THE COURT:  I don't know exactly where they'll be

16   held.  But if there is a question, then the attorneys and the

17   defense and the defense -- the defendants have a right to be

18   here unless the attorneys waive their presence, but absolutely

19   they would be transported and we would not address the jury

20   question until they were transported.

21           Is that your question?

22           MR. LEVENTHAL:  So not -- not to say -- no.  No.  My

23   question is not where they're going to be housed at, it's just

24   that they'll be available here in case the jury wants to watch

25   a video and they want to be a part of it, they have that right

1    to be there and so, I would assume that they're going to be

2    here every -- well, not where they're housed, but they'll be

3    close by in proximity to the -- to the courthouse in case a

4    verdict comes back or somebody wants to -- or the jurors want

5    to view video and they want to be a part of that.

6                 THE COURT:  You know, "close by" is a relative term.

7                 MR. LEVENTHAL:  Yes.

8                 THE COURT:  I don't know if they're going to be on

9    the second floor or in some other, you know, county facility,

10   but they will need to be here if we are to address any jury

11   questions, unless the attorneys waive their presence.

12                MR. LEVENTHAL:  Very good.

13                THE COURT:  So we wouldn't be going forward until

14   they're here, however long it takes.

15                MR. LEVENTHAL:  Okay.

16                THE COURT:  Whether it's --

17                MR. LEVENTHAL:  You've answered my question.

18                THE COURT:  Whether they're downstairs or 10 minutes

19   away or 30 minutes away, I won't know.

20                MR. LEVENTHAL:  And for purposes of myself, I'll know

21   where my -- they're -- where my client's at, I guess at all

22   times, because I -- you know, I'll need to contact him.

23                THE COURT:  That's a good point.  I don't know

24   necessarily they'll be all kept in the same location.  They

25   might end up being in different places.  I don't know.

1        MR. LEVENTHAL:  In case he has a question -- okay.

2        THE COURT:  We'll call the marshals to let them know

3   that there's a jury note and then they'll make whatever

4   accommodations they need to make to transport them here,

5   if they're not already here.

6        MR. LEVENTHAL:  Very good.

7        It was brought to my attention earlier that --

8   somebody thought that maybe one of the jurors had a week-long

9   vacation next week.  I don't know if that's true and I didn't

10  know if the Court remembered that or . . .

11       THE COURT:  No.

12       MR. LEVENTHAL:  Does that change anything?

13       I don't know if it's true.  It was just mentioned

14  earlier today that one of the jurors indicated that they had --

15  that they wanted -- that we thought we could be done by then.

16  I'm not sure if that's true.  But if we're going to -- if

17  there's going to be a deliberations and then all of a sudden

18  one week off, I don't know if that changes things.

19       THE COURT:  I'll double-check.  There was the

20  individual who had a doctor's appointment last week in the

21  morning and then I think there was someone else who had a

22  vacation in late April and I told them, "Oh, we'll be done

23  before then," but I don't think that -- okay.

24       It's April 25th is the day of the vacation.

25       MR. LEVENTHAL:  Okay.  Good.

1          THE COURT:  On that one juror.

2          MR. LEVENTHAL:  I just want to make sure we're not

3    because then --

4          THE COURT:  I'm thinking it was the gentleman on the

5    top, but I really don't remember, I'm just speaking off the top

6    of my head, who had something on April 25th.

7          MR. JACKSON:  Your Honor, I have one question.

8          If we go out to deliberation on either Wednesday

9    evening or Thursday morning or whatever, does the Court plan to

10   keep them over the weekend or is the Court going to release

11   them because of the Easter holiday and send them home?

12         THE COURT:  Right.  So they can deliberate -- they

13   actually choose their own schedule from here on out.  They can

14   be here as early as 8:00 a.m.  The only reason we were starting

15   court at 8:30 is because defense counsel asked for that

16   adjustment, but they can be here as early as 8:00 a.m. if they

17   want to be and we do, however, start locking up at 4:30 in the

18   back room.  So, they would need to leave by 4:30.

19         They can come in on Friday, even though that wasn't a

20   normal court day that we were accustomed to having because I'll

21   still be here.  You all can still be on notice, on call,

22   rather.  I'll be here with other cases, so there's no reason

23   why they shouldn't be able to deliberate on Friday.  But we are

24   closed on Saturday and Sunday so they will not be deliberating

25   Saturday and Sunday.  If they haven't reached a verdict by 4:30

1   on Friday, then they'll be instructed to come back on Monday,

2   and again, they can tell us if it's 8:00 or 8:30.

3           MR. JACKSON:  It will not be --

4           THE COURT:  But we'll -- we'll always let you know.

5   My courtroom deputy always lets everybody know when the jury

6   leaves, what time they left, so you can take off your suits and

7   get comfortable and not worry that you might be called to

8   court, and also tells you what time to expect that they're

9   going to be back in, you know, whatever time they tell us

10  they're going to be coming back so then you know what time you

11  need to be ready and on call for any question or verdict.

12          MR. JACKSON:  So the latest they would deliberate

13  would be until Friday sometime in the evening?

14          THE COURT:  4:30 on Friday would be the latest that

15  they would be here on Friday and then they're welcome to come

16  back on Monday at 8:00 or 8:30, whichever they choose.

17          MR. JACKSON:  All right.

18          THE COURT:  All right.  So it looks like we've

19  answered all the questions so we'll see you back here on

20  Wednesday morning at 8:30 a.m.

21          Please make a point of showing each -- opposing party

22  any of the demonstratives that you're going to use, just to

23  make sure you're using the right one.  There were some things

24  that were redacted.  There were some things that were not

25  admitted that some people thought were admitted and so let's

168

1    make sure that we don't -- we've come this far.  Let's not make

2    that mistake.  So please, opposing parties, show each other

3    what it is that you plan to use just to make sure that we

4    are -- we're all using the correct information.

5              All right.  Off record.

6         (Proceedings adjourned at 2:45 p.m.)

7

8                        --oOo--

9              COURT REPORTER'S CERTIFICATE

10

11             I, Heather K. Newman, Official Court Reporter, United

12   States District Court, District of Nevada, Las Vegas, Nevada,

13   do hereby certify that pursuant to Section 753, Title 28,

14   United States Code, the foregoing is a true, complete, and

15   correct transcript of the proceedings had in connection with

16   the above-entitled matter.

17

18   DATED:  5-20-2017          /s/ Heather K. Newman
                                Heather K. Newman, CCR #774
19                              OFFICIAL FEDERAL REPORTER

20

21

22

23

24

25