1

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4  UNITED STATES OF AMERICA,        )
                                    )   Case No. 2:16-cr-046-GMN-PAL
5                    Plaintiff,     )
                                    )   Las Vegas, Nevada
6            vs.                    )   Wednesday, April 12, 2017
                                    )   Courtroom 7C, 8:32 a.m.
7  ERIC PARKER, O. SCOTT            )
   DREXLER, RICKY LOVELIEN,         )   JURY TRIAL DAY TWENTY-EIGHT
8  STEVEN STEWART, TODD ENGEL       )
   and GREGORY BURLESON,            )
9                                   )
                     Defendants.    )
10                                  )   C E R T I F I E D   C O P Y
   _____

11

12

13                REPORTER'S TRANSCRIPT OF PROCEEDINGS

14   BEFORE:        THE HONORABLE GLORIA M. NAVARRO,
                    UNITED STATES DISTRICT JUDGE, CHIEF
15

16

17

18   APPEARANCES:

19           See next page

20   COURT REPORTER:

21           Heather K. Newman, RPR, CRR, CCR #774
             United States District Court
22           333 Las Vegas Boulevard South, Room 1334
             Las Vegas, Nevada  89101
23           (702) 471-0002

24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

2

1    APPEARANCES:

2    For the Plaintiff:

3             UNITED STATES ATTORNEY'S OFFICE
             BY:   STEVEN W. MYHRE
4                  ERIN M. CREEGAN
                   NADIA JANJUA AHMED
5                  NICHOLAS D. DICKINSON
             501 Las Vegas Boulevard South, Suite 1100
6            Las Vegas, Nevada 89101
             (702) 388-6336
7
     For Defendant Parker:
8
             LAW OFFICE OF JESS R. MARCHESE
9            BY:   JESS R. MARCHESE
             601 South Las Vegas Boulevard
10           Las Vegas, NV  89101
             (702) 385-5377
11
     For Defendant Drexler:
12
             LEVENTHAL AND ASSOCIATES
13           BY:   TODD M. LEVENTHAL
             626 South Third Street
14           Las Vegas, NV  89101
             (702) 472-8686
15
     For Defendant Lovelien:
16
             LAW OFFICE OF SHAWN R. PEREZ
17           BY:   SHAWN R. PEREZ
             626 South Third Street
18           Las Vegas, NV  89101
             (702) 485-3977
19
     For Defendant Stewart:
20
             TANASI LAW OFFICES
21           RICHARD E. TANASI
             601 South Seventh Street, 2nd Floor
22           Las Vegas, NV  89101
             (702) 906-2411
23

24

25

1    APPEARANCES (Con't):

2    For Defendant Engel:

3            JOHN G. GEORGE, Standby Counsel
             600 South Eighth Street
4            Las Vegas, NV  89101
             (702) 625-1183

5

     For Defendant Burleson:

6

             LAW OFFICE OF TERRANCE M. JACKSON
7            BY:  TERRENCE M. JACKSON
             624 South Ninth Street
8            Las Vegas, NV  89101
             (702) 386-0001

9

10   Also present:

11           Gwen Wilson
             Bryan Ginn
12           Christine Abbott

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1          LAS VEGAS, NEVADA; WEDNESDAY, APRIL 12, 2017; 8:32 A.M.

 2                              --oOo--

 3                   P R O C E E D I N G S

 4          (Outside the presence of the jury at 8:32 a.m.:)

 5          COURTROOM ADMINISTRATOR:  All rise.

 6          THE COURT:  Thank you.  You may be seated.

 7          COURTROOM ADMINISTRATOR:  This is the time set for

 8  Jury Trial Day Twenty-Eight in Case No. 2:16-cr-046-GMN-PAL,

 9  United States of America vs. Eric Parker, O. Scott Drexler,

10  Ricky Lovelien, Steven Stewart, Todd Engel, and

11  Gregory Burleson.

12          Counsel, please make your appearances for the record.

13          MS. CREEGAN:  Erin Creegan, Steve Myhre, Nadia Ahmed,

14  and Nick Dickinson for the United States.  Steven Myhre will be

15  here very shortly.

16          THE COURT:  All right.  Good morning.

17          MR. TANASI:  Good morning, Your Honor.

18          Rich Tanasi for Steven Stewart.  Also present with us

19  is Gwen Wilson and Bryan Ginn.

20          I think Mr. Leventhal and Mr. Myhre are just kind of

21  talking about some closing PowerPoint issues.

22          THE COURT:  They're coming in right now.

23          MR. TANASI:  Perfect.

24          MR. MARCHESE:  Jess Marchese on behalf of

25  Eric Parker.
```

```
 1              MR. LEVENTHAL:  Good morning.

 2         Todd Leventhal on behalf of Mr. Drexler.

 3              MR. GEORGE:  Good morning.

 4         John George on behalf of Todd Engel.

 5              MR. PEREZ:  Good morning, Your Honor.

 6         Shawn Perez on behalf of Ricky Lovelien.

 7              MR. JACKSON:  Terrence Jackson for Gregory Burleson.

 8    Also with me is Christine Abbott.

 9              THE COURT:  Good morning.

10         All right.  So, before we begin, I need to make the

11    preliminary remarks, as I have been every day, but while there

12    are mostly familiar faces here, every once in a while there are

13    folks coming in for the first time.  So it's important to

14    remind everyone that this is a courtroom and it is not a

15    sporting event so it is never appropriate to make -- well, I

16    think there's actually more -- yes.  Yes, that's fine.

17         Okay.  We're going to go ahead and let another . . .

18      (Brief pause in proceedings.)

19              THE COURT:  All right.  It looks like we're ready to

20    begin.  Everybody's in the courtroom.

21         Before we bring if the jury, I need to make some

22    preliminary remarks to set clear the expectations about how

23    court will be conducted today, as it has been conducted every

24    day.

25              Please remember that this is a courtroom; it is not a
```

6

1    sporting event, which means it is never appropriate to make any

2    expression about your opinion, whether verbal or through body

3    language, no matter how much you may agree or disagree with

4    what is being said.  The marshals are authorized to remove

5    anyone that is seen making any kind of body expression or vocal

6    expression.  These distractions are not permitted in federal

7    court.

8         In addition, people may not speak out of turn.  The

9    defendants are represented by attorneys and they all have

10   microphones and they will be called on, in order.  If anyone

11   makes an outburst, that being either an attorney or a defendant

12   or anyone in the public, that person will be removed from the

13   courtroom.

14        We do have a holding cell right next door with a

15   speaker system.  So if any of the defendants need to be

16   removed, they will stay for the remainder of the day in that

17   room and can still hear the proceedings contemporaneously as

18   they're occurring.  However, they will not be permitted to stay

19   in the courtroom if they cannot control their body language and

20   their vocal language.

21        I also ask you to please make sure and double-check

22   that you do not have any electronic devices, no cell phones, no

23   laptops, no iPad devices or any of those things are permitted.

24   Even if they're in a turned-off mode, private mode, vibrate

25   mode, they're still not permitted.  The attorneys and some of

7

1    the defendants do have electronic devices, but that is so that

2    they may be able to review the discovery, the presentation of

3    evidence, and to be able to provide evidence here in court for

4    the jury to see.

5         No one is allowed to make any audio or video

6    recordings of the proceedings, as audio and video recordings

7    are never permitted in federal court.

8         And all of the tables are equiped with microphones.

9    So counsel, you may stay at your table if you wish to, but we

10   do have the podium set up next to the computer and also the

11   other system so that you may display during your closing

12   arguments while you're at the podium.

13        And Mr. Engel will be permitted to represent himself

14   in closing argument, as I already noticed you on Monday.  There

15   are certain things that you can and cannot say during argument.

16   It's not a free-for-all and I did also encourage you to write

17   it down just in case there were objections that were made that

18   legally must be sustained and you are not able to say things

19   that you had planned to say and can't figure out a way to

20   rephrase it so that it would be appropriate; if you get stuck,

21   we will have Mr. John George here to read it for you and since

22   he is an experienced attorney, he'll be able to turn the phrase

23   around to make it more accommodating so that it's legally

24   appropriate to make the argument that you want to make,

25   assuming that it's a legal argument.

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)471-0002

1          All right.  So we're going to go ahead and bring in

2    the jury unless anybody has any questions.

3          Yes.

4          MR. MYHRE:  Good morning, Your Honor.

5          We do have some objections to some of the defense's

6    proposed exhibits that they intend to use and PowerPoints and

7    so forth.  We can take that up after the Government's opening,

8    no need to take it up now, but we just wanted to give notice to

9    the Court we do have objections.

10          THE COURT:  Okay.  So they're not things that have

11    been admitted already in court; they're something else?

12          MR. MYHRE:  Yes.  Yes, Your Honor.  And -- or things

13    that have been admitted, but for a particular purpose that they

14    now wish to use for another purpose and so those are the issues

15    that we have.

16          THE COURT:  All right.  Well, there are defenses that

17    the Court has determined the law does not permit to be made.

18    They're not defenses to this -- in this particular case.  If

19    the law does not permit a particular defense, then that means

20    that attorneys are not permitted to argue to the jury those

21    defenses.  The jury has taken an oath to follow the law.  And

22    so the attorneys are not permitted to argue to the jury that

23    they are to ignore the law.

24          MR. LEVENTHAL:  That's -- I apologize.  That's not

25    what I think Mr. Myhre is speaking to.  There's -- I have a

9

1     video that shows the arrest of David Bundy that came in through

2     one of the -- and I don't believe -- who was that?

3     Agent Stover?  Stover?  And then there's the Margaret Houston,

4     when she was taken down, that came in through -- I think it

5     came in twice actually as I think about it, but a portion of it

6     came in through Stover, with the dog, and the biting and I know

7     if you remember, Jess actually was asking questions about

8     whether the dog bit first or whether -- and so there was that,

9     and then there's -- but then last week we got, through

10    Mr. Parker, we got in the beginning of that tape when -- if the

11    Court remembers, and so that's all come in, as evidence.  Now,

12    that doesn't go to a defense; it just -- and my client's on

13    Long Bow saying he came down here because he saw an overreach

14    of the federal government and I'm permitted, in closing, to

15    help the jury interpret what that meant and those are the three

16    things that he was referring to that he -- he -- he meant by

17    the overreach of the federal government.

18             So, I would tender that that evidence or that -- in

19    my closing, I should be able to talk about it and then play

20    that video that I've already played for Mr. Myhre, but in

21    the -- secondly, in the Margaret Houston takedown video, it's a

22    longer video and I checked with Aaron, your clerk, and he

23    indicated that the whole thing came in.  Now, there's things in

24    there that I would agree that I'm not playing.  For example,

25    the dead cows and all of the other stuff, I have left that out,

1    but there is -- there is -- it is in evidence and there's one

2    little portion after Mr. Marchese turned it off, it did come

3    in, and it's an interview that I've showed Mr. Myhre.  So it's

4    in part of my closing as a video and it's just those three

5    things.

6              And . . . it's an interpretation.  It's closing.

7    It's not evidence.  It's not argument, and I don't see any

8    reason why I can't bring that video in for my client as an

9    interpretation of what he meant by the overreach of the federal

10   government.  It doesn't go to a wrong defense in any way; it

11   interprets what he's saying on Long Bow.  That's all it is.

12             THE COURT:  Well, it's not enough that it be

13   evidence; it also has to be facts that are in evidence.  So if

14   it's connected to the statement he made on the Long Bow video,

15   if that inference can be made, then that could be a fact that's

16   evidence that could be argued, but I don't -- was there a

17   different statement?  A different video?  You said a different

18   interview that we didn't see of Mr. Drexler?

19             MR. LEVENTHAL:  No.  I apologize.  There's -- and I

20   don't know the number, but it came in -- Mr. Marchese got it in

21   through Mr. Parker and the whole thing came, in according to

22   your clerk.  It came in because that's what he saw before he

23   came down.  But Mr. Marchese only played a portion of it, but

24   the whole thing came in as evidence.  And so, I've played just

25   a piece of --

1          THE COURT:  All right.  So has there been evidence

2     that Mr. Drexler saw that video?

3          MR. LEVENTHAL:  Well --

4          THE COURT:  Because Mr. Parker testified he saw that

5     video, so it goes to his mens rea.

6          MR. LEVENTHAL:  Right.  And so -- well, and I

7     would -- I would, again, argue that the overreach of the

8     federal government, he said he did research, a couple days.  On

9     his Long Bow he said Eric Parker called me, I did my research,

10    and he watched those things and he saw an overreach of the --

11    what he thought was an overreach of the federal government.

12    And I think this is closing and I should be able to argue what

13    that -- what his state of mind was and what his intent was and

14    what the overreach of the federal government means.  I mean,

15    it's closing.  It's like opening.  It's argument.  It's not --

16    it's not facts.  It's all come in.  It's all evidence.  It's

17    come in for different reasons.  It's come in because of an

18    investigator or Agent Stover.

19          THE COURT:  But there's no fact in evidence that

20    Mr. Drexler saw that particular video.  So you can't argue that

21    he saw the video; right?  Is that the problem?

22          MR. LEVENTHAL:  Well --

23          MR. MYHRE:  Yes --

24          MR. LEVENTHAL:  Oh, sorry.

25          MR. MYHRE:  In part, yes, Your Honor.

1          MR. LEVENTHAL:  Other than -- other than -- but then

2     the Court's precluding me to -- to -- this is closing and it's

3     an interpretation of what that meant by an overreach of the

4     federal government.  That's clearly in his Long Bow.  And in

5     closing I should be able to explain what it is that he meant by

6     saying that.  Not only that, this is a conspiracy case where

7     everybody's -- everybody's here because of somebody else's

8     thoughts, feelings, what they said, but what goes -- what was

9     in his state of mind when he was interviewed in Long Bow, is,

10    it's an overreach of the federal government.  Well, if I can't

11    explain that in closing, then -- I mean, I -- it's not a

12    defense for him, it's just an explanation, in closing argument,

13    as to what he meant by an overreach, and it's those three

14    things.

15          THE COURT:  Mr. Myhre?

16          MR. MYHRE:  Yes, Your Honor.

17          As we -- as the Court knows, we've had a lot of

18    litigation about this on the 6th and the 9th and there is no

19    evidence to show that Mr. Drexler saw that video or the

20    portions of the video that counsel wishes to play.  So

21    therefore, as to his state of mind, it's irrelevant.

22          There are also portions of that interview that --

23    or -- excuse me -- of that video that Mr. Drexler -- excuse

24    me -- Mr. Parker did not attest to on the stand as having seen.

25    Mr. Marchese played portions of it, which he said he saw, but

1    then, you know, Mr. Leventhal's now saying, well, the entire

2    thing has come in and the entire portion of it is, you know,

3    available for everybody to argue.  There is no evidence that

4    Mr. Drexler saw it.  There is no evidence that this is what was

5    meant by federal overreach.  So, therefore, as to Mr. Drexler,

6    we believe there -- they would be arguing facts not in evidence

7    to say that this video is somehow relevant to them.

8             MR. LEVENTHAL:  Your Honor, that's like saying that

9    because my client wasn't in the -- in the -- in the BLM vehicle

10   when the dash cam was rolling and he didn't actually hear what

11   was said, I can't argue that in closing.  Well, I plan on

12   arguing that in closing, what was played in that vehicle, what

13   was being said on the BLM side.  There's a lot of it -- or the

14   prayer group.  He wasn't at the prayer group either.  Can I --

15   am I precluded from showing that or arguing that this is

16   what -- what was occurring during this time?  This is closing

17   argument.  We're -- we're not talking about what I'm doing in

18   evidence and in a case-in-chief.

19             THE COURT:  But if you're introducing it for what was

20   occurring, and there's evidence that it occurred, then that's

21   appropriate.  If you're introducing it as evidence of what the

22   defendant, your client, saw, and his motivation, but there is

23   no evidence of that, then that's why it's not appropriate.

24   It's not facts in evidence --

25             MR. LEVENTHAL:  And it's couched --

1           THE COURT:  -- for that purpose.

2           MR. LEVENTHAL:  And I understand that, but it's

3    couched in -- we've heard a lot of discussion about how these

4    things went viral and, you know, one of the things I'm going to

5    ask the jurors, why -- why do you think so many people are

6    coming down here, including my client?  Why?  I mean, they're

7    not going down there because BLM was, you know, petting

8    kittens.  I mean, it has to be put into perspective and I'm

9    allowed to argue that.

10          A lot of people saw it and a lot of people went to

11   Bunkerville on April 12th because they saw those videos,

12   including my client, and when he says the -- you know, just

13   because he didn't get specific in Long Bow -- he says the

14   overreach -- I should be allowed to, again, analyze and play

15   that for the jury as to why he, or anyone else for that matter,

16   what they saw, why -- it went viral.  We all know that.  And

17   it's just those three little clips.

18          And I understand what the Court's saying, but he

19   wasn't in the prayer group.  He wasn't at a lot of different

20   things that I plan on using in closing.  This is closing

21   argument.  I'm not -- I'm not, you know, asking to bring up any

22   crazy defenses that the Court's indicated I'm not allowed.  I'm

23   not going to do that.  That's not what we're talking about

24   here, but it's closing.  It's just like when we're talking

25   about opening arguments and, you know, we lay out our case.

1    Well, you know, this is closing and we can interpret facts

2    that's in evidence, whether or not it's -- he said

3    specifically --

4          THE COURT:  You can interpret the facts that are in

5    evidence that have been provided for that particular purpose.

6    So, you haven't given me any legal basis for why evidence

7    that's been admitted through a different witness, in this case

8    a defendant, who said that he saw the video, how you could

9    argue that your client saw that video, too.  There's no

10   evidence of the fact that your client saw that video.  It's --

11   it's facts that are not in evidence so you can't argue that he

12   saw this video and that's why he came.

13         MR. LEVENTHAL:  Well, I -- I would just say that the

14   Court allowed this --

15         THE COURT:  I've made my ruling.  I've let you argue

16   quite a bit.

17         UNIDENTIFIED GALLERY MEMBER:  Treason!  Treason!

18         MR. LEVENTHAL:  The Court -- the Court --

19         THE COURT:  Mr. Leventhal, I've made my ruling.

20         MR. LEVENTHAL:  I appreciate that.  I understand.

21         So -- so -- and I'm going to be clear.  So, I'm not

22   going to play it, but then Mr. Marchese can play it as long

23   as -- I'll just give it to Mr. Marchese to play.

24         THE COURT:  All right.

25         MR. JACKSON:  Your Honor, could I just say a word?

1          THE COURT:  Just a minute.  Mr. Tanasi is standing up

2     first, so let's try to go in order.

3          MR. TANASI:  Sorry, Mr. Jackson.

4          Your Honor, I think Mr. Myhre's issue with my closing

5     is a little bit different but maybe somehow related.  I have

6     one slide that I intended to offer four different kind of

7     historical quotes, and I understand the quotes are not in

8     evidence.  I -- I -- I'm not at all advocating that.  However,

9     for purposes of kind of giving context to my client's state of

10    mind, that's why I'm offering those -- those quotes, those

11    historical quotes.  Again, it's interpreting the evidence in

12    the case, which there's plenty of Facebook evidence in the case

13    from what my client said, "Heading to Nevada to stand up

14    against a corrupt government."  You know, that all is in

15    evidence.  And so, my purpose in giving these historical quotes

16    and context is to kind of show that's not a new idea.  It's not

17    a crazy idea.  His state of mind is not something that's

18    unreasonable.  And again, I think that that is entirely for the

19    jury to decide based on all the evidence in the case, the

20    direct evidence and the circumstantial evidence and

21    circumstantial evidence ultimately has kind of a reasonableness

22    component as well.  So, the jury is deciding what to believe,

23    what not to believe.  I'm providing context with these

24    historical quotes to show that his state of mind, his reasons

25    for going to Bunkerville are not these crazy ideas to stand up

1   against the government and that, in fact, folks all throughout

2   history have done the exact same thing.

3            THE COURT:  So are these quotes that were in his

4   Facebook page or texts or e-mails or something?

5            MR. TANASI:  They are not, Your Honor.  They were not

6   in his Facebook page.  These are just other historical quotes

7   that I've -- would like to present to the jury.  And I don't

8   think there's any dispute over the accuracy of the quotes.  I

9   think the issue is just the quotes themselves, Your Honor.  So

10  it's just to provide kind of a context for my argument, which

11  is that my client came to Bunkerville for the First and the

12  Second Amendment and protest is not a new concept in America.

13           THE COURT:  So you're going to argue that these --

14  that this relates to his state of mind, but is there any

15  evidence that that relates to his state of mind?

16           MR. TANASI:  Evidence in that the quotes are similar.

17  Again, from a circumstantial component, Your Honor.  There's no

18  direct evidence.  There's nothing that my client --

19           THE COURT:  Similar to what?  Similar to something

20  that is in evidence?

21           MR. TANASI:  His quotes.  That's essentially my

22  argument.  "Heading to Nevada to stand up against a corrupt

23  government."  "United we stand.  No more government bullying."

24  Those kind of big picture quotes, those kind of big emotional

25  quotes are exactly what this case is about for Mr. Stewart.

1    And so --

2              THE COURT:  If that's what he said on his -- there's

3    evidence that he made those statements?

4              MR. TANASI:  Correct.  There's Facebook evidence --

5    his -- those -- what I just reiterated, those are two quotes

6    from Steven Stewart.

7              THE COURT:  All right.  And then you're going to

8    rephrase them in your closing?  Is that --

9              MR. TANASI:  No.  What I'd be providing is a quote

10   from Alexander Hamilton, a quote from Benjamin Franklin, a

11   quote from Susan B. Anthony, a quote from a fired up Baltimore

12   crowd about the death of Freddie Gray, right?  And so, just to

13   show -- just to kind of lay the foundation that this notion of

14   protest is not a new notion and it's a notion that folks from

15   the beginning of our country, you know, have -- have advanced.

16   And again, that's the theory that's the -- essentially the

17   defense theory in the case, First and Second Amendment protest.

18             THE COURT:  All right.  But there's no evidence that

19   he's familiar with those quotes or that that was his intent, so

20   I think you need to be careful in the phrasing of how you use

21   them.  For reasonable doubt, you could argue this is the kind

22   of case that it is and this is why --

23             MR. TANASI:  I --

24             THE COURT:  -- there is reasonable doubt to believe

25   that the things occurred the way that the government is

1    arguing, but I don't think that you can say that this is why he

2    came, or this is what he was thinking, or this was the thought

3    that was going through his mind, because there's no evidence of

4    that.

5            MR. TANASI:  Completely fair.  I would not make that

6    direct connection, Your Honor, then.

7            THE COURT:  Mr. Myhre?

8            MR. MYHRE:  Yes, Your Honor.

9            Let me just read the quotes for you.  So one is, "We

10   must all hang together or surely we all hang separately,"

11   Benjamin Franklin.

12           "I declare to you that woman must not depend upon the

13   protection of man but must be taught to protect herself and

14   there I take my stand," Susan B. Anthony.

15           And then, "No justice.  No peace.  No racist police,"

16   Baltimore crowd protesting the death of Freddie Gray.

17           It's not just the quotes in and of themselves, which

18   we believe are not relevant nor do they reflect the state of

19   mind -- there's no evidence that these reflect the state of

20   mind of Mr. Stewart, but they're also attempting -- this would

21   basically bring jury nullification arguments to the jury

22   because the implicit argument here is we can analogize these

23   events to the Founding Fathers and the revolutionary war,

24   Ben -- a la Ben Franklin, or we can analogize this to someone

25   standing up for social justice, like Susan B. Anthony, or we

1    can analogize this to people standing against racist police.

2    And this is -- there's no evidence of police misconduct in this

3    case.  There's no evidence of any racism.  There's no evidence

4    that this is, you know, some sort of just cause, if you will,

5    for any of this.  And we believe these are improper analogies

6    and we cannot make improper analogies during closing argument.

7    And again, I go back to the fact that none of this is reflected

8    in Mr. Stewart's Facebook postings.  None of this is reflected

9    in any of the evidence that has been brought to the -- or has

10    been admitted to this jury.

11            THE COURT:  Well, as I said before, you can't argue

12    something that is a defense that the law does not recognize in

13    this case.  So if that's the purpose for using the quotes, then

14    that would not be an appropriate purpose.

15            MR. TANASI:  Your Honor, the purpose is not to argue

16    that those quotes are why my client is not guilty.  That's

17    not -- that's not the purpose.  The purpose is to just provide

18    context to my client's state of mind.  In other words, his

19    direct quotes from Facebook, "United we stand.  No more

20    government bullying."  His other quote, "Headed to Nevada to

21    stand up against a corrupt government."  Those types of quotes,

22    the Government surely is going to be arguing, is what proves up

23    a conspiracy, is what proves up my client's nefarious ill will

24    when he's heading to Bunkerville.

25            The other quotes that Mr. Myhre's gone through that I

1    intend to read to the jury is to provide context that folks --

2    people who don't have ill will in their mind or in their heart,

3    folks like Benjamin Franklin, right, they make those kind of

4    quotes and it's a concept that is completely, completely

5    legitimate.  And -- and again, I'm not going to make the

6    argument that my client is Benjamin Franklin, right, but it's

7    just the notion that standing up against government bullying,

8    standing up against police, that's not anything that is new.

9    It's not new to this case; it's part of history.

10            MR. MYHRE:  Standing up against police, when

11   executing their lawful duties, is not lawful conduct.

12            MR. TANASI:  Your Honor, Mr. Myhre is going to do a

13   fantastic job in his rebuttal, I am confident of that, by

14   fleshing out that argument and by making that argument.  But to

15   keep me from providing context, I think that -- I think that

16   goes a little bit too far.

17            THE COURT:  It sounds like you're arguing that

18   revolution and overthrow of the government is legal and

19   should -- and that a person cannot be found not guilty of doing

20   such.  It's exactly the -- the defense that the law does not

21   permit in this case, so . . .  You know, you'll have some time

22   to think about it and see if you can come up with a different

23   reason how it could be applicable in some other way, but at

24   this stage I haven't -- I don't see how it's permissible.

25            MR. TANASI:  Understood.

22

1          THE COURT:  I agree with Mr. Myhre that maybe we

2   should just take up the rest of it at lunch so we can just get

3   started because this jury has been here for a while waiting.

4   So let's go ahead and bring in the jury, let the Government

5   argue, and then we'll address any other matters.

6          (Brief pause in proceedings.)

7          COURTROOM ADMINISTRATOR:  All rise.

8          (Jury returned to courtroom at 9:14 a.m.)

9          THE COURT:  All right.  Everyone may be seated.

10          We welcome back the jury.

11          When we recessed on Monday, we had heard the

12   conclusion of the testimony from one of the defense witnesses.

13   So, on the record, I just want to make sure that I'm clear.

14   Are there any other defendants that would like to call a

15   witness?

16          MR. TANASI:  No, Your Honor.

17          THE COURT:  All right.  And does the Government have

18   any rebuttal witnesses?

19          MR. MYHRE:  No rebuttal, Your Honor.

20          THE COURT:  All right.

21          So now we're going to begin with the jury

22   instructions.  I'm going to provide those to you.  Then after

23   that, you're going to hear the closing arguments, beginning

24   first with the Government's summation and then each of the

25   defendants will have a right to make a closing argument and

23

1    then because the Government bears the burden in the case, they

2    have a right to also make a rebuttal argument at the end.

3    After that, you will begin your deliberation process and we'll

4    excuse you to begin that.

5          We might be done today; we might not be done until

6    tomorrow.  So we'll -- thank you.

7          Let me make sure you all can see that.

8          Please raise your hand if any of your monitors aren't

9    working.

10        (No hands raised.)

11         All right.  It looks like all the monitors are

12   working.

13         During this -- I'm going to be reading them to you,

14   but I also like to visually display them because some people I

15   think find it easier to read along instead of just listening.

16   You will also have a copy of these jury instructions with you

17   in the jury room.

18         If, at any time, while I'm reading these, you can't

19   see, raise your hand and someone will get my attention and let

20   me know.

21         All right.  So these are the jury instructions for

22   United States vs. Eric Parker, O. Scott Drexler,

23   Ricky Lovelien, Steven Stewart, Todd Engel, and

24   Gregory Burleson.

25         There will be an index at the beginning of the jury

24

1    instructions so that you can more easily find what you're

2    looking for.  And I think I'll turn it this way to make it

3    easier for you to see.

4              "Instruction No. 1.

5              "Duties of Jury to Find Facts and Follow Law.

6              "Members of the jury, now that you have heard all the

7    evidence, it is my duty to instruct you on the law that applies

8    to this case.  A copy of these instructions will be available

9    in the jury room for you to consult.

10             "It is your duty to weigh and to evaluate all the

11   evidence received in the case and, in that process, to decide

12   the facts.  It is also your duty to apply the law as I give it

13   to you to the facts as you find them, whether you agree with

14   the law or not.  You must decide the case solely on the

15   evidence and the law and must not be influenced by any personal

16   likes or dislikes, opinions, prejudices, or sympathy.  You will

17   recall that you took an oath promising to do so at the

18   beginning of the case.

19             "You must follow all these instructions and not

20   single out some and ignore others; they are all important.

21   Please do not read into these instructions or into anything

22   that I may have said or done any suggestion as to what your

23   verdict you should be.  That is a matter entirely up to you.

24             "Instruction No. 2.

25             "Charge Against Defendant Not Evidence.

1           "Presumption of Innocence-Burden of Proof.

2           "The Superseding Indictment is not evidence.  The

3    defendants have pleaded not guilty to the charges.  The

4    defendants are presumed to be innocent unless and until the

5    Government proves the defendants guilty beyond a reasonable

6    doubt.  In addition, the defendants do not have to testify or

7    present any evidence to prove innocence.  The Government has

8    the burden of proving every element of the charges beyond a

9    reasonable doubt.

10           "Instruction No. 3.

11           "Reasonable Doubt-Defined.

12           "Proof beyond a reasonable doubt is proof that leaves

13    you firmly convinced that the defendant is guilty.  It is not

14    required that the Government prove guilt beyond all

15    reasonable -- possible doubt.

16           "A reasonable doubt is a doubt based on reason and

17    common sense and is not based purely on speculation.  It may

18    arise from a careful and impartial consideration of all the

19    evidence, or from lack of evidence.

20           "If after a careful and impartial consideration of

21    all the evidence, you are not convinced beyond a reasonable

22    doubt that the defendant is guilty, it is your duty to find the

23    defendant not guilty.  On the other hand, if after a careful

24    and impartial consideration of all the evidence, you are

25    convinced beyond a reasonable doubt that the defendant is

26

1    guilty, it is your duty to find the defendant guilty.

2              "Instruction No. 4.

3              "Separate Consideration for Each Defendant.

4              "Although the defendants are being tried together,

5    you must give separate consideration for to each defendant.  In

6    doing so, you must determine which evidence in the case applies

7    to each defendant, disregarding any evidence admitted solely

8    against some other defendants.  The fact that you may find one

9    of the defendants guilty or not guilty should not control your

10   verdict as to any other defendants.

11             "Instruction No. 5.

12             "Separate Consideration of Multiple Counts.

13             "Multiple Defendants.

14             "A separate crime is charged against one or more of

15   the defendants in each count.  The charges have been joined for

16   trial.  You must decide the case of each defendant on each

17   crime charged against that defendant separately.  Your verdict

18   on any count as to any defendant should not control your

19   verdict on any other count or as to any other defendant.

20             "Instruction No. 6.

21             "On or About Explained.

22             "The Superseding Indictment charges that the offenses

23   alleged were committed on or about certain dates.

24             "Although it is necessary for the Government to prove

25   beyond a reasonable doubt that the offenses were committed on a

1    date reasonably near the dates alleged in the Superseding

2    Indictment, it is not necessary for the Government to prove the

3    offenses were committed precisely on the dates charged.

4              "Instruction No. 7.

5              "Count One-Conspiracy to Commit an Offense-Elements.

6              "The defendants are charged in Count One of the

7    Superseding Indictment with conspiring to commit an offense

8    against the United States, in violation of Section 372 of Title

9    18 of United States Code.  In order for a defendant to be found

10   guilty of that charge, the Government must prove each of the

11   following elements beyond a reasonable doubt:

12             "First, beginning on or about March 28th of 2014, and

13   ending on or about March 2nd, 2016, there was an agreement

14   between two or more persons to commit at least one of the

15   following crimes charged in the Superseding Indictment:

16             "Number 1.  Assault on a federal officer, in

17   violation of Title 18, United States Code, Section 111(a)(1)

18   and (b);

19             "Number 2.  Threatening a federal law enforcement

20   officer, in violation of Title 18, United States Code, Section

21   115(a)(1)(B);

22             "Number 3.  Use and carry of a firearm in relation to

23   a crime of violence, in violation of Title 18, United States

24   Code, Section 924(c);

25             "Number 4.  Obstruction of the due administration of

28

1   justice, in violation of Title 18, United States Code, Section

2   1503;

3          "Number 5.  Interference with interstate commerce by

4   extortion, in violation of Title 18, United States Code,

5   Section 1951; or

6          "Number 6.  Interstate travel in aid of extortion, in

7   violation of Title 18, United States Code, Section 1952.

8          "Second, the Government must also prove that the

9   defendant became a member of the conspiracy knowing of at least

10  one of its objects and intending to help accomplish it; and

11         "Third, one of the members of the conspiracy

12  performed at least one overt act for the purpose of carrying

13  out the conspiracy.

14         "A conspiracy is a kind of criminal partnership - an

15  agreement of two or more persons to commit one or more crimes.

16  The crime of conspiracy is the agreement to do something

17  lawful; it does not matter whether the crime agreed upon was

18  committed.

19         "For a conspiracy to have existed, it is not

20  necessary that the conspirators made a formal agreement or that

21  they agreed on every detail of the conspiracy.  It is not

22  enough, however, that they simply met, discussed matters of

23  common interest, acted in similar ways, or perhaps helped one

24  another.  You must find that there was a plan to commit at

25  least one of the crimes as I just listed as an object of the

1    conspiracy, with all of you agreeing as to the particular crime

2    which the conspirators agreed to commit.

3              "One becomes a member of a conspiracy by willfully

4    participating in the unlawful plan with the intent to advance

5    or further some object or purpose of the conspiracy, even

6    though the person does not have full knowledge of all the

7    details of the conspiracy.  Furthermore, one who willfully

8    joins an existing conspiracy is as responsible for it as the

9    originators.  On the other hand, one who has no knowledge of a

10   conspiracy, but happens to act in a way which furthers some

11   object or purpose of the conspiracy, does not then become a

12   conspirator.  Similarly, a person does not become a conspirator

13   merely by associating with one or more persons who are

14   conspirators, nor merely by knowing that a conspiracy exists.

15             "An overt act does not itself have to be unlawful.  A

16   lawful act may be an element of a conspiracy if it is done for

17   the purpose of carrying out the conspiracy.  The Government is

18   not required to prove that the defendant personally did one of

19   the overt acts.

20             "Count Two" -- "Instruction No. 8.

21             "Count Two - Conspiracy to Impede or Injure a Federal

22   Officer-Elements.

23             "The defendants are charged in Count Two of the

24   Superseding Indictment with conspiracy to prevent by force,

25   intimidation, or threats of violence, federal law enforcement

1    officers from discharging the duties of their office under the

2    United States, and to induce by force, intimidation, and

3    threats, federal law enforcement officers to leave the place

4    where their duties were required to be performed, in violation

5    of Section 372 of Title 18 of the United States Code.  In order

6    for the defendants to be found guilty of that charge, the

7    Government must proven each of the following elements beyond a

8    reasonable doubt:

9         "First, beginning on or about March 28th, 2014, and

10   ending on or about March 2nd, of 2016, there was an agreement

11   between two or more persons to do one of the following:

12        "Number 1.  To prevent, by force, intimidation, or

13   threats, federal law enforcement officers from discharging the

14   duties of their office under the United States; or

15        "2.  To induce, by force, intimidation, or threats,

16   any federal law enforcement officer of the United States to

17   leave the place where their duties were required to be

18   performed; and

19        "Second, that the defendant became a member of the

20   conspiracy knowing of at least one of its objects and intending

21   to help accomplish it.

22        "Instruction No. 8.1.

23        "Unlike Count One, the Government does not have to

24   prove that one of the members of the conspiracy performed at

25   least one overt act for the purpose of carrying out this

31

1    conspiracy.

2           "For a conspiracy to have existed, like in Count One,

3    it is not necessary that the conspirators made a formal

4    agreement or that they agreed on every detail of the

5    conspiracy.  It is not enough, however, that they simply met,

6    discussed matters of common interest, acted in similar ways, or

7    perhaps helped one another.  You must find that there was a

8    plan to commit at least one of the alleged objects of the

9    conspiracy, with all of you agreeing as to the particular

10   object which the conspirators agreed to commit.

11          "One becomes a member of a conspiracy by willfully

12   participating in the unlawful plan with the intent to advance

13   or further some object or purpose of the conspiracy, even

14   though the person does not have full knowledge of all the

15   details of the conspiracy.  Furthermore, one who willfully

16   joins an existing conspiracy is as responsible for it as the

17   originators.  On the other hand, one who has no knowledge of a

18   conspiracy, but happens to act in a way which furthers some

19   object or purpose of the conspiracy, does not thereby become a

20   conspirator.  Similarly, a person does not become a conspirator

21   merely by associating with one or more persons who are

22   conspirators, nor merely by knowing that a conspiracy exists.

23          "Instruction No. 9.

24          "Conspiracy-Knowledge of and Association with other

25   Conspirators.

32

1          "A conspiracy may continue for a long period of time

2     and may include the performance of many transactions.  It is

3     not necessary that all members of the conspiracy join it at the

4     same time, and one may become a member of a conspiracy with

5     full knowledge of all the details of the unlawful scheme or the

6     names, identities, or locations of all the other members."

7          I'm sorry.  I misread that.  It is, "and one may

8     become a member of a conspiracy without full knowledge of all

9     the details of the unlawful scheme or the names, identities, or

10    locations of all the other members.

11         "Even though a defendant did not directly conspire

12    with other conspirators in the overall scheme, the defendant

13    has, in effect, agreed to participate in the conspiracy if the

14    Government proves each of the following beyond a reasonable

15    doubt that:

16         "Number 1.  The defendant directly conspired with one

17    or more of the conspirators to carry out at least one of the

18    objects of the conspiracy;

19         "Number 2.  Defendant knew or had reason to know that

20    other conspirators were involved with those with whom the

21    defendant directly conspired; and

22         "Number 3.  The defendant had reason to believe that

23    whatever benefits the defendant might get from the conspiracy

24    were probably dependent upon the success of the entire venture.

25         "It is not a defense that a person's participation in

1    a conspiracy was minor or for a short period of time.

2          "Instruction No. 10.

3          "Knowingly-Defined.

4          "An act is done knowingly if the defendant is aware

5    of the act and does not act through ignorance, mistake, or

6    accident.  The Government is not required to prove that any one

7    of the defendants knew that his acts or omissions were

8    unlawful.  You may consider evidence of a defendant's word,

9    acts, or omissions, along with all the other evidence, in

10   deciding whether each defendant acted knowingly.

11         "Instruction No. 11.

12         "Proof of Intent or Knowledge.

13         "The intent of a person, or the knowledge that a

14   person possesses at any given time, may not ordinarily be

15   proved directly because there's no way of directly scrutinizing

16   the workings of the human mind.  In determining the issue of

17   what a person knew or what a person intended at a particular

18   time, you may consider any statements made or acts by that

19   person and all other facts and circumstances received in

20   evidence which may aid in the determination of that person's

21   knowledge or intent.

22         "You may infer, but you are certainly not required to

23   infer, that a person intends the natural and probable

24   consequences of acts knowingly done or knowingly omitted.  It

25   is entirely up to you, however, to decide what facts to find

34

1    from the evidence received during this trial.

2                "Instruction No. 12.

3                "Mere Presence.

4                "Mere presence at the scene of a crime or mere

5    knowledge that a crime is being committed is not sufficient to

6    establish that the defendant committed the crime of conspiracy.

7    The defendant must be a participant and not merely a knowing

8    spectator.  The defendant's presence may be considered by the

9    jury along with the other evidence in the case.

10               "Instruction No. 13.

11               "Count Five-Assault on Federal Officer or Employee

12   with a Deadly or Dangerous Weapon-Elements.

13               "The defendants are charged in Count Five of the

14   Superseding Indictment with assault on a federal officer in

15   violation of Section 111(b) of Title 18 of the United States

16   Code.  In order for the defendant to be found guilty of that

17   charge, the Government must prove each of the following

18   elements beyond a reasonable doubt:

19               "First, the defendant forcibly assaulted a federal

20   officer or employee;

21               "Second, the defendant did so while the federal

22   officer or employee was engaged in, or on account of, his or

23   her official duties; and

24               "Third, the defendant used a deadly or dangerous

25   weapon.

35

1          "There is a forcible assault when one person

2   intentionally threatens another coupled with an apparent

3   ability to inflict injury on another which causes a reasonable

4   apprehension of immediate bodily harm.

5          "A reasonable apprehension of immediate bodily harm

6   is determined with reference to a reasonable person aware of

7   the circumstances known to the victim.  Circumstances unknown

8   to the victim are not included.

9          "The Government is not required to prove that the

10  defendant knew the victim was a federal officer.  The

11  Government is also not required to prove that the defendant

12  intended to cause bodily injury.

13         "A firearm, loaded or unloaded, is a dangerous

14  weapon.  Federal officers acting in the good faith performance

15  of their duties may not be forcibly resisted by another.

16         "Instruction No. 14.

17         "Count Eight-Threatening a Federal Law Enforcement

18  Officer-Elements.

19         "The defendants are charged in Count Eight of the

20  Superseding Indictment with threatening to assault a federal

21  officer in violation of Section 115 of Title 18 of the United

22  States Code.  In order for the defendant to be found guilty of

23  this charge, the Government must prove each of the following

24  elements beyond a reasonable doubt:

25         "First, the defendant made a statement or did an act

1    that constituted a threat to assault a federal law enforcement

2    officer;

3              "Second, the defendant intended the statement or act

4    to be a threat or made the statement or did the act knowing the

5    words or actions would be viewed as a threat;

6              "Third, that a reasonable person making the statement

7    or doing the act would foresee that the statement or act would

8    be interpreted by those to whom the maker communicated the

9    statement or act as a serious threat;

10              "Fourth, that the threat was made with the intent to

11    impede, intimidate, or interfere with the federal law

12    enforcement officer or to retaliate for the performance of his

13    or her official duties.

14              "A threat is a serious statement expressing an

15    intention to inflict bodily injury at once or in the future, as

16    distinguished from idle or careless talk, exaggeration, or

17    something said in a joking manner.

18              "To determine whether or not statements or acts

19    constitute a threat, you should consider the circumstances

20    under which the alleged threat was made, including its context

21    with respect to surrounding events, the reaction of those who

22    heard the statements or saw the acts, the physical and mental

23    condition of the defendant, and whether the statements or acts

24    were conditional.

25              "It is not necessary that the Government prove that

37

the defendant intended to carry out the threat or that he had
the present ability to carry out the threat.  It is not
necessary that the Government prove the exact words or actions
that constitute the threat.

"The defendant need not communicate the threat
directly to the intended target.

"The Government must prove beyond a reasonable doubt
that the victim was a federal law enforcement officer at the
time the threat was made, but the Government does not have to
prove that the defendant knew that he or she was a federal law
enforcement officer.

"A federal law enforcement officer is any officer,
agent, or other employee of the United States government who is
authorized by law or by a government agency to engage in or
supervise the prevention, detection, investigation, or
prosecution of any violation of federal criminal law.

"'Impede' means to stop the progress, obstruct, or
hinder.  'Intimidate' means to make timid or fearful, to
inspire or affect with fear, to frighten, or to defer.
'Interfere with' means to come into collision with, to
intermeddle, to hinder, to interpose, or to intervene.  To
'retaliate' means to return for like, to act in reprisal for
some past act.

"Instruction No. 15.

"Count Twelve-Obstruction of Justice-Elements.

38

1          "The defendants are charged in Count Twelve of the

2   Superseding Indictment with Obstruction of Justice in violation

3   of 1503 -- Section 1503 of Title 18 of the United States Code.

4   In order for a defendant to be found guilty of that charge, the

5   Government must prove each of the following elements beyond a

6   reasonable doubt:

7          "First, that the defendant influenced, obstructed, or

8   impeded, or tried to influence, obstruct, or impede, the due

9   administration of justice;

10          "Second, that the defendant acted corruptly, or by

11   threats or force, or by any threatening communication, with the

12   intent to obstruct justice.

13          "The Government need not prove that the defendant's

14   sole or even primary intention was to obstruct justice so long

15   as the Government proves beyond a reasonable doubt that one of

16   the defendant's intentions was to obstruct justice.  The

17   defendant's intention to obstruct justice must be substantial.

18          "The word 'corruptly' as used in this instruction

19   means that the act must be done with the purpose of obstructing

20   justice.

21          "Instruction No. 16.

22          "Count Fourteen-Hobbs Act Extorsion-Elements.

23          "The defendants are charged in Count Fourteen of the

24   Superseding Indictment with extortion by force, violence, or

25   fear in violation of Section 1951 of Title 18 of the United

1   States Code.  In order for a defendant to be found guilty of

2   that charge, the Government must prove each of the following

3   elements beyond a reasonable doubt:

4          "First, the defendant induced someone to part with

5   property by the wrongful use of actual or threatened force,

6   violence, or fear;

7          "Second, the defendant acted with the intent to

8   obtain property;

9          "Third, commerce from one state to another was

10  affected in some way.

11         "A defendant's claim of right to the property is not

12  a defense.

13         "The word 'fear' as used in this instruction means an

14  apprehension, concern, or anxiety about physical violence or

15  harm that is reasonable under the circumstances.

16         "Conduct affects interstate commerce if it in any way

17  interferes with, changes, or alters the movement or

18  transportation or flow of goods, merchandise, money, or other

19  property in commerce between or among the states.  The effect

20  can be minimal.  It is not necessary to prove that the

21  defendant intended to obstruct, delay, or interfere with

22  interstate commerce or that the purpose of the alleged crime

23  was to affect interstate commerce.  Further, you do not have to

24  decide whether the effect on interstate commerce was to be

25  harmful or beneficial to a particular business or to commerce

1   in general.  You do not even have to find that there was an

2   actual effect on commerce.

3            "All that is necessary to prove this element is that

4   the natural consequence of the offense potentially caused an

5   effect on interstate commerce to any degree, however minimal or

6   slight.

7            Instruction No. 17.

8            "Count Sixteen-Interstate or Foreign Travel in Aid of

9   Extortion-Elements.

10           "The defendants are charged in Count Sixteen of the

11  Superseding Indictment with violating Section 1952(a)(2) of

12  Title 18 of the United States Code.  In order for a defendant

13  to be found guilty of that charge, the Government must prove

14  each of the following elements beyond a reasonable doubt:

15           "First, that the defendant traveled in interstate

16  commerce or used a facility in interstate commerce, namely the

17  Internet or World Wide Web, with the intent to commit a crime

18  of violence in furtherance of an unlawful activity, namely

19  extortion in violation of Nevada law;

20           "Second, that after doing so, the defendant committed

21  or attempted to commit the violent crime in furtherance of the

22  unlawful activity.

23           "Nevada Revised Statute Section 205.320, concerning

24  extortion, provides in pertinent part, that a person who, with

25  the intent to extort or gain any money or other property . . .

41

1    or to do or abet or procure any illegal or wrongful act,

2    whether or not the purpose is accomplished, threatens directly

3    or indirectly, to injure a person or property, has committed

4    the offense of extortion.

5         "You are instructed that assault on a federal

6    officer, Count Five, and threatening a federal officer, Count

7    Eight, are crimes of violence.  It is for you to determine

8    whether the defendant traveled in interstate commerce or used a

9    facility in interstate commerce with the intent to commit a

10   crime of violence in furtherance of the unlawful activity.

11        "Instruction No. 18.

12        "Counts Six, Nine, and Fifteen-Using, Carrying, or

13   Brandishing a Firearm During and in Relation to a Crime of

14   Violence-Elements.

15        "The defendants are charged in Counts Six, Nine, and

16   Fifteen of the Superseding Indictment with using, carrying, or

17   brandishing a firearm during and in relation to three different

18   crimes of violence in violation of Section 924(c) of Title 18

19   of the United States Code.  The crimes of violence are:

20        "Count Five, assault on a federal officer, which

21   relates to the underlying crime for Count Six.

22        "Count Eight, threatening a federal officer is the --

23   the crime of violence for the crime of Count Nine.

24        "And Count Fourteen, interference with interstate

25   commerce by extortion is the underlying crime of violence for

42

1    Count Fifteen.

2              "In order for a defendant to be found guilty of any

3    one of these charges, the Government must prove each of the

4    following elements beyond a reasonable doubt:

5              "First, the defendant committed the underlying crime

6    as charged in Counts Five, Eight, or Fourteen of the

7    Superseding Indictment, all of which I instruct you are crimes

8    of violence; and

9              "Second, that the defendant knowingly used or carried

10   a firearm during and in relation to that crime.

11             "A defendant used a firearm if he actively employed

12   the firearm during and in relation to the crime of violence.

13             "A defendant carried a firearm if he knowingly

14   possessed it and held, moved, conveyed, or transported it in

15   some manner on his person or in a vehicle.

16             "A defendant used or carried a firearm during and in

17   relation to the crime if the firearm facilitated or played a

18   role in the crime as charged in that particular count of the

19   Superseding Indictment.

20             "If you find a defendant guilty of using or carrying

21   a firearm during and in relation to a crime of violence in

22   violation of Section 924(c) of Title 18 of the United States

23   Code as charged in Counts Six, Nine, or Fifteen of the

24   Superseding Indictment, you will then be asked to find if the

25   Government proved beyond a reasonable doubt that the defendant

43

1    brandished the firearm during and in relation to the crime of

2    violence.

3            "A defendant brandished a firearm if he displayed all

4    or part of the firearm, or otherwise made the presence of the

5    firearm known to another person, in order to intimidate that

6    person, regardless of whether the firearm was directly visible

7    to that person.

8            "Instruction No. 19.

9            "Firearm.

10           "The term 'firearm' means any weapon which will or is

11   designed to or may be readily converted to expel a projectile

12   by the action of an explosion -- an explosive, or the frame or

13   receiver of any such weapon.  The Government is not required to

14   prove that a firearm was loaded or operable.

15           "Instruction No. 20.

16           "Liability for Substantive Offense Committed by

17   Co-Conspirators.

18           "Each member of the conspiracy is responsible for the

19   actions of the other conspirators performed during the course

20   and in furtherance of the conspiracy.  If one member of the

21   conspiracy commits a crime in furtherance of a conspiracy, the

22   other members have also, under the law, committed that crime.

23           "Therefore, you may find the defendants guilty of the

24   crime as charged in Counts Five, Six, Eight, Nine, Twelve,

25   Fourteen, Fifteen, or Sixteen of the Superseding Indictment if

1    the Government has proved each of the following elements beyond

2    a reasonable doubt:

3            "First, that a person committed the crime as alleged

4    in Counts Five, Six, Eight, Nine, Twelve, Fourteen, Sixteen,

5    Fifteen of the Superseding Indictment; and

6            "Second, that the defendant was a member of the

7    conspiracy charged in Counts One or Two, or both;

8            "Third, that the person committed the crime in

9    furtherance of the conspiracy charged in Counts One or Two, or

10   both; and

11           "Fourth, the defendant was a member of the same

12   conspiracy at the time that the offense charged in Counts Five,

13   Six, Eight, Nine, Twelve, Fourteen, Fifteen, and Sixteen was

14   committed; and

15           "The fifth element the Government must prove is that

16   the offense fell within the scope of the unlawful agreement and

17   could reasonably have been foreseen to be a necessary or

18   natural consequence of the lawful agreement.

19           "Instruction No. 21.

20           "Aiding and Abetting.

21           "A defendant may be found guilty of the crimes

22   charged in Counts Five, Six, Eight, Nine, Twelve, Fourteen,

23   Fifteen, or Sixteen of the Superseding Indictment, even if the

24   defendant personally did not commit the act or acts

25   constituting the crime, but they aided and abetted in its

1    commission.  To prove a defendant guilty of a crime by aiding

2    and abetting, the Government must prove each of the following

3    beyond a reasonable doubt:

4              "First, the crime was committed by someone;

5              "Second, the defendant aided, counseled, commanded,

6    induced, or procured that person with respect to at least one

7    element of the crime;

8              "Third, the defendant acted with the intent to

9    facilitate the crime; and

10             "Fourth, the defendant acted before the crime was

11   completed.

12             "It is not enough that the defendant merely

13   associated with the person committing the crime, or unknowingly

14   or unintentionally did things that were helpful to that person,

15   or was present at the scene of the crime.  The evidence must

16   show beyond a reasonable doubt that the defendant acted with

17   the knowledge and intention of helping that person commit the

18   crime.

19             "Instruction No. 21.1.

20             "A defendant acts with the intent to facilitate the

21   crime when the defendant actively participates in a criminal

22   venture with advanced knowledge of the crime and having

23   acquired that knowledge when the defendant still had a

24   realistic opportunity to withdraw from the crime.

25             "The Government is not required to prove precisely

46

1  which defendant actually committed the crime and which

2  defendant aided and abetted.

3          "Instruction No. 22.

4          "Defendant's Decision Not to Testify.

5          "A defendant in a criminal case has a constitutional

6  right not to testify.  You may not draw any inference of any

7  kind from the fact that the defendant did not testify.

8          "Instruction No. 23.

9          "Defendant's Decision to Testify.

10          "One of the defendants has testified.  You should

11  treat this testimony just as you would the testimony of any

12  other witness.

13          "Instruction No. 24.

14          "What is evidence?

15          "The evidence you are about to -- you are to consider

16  in deciding what the facts are consists of:

17          "Number 1.  The sworn testimony of any witness; and

18          "Number 2.  The exhibits received in evidence; and

19          "Number 3.  Any facts to which the parties have

20  agreed.

21          "Instruction No. 25.

22          "What is Not Evidence.

23          "In reaching your verdict you may consider only the

24  evidence and exhibits received in evidence.  The following

25  things are not evidence and you may not consider them in

47

1    deciding what the facts are:

2            "Number 1.  Questions, statements, objections, and

3    arguments by the lawyers are not evidence.  The lawyers are not

4    witnesses.  Although you must consider a lawyer's question to

5    understand the answer of a witness, the lawyer's questions are

6    not evidence.  Similarly, what the lawyers have said in their

7    opening statements, will say in their closing statements, and

8    at other times is intended only to help you interpret the

9    evidence, but it is not evidence.  If the facts as you remember

10   them differ from the way the lawyers state them, your memory of

11   them controls.

12           "Number 2.  Any testimony that I have excluded,

13   stricken, or instructed you to disregard is not evidence.  In

14   addition, some evidence was received only for a limited

15   purpose; when I have instructed you to consider certain

16   evidence in a limited way, you must do so.

17           "Number 3.  Anything you may have seen or heard when

18   the court was not in session is not evidence.  You are to

19   decide the case solely on the evidence received at the trial.

20           "Instruction No. 26.

21           "Direct and Circumstantial Evidence.

22           "Evidence may be direct or circumstantial.  Direct

23   evidence is direct proof of a fact, such as testimony by a

24   witness about what the witness personally saw or heard or did.

25   Circumstantial evidence is indirect evidence, that is, it is

48

1   proof of one or more facts from which you can find another

2   fact.

3           "You are to consider both direct and circumstantial

4   evidence.  Either can be used to prove any fact.  The law makes

5   no distinction between the weight to be given to either direct

6   or circumstantial evidence.  It is for you to decide how much

7   weight to give to any evidence.

8           "Instruction No. 27.

9           "Evidence for a Limited Purpose.

10          "During trial you were advised that Mr. Burleson's

11  phone conversation with FBI agent Michael Caputo was to only be

12  admitted against Mr. Burleson.  Also during trial you were

13  advised that the audio of Mr. Parker's custodial interview with

14  FBI Agent Mark Seyler was only to be admitted against

15  Mr. Parker.  You must consider this evidence only limited as to

16  that defendant.

17          "Instruction No. 28.

18          "Jury Consideration of Punishment.

19          The punishment provided by law for this crime is for

20  the Court to decide.  You may not consider punishment in

21  deciding whether the Government has proved its case against the

22  defendant beyond a reasonable doubt.

23          "Instruction No. 29.

24          "Credibility of Witnesses.

25          "In deciding the facts in this case, you may have to

49

1    decide which testimony to believe and which testimony not to

2    believe.  You may believe everything a witness says, or part of

3    it, or none of it.

4           In considering the testimony of any witness, you may

5    take into account:

6           "Number 1.  The witness' opportunity and ability to

7    see or hear or know the things testified to;

8           "Number 2.  The witness' memory;

9           "Number 3.  The witness' manner while testifying;

10          "Number 4.  The witness' interest in the outcome of

11   the case, if any;

12          "Number 5.  The witness' bias or prejudice, if any;

13          "Number 6.  Whether other evidence contradicted the

14   witness' testimony;

15          "Number 7.  The reasonableness of the witness'

16   testimony in light of all the evidence; and

17          "Number 8.  Any other factors that bear on

18   believability.

19          "The weight of the evidence as to a fact does not

20   necessarily depend on the number of witnesses who testify.

21   What is important is how believable the witnesses were, and how

22   much weight you think their testimony deserves.

23          "Instruction No. 30.

24          "Statements by a Defendant.

25          "You have heard testimony that a defendant made a

1    statement.  It is for you to decide, number one, whether a

2    defendant made the statement, and number two, if so, how much

3    weight to give to it.  In making those decisions, you should

4    consider all the evidence about the statement, including the

5    circumstances under which a defendant may have made it.

6                "Instruction No. 31.

7                "Witness Pretrial Preparation.

8                "It is proper for an attorney to interview any

9    witness in preparation for trial.

10               "Of course, in the process of trial preparation, a

11   party may not suggest that the witness depart from the truth.

12               "You have also heard testimony that a witness read or

13   reviewed certain material pertaining to the case before the

14   witness testified at trial.  The law permits a witness to do

15   so.

16               "Instruction No. 32.

17               "Government's Use of Undercover Agents.

18               "You have heard testimony from an undercover agent

19   who was involved in the Government's investigation in this

20   case.  Law enforcement officials may engage in stealth and

21   deception, such as the use of undercover agents, in order to

22   investigate criminal activities.  Undercover agents may use

23   false names and appearances.

24               "Instruction No. 33.

25               "Duty to Deliberate.

1          "When you begin your deliberations, elect one member

2     of the jury as your presiding juror who will preside over the

3     deliberations and speak for you here in court.

4          "You will then discuss the case with your fellow

5     jurors to reach agreement if you can do so.  Your verdict,

6     whether guilty or not guilty, must be unanimous.

7          "Each of you must decide the case for yourself, but

8     you should do so only after you have considered all the

9     evidence, discussed it fully with the other jurors, and

10    listened to the views of your fellow jurors.

11         "Do not be afraid to change your mind -- your opinion

12    if the discussion persuades you that you should.  But do not

13    come to a decision simply because other jurors think it is

14    right.

15         "It is important that you attempt to reach a

16    unanimous verdict but, of course, only if each of you can do so

17    after having made your own conscientious decision.  Do not

18    change an honest belief about the weight and effect of the

19    evidence simply to reach a verdict.

20         "Instruction No. 34.

21         "Consideration of Evidence-Conduct of the Jury.

22         "Because you must base your verdict only on the

23    evidence received in the case and on these instructions, I

24    remind you that you must not be exposed to any other

25    information about the case or to the issues it involves.

52

1    Except for discussing the case with your fellow jurors during

2    your deliberations:

3           "Do not communicate with anyone in any way and do not

4    let anyone else communicate with you in any way about the

5    merits of the case or anything to do with it.  This includes

6    discussing the case in person, in writing, by phone, or

7    electronic means, via e-mail, text messaging, or any Internet

8    chat room, blog, website, or other feature.  This applies to

9    communicating with your family members, your employer, the

10   media or press, and the people involved in the trial.  If you

11   are asked or approached in any way about your jury service or

12   anything about this case, you must respond that you have been

13   ordered not to discuss the matter and to report the contact to

14   the Court.

15          "Do not read, watch, or listen to any news or media

16   accounts or commentary about the case or anything to do with

17   it; do not do any research, such as consulting dictionaries,

18   searching the Internet, or using other reference materials; and

19   do not make any investigation or in any other way try to learn

20   about the case on your own.

21          "Instruction No. 34.1.

22          "The law requires these restrictions to ensure the

23   parties have a fair trial based on the same evidence that each

24   party has had an opportunity to address.  A juror who violates

25   these restrictions jeopardizes the fairness of these

1    proceedings, and a mistrial could result that would require the

2    entire trial process to start over.  If any juror is exposed to

3    any outside information, please notify the Court immediately.

4                "Instruction No. 35.

5                "Use of Notes.

6                Some of you have taken notes during the trial.

7    Whether or not you took notes, you should rely on your own

8    memory of what was said.  Notes are only to assist your memory.

9    You should not be overly influenced by your notes or those of

10   your fellow jurors.

11               "Instruction No. 36.

12               "Communication with the Court.

13               "If it becomes necessary during your deliberations to

14   communicate with me, you may send a note through the Court

15   Security Officer, signed by any one or more of you.  No member

16   of the jury should ever attempt to communicate with me except

17   by a signed writing, and I will respond to the jury concerning

18   the case only in writing or in here open court.  If you send

19   out a question, I will consult with the lawyers before

20   answering it, which may take some time.  You may continue your

21   deliberation while waiting for the answer to any question.

22   Remember that you are not to tell anyone, including me, how the

23   jury stands, numerically or otherwise, on any question

24   submitted to you, including the question of the guilt of any

25   defendant, until after you have reached a unanimous verdict or

1   have been discharged.

2          "Instruction No. 37.

3          "Verdict Form.

4          "A verdict form has been prepared for you.  After you

5   have reached unanimous agreement on a verdict, your presiding

6   juror should complete the verdict form according to your

7   deliberations, sign and date it, and advise the Court Security

8   Officer that you are ready to return to the courtroom.

9          "Verdict Form.

10          "We, the jury, in the above-entitled case, upon our

11   oaths do say:

12          "Count One.

13          "As to Count One of the Superseding Indictment

14   charging Conspiracy to Commit an Offense Against the United

15   States, in violation of Title 18, United States Code, Section

16   371, We, the jury, unanimously find that there was an agreement

17   between two or more persons to commit at least one of the

18   following crimes charged in the Superseding Indictment; choose

19   all that apply unanimously:

20          "Number 1.  Assault on a federal officer.

21          "Number 2.  Threatening a federal law enforcement

22   officer.

23          "Number 3.  Use and carry of a firearm in relation to

24   a crime of violence.

25          "Number 4.  Obstruction of the due administration of

1   justice.

2           "Number 5.  Interference with interstate commerce by

3   extortion.

4           "Number 6.  Interstate travel in aid of extortion.

5           "Or Number 7.  None of the above.  If the jury

6   chooses this answer, then the jury must find all defendants not

7   guilty of Count One.

8           For Count One, "We, the jury, unanimously find as to

9   . . ." and then it lists all the defendants in alphabetical

10  order with the option of "not guilty" or "guilty."

11          "Count Two.

12          "As to Count Two of the Superseding Indictment

13  charging Conspiracy to Impede or Injure a Federal Officer, We,

14  the jury, unanimously find that there was an agreement between

15  two or more persons to do the following":

16          Choose all that apply.

17          "Number 1.  To prevent by force, intimidation, or

18  threats, federal law enforcement officers from discharging the

19  duties of their office under the United States.

20          "Number 2.  To induce by force, intimidation or

21  threats, any federal law enforcement officer of the United

22  States to leave the place where their duties were required to

23  be performed.

24          "Number 3.  None of the above.  If the jury chooses

25  this answer, then the jury must find all defendants not guilty

56

1    of Count Two.

2          For Count Two.  "We, the jury, unanimously find as

3    to . . ." and then again, all the defendants are listed in

4    alphabetical order with the two options, "not guilty" or

5    "guilty."

6          "Count Five.

7          "As to Count Five of the Superseding Indictment

8    charging Assault on a Federal Officer, We, the jury,

9    unanimously find the defendant . . ." and the defendants are

10   listed in alphabetical order with the two options of "not

11   guilty" and "guilty."

12         "Count Six.

13         "As to Count Six of the Superseding Indictment,

14   Using -- charging Use and Carry of a Firearm During and in

15   Relation to a Crime of Violence, this relates to Count Five,

16   Assault on a Federal Officer" -- the crime of violence -- let

17   me say that again.

18         So, "Count Six."

19         The charge in Count Six is Use and Carry of a Firearm

20   During and in Relation to a Crime of Violence.  The crime of

21   violence referred to in this Count Six is Count Five, Assault

22   on a Federal Officer.

23         Then the defendants are in alphabetical order, the

24   first one being Gregory Burleson, with the option of "not

25   guilty" or "guilty."

1          "If the jury finds a defendant guilty of Count Six of

2    the Superseding Indictment, the jury must also answer the

3    following question:

4          "We, the jury, unanimously find that the firearm was

5    brandished."

6          "No" or "yes."

7          And the same follows for each of the defendants in

8    alphabetical order.

9          "Count Eight.

10         "As to Count Eight of the Superseding Indictment

11   charging Threatening a Federal Law Enforcement Officer, We, the

12   jury, unanimously find the defendant . . ." and again, in

13   alphabetical order -- "not guilty" or "guilty."

14         "Count Nine.

15         "As to Count Nine of the Superseding Indictment

16   charging Use and Carry of a Firearm During and in Relation to a

17   Crime of Violence" -- the crime of really referred to here is

18   Count Eight, Threatening a Federal Law Enforcement Officer --

19   "We, the jury, unanimously find as to . . ." again, each

20   defendant is listed in alphabetical order.  And, for example,

21   for the first one, Gregory Burleson, you are to find whether or

22   not -- choose one of the two options; "not guilty" or "guilty."

23   And then "If the jury finds the defendant guilty of Count Nine

24   of the Superseding Indictment, the jury must also answer the

25   following question:

58

```
 1              "We, the jury, unanimously find that the firearm was
 2    brandished," and the options are "no" or "yes."
 3              And the same follows for the other defendants in
 4    alphabetical order.
 5              "Count Twelve.
 6              "As to Count Twelve of the Superseding Indictment
 7    charging Obstruction of the Due Administration of Justice, We,
 8    the jury, unanimously find the defendant . . ." listed in
 9    alphabetical order and each one has the option for you to
10    choose "not guilty" or "guilty."
11              "Count Fourteen of the Superseding Indictment
12    charging Interference with Interstate Commerce by Extortion,
13    "We, the jury, unanimously find the defendant . . ." again,
14    listed in alphabetical order and the two choices are "not
15    guilty" or "guilty."  Each defendant has a separate choice for
16    you to choose.
17              "Count Fifteen.
18              "As to Count Fifteen of the Superseding Indictment
19    which charges Use and Carry of a Firearm During and in Relation
20    to a Crime of Violence" -- the crime of violence here is the
21    one charged in Count Fourteen, Interference with Interstate
22    Commerce by Extortion -- "We, the jury, unanimously find . . ."
23    The defendants are listed in alphabetical order.  The choices
24    are "not guilty" or "guilty."
25              "If the jury finds the defendant guilty of Count
```

59

1    Fifteen in the Superseding Indictment, the jury must also

2    answer the following question:

3            "We, the jury, unanimously find that the firearm was

4    brandished."  "No" or "yes" are the two options.

5            And the same follows for each of the other individual

6    defendants.

7            "And Count Sixteen.

8            "As to Count Sixteen of the Superseding Indictment

9    charging Interstate Travel in Aid of Extortion, We, the jury,

10   unanimously find the defendant . . ."  They're listed, again,

11   in alphabetical order, with two options of "not guilty" or

12   "guilty."

13           "So say we all," and then the foreperson is to date

14   and sign the verdict form.

15           All right.  Do we need a break before we go into

16   summation?  It's up to you.

17           MR. MYHRE:  Yes, Your Honor.

18           THE COURT:  I probably put everyone to sleep.

19           MR. MYHRE:  No, Your Honor.  That's fine.

20           Yes, Your Honor.  We would ask for a break.  However,

21   I just want to clear up one matter on Instruction 20, and I

22   probably misheard the Court but I just wanted it to be clear,

23   on the second element under the co-conspirator liability, the

24   Court -- I heard the Court say the second -- the "defendant"

25   was a member of the conspiracy as opposed to the "person."  So

1    I just wanted to make sure that that was clear on the record.

2              THE COURT:  This was Instruction No. 20?

3              MR. MYHRE:  Yes, Your Honor.

4              THE COURT:  Do you remember what line?

5              MR. MYHRE:  Line 17.

6              And I apologize if I misheard, Your Honor, but . . .

7              THE COURT:  All right.  So there's four elements.

8    The second element is that "the person was a member of the

9    conspiracy charged in Counts One or Two, or both."  It doesn't

10   have to be a defendant; it's just "the person" was a member of

11   the conspiracy.  Sorry if I misspoke.

12             MR. MYHRE:  Thank you, Your Honor.

13             THE COURT:  All right.  So let's go ahead and take

14   about a 10-minute stretch break.

15             Again, the jury is reminded, do not discuss this case

16   with anyone.  Do not read, or listen to, or view anything

17   touching upon this case, nor attempt to perform any research or

18   any independent investigation and please do not form an

19   opinion.

20             We'll go ahead and stand for the jury.

21             It's 10:05.  We'll welcome them back at 10:15.

22   Everyone can take a stretch break.  We won't take another break

23   until lunch.

24        (Jury excused from courtroom.)

25        (Recess was taken at 10:05 a.m.)

61

1          (Outside the presence of the jury at 10:30 a.m.:)

2              THE COURT:  All right.  We're on the record.  It

3      looks like everyone's back in the courtroom.  We're going to

4      call in the jury.

5              COURTROOM ADMINISTRATOR:  All rise.

6          (Jury returned to courtroom at 10:31 a.m.)

7              THE COURT:  All right.  Everyone may be seated.

8              We welcome back the jury and now we're going to begin

9      with the Government's summation.

10             Mr. Dickinson.

11             MR. DICKINSON:  Defense counsel, Your Honor, ladies

12     and gentlemen of the jury, Cliven Bundy told everyone to go get

13     the cattle.

14             "Long gun."  "Unknown rifle to the right side of the

15     white van."  "All lanes of the northbound I-15 have been shut

16     down."  "Post 2, you have a huge group walking towards you down

17     that road."  "40 horses 20 minutes out."  "Two long guns."

18     "You also have three individuals on the overpass with

19     handguns."  "Guy.  Got a guy heading at you with a long gun."

20     "Looks like you have a guy above you with a long gun on the

21     side of the freeway."  "People with long guns wearing vests."

22     "Two with long guns under the bridge."  "Two long guns.  We

23     have lost track of how many long guns in the crowd."  "20 long

24     guns that are up on the bridge and in the crowd."  "Horses

25     coming towards us at this time."  "They're wearing body armor."

62

1    "Individual with M4 got a scope and a mag and M4 on northbound

2    overpass.  One is wearing a black hat with a white insignia

3    with body armor."

4         Ladies and gentlemen, those are just some of the

5    things, that three years ago today, federal law enforcement

6    officers saw in the Toquop Wash about 70 miles northeast of

7    this courthouse.  It was the day that those officers, and

8    specifically the 14 officers -- federal law enforcement

9    officers that you heard from, personally, in this case, will

10   never forget.  They thought they were going to die in that wash

11   for simply carrying out their lawful duties.

12        So on that day Cliven Bundy and his armed followers,

13   including these six defendants (indicated), assaulted,

14   threatened, intimidated, extorted, and obstructed federal law

15   enforcement officers into releasing close to 400 head of cattle

16   that were lawfully in the custody of the United States

17   government.  They also used the barrel of a gun to force those

18   officers to leave federal public lands where they were lawfully

19   carrying out their duties, and on that day those duties were

20   two federal court orders.

21        Now, despite those court orders, Cliven Bundy had

22   always said he would do whatever it takes to prevent BLM from

23   impounding his cattle.  And you've heard in this case, once the

24   impoundment started in 2014, he quickly realized that he needed

25   more help.  He aligned himself with the self-described militia

1    and they put out a call for arms and people answered.  They

2    recruited gunmen.  They traveled to Nevada to make a show of

3    force, to get the BLM and the National Park Service, and the

4    federal law enforcement officers to back down.  And by the

5    morning of April 12th, hundreds of people, including armed

6    gunmen, specifically in this case, these six defendants, had

7    traveled and came to align themselves with the Bundys to

8    execute a plan to recover Bundy's cattle by armed force,

9    threats, and intimidation.

10          Ladies and gentlemen, you've heard a lot of evidence

11   in this case.  You've seen a lot of video.  You've seen a lot

12   of Facebook posts.  You've been very patient and on behalf of

13   the United States, I want to thank you for your attention, on

14   behalf of Mr. Myhre, Ms. Creegan, and Ms. Ahmed.

15          And as Mr. Myhre told you when he gave his opening

16   statement, and as the Court has instructed you, the Government

17   bears the burden of proof beyond a reasonable doubt on all

18   charges.  That is a burden that we told you we would meet and

19   that is a burden that we have met.  We have proven all six of

20   these defendants guilty of all counts beyond a reasonable

21   doubt.

22          I want to spend some time this morning to talk to you

23   about and summarize why the Government has proven beyond a

24   reasonable doubt that these defendants are guilty.  And at

25   first, How did this all start?  It started with two federal

 1     court orders.

 2          (Exhibit published.)

 3          Exhibits 5 and 6.  One's six pages; one's five pages.

 4     Clearly instructing Mr. Bundy that he needs to get his cattle

 5     off the Bunkerville allotment and the Lake Mead National

 6     Recreational Area and that they're in prep and if he doesn't do

 7     it, the BLM will be authorized to do it for him.  Mr. Petri

 8     talked about the Court orders, talked about the litigation, and

 9     talked about their legal authority.  That left the BLM with the

10     job of enforcing those court orders.  And you heard from Agent

11     Stover about how they had to go out and do it.

12          They had to impound over 1000 head of trespassed

13     cattle, over 578,000 acres of arid and difficult desert terrain

14     with large -- with small ingresses and egresses, very difficult

15     terrain.  They needed a roving gathering rings of security.

16     You heard about the rings of security -- inner ring, outer

17     ring, more of an outer ring -- to prevent any sort of influence

18     or obstruction of those contractors because they needed

19     contractors.  They needed trucks.  They needed helicopters.

20     They needed large trucks that could carry cattle.  All of this

21     was very dangerous going in and out of these small ingresses

22     and egresses so they needed a security operation.

23          They also needed a place to set up their command

24     post.  We -- you've all seen it now, the ICP, off the

25     Interstate 15, and they chose that because it had a simple

1    ingress and egress from the 15.  And they set up their command,

2    which was rather large, many trailers, many equipment, the pens

3    to hold the cattle that were being impounded, and they kept it

4    away from the Bundys and their property as much as they could.

5    Seven miles away from the Bundy ranch, set off in the back of

6    the freeway.  If you just drove by on I-15, you wouldn't really

7    know unless you looked and saw the entrance to the -- to

8    Post 1.

9            And you heard a little bit about the security and

10   Agent Briscoe told you that they had it secure, and there was

11   concern about Post 1, up front, because that's where people

12   would naturally enter and exit.  But they had some security on

13   Post 2, down underneath the wash and then behind them in Post

14   6, where people could enter through the back in the desert.

15   But their primary concern was Post 1.  Control the access

16   points.

17           So the BLM gets out there and starts their plan.

18   There's the temporary closure order which you heard about and

19   the temporary closure order closed a large portion of the Lake

20   Mead National Recreation Area and the Bunkerville allotment.

21   However, it was not a permanent closure order.  It was in place

22   from March 22nd through May 12th and it didn't close the entire

23   lands for the entire period of time.  What was closed was where

24   the BLM were going to be working that day.  It was a roadblock.

25   So if BLM was working in one portion gathering cattle, in the

1    area around that would be closed.

2             They also set up the First Amendment areas on either

3    side.  You heard about that.  But it didn't prevent people from

4    protesting or exercising their First Amendment rights in areas

5    where the BLM were not operating on that specific date.

6             There was a Notice of Intent to Impound, Exhibit 8,

7    that was sent out.  The Bundys saw it.  It was posted at the

8    post offices.  It was commonly well known that the BLM was

9    going to start a cattle impoundment.

10            Again, the BLM knew that there theoretically might be

11   some sort of obstruction from the Bundy family is what they

12   thought.  They had heard "whatever it takes" over the years and

13   they wanted to prevent that.  So you heard from Special Agent

14   Michael Johnson, they went out trying to search out members of

15   the Bundy family to say, Hey, the impoundment's going to start.

16   We don't want trouble.  We want to have a contact, et cetera.

17   They finally made contact with Ryan Bundy.  And you heard

18   portions of that phone call, Exhibit 13.  And, in short,

19   Ryan Bundy is very agitated, tells Special Agent Johnson, We're

20   going to do whatever it takes, we're going to bring hundreds of

21   people, and we're not going to let you impound our cattle.

22            That takes us to March 28th, when the contractors are

23   pulling into the ICP with their horse trailers and their trucks

24   and they're out on to the I-15.  That's Exhibit 14, and that

25   was videotaped and put on the Internet with the title "Range

1  War" with the subtitles "The BLM's Stealing the Cattle" and it

2  had this sort of western song lyrics to it, but what you saw

3  was that Cliven, Ryan Bundy and others were blocking the convoy

4  of civilian vehicles, riding in and out, taking pictures of the

5  license plates.  Ryan Bundy putting his hand in and out of his

6  jacket or his -- appearing like he had a gun.  And that's the

7  day, ladies and gentlemen, that the conspiracy definitely

8  started, on March 28th, as it's alleged in the Indictment,

9  where clearly now the Bundys are obstructing the BLM's

10  operations.

11       And at that point, as Special Agent Stover told you,

12  the threat assessment went up.  Like, okay.  Now we're actually

13  seeing things go on.  And this goes on and on and on until

14  April 11th.

15       You heard Agent Stover talk about a call from the

16  Arizona port of entry where Ryan and Cliven Bundy went up there

17  asking the lady working there if she had seen stolen cattle

18  coming through.  That was on March 31st, 2014.

19       April 2nd you heard Agent Stover talk about that

20  their threat assessment went up because they heard about

21  interference up at the cattle barn in Utah where they had --

22  BLM had contracted to take the impounded cattle, with

23  Ryan Bundy and others disrupting the auction.  That raised the

24  BLM's threat assessment.

25       April 6th, Dave Bundy's arrested for failure to

68

1    disperse.

2            Now, on April 7th you heard Agent Stover testify that

3    himself and Agent Love went out and met with some of the Bundys

4    to return Dave Bundy's property and Ammon Bundy was out there

5    and he had one of the closure signs that the BLM had had out on

6    parts of the area tied to his ATV.  And he told them, he told

7    Agent Stover and Agent Love, "You know what you can do?  You

8    can get the hell off our land.  You can leave them cows right

9    where they are and get the hell out.  We're going to win this

10   thing.  We're going to win this war today.  Guaranteed."

11           Agent Stover told you what they were seeing then now

12   on social media that the narrative was the BLM's out of

13   control, they're stealing Bundys's cattle, they're acting

14   illegally, they're violating Mr. Bundy's rights, BLM is locking

15   people out of public land.

16           That goes all the way up and through the 11th where

17   they're posting, Exhibit 11, where now BLM has found someplace

18   to take the cattle in California at the Euclid Stockyard.  They

19   somehow find out about that, encouraging people to call

20   Euclid Stockyard and say don't take the cattle, et cetera.

21   Each step of the way the BLM's threat assessment is rising.

22   But what this is not impeding is the BLM's ability to impound

23   the cattle.  The BLM is successfully impounding the cattle.

24   They're doing what the court orders allow them to do.  And by

25   the morning of April 11th, 377 cattle, approximately, had been

1     impounded and were housed at the impoundment site.

2          The Bundys realized they couldn't do it alone.  So

3     what happened?  As you've heard, the Bundys aligned themselves

4     with the militia and they put out a call for people to come to

5     Bundy ranch, with guns, to face off with the federal government

6     to stop them from collecting his cattle.

7          (Exhibit published.)

8          We first start seeing that with Ricky Lovelien.  And

9     this is prior to April 12th.  It's in 2013, but it shows you

10    his state of mind that carries forward into April 12th, 2014.

11         Talks about the country, but down below, "I am an

12    American.  I demand our country back and if you will not give

13    it back, then we are quite prepared to take it back, so help me

14    God."

15         (Exhibit published.)

16         We go into Operation Mutual Aid.  This is

17    Ryan Bundy -- I mean, Ryan Payne from Montana and

18    Jerry Bruckhart from Pennsylvania.  And they have a website and

19    they discuss their motives, et cetera.  We have shown you --

20    through -- Agent Seyler testified about this extensively and

21    there are a number of exhibits and these are just a sample

22    of -- of how Ricky Lovelien and others went to this website,

23    saw what they were posting, saw OMA's objectives.

24         "Expected the militia to act offensively in defense

25    of freedom.  At any time people feel their ability to pursue

1    happiness is being hindered by the government, they have a

2    constitutional duty to act offensively in defense for the

3    pursuit of happiness."

4            So double-talk, but essentially act defensively if

5    you personally feel like your constitutional rights are being

6    violated.

7        (Exhibit published.)

8            Now we see the Bundys.  Carol Bundy updating her

9    Facebook status.  "They have the cattle.  Now they have my

10   boys.  Rang war begins tomorrow at Bundy ranch at 9:30.  We are

11   getting the job done."

12       (Exhibit published.)

13           Back to Ricky Lovelien.

14           "Contact info to coordinate groups.  Ryan Payne,

15   OMA," gives his phone number.  "They have made live contact and

16   are setting up security ops."

17           So now you have Ricky Lovelien coordinating with

18   Ryan Payne who is coordinating with the Bundys to bring the

19   militia with guns to Bunkerville.  This is Ricky Lovelien, who

20   you heard was co-leader of the Montana State Defense Force in

21   other slides, evidence, referred to himself as

22   Captain Lovelien.

23       (Exhibit published.)

24           Here, we're seeing Mr. Payne and Mr. Lovelien

25   communicating.  April 7th.  "Rick, please call me as soon as

1   possible.  Send your number to my contacts.  Thanks, sua

2   sponte.  Please keep me updated."

3            So clearly now Mr. Lovelien and Mr. Payne are

4   coordinating, coordinating their efforts to get to Bundy ranch

5   and to get other so-called self-styled militia to Bundy ranch

6   with guns.

7        (Exhibit published.)

8            Rick Lovelien to Randy Eaton on the 8th of 2014

9   [sic].  Pleading for help -- or said -- saying a plea -- "A

10  plea for help went out yesterday.  Other militia units are

11  mobilizing.  I am in contact with one of the coordinators.

12  Waiting for more intel at this time."  Again, showing that Mr.

13  Lovelien is coordinating, coordinating with militia groups to

14  come to Bundy ranch on April 8th.

15           "Do we have an exact location?"  Ryan Payne, giving

16  him coordinates.

17           "I just got off the phone with Cliven.  He knows we

18  are coming.  He has opened his land up to everyone willing.

19  OMA is moving.  Not going public with it until we are en

20  route."

21           Why not go public with it?  Because they're bringing

22  armed militia into Nevada to help Cliven Bundy.

23       (Exhibit published.)

24           Now we have Mr. Engel.  He's posting a video on

25  YouTube.  "Must watch.  They've taken his cattle.  Now they

72

1    took his son.  If they want war, let it begin here.  Oiling

2    bolt, loading magazines."  Oiling bolt, referring to a rifle,

3    and loading magazines.  Not making a sign to come protest.

4        (Exhibit published.)

5            Now we have Mr. Engel clearly being -- or observing

6    and knowing about Operation Mutual Aid.

7            You can see Operation Mutual Aid, his Facebook page

8    April 9th, 2014.  "Gentlemen, make me cry peace.  Peace, but

9    there is no peace.  The war has actually begun.  The gale

10   sweeps from the north will bring to our ears the clash of

11   resounding arms," et cetera, et cetera.  "Give me liberty or

12   give me death" he ends with.  So no, Mr. Engel is aware of

13   what's going on.

14           The Bundys are clearly knowing what's going on now

15   and they've recruited Operation Mutual Aid.  Carol Bundy

16   updating her Facebook status.

17           "Attention, all people, friends and family and

18   Facebook world, the Bundy family is requesting help from

19   militia groups, including Operation Mutual Aid, 3 Percenters

20   Club, Freedom Fighters, and other operations to come and stand

21   with us and regain our rights and freedom.  The Bundy family is

22   grateful and overwhelmed with the support of millions of people

23   from around the country," et cetera.

24       (Exhibit published.)

25           Now defendant Parker is aware.  He's on social media.

1    Now it's starting to spread like wildfire.  "Got a neighbor in

2    some trouble down in Nevada.  What are you going to do when the

3    shooting starts?"

4            He's linking to a militia group.

5        (Exhibit published.)

6            Exhibit 178.  Now we have Rick Lovelien posting to

7    his Montana State Defense Force militia site.

8            "Nevada militia has officially broadcasted a mutual

9    aid request of Oath Keepers and militia."  Gives a contact

10   information.  "This is not a drill.  Repeat.  This is not a

11   drill."  You know, "Rumors going around that Bundy doesn't want

12   help.  He really does.  Pass the word to people for rapid

13   deployment to Nevada outside of Las Vegas."

14       (Exhibit published.)

15           Rick Lovelien again.  "Direct contact with personnel

16   at the Bundy ranch."  He's heading out shortly himself.  He's

17   traveling from Montana to Nevada.  "There's plenty of camping

18   room provisions.  Direct request from Mr. Bundy.  Anyone

19   wishing to join me is welcome to do so.  Contact me."

20           Recruiting.  He's recruiting other militia members.

21       (Exhibit published.)

22           Ryan Payne.  Now we have Ryan Payne on ground in

23   Nevada on April 9th.

24       (Government Exhibit 208 published.)

25           Clearly demonstrating that they're recruiting militia

74

1    to come help Mr. Bundy and that people are coming.

2         Also on the 9th we have, on Exhibits 30 and 31,

3    Peter Santilli and Melvin Bundy -- Mel Bundy, Cliven Bundy's

4    son, they go to the ICP, Post 1.  They want to talk to

5    somebody.  Agent Love comes out and talks to them.  But they

6    tell me, "What are you going to do if 10,000 people show up?

7    Are you prepared for this?  I don't believe in firing a single

8    bullet unless it's an absolute defense and it's legal and

9    constitutional."

10        Again, double-speak.  Just warning them.  Nobody

11   maybe took that seriously at that point, but, "What are you

12   going to do if 10,000 people show up?"

13       (Exhibit published.)

14        Back to Mr. Parker, April 10th, again, onto Facebook,

15   posting an article.  "Citizens of the United States fought the

16   toughest, biggest army in the world in 1776.  Do not think we

17   can't do it again."

18        "Interview with Mr. Bundy, the rancher in Nevada.

19   'If they keep messing around, they're going to figure out

20   exactly what battle born means.'  The militia is already in his

21   front yard and Stewart Rhodes, the founder of the Oath Keepers,

22   just asked all the Keepers from Arizona and California to bring

23   their camping gear.  We have rights . . . has no place in

24   America."

25        His own words.  He's talking about the war, comparing

1    it to 1776.  Clearly knows the militia was there and they're

2    coming to Nevada, or if they're not already in Nevada on

3    Mr. Bundy's front yard.

4         (Exhibit published.)

5              Exhibit 272.  Now we have Mr. Burleson.  His message.

6    "Attention all militia and concerned citizens of America,

7    militia has been activated and a call for help has been issued

8    by the Bundy family and the town folk in this area.  This isn't

9    a drill.  Call to arms.  Arizona Militia units have been

10   activated and we are en route to aid the Bundy ranch.

11   Nationwide units are en route to Nevada.  Contact me for

12   details to the next mobilization to Nevada this weekend."

13             Again, now we see Mr. Burleson knows and he's also

14   recruiting.

15             You can also see that in Exhibit 335, his Long Bow

16   interview, 335 clip B, he discusses his meetings and his

17   coordination with other Arizona Militia groups and their

18   decision to come to Nevada to show force for Mr. Bundy.

19        (Exhibit published.)

20             Now we head back to Mr. Lovelien.  Cheyenne Miller,

21   who you heard from Agent Seyler, is Mr. Lovelien's sister.

22   This is distributed to the Montana State Defense Force Facebook

23   page.  They set out their goals.  "Secure the Bundy family from

24   government incursion, which includes protection of all persons

25   held responding in support of the Bundys, protestors, extended

1    family and friends.  Thus, setting off protestors from

2    militia."

3              "Number 2.  Return the confiscated Clark County

4    Nevada property -- the cattle -- currently blocked by federal

5    personnel to the rightful stewards the people of Clark County,

6    Nevada."

7              "To secure a return to Mr. Bundy's ranch the mounting

8    number of cattle which had been confiscated by BLM agents and

9    private contractors."

10             Actually, Number 3 is the cattle; Number 2 is just

11   talking about the federal public lands.  These are their

12   objectives.  It goes on.  But clearly, at April 10th,

13   Mr. Lovelien knows the objectives are to get the cattle back.

14        (Exhibit published.)

15             Again, Mr. Lovelien.

16             Ryan Payne ends with -- with talking to another

17   militia member.  "The local rep is here.  They're late as 'F.'

18   Montana has most guys.  Utah, Nevada, unorganized.  Idaho.

19   Many more en route.  I am designated liaison for the militia

20   via Cliven Bundy.  In constant communication and all

21   information disseminated is vetted by him."

22             So now Ryan Payne is the militia leader.  He's there.

23   All his information is being disseminated and worked in concert

24   with Cliven Bundy.

25        (Exhibit published.)

1          Gentleman named Matt Steffan communicating with

2    Rick Lovelien.  "Just a suburban load of guys coming from

3    Gasparilla (phonetic).  They are three leaving at -- there

4    are -- they are leaving 3:00 a.m. tomorrow morning.  I believe

5    most of them are Oath Keepers.  Well, they will join Stewart

6    Rhodes and Sheriff Mack when they get there."  Keeping

7    Mr. Lovelien informed of his recruitment efforts.

8         (Exhibit published.)

9          Cheyenne Miller on Montana State Defense Force.

10         "This just in.  Ricky Lovelien, Montana State Defense

11   Force, will be running the security detail at the protest site

12   on the Bundy branch in Nevada.  All support and prayers

13   welcome."

14         What goes on on April 8th, he's -- Mr. Lovelien, or

15   as he likes to call himself in some of the e-mails,

16   Captain Lovelien, is running the security operation at Bundy

17   ranch, which we know is true from other evidence you've heard

18   in this case.

19         (Exhibit published.)

20         Mr. Stewart.  "Sick of this 'S' . . . heading to

21   Nevada now.  Heading to Nevada.  Going to stand up with my

22   fellow countrymen against a corrupt government."

23         (Exhibit published.)

24         Ricky Lovelien.  Morning of the 12th.  Posting about

25   "the patriots can find sanctuary from the feds at the Bundy

1    ranch and a nearby Indian tribal office."

2        (Exhibit published.)

3            Shockingly, not a coincidence, Todd Engel posting a

4    similar, "We're staging at the Moapa Indian Reservation where

5    the feds are restricted access."

6            Ladies and gentlemen, you have to ask yourself, why?

7    Why would these six defendants, why would they travel to a

8    place they had never been, for people they didn't know, for

9    something they knew very little about, in and around the days

10   of April 12th, 2014?  By their own words, some of which we've

11   seen here, some of which we're going to continue to see, they

12   were clearly coming to match force or show force or stand up to

13   the federal government, but not with signs, but with guns.

14           They might not have known when they got in their car,

15   when Mr. Parker, Mr. Stewart, and Mr. Drexler got in their car

16   that they'd be standing in that wash on March 12th -- on

17   April 12th, and Mr. Lovelien might not have known when he got

18   into his white truck that he'd be standing in that wash on

19   April 12th, or Mr. Burleson, when he got in his car, with

20   others from Arizona, but that's not what we have to prove to

21   you.  We have to prove to you that they conspired with each

22   other to commit the crimes in the Indictment.  And by the time

23   of the morning of April 12th they had clearly entered into an

24   agreement and had a plan, if they didn't already have the plan

25   before, which the Government submits the evidence shows they

 1    did.

 2              It's shocking how little information they had.

 3    They're getting it from the Internet.  They're getting it from

 4    each other, crossposting from the militia.

 5              You heard Mr. Parker himself.  Well, I saw this, I

 6    saw that, I saw Dave Bundy, I saw Ammon Bundy, but this post I

 7    didn't even read.  This post doesn't fit with what I -- you

 8    know, that the BLM is the big bad person in the group, so I

 9    didn't read that.  I saw the court orders, but, you know, they

10    could be corrupt.  No one knew anything.  They knew what they

11    heard from their fellow militia members, to come to

12    Cliven Bundy's ranch to stand up to the federal government, to

13    show force, to bring guns.  We need to match force with force.

14         (Exhibit published.)

15              April 12th.  "I see all those" -- it's Greg Burleson.

16    "I see all those who have gone before me and they begged me to

17    make my place beside them in Valhalla.  Feds and BLM have

18    started confiscating weapons from civilians.  Unconfirmed" --

19    just like everything else these defendants saw, and thought

20    they saw, and thought what they believed -- "400 more BLM

21    rangers are on their way to the Bundy ranch.  I look forward to

22    joining my ancestors in the afterlife.  Wagon burner.  Wish me

23    a good fight and a good death."

24              Pretty clear what Mr. Burleson's intentions were when

25    he was traveling to Bunkerville.

1             Now, on April 11th, the day before, the BLM's

2    starting to see with their own intelligence that people are

3    coming into to Nevada with guns.  They see the Internet.  They

4    see what's going on.  They see a lot of these posts.  They also

5    see, if you recall Special Agent Sully's testimony -- he's the

6    one that went -- one of the two that went undercover.  He was

7    out there on the 7th and they went out there and they didn't

8    see much.  They saw cowboys.  They saw some locals with

9    handguns, but not out of the ordinary for what you would see in

10   Bunkerville, Nevada.  But at that point Cliven's plan and the

11   plan was being implemented.  They put up their stage, their own

12   base of operations.  Saw the pictures of putting up the poles.

13   One of them they apply the American flag below the state flag

14   and the county flag.

15           Fast-forward to the 11th.  Sully goes out there.  He

16   sees militia.  He sees people with long guns.  He hears

17   Mel Bundy telling someone about the militia camps.  He talks to

18   somebody called JT who tells him all the important decisions

19   are being made in the militia camps and that we have more guns

20   and better guns than the BLM.

21           Also, on the morning of the 11th, you have

22   Peter Santilli, who comes, again, this time with a

23   Colonel Potter to meet with Dan Love.  Dan Love comes out and

24   talks with him.  But what -- you can -- and you can listen to

25   it, it's Exhibit 50.  Love is calm.  Polite.  He's a little

1     more aggressive this time, but he's aggressive because of what

2     Mr. Santilli is telling him.  And part of what he said is, "We

3     are going to have a face-to-face confrontation.  We have

4     thousands of people.  We are going to come here and it's

5     non-negotiable.  If that comes about, we want to make sure any

6     BLM officer who wants to stand down will not be retaliated

7     against.  This is non-negotiable.  If you make the decision to

8     go face to face and someone gets hurt, we are going to hold you

9     responsible.  You tell D.C. the justification from this is from

10    a corrupt court.  I'm relaying a message," because as you know,

11    Mr. Santilli was the liaison for the Bundys.  His words.  "If

12    anyone is acting unconstitutionally, they will be arrested."

13    Doesn't say arrested by who.  "I came here to allow you to

14    prevent a scenario where someone gets hurt."

15              Again, double-speak.  It's do what we want.  Stop

16    collecting the cattle.  Leave.  And then you don't have to hurt

17    anybody.  Because otherwise, we're going to put you in a

18    position where you're going to have to hurt somebody.

19              And you heard Love and he said, "You're going to have

20    to have more people than that," and "What are you going to do,

21    go arrest the sheriff?"  Because it really does sound somewhat

22    unbelievable.  But as you've heard, what Mr. Santilli said, it

23    might not have been thousands, but it was hundreds, actually

24    happened, less than 24 hours after Mr. Santilli had that

25    conversation with Special Agent Love.

1            So, the threat level is rising.  Everything is coming

2      to a head.

3            As Special Agent Stover told you, they get a call

4      from the FBI and the FBI needs to tell them, and this is a --

5      this ultimately is why the BLM stopped impounding the cattle.

6      And the FBI, in D.C., as Mr. Stover told you, the deputy

7      assistant director, said at that particular time the FBI's

8      intelligence was showing a buildup of militia like they had

9      never seen before anywhere and that it was a flashpoint.  If

10     you leave, it's a flashpoint, if you stay, it's a flashpoint.

11     If you confront the Bundys, it's a flashpoint.  If you collect

12     more cattle, it's a flashpoint.  If you do anything, it's a

13     flashpoint.  That's what the BLM was faced with.  And that's

14     not what the BLM was prepared for.  They were prepared to come

15     out, impound a thousand head of cattle over a large area, and

16     that's what they had the law enforcement resources to do, to

17     protect the civilians and their equipment.  They didn't have

18     the resources to stand up against an armed mob.  So they go in

19     to do the best they can with what they have with their

20     training.  And as Special Agent Stover told you, at that point

21     their top priority was to ensure the safety of the civilians,

22     the contractors working -- the contractors working there and to

23     develop a plan to get -- to move the cattle out of the area and

24     at that point it was to the Euclid Stockyards in California.

25     So that's what they started to do.  And that night they started

1    to fortify, the best they could, their impoundment area.  And

2    still -- and still, as you heard, the most -- the most logical

3    place that anyone would come down there and try to do anything

4    and get in would be Post 1, and that that's where they focused

5    their efforts.  They put some people down at Post 2.  You heard

6    from Ranger Johnson, Greg Johnson, the one who's on the radio

7    for like an hour, tell you, he was in his car all night down at

8    Post 2.  They had, like, a car back -- I think Agent Johnson

9    was -- the other, Michael Johnson was back by the trailers.

10   They also had another agent back at Post 6, but the focus was

11   at Post 1.

12           What's happening up the road seven miles?  The

13   militia camps are there.  People are pouring in.  Defendants

14   Drexler, Parker and Stewart arrived.  They get there.  They

15   meet one of the Bundy sons.  Where do you want to camp?

16   Protestors?  Or militia camp?  Militia camp.  We're not

17   militia, but we're going to stand with the militia.  Mr. Parker

18   told you, you heard from him in his undercover Long Bow video,

19   we want to go to the militia camp and camp with the militia.  I

20   believe he testified one of the reasons was we wanted

21   information.  So that's where they go.  They end up doing guard

22   duty.  Of course, no special -- no federal law enforcement came

23   that night to attack the Bundys at their protest site or their

24   house.  But they do guard duty and then they get up the next

25   morning and there's a briefing.  There's a blue tent where

84

1    everyone goes to get briefed and everyone from each group has

2    to send a leader.  There's the 3 Percenters.  There's the Oath

3    Keepers.  There's the Montana group.  There's the Arizona State

4    Militia who were very organized, the guys in the camouflage.

5    Mr. Parker goes with his group.  They're briefed.  It's going

6    to be a fluid plan.  We want to protect Cliven.  He's going to

7    be brought to the stage and we got to protect him.  And the

8    sheriff's going to come and, you know, depending on what the

9    sheriff says, it's a fluid plan.  We know that, at least.  But

10   as we'll see, Mr. Parker, Mr. Stewart, and Mr. Drexler are then

11   seen around all morning with Mr. Lovelien.

12          And it wasn't just the FBI or the federal government

13   getting anybody all ginned up that the militia are there to do

14   something.  Here we have Government's Exhibit 373.

15       (Exhibit published.)

16          On a Saturday morning, the sheriff of Clark County

17   and his entire leadership team, as well as a full Saturation

18   Team led by Sergeant Jenkins, as well as a SWAT Team are

19   deployed to the Bunkerville area.  The sheriff himself comes

20   out because as the sheriff of Clark County, he feels like he

21   might be able to keep this peaceful.

22       (Exhibit published.)

23          Here we see 9:00 a.m., Mr. Drexler, Mr. Stewart,

24   Mr. Parker testified that he was in the front seat, with their

25   long guns, are at the rally site, in Captain Lovelien's car,

85

1    the security leader, the commander of the security at the Bundy

2    ranch.

3           (Exhibit published.)

4              There they are again, Mr. Parker, Mr. Lovelien.

5    (Indicating).  Providing security.

6           (Exhibit published.)

7              Gentleman in camouflage, desert fatigues.

8           (Exhibit published.)

9              Again, Mr. Parker, Mr. Stewart, and Mr. Drexler

10   (indicating).

11             But here, at their base of operations, they didn't

12   need their long guns.  They kept those in the car.

13          (Exhibit published.)

14             Again, Mr. Lovelien standing, waiting.

15             Horses already set up on the hill at 10:30

16   (indicating).

17             Sheriff wants to meet with Cliven Bundy and as you

18   heard, from now Sheriff Lombardo, Cliven Bundy said, No.  I'm

19   not going to meet with you; you're going to meet with the

20   people.  You're going to meet with us on stage.  That's fine.

21   Sheriff's going to do what he thinks is best.  He gets on

22   stage.  I'm not going to play it again.  You've heard it

23   countless times.  But the most important thing he says is, "I'm

24   here to make an emotional issue safe."  Safe.  It clearly was

25   an emotional issue and he wanted to make it safe.  And he talks

1   about how the BLM's ending their impoundment operations and

2   they need to get their stuff out of there and we need to

3   discuss how they're going to do that safely, and then people

4   started going on about the cattle.  He never said that the

5   BLM's gone.  He never said that the BLM is leaving right this

6   second.  It's undeniable that none of that could be implied

7   from what the sheriff said.  And to be quite honest, it doesn't

8   matter because the BLM were still there, on federal land, as

9   federal officers, where they could be, to do their job.

10          But what does Cliven Bundy do?

11          It's not good enough.  They want unconditional

12   surrender.  They want the cattle back.  At this point they got

13   everything they want.  The BLM's leaving.  They're not going to

14   start impoundment anymore.  The closure area is going to be

15   lifted.  We just got to talk about how the BLM are going to get

16   out of here and then we got to talk about the cattle, which the

17   BLM -- which the BLM is franticly trying to get to California.

18   And we got to facilitate this in a safe way.  Not good enough.

19   Sheriff gets the microphone -- or Cliven Bundy gets his

20   microphone, gets his yellow legal pad where he had his speech

21   written out and makes his ridiculous demands.  Go disarm the

22   Park Service.  Go tear down Red Rock.  Go tear down Lake Mead.

23   Go to the compound and get the guns and stack them up here at

24   the flag pole in front of these people.

25          Not here to negotiate.  That was his bottom line.

87

1    Put legs under the sheriff.  Let's ridicule the sheriff on

2    stage, which is fine.  Where's that getting you?  Nowhere.

3    It's inciting the crowd.  The crowd that Cliven Bundy and Ryan

4    Payne, Rick Lovelien, and everybody else either came or

5    recruited to be in front of that stage on that day to show

6    force.

7            Cliven says, If you don't do it within the hour, then

8    we'll see what -- we'll see what the plan's going to be.

9    Anyone in their right mind knows that the sheriff is not coming

10   back in an hour.  He's not disarming the federal government,

11   he's not disarming federal agents, he's not tearing down the

12   Red Rock toll booth.  None of that's happening.  This is all

13   just rhetoric to gin up the armed crowd.

14           He knows he has to strike while the iron is hot.  He

15   can't negotiate.  He can't negotiate the release of his cattle.

16   He has what he wants right there, right then, on that Saturday

17   morning, armed militia ready to do his bidding.

18           Parker, Drexler, Lovelien, Engel, they hear it.  They

19   don't leave.  They stay.  They stay.

20           You hear at 334C, Drexler talks about he goes and

21   gears up after the sheriff's speech.  Eric Parker now knows the

22   situation is "so severe," that he feels like he has to call his

23   wife and children.  He's not going to protest, ladies and

24   gentlemen.  That wouldn't be so severe.

25           They waited an hour.  "Sheriff has been given one

88

1    hour to disarm BLM."  Not, hey, I'm at this rally and the

2    sheriff -- or Cliven Bundy said some crazy stuff to the

3    sheriff.  Maybe I should go home.

4            Ladies and gentlemen, the judge instructed you on

5    conspiracy and I'm going to go back and talk about that a

6    little bit towards the end, but you have to have a plan.  It

7    doesn't have to be in writing.  It doesn't have to be in blood.

8    It doesn't have to be a contract.  But in this case we've seen

9    the plan develop through the evidence to this point, this point

10   in time when Cliven Bundy gets on that stage and he tells the

11   people to go get my cattle, go down the Toquop Wash, et cetera,

12   which we're going to hear in a second, for these -- or five of

13   these six defendants know exactly that's the plan and if they

14   hadn't already joined the conspiracy, which I submit to you

15   they have, they're in, and they're in for it all.  Because once

16   you join, you're responsible for everything that happened

17   before you and everything that happens after if it's reasonably

18   foreseeable.  And everything that took place on April 12th,

19   2014, after this moment, was reasonably foreseeable to the --

20   five of the six defendants -- and I'll talk about Mr. Burleson

21   in a second -- that were there at that stage and heard this

22   speech.

23            I want to point out, that's Ryan Payne on the stage

24   (indicating), with the long gun, the militia liaison or the

25   militia leader for the Bundy family as you heard from

1    Carol Bundy herself, talking with one of his troops.  They're

2    all lined up in front of the stage.

3        (Government Exhibit 427 published.)

4        You saw that video again, all the militia, Ryan Payne

5    on the side, talking to them.  Cliven Bundy gives the order,

6    gives the plan, gives some double-talk.  You're free people,

7    decide.  That's all fine and good, but we know what

8    Mr. Drexler, defendant Burleson -- I mean, defendant Drexler,

9    Stewart, Parker, Engel, and Lovelien do.  They go.  They

10   choose.  They make a choice.  They don't go home.

11       What we do know at this time, and what everyone in

12   that crowd knows, is that the BLM's still there.  They

13   weren't -- they hadn't left.  They still had their weapons,

14   because the sheriff hadn't brought them back and stacked them

15   in front of the flag pole.  There's a decent chance the cattle

16   might be there, or they might have been gone to California,

17   like Cliven said.  It appears Cliven wasn't sure, but that's

18   what we know.  And that's what we know when they leave to get

19   in their cars and drive the seven miles down the road to the

20   ICP where the BLM are.

21       (Exhibit published.)

22       This could not be more clear.  Eric Parker, right

23   after.  "Bundy gave the sheriff one hour to disarm the BLM.  He

24   did not reply.  We are now going to free the cattle by any

25   means."  Not by holding up a sign that says "Free the Cattle."

1    "The sheriff claimed that the BLM is standing down, but offered

2    no proof."  No proof the BLM is standing down.  "Mr. Bundy gave

3    him the do-it-or-else.  We will not be lied to."

4         Mr. Parker knows, he knows what he signed up for and

5    he knows what he's going to do.

6         (Exhibit published.)

7         Todd Engel.  "Headed out to block the freeway and

8    take the cows back."  Not hold a protest sign.  "Leaving now to

9    shut down the freeway by force of arms."  Arms.  Armed

10   standoff.

11        (Exhibit 100A published.)

12        The militia has shut down northbound, just like

13   Cliven Bundy told them to do

14        They've chosen.  They've made a choice.  Stewart,

15   Drexler, Lovelien, Parker (indicating).  Had to pull over to

16   let Sergeant Serena through, blocking the freeway, impeding law

17   enforcement from getting where they needed to go

18        Now, when the sheriff heard the ridiculous demands,

19   he knew what was going to happen, or might happen, so he

20   immediately goes down to the ICP and talks to the BLM and says,

21   Hey, Cliven Bundy said -- told me to come disarm you.  Talks to

22   them.  Sheriff leaves his command staff.  Leaves now Sheriff

23   Lombardo in charge of the situation, and goes back to try to

24   talk with BLM upper people and the governor about what can we

25   do to diffuse the situation.  And he leaves.  He also leaves

91

1    his Homeland Security unit, led by Sergeant Jenkins who you

2    heard from, a SWAT Team, and they begin -- they go --

3    they're -- Lombardo drives down to where they are, sets up for

4    a while, and then he hears the people are coming.  They're

5    coming.  He got the call.  Cliven Bundy gave the order, they're

6    coming to get the cattle.

7        (Exhibit published.)

8            So, Metro comes up and at this point, at 11:17, Metro

9    is not there, but as we can see, BLM, again, focused all their

10   attention, for the most part, or the majority of their

11   attention, at Post 1.  The natural ingress off the freeway.

12           And going back real quick, you also heard

13   Sheriff Lombardo, who was at the speech, that when they told

14   Sheriff Gillespie to go get those guns, that the crowd

15   attitude -- or the attitude of the crowd, their demeanor,

16   "behavior had completely changed from the point we had

17   arrived."  Sheriff Lombardo told you when he arrived, he was

18   concerned at that point, before Cliven Bundy gave his

19   ridiculous demands, by the unknown armed people, who he had no

20   idea how they were trained, no idea where they were from, no

21   idea what their intentions were

22           So now Metro comes up.  We have people arriving.

23           Mr. Engel.

24       (Government Exhibit 70 published.)

25           Parking on the side of the freeway, fully tacked out,

92

1    with a long gun.  The side of Interstate 15.  Have you ever

2    seen that before?  Use your common sense.  He's not holding a

3    sign.  He's getting out of that car with a purpose, or his

4    truck with a purpose.

5           So now Metro arrives and you had Sergeant Jenkins'

6    led Saturation Team, and they put up the line, again, focusing

7    on Post 1, which would have been the natural entryway.  And you

8    heard Sergeant Jenkins talk to you.  His goal was no one enters

9    Post 1.  But what they're seeing, they're seeing guns

10   everywhere.  Guns.  Guns.  Guns.  Guns.  Guns.

11          And as things progress, Ryan Bundy comes up to him,

12   recognizes Ryan Bundy and says, "Release the cows."  Jenkins

13   says, I'm not here about cows; I'm here to keep the peace.

14   Ryan Bundy replied to him, "The blood of your team was going to

15   be on his hands if Jenkins did not release the cows."  Then

16   Ryan Bundy started to cry.

17          So it starts to become a dangerous situation at

18   Post 1.  All the militia people are piling in.  And it's not

19   just them, as we'll see, as you've heard, it's the unarmed

20   people, it's the women and children, mixed in with the people

21   with guns that is a huge concern for law enforcement.

22          Sheriff Lombardo is there -- or now Sheriff

23   Lombardo -- who was left in charge by Sheriff Gillespie.  As he

24   told you, he saw guns everywhere, but it's his job -- 29 years

25   of being a law enforcement officer -- to try to make the

1    situation stop.  So he goes across the street, tries to find

2    someone -- tries to find a Bundy to talk to.  He gets Dave

3    Bundy.

4         (Exhibit 103 published.)

5         Dave Bundy, he asks him, what's their -- What's your

6    intent?  Dave Bundy says immediately, "Release the cattle."

7    Sheriff's like -- or Lombardo's like, the sheriff's returned to

8    Las Vegas to engage with the BLM, the governor, this is going

9    to take time to find an amenable solution, for him to slow

10   down.  Dave Bundy's reply, "You have an hour."

11        Then the sheriff's questioned by people in the crowd.

12   Why do you have guns pointed?  Why are there guns pointed?  He

13   told you, I told them because we have guns pointed at us and I

14   was continually told to -- people are continuing to tell

15   Lombardo to do your job, do your job, do your job, whatever

16   that means.  But the evidence is clear in this case what "do

17   your job" means is make the BLM leave and give us the cattle.

18        Now, Sheriff Lombardo told you that the crowd was

19   even more threatening.  Their emotions were obviously higher

20   and it seemed like "they had a mission and it was to retrieve

21   the cattle."

22        He also told you that based on his training and

23   experience, in Las Vegas, with huge events, huge protests, he

24   needed 500 officers to secure the site.  500.  Blocking of the

25   traffic made that impossible to get the officers there in the

1    hour time frame he was given by the Bundys.

2            And it was sucking up Nevada Highway Patrol's time as

3    well.  They had a small group out there.  You heard from them.

4    Highway patrol, Captain Thomas Jackson came in and told you he

5    saw firearms everywhere.  He had never faced a group -- he's

6    now third in command at the highway patrol -- never faced a

7    group of people equipped in that way.  They made him seem like

8    they were prepared for instant combat and instant firearm

9    combat.  There was a palpable menace coming from the members of

10   this crowd is what he told you.

11           He ran into Mr. Burleson in his minuteman hat.

12       (Government Exhibit 76 published.)

13           You've seen still frames from this video.  That's

14   when Mr. Parker gets on the bridge.  Mr. Engel is already right

15   there (indicating) on the side of the bridge.  He's not

16   running, his gun's down, vest on, hat forward, extra magazines,

17   walking onto the bridge.  Clearly the gentleman screaming could

18   hear the orders.

19           A little bit about the orders.  By this time

20   Greg Johnson, who you heard testify, you heard his video, you

21   sat here while we played the entire video, go home.  Peacefully

22   leave.  Leave the area.  You're in violation of court orders.

23   Court orders.  Court orders.  Court orders.  Peacefully leave.

24   Peacefully leave.  You're in violation.  You're in violation.

25   Was it windy out there?  Were people far away?  Were people

95

1    yelling?  Absolutely, the evidence shows it.  But it was

2    repeated over and over and over again for a long period of

3    time.  By what the crowd's yelling and what other people are

4    saying, there is -- it is implausible that you could not hear

5    at least once "court orders" and "disperse the area."  There's

6    closure orders.  There's people with binoculars.  There's

7    closure orders on those fences, and not that it matters,

8    because as the Court has instructed you, we don't have to prove

9    the defendants knew they were federal law enforcement officers,

10   but it's crystal clear that these (indicating) are people with

11   authority and that they are federal law enforcement officers,

12   or law enforcement officers, and any claim to the contrary is

13   ridiculous.

14            I'm going to -- so we'll walk through some of those

15   slides and saw what happened in the wash.  These defendants

16   came to the BLM.  The people in the crowd, the people on the

17   bridges, these six defendants, they sought out the BLM.  The

18   BLM wasn't up at the rally site with Mr. Bundy protesting, they

19   weren't around there.  They were in their compound, figuring

20   out how to get out of there and pack up and protect the cows

21   and protect the civilians.  They came to them.  They came to

22   the BLM's incident command post.  They had come into a closed

23   area, to show force, to confront the BLM, to get them to back

24   down and to get the cattle back.  And the only way they could

25   do that is by the barrel of a gun.  By threatening them,

1    assaulting them, extorting them, and obstructing justice.  And

2    they were all working together.  It was clear concert of action

3    when you look at the evidence, ladies and gentlemen.  They knew

4    that together they were a superior force assisting one another.

5    And they all knew the objective -- it's crystal clear -- which

6    could only be carried out by guns.

7              A little bit on Mr. Burleson.

8              He wasn't at the rally site and he didn't hear

9    Cliven Bundy give the orders, but the evidence shows by his

10   Facebook postings and by his Long Bow video and by his

11   association and planning with the Arizona Militia people that

12   he discusses, that he clearly knew what the objective was, and

13   his intent is crystal clear.  I came here to kill federal

14   agents.  Even if you want to chalk some of that up to, oh,

15   maybe he was boasting a little bit.  Who boasts about that?

16   And he says it multiple times in multiple incarnations.  And

17   once he gets there, he knows what the plan is and he describes

18   it.  And you can see by his movement.  So Mr. Burleson, at the

19   latest, is a plan -- is part of this conspiracy when he gets

20   into that wash.  And the Government submits that the evidence

21   shows that he's joined the conspiracy when he's in Arizona

22   recruiting people and giving his intention of what's going to

23   happen when he gets there, which is to back down the BLM and

24   federal officers by a show of force and arms.

25        (Exhibit published.)

1          There is Mr. Burleson, in his minuteman hat, by the

2     NHP, Sergeant Jackson and -- I mean, Captain Jackson and

3     Sergeant Serena, both talk about seeing him in the distinct

4     minuteman hat.

5          Now the crowd has moved forward.  So you already know

6     some people sat under the bridge, there was a prayer circle,

7     BLM is giving out orders to disperse, they're chanting under

8     the bridge.  "Go home BLM."  But when the horsemen arrive,

9     just -- and to mention, that Ammon Bundy had led that group

10    when they were waiting for the horsemen, the immediate second

11    the horsemen arrive, they move into the middle of the wash.

12         Now, the BLM is facing superior numbers, horses,

13    unarmed people, including women and children, in this crowd

14    (indicating).  And numerous firearms.  And not only firearms in

15    front of them (indicating), but as you've heard testimony,

16    firearms here (indicating), firearms here (indicating),

17    firearms -- when we get to it -- on the northbound bridge,

18    under the northbound bridge, on the skirts of the northbound

19    bridge.  People moving in and out.  Gas masks.  Body armor.

20    The number of guns and the variety of guns, handguns, shotguns,

21    assault rifles.  The tactical position and the movements of the

22    people with guns, the gunmen in the wash, the gunmen on the

23    skirt, the gunmen on the northbound bridge, the gunmen on the

24    side of the skirts, the gunmen bobbing up and down

25    specifically, as we'll see in a second, with spotting scopes,

1    an immense threat to the BLM and those officers behind that

2    gate.  Nobody, nobody is obeying the lawful commands of the

3    officers.  Nobody.  They keep moving forward.  They don't

4    listen.  Leave.  Peacefully leave.  No one's trying to arrest

5    them.  No one comes out from the gate.  There's not a force up

6    on the northbound bridge ready to arrest the people coming out

7    of the wash.  Just leave.  Nobody leaves.  More importantly,

8    these six defendants don't leave.  They continue to use, carry,

9    brandish, and even point their firearms at federal law

10   enforcement officers.

11        (Exhibits published.)

12            One of the better exhibits showing the view at this

13   point in time from the BLM's -- somewhat from the BLM's

14   perspective.  This is what they're seeing (indicating).

15   Trained law enforcement officers, though, are looking for the

16   guns.  As you saw, Special Agent Simpkins came in and had the

17   summary chart that -- of clippets from where he pointed out

18   where the guns were.

19            People on the bridges (indicating), on the northbound

20   side.  People under here (indicating).  There's testimony there

21   were guns there.  We know for a fact that there were guns here

22   (indicating), including someone in desert fatigues proned out

23   with a long gun.

24        (Exhibit published.)

25            The stack.  11:58.  No one is listening to commands.

99

1    No one is dispersing.  Guns.  Guns.  Guns.

2            Not an unreasonable response.  They're federal law

3    enforcement officers.  They need to minimize the threat to

4    themselves and to the civilians behind them.

5            Contemplating dispersing gas.  As you heard -- as you

6    heard them talk about, Officer McBride is holding this

7    (indicating).  They decided that wasn't a good idea.  There

8    were too many guns.  The people were too angry.  It could have

9    set things off.  They used their training and their experience

10   to make a decision, even though they were told fire gas, to

11   exercise their judgment as law enforcement officers to say no,

12   not a good idea.

13           They were seeing gunmen on the sides of the bridge.

14   They're being told to stay in that position.  Again, they used

15   their training and experience and they back up.  They don't go

16   home, but they back up.  That's how in fear they were and how

17   dangerous that situation was just after 11:58.

18       (Exhibit published.)

19           We start seeing our defendants on the bridge.  11:59.

20   Steven Stewart kneeling.  Long gun.

21       (Exhibit published.)

22           11:59.  Crowd still not obeying.  Still staging.

23   (Indicating).

24       (Exhibit published.)

25           Start seeing Mr. Burleson's movements.  He's up on

1    the skirt (indicating).  Long gun.

2         (Exhibit published.)

3              Right there at 12 o'clock on that skirt (indicating).

4    The right skirt facing the officers.

5         (Exhibit published.)

6              And similar time on the left side, this gentleman

7    (indicating), proned out, with a long gun, towards law

8    enforcement officers.

9         (Exhibit published.)

10             Now we see Mr. Burleson moving over here (indicating)

11   a couple minutes later.  Flanking, just like he told you.  His

12   own words, "we were flanking," in his Long Bow video.

13        (Exhibit published.)

14             Keeps moving.  12:05.

15        (Exhibit published.)

16             Now he's got his gas mask on (indicating).  12:08,

17   which is consistent with seeing the officers with the pepper

18   ball guns, the big thing on top.  It clearly is not -- for

19   anyone that knows firearms, which apparently Mr. Burleson has

20   some association with them, might recognize as a pepper ball

21   gun.

22             So, 12:08 gas mask in the crowd.  Now Mr. Burleson

23   has flanked the BLM over here in the bush (indicating).  Hat

24   backwards.  Ready for battle.

25        (Exhibit published.)

1          Go back, 12:10.  Now we have Eric Parker on the

2     bridge (indicating).  Firearm can be seen.  Can be seen.  Can

3     be seen by those officers behind the bridge -- I mean, behind

4     the gate, while he's on the bridge.  Up.  Down.  Up.  Down.

5          12:10.  Now, logically the person that was proned,

6     same hat, another individual, camouflage (indicating).  Can't

7     quite make out one way or the other.  Logic tells you he was

8     probably armed.

9        (Exhibit published.)

10         Todd Engel, 12:10 p.m.  See his gun pointing down the

11    northbound bridge.  He's trying to say he was walking away,

12    walking away from trouble.  No.  He's right here (indicating),

13    looking this way, gun down.  Tacked out in a vest.  Not holding

14    a protest sign.  Ready for battle.

15       (Exhibit published.)

16         Now we see Ammon Bundy who is leading this assault on

17    the BLM compound.  He's clearly seeing Mr. Burleson, armed,

18    vest, gun.

19         See people up here (indicating).

20         If we could play Government's Exhibit 431F.

21       (Government Exhibit 431F published.)

22         "Go home BLM."  "Go home BLM."  "Go home BLM."  They

23    clearly know they're BLM, telling them to go home.  You've

24    heard testimony they were yelling give the cattle back.  Get

25    the "F" out of here.  All kinds of other chants.

1          So, at some point -- excuse me -- Sheriff Lombardo --

2    now Sheriff Lombardo, who, ladies and gentlemen, was

3    essentially asking -- acting as a hostage negotiator to get

4    those BLM officers and National Park Service officers and

5    civilians out of that compound, he pulled the plug.  And he

6    told you why.  He went down there and looked at it for himself.

7    He's already told you what he saw at Post 1 gun's everywhere,

8    people asking him to do his job, do your duty, follow your

9    oath.  He told you he saw numerous individuals amassed up

10   against the fence line.  There was also individuals up in the

11   concrete high elevation areas directly adjacent to the bridge

12   that were in possession of weapons pointing at the BLM, in the

13   direction of the BLM, and myself.  And then there was numerous

14   individuals in possession of weapons up against the fence line

15   and the horses arrived to the rear of those individuals.  "The

16   threat was there where weapons pointed in the direction --

17   pointed in our direction and we were basically defenseless at

18   that point."  Felt shots would be fired, that the protestors --

19   the protestors -- the protestors would engage the BLM; not vice

20   versa.  "My concern was personal safety and officer safety at

21   the scene and I am making the decision to release the cattle."

22          He was asked, "What is your assessment -- what was

23   your assessment of the overall -- in terms of the overall

24   threat that was present at that time?  Did you fear shots would

25   be fired?"  "Yes.  It could have been a bloodbath."  An hour

1    had passed, an hour from when Dave Bundy had told him, "You

2    have an hour."  His concern was personal safety and officer

3    safety.

4             So, Special Agent Love heads to the gate to try to

5    diffuse the situation at Post 2, and this is about 12:13 p.m.

6         (Government Exhibit 432A published.)

7             "De-escalate the situation."  "We're trying to get

8    ahold of your father to get an end to this."  "We're not

9    playing here."  "We're not playing here."  Backed by an armed

10   mob, including these six defendants, Ammon Bundy tells him,

11   "We're not playing here.  We're here -- we'll stay here as a

12   presence."  It's the same show of force, match force.  We're

13   staying here as a presence.  If the presence wasn't armed

14   gunmen, they would not be releasing the cattle, ladies and

15   gentlemen.

16            "You need to leave."  "You leave."

17        (Exhibit 111 published.)

18            Ladies and gentlemen, this is the disputed Exhibit

19   111.  You heard sort of back and forth was Mr. Parker pointing

20   a gun, was he not pointing a gun.  Government submits that this

21   shows he raised up his gun and was pointing it, but the real

22   purpose of slowing this down and showing you -- let's continue

23   to play it -- the real purpose of this is to show you what law

24   enforcement was seeing.  Somebody coming up like this

25   (indicating) with a gun.  Split second, split second

1    decision-making.  And it wasn't just Mr. Parker on that bridge

2    as we all know.  Mr. Engel, Mr. Lovelien, Mr. Stewart,

3    Mr. Drexler, and others, armed with long guns.  That's what law

4    enforcement officers are seeing.  They're also seeing all the

5    people in the wash.  You heard Mr. Bushman, their own witness,

6    he counted 30, similar to Agent Simpkins, what he told you of

7    the law enforcement officers in the wash.  Those are the

8    decisions.  They make decisions off of those split second

9    actions.

10           You have an angry crowd, with guns, who's already

11   made their intent known, bobbing up and down like that?

12   Pointing.  Not pointing.  The intent is there.  And as the

13   judge has told you, in none of the counts do we have to prove

14   anyone was pointing, although we know, of course, that

15   Mr. Parker and Mr. Drexler both pointed.  It's the brandishing,

16   it's the carries, it's the using, it's the possessing, in front

17   of the law enforcement officers, to get what they want, to

18   assault them and threaten them.

19           Now we go to Mr. Lovelien and Mr. Engel on the

20   bridge.

21        (Exhibit 102 published.)

22           They're both on the bridge.  They're both tacked out.

23   Mr. Lovelien's in full camouflage.  They both have long guns.

24   They're both visible into the wash.  They both can see the BLM.

25   The BLM can see them.  This is where Sergeant Serena tells you

he's sort of talking to Mr. Engel and he's saying, oh, they're
pointing guns and he thinks, oh, some -- somebody's pointing
guns at law enforcement officer, or he's confused, he doesn't
really understand what the situation is -- for law enforcement
officer is unbearable and that's when Captain Lovelien walks up
and says, as Sergeant Serena told you, it appeared he was in
some position of authority because Mr. Engel stopped talking,
turned away, didn't want to interact with him anymore, and
that's what you see right there.

         And then at 12:16, Mr. Burleson in his flanking
position, long gun, hat backwards, vest.

         Mr. Parker, 12:18, proned out on Interstate 15, 70,
80 miles from here.

         Again, use your common sense, ladies and gentlemen.
When have you ever seen that on the freeway?

         Sort of the perfect place and the perfect time for
these defendants.  Middle of nowhere.  Even though it's --
close to Las Vegas.  BLM outnumbered.  Now we can match force
with the federal government.  Now it's possible.  Possible
(indicating).

         Here's Mr. Drexler.  Clearly Mr. Parker's here and
the people taking pictures of him, on the bridge 12:18, proned
out, pointing at law enforcement officers

         12:20.  Proned.  Pointing at law enforcement
officers.

1          12:20.  Mr. Drexler, same position.  Gun down,

2     looking over, observing, ready.

3          12:23.  Todd Engel down, long gun.  Ready to be

4     brought up.  I suggest to you the evidence shows that he's not

5     resting his back.

6          Captain Lovelien, standing watch.  Waiting

7     (indicating).

8          (Exhibit published.)

9          Agent Seyler testified identifying Mr. Lovelien's

10    gun, 191 and 192.  He had that on his Facebook page.  One of

11    the guns that intimidated, threatened, and assaulted the law

12    enforcement officers that day.

13         (Exhibit published.)

14         12:23.  Mr. Parker still down, prone (indicating),

15    aiming at law enforcement.  Mr. Drexler (indicating), some

16    other guy (indicating), long gun.  Point out, as Mr. Parker

17    stated, I believe in his interview, oh, militia, some could be

18    crazy, some could be nuts, racist, whatever.  Want to blow up

19    the government.  He had no idea who this guy was (indicating),

20    what his training was, or not training.  I'm not here -- I

21    would -- the Government would submit it's not good either way.

22    Maybe this person had all the firearms training in the world

23    and was an expert.  That wouldn't be good for law enforcement.

24    Or maybe he had no idea how to operate his weapon and he had

25    bought it at Walmart two days ago to go show force with the

1    federal government and answer the call to arms.

2        (Exhibit published.)

3            Now Mr. Drexler has found his own crack (indicating)

4    with the water bottles we've seen.  So now he's followed

5    Mr. Parker's direction.

6            It's also good to notice up here (indicating), three

7    guys in desert fatigues (indicating), all surrounding the BLM

8    and the National Park Service officers when they're in that

9    fatal funnel.

10       (Exhibit published.)

11           Now, now Mr. Parker is ready (indicating).  He's got

12   his backpack, elbow rested, gun through, hat backwards, just

13   like officers testified.  He's turning his hat backwards.  You

14   heard -- you heard what that meant to the law enforcement

15   officers.  That now he's ready to fire.

16           That definitely was assaulting them, intimidating

17   them, threatening them, with a long gun, combined with all the

18   other people with long guns, and handguns, and horses, and gas

19   masks, and vests.

20       (Exhibit published.)

21           Mr. Engel -- I mean, Mr. Drexler now, clear of what

22   he's seeing (indicating), women and children (indicating),

23   unarmed men mixed in there.

24           Again, 12:39.  Mr. Parker's still down (indicating).

25   Mr. Drexler's taking a break getting some water.  Mr. Stewart's

1    above, long gun above.  Officers can see.  We've also heard

2    testimony of the bouncing up and down, of the movement.

3         (Exhibit published.)

4              Finally, sheriff's given his cease and desist and

5    this is the way it has to go.  Dan Love clearly at some point

6    went along with that because he goes to the gate, brings

7    Ryan -- or brings Dave Bundy up.  You see the meeting they have

8    where, you know, You leave.  You leave.  You leave in an hour.

9    You have an hour to leave.  And Dan Love's like, We have all

10   this stuff.  You know, You have an hour to leave.  You need to

11   send somebody out now to show -- show us that you mean it,

12   to -- to -- you know, calm the crowd down.  You have an hour.

13   An hour.  Dan Love, all he can say is we'll go as fast as we

14   can and I can't, under authority of the United States

15   government, allow you to release those cattle.  I'm not giving

16   you permission to do that.  You do it at your own risk.

17        (Government Exhibit 93 published.)

18             Some of the BLM and Park Service officers retreat.

19   They don't fulfill their duties that day.  They don't finish

20   what they went out there to do, impound the cattle, or even the

21   cattle they impounded, all the work that went into that, gone.

22   Still in fear, they give an hour to leave.  They're told hour

23   to leave.  They pack up frantically.  They're still scared.

24   They're still in fear.  You've heard the testimony.  They all

25   pack up as much as they can.  They get in their cars, and

1    trucks, and they leave, en masse, led by Metro.  Now law

2    enforcement is being escorted by other law enforcement to

3    protect them.  Unheard of.  Not one law enforcement officer

4    said they've ever heard of that.  They drive to Mesquite.  You

5    heard Sergeant Jenkins say, "At that point we had our rifles

6    out.  We still felt there was a threat.  There's cars weaving

7    in and out of the convoy."  They collect their stuff; they head

8    back to Vegas.

9        (Exhibit published.)

10        Ryan Bundy (indicating), after giving his hour, you

11    got to leave, you got to leave in an hour, comes down and tells

12    the crowd the west has now been won.  We're getting the cattle.

13        (Exhibit published.)

14        And conveniently, a sign comes out, "The West Has Now

15    Been Won (indicating)."  Still on the bridge.  Defendant

16    Stewart, defendant Parker, defendant Lovelien, defendant

17    Drexler, but it wasn't about the cows.  But they're there.

18    Mission accomplished.

19        Before we -- yeah, go ahead.

20        (Government Exhibit 83 published.)

21        So, there's a few things.  Mr. Parker, Mr. Drexler,

22    and Mr. Stewart are still on that bridge, still with their long

23    guns.

24        Mr. Parker sat up there and told you, "Oh, I was

25    being cocky, I was annoyed."  I was annoyed that this guy with

1    a camera came up to me and had dare ask me about what we just

2    saw.  He's annoyed, while at this time the BLM officers and the

3    victims of his crime are having to pack up in an hour, but he's

4    annoyed.  And he was so emotional about this whole event.

5    Clearly shown in this video.

6            Get on a bridge.  Show 'em force.  Do it in Texas.

7    Clearly he had did some other research about somewhere else

8    that somebody should show force to the federal government.  Get

9    on a bridge and show 'em force.  That's why he came to Nevada.

10   That's why all six of these defendants came to Nevada, and

11   that's what they did.  But it wasn't matching force.  You heard

12   Mr. Parker talking about, in his UCO, well, before I came, I

13   heard that 200 people and 200 people and, oh, it's a good match

14   of force.  It was overwhelming force.  That's how they got the

15   cattle, overwhelming force.

16           It was good to have women and children in the wash.

17   It's probably the only reason they didn't get gassed.  First

18   off, he said "gassed" and as we'll hear, Mr. Stewart also says

19   "gassed" in his video, and maybe that makes sense because at

20   12:18 Ranger Johnson said, as we've heard, "less lethal," we've

21   been authorized to use "less lethal."  He says it once.  "Less

22   lethal."  And then four times, directly after that, he says

23   "pepper ball," "pepper ball," "pepper ball," "pepper ball."  He

24   didn't say "shoot."  The evidence is uncontroverted that they

25   never said "shoot."  They never say we're going to shoot you if

1    you take one step forward.

2            Right in time.  Close in time.  The closest thing we

3    have from defendant Parker, I think they would be saying they

4    threatened to shoots those kids.  Can you believe that?

5    Where's the sheriff?  We got to get the sheriff.  They're going

6    to shoot kids.  No.  You know why it was good to have women and

7    children in that wash?  You heard those officers testify, they

8    couldn't engage.  There was unarmed people -- it's not just

9    women and children; it's unarmed people.  It was the people

10   that they did not view as the threat, the assaulters.  It's

11   because those women and children that unarmed people were

12   essentially human shields.  They were there so the militia

13   could do Cliven Bundy's bidding.  And if they weren't there,

14   who knows?

15           And this goes to this whole notion of BLM.  BLM, the

16   big bad BLM.  You saw 14 BLM officers testify.  Judge has given

17   you a credibility instruction.  You use that.  They are victims

18   in this case.  They weren't investigating the case.  You heard

19   from Agent Seyler and Agent Willis, Agent Draper, the FBI

20   agents investigating this case.  The special agents you heard

21   from, they're law enforcement, but they're victims, and they

22   told you about their fear.  They're real people.  They're not

23   some faceless, BLM-behind-the-gate, evil people.

24           Special Agent Michael Johnson, former secret service

25   agent, entrusted to guard the president, his dream job, he left

1    the Secret Service, he told you, because he wanted to work for

2    the BLM on public lands in Utah and that spot came open and he

3    went there because that's what he wanted to do.  He absolutely

4    felt threatened and was absolutely concerned about the safety

5    of his fellow officers.

6            Ranger Logan Briscoe feared for his life and for the

7    lives of his fellow officers.  It affected how he performed his

8    job after April 12th, 2014.

9            Special Agent Mark Brunk said this was the second

10   most scary experience that he's ever had as a law enforcement

11   officer, and the first one was an officer involved shooting.

12           Ranger Patrick Apley, feared for his safety in terms

13   of the level of -- on a scale of 1 to 10, 10 being the highest,

14   said 7 and compared it to his combat experience when he served

15   in the military.  Affected how he performed his job after

16   April 12th, 2014

17           Officer Tara McBride, the most threatened I've ever

18   felt in my law enforcement career.

19           Ranger Keith Whitworth.  "It's the worst situation

20   I've been in.  Scariest situation I've been in in my whole

21   career."

22           Special Agent Rand Stover, "It did cause me to fear

23   for the safety of especially my fellow officers, but also

24   myself."  Risk assessment was at a 10 for violence, scale of 1

25   to 10.

 1              Ranger Greg Johnson, who stood up there, dehydrated,

 2    had to go to the medical tent afterwards, giving those

 3    commands, giving those commands, giving those commands, feared

 4    for his safety.  "I really felt like I was, at best, going to

 5    get shot, possibly going to die that day."  And he told the

 6    FBI, "We were fucked."

 7              Special Agent Robert Shilaikis, he served in four

 8    different war zones he told you.  "I was absolutely fearful for

 9    my own safety.  I was absolutely fearful for the law

10    enforcement officers that were down in that wash.  One of the

11    worst positions they could have been in."  The fatal funnel.

12    Emotionally impacted him after this event.

13              Brandon Novotny, feared for the safety of his

14    officers -- excuse me, Officer Brandon Novotny, feared for the

15    safety of himself and officers and ranked the situation as a 10

16    from 1 to 10, 10 being the highest in terms of danger that he

17    felt to himself and his fellow Officers.

18              Ranger David Keltner, he didn't have time to be

19    afraid.  "I had time to worry about making sure that I had made

20    good decisions so that we could try to get out of there without

21    dying.  It's been hard.  I think about this a lot and sometimes

22    it affects my ability to focus on other things."

23              Special Agent Adam Sully, standing in the wash

24    thinking about leaving behind a son and a daughter.

25              Special Agent Carpenter, called by the defense, on

1    redirect -- or cross, he testified similar.  Special Agent

2    Swanson also as well.

3              You heard what the sheriff thought.  You heard what

4    Sergeant Jenkins thought, he was scared.  Been working for

5    Metro for 29 years some of the biggest events in Las Vegas.

6    The Saturation Team.  He's definitely not some Keystone cop.

7    None of these officers were.  And the implication that they

8    were is ridiculous.

9              They were experienced law enforcement officers, some

10   who have served in the military, some who have served in the

11   Secret Service, other law enforcement officers agencies, and

12   they were carrying out court orders.

13             If you don't believe them, Captain Thomas Jackson, he

14   felt fear for his safety and his officers on that day, NHP.

15             "Question:  Did the fear rise to the level of you

16   thinking that you or your officers might lose their lives out

17   there?

18             "Answer:  Yes, it did."

19             Became emotional after the event and pulled his

20   patrol car over and cried.  It was the most frightening day of

21   his life.  He's third in command now of NHP.

22             Sergeant Serena, on the bridge, interacting with

23   Captain Lovelien and Mr. -- and defendant Engel.  Feared for

24   his safety.  To this day he gets a pit in his stomach when he

25   travels through that area.

1              But, it's a little bit different.  Unlike, maybe

2    others, these were all law enforcement officers, and they

3    train.  And you heard, you know, almost all of them that

4    testified, when we called them, asked them about their

5    training, maybe at some point they're like, okay, I know they

6    go to FLOOD SEA, I know they go to FLOOD SEA, I asked them that

7    question, but their reaction to these situations is based on

8    their training and their experience, and you heard all the

9    training and experience they have.  Despite the fear they had

10   and despite the fact that they were outnumbered, they were

11   trained law enforcement agents and they continued to do their

12   jobs and their training kicked in.  You heard them.

13             What are we going do if the horses come in?  Are we

14   going to jump in the back of the trucks?  Are we going to get a

15   rumbler?  Do we have plastic cuffs if people cross the thing?

16   All kinds of discussion about whether to use pepper ball or not

17   pepper ball and used their experience to make the decision not

18   to.  Contemplating a medical setup and do we need a triage

19   area.  You know, again, Officer McBride pulled back, but they

20   didn't leave, because that's not what they're trained do.

21   They're not going to get in their cars and run away.  Some law

22   enforcement officers do.  They face a situation and try to make

23   it the best they can, and this was an impossible situation.  It

24   was impossible for those federal law enforcement officers

25   behind that gate, it was impossible for those highway patrol

1    officers on that bridge, it was impossible for the sheriff, it

2    was impossible for the Metro Saturation Team, it was impossible

3    for the SWAT Team that wasn't deployed because it wouldn't have

4    mattered.  It would have escalated things to God knows what.

5         (Exhibit published.)

6              Not about the cows.  But Eric Parker, "We have cows,

7    happy cows, free cows, American cows raised on an open range,

8    not a cage.  It's over.  We won."

9              Eric Parker.  "Feds get scared when you got there and

10   backed off in?"

11             Thumb.  Thumbs up.

12             Down below this in Exhibit 238, which you can look

13   at.  "We won.  It's over."

14             "Oh, it took a standoff," is where it says on 238.

15             Todd Engel, right after the BLM is leaving, or right

16   when the BLM is leaving.

17        (Government Exhibit 304 published.)

18             Any doubt about his intent that day?  Wasn't just

19   being angry.  Combine that with all the other evidence.

20             His own words.  "BLM lost and has backed down due to

21   the overwhelming force of the people and our arms."  Not our

22   signs.  Not our flags.  Our arms.  "We win.  Cattle being

23   released as we speak," but it wasn't about the cattle.  If they

24   don't trouble -- "If they don't, trouble will start.  Again, it

25   was very close to an exchange of gunfire.  We rushed their

1  barricades."  We.  We.  We.  Because they were the aggressors.

2  They were the attackers.  "We rushed their barricades with

3  armed people" -- armed people.  Not people with signs.  Not

4  people with flags.  Armed people -- "and cowboys on horseback.

5  Crazy."

6          "We win."  And then pardon the language on his little

7  glorification video.

8          Steven Stewart.

9     (Exhibit published.)

10          Again, threatening to shoot chemicals in the crowd.

11  Not threaten to shoot women and children.  Not, oh, my God, I

12  thought women and children were going to die.  His

13  demeanor doesn't seem like he's real upset that he almost saw

14  women and children gunned down in the wash.

15          "We pushed forward."  "We pushed forward."  Again,

16  they're the aggressors.

17          "We, on the other side."  "They fought against us."

18  Sergeant Serena, who is out there directing traffic, completely

19  in the open wearing a vest, exposed to all of this, doing the

20  best he can to just keep the situation de-escalated.  How did

21  he fight against them?

22          "It's been a long day.  What's up?  Well, I have a

23  little earlier with a really high-powered scope.  Show me F'ing

24  awesome."

25          Steven Stewart.

1          "First they said they were going to release

2     everything and leave."  We know that's not what happened.

3     "Then they held the gates to Gold Butte and threatened us with

4     chemicals."  Not bullets.  "Then we pushed forward and they had

5     to back off."  We pushed forward.  "They are releasing the cows

6     now.  BLM is leaving."

7          And again, even if this (indicating) was true --

8     which, of course, it's not and no reasonable person could have

9     thought that -- it wouldn't have mattered, because when they

10    got there, Mr. Stewart got there, BLM's there, law

11    enforcement's there.  Go away.  Back off.  Maybe they did --

12    even if they were, for sake of argument, they were intending to

13    leave within an hour and they said leave now, we need to pack

14    up, federal law enforcement officers, giving lawful orders that

15    as the judge has instructed you, you can't resist, and you sure

16    can't resist by the barrel of a gun.

17          Not about the horses, but Mr. Stewart posts the

18    cowboys going and getting the horses.

19          The next day, Todd Engel.

20       (Government Exhibit 447B published.)

21          Defendant Engel's own words.  Although we know Cliven

22    didn't say get your guns.  That's how Mr. Engel wants it to be

23    said.  This is where the glorification starts, the next day,

24    all six of these defendants.  Let's glorify what we did,

25    because somehow this is great.

1           Next day.  He's not eating steak by a pool at a hotel
2      in Mesquite; he's tacked out, at a rally, at the rally site, by
3      Cliven Bundy's ranch, with Cliven Bundy, giving his story of
4      the battle from the day before, how they overcame and
5      overmatched the BLM with force.
6           "What you don't see is there was another 150 of us
7      with guns behind those cowboys."  His own words.
8         (Exhibit published.)
9           Rick Lovelien.  "Heads-up.  I have returned home for
10     the time being the Bundy -- from the Bundy ranch.  I will
11     update what I can as I can.  The operation" -- operation -- the
12     plan -- "is still ongoing in Nevada and although the federal
13     agents have surrounded -- or surrendered their position" --
14     acknowledging the federal agents surrendered and withdrew --
15     "the area is still active" -- whatever that means -- "and we
16     still have boots on the ground."  We.  "We have boots on the
17     ground.  Security is our top priority, as always."
18           You'll hear in Count Two -- because there's two
19     different conspiracies -- this keeps going.  It keeps going.
20     They want to encourage people, whether it's social media,
21     whether it's Long Bow videos, whether it's interviews to A, B,
22     and C, to encourage people to stand up and have the threat out
23     there so people don't go back to Bundy ranch, so BLM doesn't
24     enforce those court orders, and that they get what they want.
25        (Exhibit published.)

1        "Please note," again -- again, Mr. Lovelien --

2    "Please note" -- April 14th -- "personnel are still needed at

3    the Bundy ranch for ongoing security operations.  Contact me or

4    Ryan Payne, OMA for more information."

5        (Exhibit published.)

6        Greg Burleson.  Tagged in Mr. Zanna's photo -- or

7    message.  "My camera went crazy on me.  Sorry.  Went on this

8    weird out-of-focus mode but we were there and glad we met in

9    person finally.  Luca."

10       (Exhibit published.)

11       Greg Burleson shared a link.  "I faced -- I faced off

12   with heavily armed federal agents this weekend.  What did you

13   do, go shopping?"  And glorifying, showing that the reason they

14   went there is to fulfill their goal or their desire to face off

15   with the federal government and again, they found the right

16   place, at the right time, at the right moment where that could

17   happen.

18       (Exhibit published.)

19       Mr. Drexler.  Posts a Reuters article.  "U.S.

20   officials ended a standoff with hundreds of armed protestors in

21   Nevada desert on Saturday calling off the government's roundup

22   of cattle it said was illegally.  But it looks like we may have

23   to go back."  Not, it was the worst experience of my life.  I

24   thought someone was going to die in that wash.  "Looks like we

25   might have to go back."

1           (Exhibit published.)

2                Steven Stewart.  Posting about Judge Lloyd D. George.

3    "These people think they own us."  Federal judge.

4           (Exhibit published.)

5                Exhibit 5, federal court order (indicating).

6                If you go to bed, there's no snow on the ground and

7    you wake up and there's snow on the ground, it snowed.  Lloyd

8    D. George.  Lloyd D. George and the court order (indicating).

9                Don't interfere.  BLM's there.  They can take the

10   cattle.

11          (Exhibit published.)

12               Rick Lovelien.

13               "Please note this money is going directly to the

14   militia at the ranch and not to the Bundy family."  Still

15   actively engaged in the conspiracy getting money -- money to

16   the Bundy ranch for the militia and the armed people that are

17   still there.

18          (Exhibit published.)

19               Scott Drexler.

20               It's a picture of him from the 12th.  "Careful.

21   Bridges are choke points," someone comments on this picture.

22   Defendant Drexler:  "That's why we used them to shut down the

23   freeway."  Again, just like Cliven Bundy said, just what the

24   plan was.

25          (Exhibit published.)

1           Steven Stewart

2           "Guys, I only went there for the weekend.  We helped

3    Cliven Bundy get his cattle back."  Get his cattle back.

4    "Straight there.  Straight back.  Two hours of sleep in

5    between."

6           How long he was there is irrelevant.  Once he joins

7    the conspiracy it doesn't matter how long he's in there as the

8    Court has instructed you.  So the fact that they were on the

9    ground for less than 24 hours, irrelevant.

10        (Exhibit published.)

11           Rick Lovelien.  Someone asks him, "Nothing much.

12    What you been doing?"

13           "Chasing off federal agents."

14           Now we're well after the 12th; 23rd.  Still living in

15    the glory of their battle with the federal government.

16        (Exhibit published.)

17           Greg Burleson.

18           The 29th of April, "Attention national malitias, Oath

19    Keepers have been charged with desertion among other charges

20    and have been banned from the Bundy ranch.  We still need boots

21    on the ground at the ranch.  There are now 20-man tents set up

22    for visiting militia."

23           Still following it.  Still making sure the BLM

24    doesn't come back.  Still protecting Cliven Bundy.

25        (Exhibit published.)

1           This picture, which we've seen (indicating),

2    Mr. Burleson posts it, thanks his cousin for finding it for

3    him.  "Never got this guy's name.  He's one of the guys that

4    was on the overpass skirt with me as we flanked the BLM to

5    their right."  Which, as you've seen, the evidence shows they

6    flanked the BLM to the right.

7           (Exhibit published.)

8           5-8.  Now we're into May.  "The party is over but we

9    still need people at the ranch for support and to build a

10   garrison and yes, it was a rush."  It was a rush.  Not, this is

11   horrible.  I'm so confused and I didn't know what federal

12   agents were going to do.  "It was a rush."  It was a rush to

13   match force, to overwhelm force with the federal government, to

14   get them to do what we wanted them to do.

15          (Exhibit published.)

16          Greg Burleson.

17          "They just don't get it, okay?  Attention FBI, arrest

18   just one militia person for the Bundy situation" -- the Bundy

19   situation -- "and the rest of us will burn this whole damn

20   thing to the ground.  Understand?  We, the people, have the

21   right to defend our people against one last -- defend our

22   people.  Again, one last warning.  Arrest even one of the

23   militia from the Bundy ranch standoff and we will burn you to

24   the ground, that includes your wives and children."

25          Put it out on social media.  Again, trying to defer

1    law enforcement from doing anything, anything with the Bundy

2    ranch.

3         (Exhibit published.)

4            Gregory Burleson.

5            "Protesting does nothing."  Protesting does nothing.

6    All caps.  "The only power they understand come from the barrel

7    of a gun and I, and some true patriots, in that gully on

8    April 12th, when we drove armed federal agents from the Bundy

9    ranch.  But hey, if protesting makes you feel good, do it.

10   They like it like that."

11           Speaks for itself.

12           The Long Bow videos.  As the Court instructed you,

13   you heard, the FBI did an undercover operation.  Perfectly

14   permissible.  Their own words.

15        (Government Exhibit 333C published.)

16           Two things.  A), acknowledges that the Internet is

17   who knows what you see on there, what's true and what's not

18   true.  So, it dispels this notion of all this intensive

19   research.  And two, you know, match force with force.  But I

20   don't want violence.  It's the whole double-talk of all of

21   these defendants, and Cliven Bundy.  We don't want violence.

22   We have 200 people matching you, or more force, but you do what

23   we want, you do what we think is constitutional, sheriff, you

24   do what we want, I want to put some legs under you to do what

25   we want, then it's okay.  Then I don't want violence, but you

1    do what we want.

2              It's same rhetoric Santilli was giving Love at the

3    gate -- or Love up at Post 1 on the 11th.  You know, we don't

4    want violence, but what are you going to do when people show up

5    and they want X, Y, and Z?  Are you going to let your people

6    retreat?

7              Go to the next slide.  Sorry.

8         (Government Exhibit 333C published.)

9              So, he was there, as has been pointed out, less than

10   24 hours but he knew enough to know that all these other groups

11   are here and it's great, we're under the banner of freedom, but

12   I don't want to be a leader, but was there long enough to

13   observe in-fighting with militia.

14        (Government Exhibit 333C published.)

15             Again, could be Internet stuff.  Maybe not true, but

16   this is what I'm basing my decision to put my gun in my car and

17   my two buddies and drive 10, 12 hours from Idaho to Nevada to

18   stand off, face off, show force with the federal government.

19             He knew about the court orders; he just didn't care

20   about the court orders.  He cared about showing force, matching

21   force, standing up for what he thought was constitutional, or

22   what he thought -- Mr. Parker -- or defendant Parker thought

23   was overreaching.  That had been decided in the courtroom.

24        (Government Exhibit 333C published.)

25             Court orders.  Fiat.  Not true.  Could have been.

1    Huh?  Okay.  Then you go to court and you litigate the court

2    orders if they're "illegal" or appeal it or what you've heard

3    from Mr. Petrie that Cliven Bundy did, but once again, just

4    nonsense.

5         (Government Exhibit 333C published.)

6              "As surrounded as they were."  As surrounded as they

7    were.  Acknowledging they were surrounding.  "Weren't going to

8    make it home?"  Once again, law enforcement had one option,

9    which was to back down and release the cattle, because there

10   was no other option.

11        (Government Exhibit 333C published.)

12             But it wasn't about the cows.  You know, it probably

13   wasn't, but it was the result of standing off with the federal

14   government and facing off with whatever perceived misdeeds

15   Mr. Parker thought the federal government was doing, which, of

16   course, is no defense, because you can't resist lawful law

17   enforcement actions.

18             Mr. Drexler.

19        (Government Exhibit 334B published.)

20             Possessing guns to show to law enforcement so they'll

21   do what you want because they think they might get hurt.

22        (Government Exhibit 334B published.)

23             Again, that's the conspiracy and that's the

24   double-talk.  We're there with guns.  We want them to know

25   we're there.  We're not happy with what you're doing, now it's

1    in your hands.  What are you going do?  We dare you.  Women and

2    children in the wash.  Unarmed men in the wash.  What are you

3    going to do?  We have guns and we're not happy with what you're

4    doing.

5         (Government Exhibit 334B published.)

6              No different than being in the armed forces.

7    Traveling to Bunkerville, having Cliven Bundy say "go get my

8    cattle" is like being in the Army.

9         (Government Exhibit 334B published.)

10             "We did what we came here to do when the cows came

11   under the underpass."  It couldn't be any more clear.  That was

12   the conspiracy.  That's why they were all there.  They had to

13   do it by assaulting, threatening, obstructing, extorting.

14   That's when it meant the most, when the cows got released,

15   whether they care about the actual physical cows or not.

16        (Government Exhibit 334B published.)

17             "You can't do the same thing through voting."

18   Apparently you can't do the same thing through court orders

19   either, because those don't matter.  It just matters what

20   defendant Drexler and the other defendants and the other

21   militia think and then we'll just go do it with our guns.  You

22   can't do it through voting.

23             Mr. Burleson.

24        (Government Exhibit 335D published.)

25             That speaks for itself.  That's how you can

1    clearly -- that alone would tell you and provide beyond a

2    reasonable doubt that Mr. Burleson joined the conspiracy

3    knowing of its objectives, even though he wasn't there when

4    Cliven Bundy said go get the cattle.

5         (Government Exhibit 335D published.)

6              That's exactly what happened.  That's exactly the

7    evidence.  They were boxed in and couldn't go anywhere but

8    back.

9              And we know he had a radio because Sergeant Serena

10   told you he had a radio and Sergeant Serena is jealous of his

11   radio and it was on the Metro scanner channel.

12        (Government Exhibit 335H published.)

13             "Retrieve Mr. Bundy's cattle for him."  They had to

14   back up.  That was the goal.  He knew it.  Knew it when he got

15   in the wash.  He joined the conspiracy.  He's a member of the

16   conspiracy.

17        (Government Exhibit 335I published.)

18             Guarding, and dead bodies, and coming into Bundy

19   ranch, continuing the glorification.

20        (Government Exhibit 335I published.)

21             Exactly what happened.  Protestors, a lot of the

22   unarmed people, horses in the middle.  I mean, the people with

23   guns, blue shirt, you saw a lot of blue shirt, but, Burleson

24   flanked them, other five defendants on the bridge with others.

25   You had the militia guys up -- you saw on the right-hand side

129

1    above in that one picture of Drexler.  You had the other ones

2    down proned out.  They were boxed in.  They were flanked.

3         Eric Parker.

4         "That's what I kept saying when people kept calling

5    me The Bundy Sniper.  My buddy Steven Stewart had to relay to

6    me what was going on through binoculars.  Not much good at that

7    distance with open sights.  Now, Steve, he's got balls.  Heads

8    up above the concrete telling me exactly what they were doing

9    after the snipers had been green lighted."

10        Mr. Parker said he was mistaken about binoculars.

11   It's irrelevant whether Mr. Stewart had binoculars or not; he's

12   relaying what's going on to Mr. Parker when he was in a proned

13   position with his rifle pointed at federal law enforcement

14   officers.  What else would he be doing?

15        (Exhibit published.)

16        This is afterwards.  No remorse.  Taking the glamour

17   shot.  Fulfilled the desire to stand off and show down the

18   federal agents.

19        Testified that that's Zanna (indicating), you also

20   heard Mr. Burleson communicate with in his Facebook.  So a lot

21   of these militias, people just keep crossing paths.

22        That's the sort of vacation photo shop -- photo shot.

23        (Exhibit published.)

24        November 20th, 2015.  Quite a bit after.  Mr. Parker

25   doing his ongoing weekly tribute.  "Lo, do they take the call

1    to me, they bid me to take my place among them, in the hallowed

2    halls of Valhalla where the brave shall live forever."  Similar

3    to Mr. Burleson quoting the halls of Valhalla in the slide we

4    showed you earlier, which is in evidence.  Just more

5    glorification.

6           (Exhibit published.)

7                This speaks for itself.  Mr. Parker admitted on the

8    stand, on the stand, he did this.  Dicks.  Dicks.  Dicks.

9                Also wouldn't admit even to this day that that's

10   federal law enforcement officers, which is beyond doubt.

11               "Always let your opponents take the field first.

12   That's one of the arts of war."

13               "Same idea.  I just wrote down a little different,"

14   says Mr. Parker.

15               "I always thought one would want to pick the ground

16   they fight from."

17               "That's the hard part.  Pick the battlefield, but let

18   them take it first."

19               "Let them take the battlefield first."  They came to

20   the BLM, ladies and gentlemen, not vice versa.  They were the

21   aggressors, with guns.

22           (Exhibit published.)

23               February 17th, 2016.  "Resist."

24               He testified he didn't make this, someone else did,

25   but it's updated his cover photo.

1           "Resist."  Not, oh, I had to defend poor women and

2    children because of the out-of-control, these crazy law

3    enforcement officers.  "Resist."  Because that's what he was

4    doing, and that's what the rest of the defendants were doing,

5    and that's what the rest of the armed gunmen were doing.  They

6    were resisting by overwhelming force.

7           Todd Engel.

8       (Government Exhibit 303B published.)

9       (Counsel conferring.)

10          I apologize.

11          Don't have the exact date, but I believe it's January

12   2016, Mr. Engel.

13      (Government Exhibit 303B published.)

14          He's willing to do it again.  Out there.  Glorifying

15   it.  Living the dream.  Backing down federal agents.

16      (Government Exhibit 303E published.)

17          Again, glorification.  Again, another example of the

18   double-talk.  "Let them fire first."  They're going to do what

19   we want them to do though, because we have guns.  Overwhelm

20   them.

21          Finally, Todd Engel on the day he was arrested.

22      (Government Exhibit 209C published.)

23          "Cut the head off the resistance."

24          THE CSO:  Your Honor?

25          THE COURT:  Yes.

1          THE CSO:  We need a break.

2          THE COURT:  Okay.

3          We'll go ahead and take our lunch break now.  It's

4    12:45.  Let's take a 45-minute break and plan to be back here

5    by 1:30.

6          I do remind the jury that during this recess you are

7    not to discuss this case with anyone nor permit anyone to

8    discuss it with you.

9          Do not read, or listen to, or view anything that

10   touches upon this case in any way.

11         Do not attempt to perform any research or any

12   independent investigation, and please do not form any opinion.

13         We'll go ahead and stand for the jury and after they

14   exit, then everyone else may take their lunch break as well and

15   we'll be back here at 1:15.

16       (Jury excused from courtroom.)

17         COURTROOM ADMINISTRATOR:  Off record.

18         THE COURT:  All right.  45-minute break.  Off record.

19       (Recess was taken at 12:48 p.m.)

20       (Outside the presence of the jury at 1:45 p.m.:)

21         COURTROOM ADMINISTRATOR:  All rise.

22         THE COURT:  Thank you.  You may be seated.

23         Before we bring in the jury and finish with the

24   Government's summation, do we want to address the other issues

25   regarding the defense argument so we don't have to take another

1    break in between?

2            MR. TANASI:  I think that would be great, Your Honor.

3    That's what I was going to ask for.

4            THE COURT:  Okay.

5            MR. TANASI:  I know where we left off kind of with

6    the historical quotes.  Again, you know, just so the record's

7    clear, I'm not arguing that those quotes are evidence.  I'm not

8    arguing that those quotes are necessarily Gospel in any way.

9    All I'm doing is providing kind of context to explain my

10   client's similar quotes.  My client makes quotes that are

11   protest oriented and that's not a new concept.  That's

12   something that's been done throughout history.  And that's

13   essentially the transition that I was looking to make.  I

14   wasn't trying to necessarily -- and I won't say that my client

15   is Benjamin Franklin or my client is, you know, Alexander

16   Hamilton.  That's not the case.  It's just that these quotes

17   show that my client's similar quotes, like "Headed to Nevada.

18   Going to stand up with my fellow countrymen against a corrupt

19   government," that is something that is not criminal in nature.

20   That's my whole argument.  And so I think that the contextual

21   quotes from history do just that.

22           THE COURT:  Mr. Myhre?

23           MR. MYHRE:  Well, Your Honor, the same argument as

24   before, but also, the third one especially with any reference

25   to race is clearly improper and prejudicial, but, again, the

1    overarching theme here is that these are analogies toward jury

2    nullification.  They're analogizing toward the Revolutionary

3    War, toward, you know, civil rights movements, which this is

4    not and that's -- that's our objection to the contextual quotes

5    that are being raised here.  The context is within jury

6    nullification.  It's not advancing any other -- any type of

7    proper argument.  That's our objection.

8            MR. TANASI:  Your Honor, I would say that it's not an

9    attempt at nullification.  It's attempt at putting my client's

10   statements into a frame of context.

11           THE COURT:  All right.  So, placing the statements

12   that there is evidence already that's been admitted, that your

13   client said or saw or posted or whatnot, explaining what those

14   statements meant or -- or how they should -- could be received

15   is one thing, but -- and I will permit you to do that, but if

16   you go the next step, which is to say -- to make that

17   connection, that revolutionary speak or those things are legal

18   and are a legal defense to this charge, I think then you'd be

19   crossing the line.

20           MR. TANASI:  So --

21           THE COURT:  So as far as you can explain what the

22   statements are that he placed on his Facebook page, what they

23   mean, what the context of it is and things of that nature, but

24   then if you go that next step, to try to connect it to say that

25   it is a legal defense to this case, the law doesn't support

1    that and so you can't argue jury nullification.  You can't

2    argue that therefore it's not illegal because it creates a

3    defense that the law doesn't acknowledge.

4            MR. TANASI:  Understood, Your Honor.  And I

5    understand kind of --

6            THE COURT:  Because I want to give you leeway, but --

7            MR. TANASI:  No.  No.  And so then what is the

8    Court's ruling with respect to the historical quotes then?  Am

9    I allowed to reference those quotes in my closing?  That's

10   what -- I mean, I just don't --

11           THE COURT:  It depends on how you're referencing

12   them.  I think that's the whole context.  At the time elicited

13   if you're using them in order to argue that a legal defense

14   exists, which the law doesn't recognize, then you can't use

15   those legal quotes that way.  If you're using the legal quotes

16   in some different way that is appropriate, then of course that

17   would be admissible.  So it depends on how you're using the

18   quotes.

19           MR. TANASI:  Understood.

20           Thank you, Your Honor.

21           MR. LEVENTHAL:  Your Honor, I -- just briefly.  I'd

22   like to renew my sort of argument before on what I wanted to

23   use in my closing, which would have been an inference or an

24   explanation to what my client indicated on Long Bow, that he

25   came down over the federal overreach as well as the First

1    Amendment zone and the Court indicated to me that I'm not

2    allowed to use or show a video of the three different things

3    that he meant by that.

4            Mr. Dickinson, in his closing, just told the jury,

5    without any evidence, the first 20 minutes, within the first 20

6    minutes, without any evidence that my client anywhere said the

7    reason he came down there was to show force.  Okay.  So without

8    any evidence, of anything that my client's done, he told --- he

9    gave them his reasoning.  And my client, on Long Bow, says

10   federal overreach and First Amendment and it's the videos that

11   he saw.  And so, I think to put that in perspective, I think I

12   should be able to show those videos, like I -- they're already

13   in, they're already in evidence, and put that in perspective

14   because it's not show of force, with him, but it was all lumped

15   into one without any other evidence that's come forward that

16   that's why he came down, because that's not what he said in his

17   Long Bow.  So I would just renew my argument that I should be

18   allowed to be able to talk about the three things that on --

19   the three videos that he saw.  They're little snippets.  I'm

20   not playing the whole thing.  They're already in evidence and I

21   should be able to, on closing, make inferences and arguments

22   towards them.

23           THE COURT:  All right.  The ruling was not that you

24   could not show video that is in evidence; the ruling was that

25   you can't argue facts which are not in evidence.  So you can't

1    argue that your client saw something if there's no evidence

2    that he saw it.  I think that -- that was the ruling.  I'm

3    sorry if that wasn't clear, but there's no ruling that you

4    can't show something that's already been admitted into

5    evidence.

6              MR. LEVENTHAL:  Right.  And so, he -- what -- on

7    Long Bow, the question was, "Why did you go down there?"  It

8    wasn't specific.  It was federal overreach, which included, and

9    he said videos.  It wasn't specific and that's sort of where

10   I -- I think I'm getting hung up on is maybe because it wasn't

11   specifically, oh, I saw that, he saw specific videos like

12   Margaret being taken down, and the Tasing.  All of that stuff

13   has come in.  So he wasn't specifically this is exactly, but he

14   wasn't asked the question on Long Bow specifically.

15   Specifically he said federal overreach, which included, in his

16   mind, the videos that he saw and he said First Amendment zone.

17   That's why he went down.  But to suggest now that he went down

18   to show force without showing any Facebooks or anything prior

19   to that, I think that leaves him -- particularly Mr. Drexler --

20   in a position that he has to answer to what does he mean by

21   federal overreach because now they're -- the Government has

22   clearly indicated it's only for a show of force and there's not

23   one word of Mr. Drexler prior to that on why these six men went

24   down there.

25              So, and I understand what the Court's ruling but --

1          THE COURT:  All right.  So you cannot say

2    definitively to the jury that Mr. Drexler watched these videos

3    because there's no evidence that he, in fact, watched these

4    videos.

5          MR. LEVENTHAL:  Right.  But I can say --

6          THE COURT:  You can offer to the jury explanation for

7    what his statement might be referring to, but you can't

8    definitively say that he actually saw those videos.

9          MR. LEVENTHAL:  Fair enough.  If I --

10          THE COURT:  We don't know that he saw the videos.  I

11    mean, that's got to be clear.  We don't know that he saw them,

12    but I think that you have the right to explain or try to

13    explain to the jury how they should interpret the statement

14    that he made about what does research mean, but you can't

15    actually say he did something if there's no evidence that he

16    did it.

17          MR. LEVENTHAL:  Fair enough.

18          THE COURT:  Anything else, Mr. Myhre?

19          MR. MYHRE:  Just as a matter of housekeeping,

20    Your Honor, one of the videos that Mr. Leventhal discussed with

21    me this morning, we do not show as being admitted into

22    evidence.  That's 5007D, which was the -- I believe it was a

23    video showing the exchange or the encounter with

24    Margaret Houston and one of the agents, or one of the officers.

25          THE COURT:  Well, if it's not admitted into evidence,

```
 1   then it can't be shown to the jury.  If it is admitted, then it
 2   can.
 3              MR. LEVENTHAL:  Correct.  Obviously.  I checked
 4   with --
 5              THE COURT:  So we'll clarify that.  What was the
 6   number again?
 7              MR. MYHRE:  5007D, as in delta.
 8              THE COURT:  Okay.
 9              COURTROOM ADMINISTRATOR:  And that one is not
10   admitted.  That one is -- 5007D was marked with Agent Stover,
11   but it was never admitted.
12              MR. LEVENTHAL:  No.  No.
13              What number is it, Jess?
14              MR. MARCHESE:  That's the one we had the issue with
15   and then I tried to admit it.
16              MR. LEVENTHAL:  No.  No.  No.  The one that you got
17   in through --
18              MR. MARCHESE:  Oh, the one I got -- 5006C, as in
19   Charlie I believe is what I have it as.
20              MR. LEVENTHAL:  5006C, as in Charlie.
21              COURTROOM ADMINISTRATOR:  That would be admitted.
22              MR. LEVENTHAL:  That's admitted?
23              COURTROOM ADMINISTRATOR:  Yes.
24              MR. LEVENTHAL:  So that would be that video.
25              MR. MYHRE:  Okay.  And then there is -- on -- on
```

1   5006C there were portions of that that were admitted through

2   Agent Willis, not the -- not exhibit in its entirety, and I

3   think that -- which includes, I believe, what they want to show

4   now, includes an interview of one of the supporters, Bundy

5   supporters after the encounter between the officers and

6   Ammon Bundy on the April 9th.  That was not -- at least our

7   understanding, was that portion was not admitted.

8           There's also a marking on the video, a circle with

9   the word "lethal" written over it.  There's an agent or an

10  officer standing with a long gun.  There was no evidence that

11  that was lethal.  No evidence of -- of it being -- it's an

12  officer at the -- I believe either it's Lowe or Sloan, I can't

13  recall not having looked at the video, but so we would object

14  to the markings on there as that's not in evidence.  Same

15  exhibit.

16          THE COURT:  Is this a different one or are you

17  talking -- the one with the lethal markings, is that also part

18  of 5006C or is that something --

19          MR. MYHRE:  That's my recollection, Your Honor.

20          MR. LEVENTHAL:  Yes, Your Honor.  The 5006C, a

21  portion of it came in with Agent --

22          MR. MYHRE:  Stover.

23          MR. LEVENTHAL:  -- Stover and then the rest of it,

24  the whole -- the whole video came in through Mr. Marchese and

25  Mr. Parker.  However, Mr. Parker was only shown part of the

1   video, but then it was objected to and he said he saw the video

2   and it all came in, but Mr. Marchese chose not to play the

3   whole video.  So, it hasn't been seen, but it's been admitted

4   in its entirety.

5          And there is a -- there is a short -- and again, I'll

6   go back to there are things on there regarding dead cows and

7   things, and that's not what we're getting into.  So, you know,

8   I'm not even touching that part of it.  There's just one part

9   that goes after sort of the dog bite, if you will, and the

10  Tasing that they -- a gentleman is being interviewed who said

11  that that was my aunt who is being taken down.

12         And -- and I put on there, the circle with the

13  "lethal."  If that needs to come off, that needs to come off,

14  but I just figured the Government has brought in numerous

15  pictures with, you know, names of all of our clients all over

16  the place and they've brought them in and asked, Hey, who is

17  that?  Well, that's him and that's him.  Well, you know, the

18  guy has a gun, it is what it is, and it's a BLM officer.

19         THE COURT:  So 5006C is the one with Santilli asking

20  for the supervisor?

21         MR. LEVENTHAL:  Yes.

22         THE COURT:  And there's a woman on the ground.

23         MR. LEVENTHAL:  Yes.

24         THE COURT:  And the Parker says he claims that on a

25  different video he could see her thrown down?

1          MR. MARCHESE:  Your Honor, if I may clarify.  I think

2   Mr. Leventhal's referring to 5006D.  That was the one that was

3   played with Agent Stover.  For whatever reason, all the

4   foundation was laid, but it was not entered into evidence.

5   That is the one that I attempted to bring in on redirect

6   examination and the objection by the Government was sustained

7   by the Court.

8          The one in evidence right now is 5006C.  Mr. Myhre

9   and Mr. --

10          THE COURT:  Okay.  So are you saying that 5007D was

11   admitted through Agent Stover or was not admitted?

12          MR. MARCHESE:  No.  No, that --

13          THE COURT:  It was just marked, but never admitted.

14          MR. MARCHESE:  I think it even might have been

15   published.  I mean, that was one of the Government's first

16   witnesses.  It was about two months ago.  Whatever reason it's

17   not into evidence.

18          THE COURT:  Okay.

19          MR. MARCHESE:  So, obviously if it's not in evidence,

20   then, you know, it can't be shown during the closing arguments,

21   but 5006C is the one that I brought in with Mr. Parker.

22          THE COURT:  And I do show that 5006C was admitted.

23          MR. MARCHESE:  Yes.

24          THE COURT:  So, Mr. Myhre, the problem is that not

25   all of 5006C should have been admitted?  Is that -- it was only

1    the portion that was shown that was . . . admissible?

2              MR. MYHRE:  It was the portion that was shown to him.

3    I believe it was admitted to show what his state of mind was.

4    What he had viewed before coming down to Bunkerville.  And

5    that's what was showed to him.  So, whether there was more to

6    that video or not, I -- if there was, it wasn't shown to a

7    witness.

8              THE COURT:  Is that the one where he said he only saw

9    a portion of it, not the whole video because it was really

10   long?

11             MR. MARCHESE:  We did lay the foundation, Your Honor.

12   It's a longer video.  I just didn't see the need to play the

13   entire video just as when the Government brought in the aerials

14   from, I believe it was, Special Agent, I think his name his

15   name is McEwen, they're not going to play two hours of aerials

16   and say, "Did you see all of this?"  Mr. Parker was actually

17   the one who suggested to me, when we met in one of our

18   meetings, that that being an exhibit.  So he has seen it.  He

19   was the one who brought it to my attention.  So rather than

20   play the 10 minutes, or whatever it is, and waste the Court's

21   time, I just laid the foundation and we entered in accordingly.

22        (Brief pause in proceedings.)

23             THE COURT:  So is this the video that he said he only

24   saw a portion of it or --

25             MR. MARCHESE:  No.

1        MR. MYHRE:  This is the video I thought -- when I

2   mentioned portion, there was a portion of that video, which is

3   the April 9th Santilli video, that Agent Stover testified, "I

4   only saw part of it."  And I -- I'm not sure if it was

5   Mr. Marchese or somebody else that had -- was discussing that,

6   may have been Mr. Tanasi, but I'm trying to recall, but we --

7   we had a discussion about how much he saw and we truncated the

8   video after -- after watching it.

9        MR. MARCHESE:  That's -- Mr. Myhre is correct on both

10  accounts actually.  He -- both Mr. Tanasi and myself questioned

11  Agent Stover about it.  I had to tailor my questions because he

12  had only testified that he saw a portion of it, so therefore

13  anything that he hadn't seen was not relevant.

14       MR. LEVENTHAL:  And just, by the way.  We did that

15  also with David -- David Bundy's arrest.  If you remember,

16  there's a dash cam and Agent Stover indicated that he had not

17  seen it up until just right there and that's when we've stopped

18  it and we haven't played anything prior to that, just after

19  what Agent Stover indicated that he saw during his

20  investigation.  So that has been admitted just for that time

21  purpose.

22       THE COURT:  All right.  Well, I have that Exhibit

23  5006C has been admitted and so whatever comprises 5006C has

24  been admitted, but if it shouldn't have been, that's then maybe

25  a different problem, but it's been admitted.

1           As far as now this -- you said there's some
2      additional markings that have been made on it that were not
3      part of the original?
4           MR. MYHRE:  Yes, Your Honor, and that's what
5      Mr. Leventhal represented that he would be willing to remove.
6      There's a circle with "lethal."
7           MR. LEVENTHAL:  I did put it on there.  It's just --
8      to show that there was lethal out there when we were told by
9      other agents that there was not lethal anywhere out there
10     before the 12th, that, in fact, there was, so I just circled
11     the person, the BLM officer that is, in fact, holding a weapon.
12     That's it.  To take it off, though, I can see if Bryan can do
13     it.  I've -- you know, a lot of the videos --
14          THE COURT:  I don't have a problem with you leaving
15     it on there so long as it's clear to the jury that you're the
16     one who put it on there and not that it appears as if it's
17     something that the law enforcement had already put on there
18     or --
19          MR. LEVENTHAL:  That's not a problem.
20          THE COURT:  -- that it came from somewhere else.
21     Then that's fine.
22          MR. LEVENTHAL:  Oh, no.  It's very clear that I put
23     it on there and if it's not and the Court has a question, I'll
24     tell the jury that -- you know, I'll circle it, because I can
25     do it anyway.  I can have Bryan stop it and circle it anyway.

1          THE COURT:  Exactly.

2          MR. LEVENTHAL:  So it doesn't really matter.

3          THE COURT:  So long as it's just clear to the jury

4     that that's not part of the original video.

5          MR. LEVENTHAL:  Yeah.

6          THE COURT:  That that's something that you're doing

7     to call attention to a portion that you want them to focus on,

8     that's fine.

9          MR. LEVENTHAL:  That's fine.

10         THE COURT:  So the question then is whether or not he

11    can call it lethal?  Is that the other --

12         MR. MYHRE:  Well, there was no evidence --

13         THE COURT:  -- concern?

14         MR. MYHRE:  -- that was lethal.  I mean, it's been

15    referred to -- well, just leave it at that.  There was no

16    evidence that it was lethal and I understand the Court's ruling

17    and that's fine, so I have -- we can move forward from there.

18         But just so I'm clear then, Your Honor, with respect

19    to both -- with 5006C, then Mr. Leventhal be allowed to play

20    that but just not be able to argue that his client saw it?  Is

21    that . . .

22         THE COURT:  Right.  He -- there's no evidence that he

23    saw it so he can't argue that he saw it, but I think the

24    testimony was that he stated in the Long Bow interview that he

25    did some research?

1              MR. LEVENTHAL:  Correct, and he saw Government

2    overreach.  And so I won't say that he saw it, but I can say --

3    I'll -- I will move around it --

4              THE COURT:  There was a lot of stuff out there.

5    You've seen a lot of the stuff that was out there.  He could

6    have seen some of the stuff that was out there.

7              MR. LEVENTHAL:  He saw a lot -- he saw it all.

8              THE COURT:  He saw something because he did do some

9    the research.

10             MR. LEVENTHAL:  He did.

11             THE COURT:  But you can't make that last connection

12   and say and, in fact, what he saw exactly was this video

13   because you can't say that.

14             MR. LEVENTHAL:  I understand.  Thank you very much.

15   I understand the ruling.

16             MR. MYHRE:  Thank you, Your Honor.

17             THE COURT:  All right.  So we'll call back the jury

18   and then Mr. Dickinson, you can -- if you need to -- I think we

19   might have caught you mid-video, so if you need to cut it back

20   a little bit so it's in context, that's fine.

21             And I wasn't planning on cutting you off, but the

22   jury needed to use the restroom.

23             MR. DICKINSON:  No.  I was actually looking.  This

24   was the perfect stopping point so I was actually going to

25   inquire with the Court right at the end of this video.

1          (Brief pause in proceedings.)

2              COURTROOM ADMINISTRATOR:  All rise.

3          (Jury returned to courtroom at 2:05 p.m.)

4              THE COURT:  All right.  Everyone may be seated.

5              We're joined by the jury after our lunch break and

6      we're now going to continue with the Government's summation.

7              Mr. Dickinson, you may proceed.

8              MR. DICKINSON:  Thank you, Your Honor.

9              So, it's been a few minutes, not too long.  I know

10     the judge has instructed you on the law but just to emphasize

11     some point of the jury instructions that the Government would

12     like you to keep in mind during your deliberations.

13             Count One -- there's two conspiracies charged in this

14     case.  The first one is a conspiracy starting on or about

15     March 28th.  It's when Cliven and Ryan and the cattle -- start

16     impeding the impoundment operation and the contractors coming

17     in, but essentially the object is to commit one of several

18     federal crimes; Assault on a Federal Officer, Threatening a

19     Federal Law Enforcement Officer, Using and Carrying a Firearm

20     in Relation to a Crime of Violence, Obstruction of the Due

21     Administration of Justice, Interference with Commerce by

22     Extortion, and Interstate Travel in Aid of Extortion.  You just

23     need to find that there was an agreement between two people to

24     commit at least one of those and unanimously find that at least

25     one of those objects was agreed to by the people that you find,

1    which in this case would be the six defendants.

2          The second conspiracy is more specific and there's

3    two alleged objectives; one is to prevent by force,

4    intimidation, or threats, federal law enforcement officers from

5    discharging their duties of their office of the United States.

6    In this one, the Government submits there's evidence, in

7    addition to the 12th, where the defendants -- some of them --

8    you've seen Mr. Burleson, Mr. Lovelien, still talking about

9    supporting the resistance at the Bundy ranch and sending money,

10   et cetera, et cetera, and also all the defendants were

11   glorifying what they've done to intimidate the BLM from coming

12   back and doing their job.

13         The second object's to induce by force, intimidation,

14   or threats any federal law enforcement to leave a place where

15   their duties were required to be performed.  Obviously, it's

16   the 12th and then thereafter.

17         And just pointing out a few things that the

18   Government does and does not have to prove with the conspiracy.

19   We don't have to prove that each single defendant directly

20   conspired with other co-conspirators or that other defendant

21   conspired with another defendant, only that they agreed to

22   participate in the conspiracy.  And that, we would have to show

23   that they directly conspired with one or more co-conspirators

24   to carry out at least one of the objects and they knew or had

25   reason to know that other co-conspirators were involved with

1    those with whom the defendant directly conspired.

2           And, for an example, if our defendants who were on

3    the bridge that day and see Mr. Burleson down there moving in

4    and out of the crowd with the gun and their object is to get

5    the cows, using guns and assaults and threats, et cetera, he's

6    a member of the conspiracy even though they don't know who he

7    is and they have never met him before, but they can see and

8    they have reason to know that there's people involved with

9    their conspiracy.

10          And the defendant has reason to believe that whatever

11   benefits the defendant might get from the conspiracy were

12   dependent upon the success of the entire venture.

13          In this case everyone's interdependent on each other

14   to get those cows.  One person is dependent on another person

15   is dependent on another person.  And then we've heard examples

16   throughout this closing that's in evidence of the cows were

17   released, the cows were released.  We came there to do what we

18   said we would do.

19          And even if the defendants had some other, you know,

20   ulterior motive, whether it be their desire to stand off with

21   the federal government, or to show force with the federal

22   government, and getting the cows was a reason -- or provided an

23   opportunity to do that, their ultimate goal was still to get

24   the cows and get the BLM to leave.

25          It's not a defense that a person's participation in a

1    conspiracy was minor or for a short period of time.  It could

2    be for an hour.  Could have been for two hours in that wash.

3              And that goes to both of the conspiracies.

4              In Count One, the conspiracy to commit one of the

5    criminal offenses the Government has to prove an overt act.

6    Only one of the defendants took an overt act, that can be legal

7    or illegal.  In this case there's hundreds of overt acts.

8    Traveling down to the bridge.  Standing on the -- you know,

9    moving around on the bridge.  Holding your firearm up.  All

10   overt acts, and we only have to prove one of them, and we've

11   done that beyond a reasonable doubt.

12             Instruction 11.  The person intends the natural

13   probable consequences of acts knowing or done -- or

14   knowingly -- knowingly done or knowingly admitted.  I ask you

15   to keep that in mind when you're reviewing some of this

16   evidence related to some of those defendants.

17             Count Five, Assault on a Federal Officer.

18             Some of these are fairly straightforward.  The

19   defendant forcibly assaulted a federal officer and assault is

20   defined as when one person intentionally threatens another

21   coupled with an apparent ability to inflict injury on another

22   which causes a reasonable apprehension of bodily harm.

23             Well, all these defendants had an apparent ability to

24   inflict injuries because they all had weapons.  And we've shown

25   through our evidence and through their own statements, through

1    their concert of action, that they intentionally threatened

2    those law enforcement officers because that's the only way they

3    could have accomplished what their goal was.

4         And reasonable apprehension of bodily harm is

5    determined with reference to a reasonable person aware of the

6    circumstances known to the victim.  Circumstances unknown to

7    the victim are not included.

8         There's no doubt that those officers had a reasonable

9    apprehension of bodily harm and that it was reasonable and that

10   a reasonable officer would -- we've heard from all the federal

11   law enforcement officers, the sheriff, the third in command of

12   the Nevada Highway Patrol, they were all in fear and they all

13   had reasonable apprehension of immediate bodily harm.

14        Government's not required -- not required to prove

15   that the defendant knew, although it's -- we have proven beyond

16   a reasonable doubt that these defendants knew that the victims

17   were federal law enforcement officers, but we don't have to

18   prove that.

19        The Government also is not required to prove that the

20   defendant actually intended to cause bodily injury.  It's the

21   mere fact that they assaulted, that they threatened another,

22   coupled with that apparent ability to inflict injury.

23        13.1.  Federal officers acting in the good faith

24   performs of their duties may not -- may not be forcibly

25   resisted by another.  Clearly the federal officers in this case

1    were acting in the good faith performance of their duties and

2    they cannot be forcefully resisted.  It's not a defense and

3    it's not an excuse.

4            Threatening a federal law enforcement officer.

5    Defendant made or did an act.  Here, there are statements that

6    were made, but primarily focusing on the acts, which is

7    brandishing, the carrying, the using the firearms, the making

8    it known that we have firearms.

9            The defendants clearly intended those statements to

10   be a threat.  That was the whole purpose.  Do what we want or

11   else.  And that would be viewed as a threat.  Clearly it would

12   be viewed as a threat.

13           That a reasonable person making the statement or

14   doing the act would foresee that the statement or act would be

15   interpreted by those to whom the maker communicated the

16   statement as an act or serious threat.

17           Clearly that was their intention.  That was the only

18   reason they had firearms out there in the wash and on the

19   bridge on April 12th, 2014.

20           And that the threat was made with the intent to

21   impede, intimidate, or interfere with federal law enforcement

22   or to retaliate for the performance of his or her duties.

23   We've proven that beyond a reasonable doubt.

24           And then there's page, 14, and onto 14.1, defining

25   threat.  It's a serious expression expressing intention to

1    inflict bodily injury at once or in the future as distinguished

2    from idle or careless talk, exaggeration, or something said in

3    a joking manner.

4            There was no exaggeration or joking manner on

5    anything that these defendants did with their weapons on

6    April 12th, 2014.

7            In determining whether the acts constitute a threat

8    you can consider circumstances under what they were made -- the

9    circumstances under which the alleged threat was made.  So, the

10   entire day, the entire circumstances surrounding the events of

11   April 12th, and you can determine -- you can use the -- and

12   evaluate the reaction of those who heard the statements or saw

13   the acts.

14           You've heard all of those law enforcement officers

15   that have testified.  I read some of their -- some of their

16   fear to you and some of their testimony.

17           And whether the statements were conditional.  Give us

18   the cows or else.

19           It's not necessary that -- the Government does not

20   have to prove that the defendants intended to carry out the

21   threat; that they, in fact, were going to harm law enforcement

22   officers or shoot the law enforcement officers.  It's the

23   threat that's the crime.

24           It's not necessary that we prove the exact words or

25   actions that constitute the threat.  Here, it's all working in

1   concert.  It's Mr. Burleson, it's Mr. Parker, it's Mr. Drexler,

2   it's Mr. Engel, it's all of these defendants.  It's the blue

3   shirt guy in the wash.  All of those acts combined.

4           Federal law enforcement officer is any agent or other

5   employee of the United States government who is authorized by

6   law, et cetera, et cetera.  All of the federal law enforcement

7   officers who testified, testified that is, in fact, who they

8   were.  It's undisputed.

9           And again, the Government does not have to prove that

10  the defendant knew that the victim, he or she was a federal law

11  enforcement, although we've done that.

12          There's definitions of impede, intimidate.

13          Just focusing on intimidate, it means to make timid

14  or fearful, to inspire or affect with fear, to frighten or to

15  defer.

16          The undisputed testimony of those law enforcement

17  officers are they were intimidated.

18          Obstruction of justice.  The defendant influenced,

19  obstructed, or impeded, or tried to -- or tried.  Doesn't

20  actually have to succeed, although they succeeded in this case,

21  to influence, obstruct, or impede the due administration of

22  justice.

23          In this case the due administration of justice is the

24  carrying out of those court orders issued by the District Court

25  of Nevada.

1            Defendants acted corruptly.  It means with the

2    purpose of obstructing justice.

3            The evidence has shown beyond a reasonable doubt that

4    one of their intentions, which was substantial, was to obstruct

5    justice.

6            Extortion.  Count No. 16.  The defendant intended to

7    induce someone to part with property by the wrongful use of

8    actual threatened force, violence, or fear.

9            Those cattle were in the legal custody of the United

10   States government.  It's not a -- it's not a defense to -- a

11   defendant's claim of right to property is not a defense.  So

12   all of these defendants, Cliven Bundy, everyone else could

13   believe till the -- in the deepest part of their heart that

14   that was actually their property and this District Court was

15   wrong; it's not a defense.

16           And it was induced with wrongful use of actual

17   threatened force, violence, or fear, and we've demonstrated

18   that over this trial beyond a reasonable doubt.

19           The sheriff testified to it.  There's no -- those

20   cattle would not have been released without the wrongful use of

21   actual or threatened force, violence, or fear.

22           The defendant acted with the intent to obtain

23   property.

24           Again, go get my cattle.  That's what they were there

25   for.

1              And that commerce from one state to another was

2     affected in some way.

3              There's a lengthy definition of commerce, but it only

4     has to have a de minimis affect of interstate commerce.  It can

5     be minimal -- the effect can be minimal.  Conduct affects

6     interstate commerce if in any way it interferes with, changes,

7     or alters the movement or transportation of the flow of goods,

8     merchandise, money, or other property in commerce between or

9     among the states.  It can be minimal.

10             And we don't have to prove that the defendant

11    intended to obstruct or delay commerce.

12             Here, the commerce, the most ready example is the

13    cows.  The cows were going to California.  That's where they

14    were intended to go, which is out of state, which is interstate

15    commerce.  On the interstate freeway.  Everyone knew that.

16    Government's Exhibit 11 shows that the conspirators knew that,

17    at least some of them.  Mr. Parker talks about, when he was on

18    the stand, that the cows were going to California and he even

19    had knowledge about where they were going to go before that.

20             It's also the affecting of the freeway.  You saw the

21    videos on the freeway.  Clear examples of trucks and markings

22    on the trucks and the blocking of the freeway and interstate

23    freeway affects interstate commerce and that's enough to find a

24    minimal effect on interstate commerce.

25             And then also fear is defined in this count as

1     apprehension, concern, or anxiety about physical violence or

2     harm that is reasonable under the circumstances.

3            Again, for the same reasons we've discussed in the

4     threats and the testimony of the federal law enforcement

5     officers, that element is met.

6            The interstate or foreign travel in aid of extortion.

7     Essentially a different charge of extortion.  This one

8     incorporates state laws.

9            Essentially the defendants have to travel in

10    interstate commerce or use a facility in interstate commerce,

11    namely the Internet or World Wide Web, with the intent -- the

12    intent to commit a crime of violence in furtherance.

13           I just want to point out it's not just the traveling.

14    For example, once the order was given to go get the cattle,

15    Mr. Parker and Mr. Drexler -- or Mr. Engel took to Facebook,

16    which is a facility of interstate commerce, and expressed their

17    intentions.  We're going to get the cattle by force.  We're

18    using guns.  We're going to close down the freeway, clearly in

19    anticipation of violence.

20           You saw the OMA and the Ryan Payne postings talking

21    about what the goal was, with Mr. Lovelien.  Mr. Burleson's

22    statements are self-explanatory and as we'll talk about in a

23    few minutes, you could find Mr. Drexler and Mr. Stewart guilty

24    of these offenses based on the fact that they were members of

25    the conspiracy and also that they were aiding and abetting the

1    rest of the defendants.

2          So after the travel or the use of the World Wide Web

3    with the intent to commit eventually a crime of violence,

4    namely extortion, after they did that, then they went and did

5    commit a violent crime in furtherance, as we allege the violent

6    crimes were Assault on a Federal Officer, Count Five, and

7    Threatening a Federal Officer, Count Eight and then that they

8    actually extorted.  In Nevada, you're given the definition of

9    Nevada extortion, which provides, in part, "that a person, who,

10   with the intent to extort or gain any money or property" -- in

11   this case the cows -- "or do or abet or procure any illegal

12   wrongful act, whether or not the purpose is accomplished" --

13   don't even have to accomplish it -- threat -- "threatens,

14   directly or indirectly" -- which we've already discussed -- "to

15   injure a person or property has committed the offense of

16   extortion."  So the Government has proven that beyond a

17   reasonable doubt.

18         Counts Six, Nine and Fifteen.  Using and Carrying or

19   Brandishing a Firearm During and in Relation to a Crime of

20   Violence.

21         These relate to count -- the Assault on a Federal

22   Officer count, the Threatening a Federal Officer count, and the

23   interstate extortion -- the Hobbs Act extortion.

24         THE COURT:  And Mr. Dickinson, you have Count Two on

25   the screen.

1             MR. DICKINSON:  Oh, I'm sorry, Your Honor.

2             The elements are simple.  The defendant committed the

3       underlying crime.  So, for example, in Count Five, the Assault

4       on a Federal Officer, and second, the defendant knowingly used

5       or carried a firearm during and in relation to that crime.

6             And used a firearm is defined as actively employing

7       the firearm during and in relation to the crime of violence.

8       Carried a firearm, if he knowingly possessed it, held it, moved

9       it, conveyed it, transported it in some manner on his person or

10      in a vehicle.  All of these defendants did that.

11            And then a defendant used or carried a firearm,

12      "during and in relation to the crime."  So, for example, here,

13      Assault on a Federal Officer, if the firearm facilitated or

14      played a role in the crime as charged in this particular count.

15            And clearly, beyond a reasonable doubt, the use of a

16      firearm played a role in the Assault on a Federal Officer

17      because that's why they were assaulted, with a dangerous

18      weapon, which was a firearm, by all of these defendants.

19            And then if you find the defendants used and carried

20      a firearm, you're going to be asked on the verdict form to find

21      did they brandish.  And brandish has a definition of if the

22      defendant displayed all or part of the firearm, or otherwise

23      made the presence of the firearm known to another person in

24      order to intimidate that person, regardless of whether the

25      firearm was directly visible to the person.

1          So the whole firearm doesn't even need to be shown to

2     the person.  It doesn't need to be pointed at the person.  It

3     just needs to be displayed to intimidate.  And I -- we've

4     proven that.  We've proven the whole point was to have firearms

5     there to intimidate the BLM and the National Park Service so

6     they would back down and release the cattle.

7          And then I just want to spend a few minutes on

8     Instructions 20, 20.1 and 21.

9          And then the same on the 924(c), it's the same for

10    the Threatening a Federal Law Enforcement Officer.  They used

11    and carried it.  That was the -- that was the threat.

12    Threatened the firearm.  They brandished it.  As well as the

13    extortion.  The cows would not have been given up without the

14    fear of the extortion.  So when Ryan Bundy says give me the

15    cows, or Dave Bundy says you have an hour to give us the cows,

16    and Ammon's up against the fence and says you leave, you leave,

17    the cows -- it's all because of the firearms.

18         Now, Instruction 20, liability for substantive

19    offense committed by a co-conspirator.  Essentially, if you

20    find the defendant was a member of one of the conspiracies and

21    that a crime was committed, it was reasonably foreseeable as a

22    membership in their conspiracy, they're guilty of it, whether

23    or not they personally committed all the elements or not.

24         So, for example, on extortion, if you find that any

25    of these defendants were a member of a conspiracy, however

1    you're not sure, you know, did -- did they -- did they go up

2    and they weren't the ones that actually said give me the cows

3    or else, it doesn't matter, because it was reasonably

4    foreseeable as part of the conspiracy that a

5    give-us-the-cows-or-else demand would be given.  Not that it

6    even has to be given verbally as it was in this case because

7    the message was quite clear from the angry mob that was in the

8    crowd.

9              So as long as the offense fell within the scope of

10   the unlawful conspiracy, the defendant's on the hook for it,

11   whether or not he committed all of the elements of the offense

12   or not.

13             And in this case, also, the assault and the

14   threatening was a concert of action.  It was Eric Parker, it

15   was Scott Drexler, it was Todd Engel, it was Ricky Lovelien, it

16   was Greg Burleson, it was Steven Stewart, it was the guy in the

17   blue shirt, it was the Arizona Militia, it was all working

18   together to threaten those federal law enforcement officers to

19   get them do what the defendants and their co-conspirators

20   wanted them to do.  So it doesn't matter if Officer A didn't

21   see Defendant B, they're all guilty, because it's a

22   reasonable -- it's reasonably foreseeable.  They're guilty of

23   the assault on a federal officer and the threats because all of

24   that is reasonably foreseeable to the conspiracy and what's

25   going on in front of them.

1          Setting aside the conspiracy, just looking at -- and

2     I'll use Assault on a Federal Officer, for example --

3     Instruction 21, aiding and abetting, a defendant can be guilty

4     of the crime charged, for example, Assault on a Federal

5     Officer, even if they didn't commit the act or all the acts

6     constituting the crime but just aided and abetted in its

7     commission.

8          And to prove aiding and abetting we need to show a

9     crime was committed by someone, and clearly here, the someone

10    was pointing a -- was brandishing firearms to get the law

11    enforcement officers to back down, to capitulate, to threaten

12    them, to assault them; and second, the defendant aided,

13    counseled, commanded, induced, or procured that person with

14    respect to at least one element of the crime; and the defendant

15    acted with the intent to facilitate the crime and acted before

16    the crime was completed.

17         Here, again, the defendants all aided and abetted

18    each other.  Drexler is aiding and abetting Stewart who is

19    aiding and abetting Parker who is aiding and abetting the blue

20    shirt in the wash who is aiding and abetting the guy proned

21    under [sic] the bridge who is aiding and abetting Ammon Bundy

22    who's aiding and abetting Cliven Bundy even though he's not

23    there, who's aiding and abetting Ryan Payne, but especially the

24    gunmen in the wash, they are aiding and abetting each other,

25    because that's how this worked.  The show of force.

1          And the evidence must show beyond a reasonable doubt

2     the defendant acted with the knowledge and intention of helping

3     that person commit the crime.

4          The photographic evidence itself shows that.  Stewart

5     and Parker are proned out on the bridge.  Burleson's movements

6     through the wash with his long gun.  Steven Stewart standing on

7     the bridge with his long gun.

8          MR. TANASI:  Your Honor, I would just like to insert

9     a late objection here.  There's no evidence of Mr. Stewart

10    proned out on the bridge.

11          THE COURT:  Sustained.

12          MR. DICKINSON:  I apologize.

13          Mr. Drexler and Mr. Parker proned out on the bridge,

14    not Mr. Stewart.  Although there's evidence that Mr. Stewart

15    was spotting for Mr. Parker on the bridge, which clearly would

16    be aiding and abetting, although he has his own gun out, but

17    the point is, these defendants were aiding and abetting each

18    other and that is how a conspiracy worked and that is how these

19    crimes were committed.

20          Just very quickly, on the verdict form, very quickly

21    on the verdict form because there are some special verdicts, on

22    Count One, you're first being asked to find was there a

23    conspiracy?  Was there an agreement between two or more persons

24    to commit one of the following offenses? and then it lists the

25    offenses; the assault, the threatening, the use, carry, et

1   cetera.  And it's only seven -- obviously the Government

2   believes you should check Boxes 1 through 6.  There's proof

3   beyond a reasonable doubt on all of those.  7 would be none of

4   the above.  But it's specific to each defendant.  So if you

5   find there was an agreement to commit at least one of those,

6   then you go down and determine whether or not each defendant

7   was part of that agreement that you've already found.  So it's

8   not all or nothing.  But the Government, again, believes we've

9   proven beyond a reasonable doubt all of these defendants are

10  guilty.  It's not one and the same.  They stand alone.  They

11  stand separate.  So, Mr. Burleson could be found not guilty and

12  the rest of the defendants could be found guilty.

13          Same as to Count Two, except here there's just the

14  two objects that I discussed with you and then it's similar.

15  If you find the conspiracy -- there was a conspiracy to do at

16  least one of these and then you address the defendants.

17          And then on the 924(c) counts, for example, Count

18  Five, if you find the defendant guilty of Assault on a Federal

19  Officer, if you do, then you go down to Count Six.  So if you

20  find Mr. Burleson guilty, you go down to Count Six and answer

21  the question is he guilty of the 924(c) which is use of a

22  firearm during and in relation, and then there's a third part,

23  if you find him guilty, then you take the definition of

24  brandishing and figure out and determine has he brandished.  So

25  it's a three-part.  Is he guilty of the underlying crime of

1    violence as the Court has instructed you?  "Guilty."  Did he

2    use or carry a firearm?  The next count, Count Six, the

3    corresponding count, "guilty," and then you go down and find --

4    and determine whether or not he has brandished.  "Yes."  And

5    that that would go with the rest of the defendants.

6              And that follows along with the other two counts, the

7    Threatening a Federal Law Enforcement Officer, and Extortion.

8              So I appreciate your time, ladies and gentlemen.

9    You've sat here a long time and you've heard a lot of evidence.

10   When Mr. Myhre first talked to you, he told you that this was a

11   simple case.  The Government still does believe it is a simple

12   case.  If you look at the jury instruction, you cannot resist

13   law enforcement officers that are acting in their lawful

14   capacity, and you especially cannot do that with guns.  And

15   that's what happened here in this case.  And all the other

16   elements are met, but at the essence of it is you just can't go

17   be vigilante and go and do whatever you want because you don't

18   like what law enforcement officers are doing, if they're doing

19   it legally, and that's what this case is.  They showed force.

20   They matched force.  They overcame, and then they bragged about

21   it and put it all out there like this was some big victory.

22             The only people that day that showed courage were the

23   law enforcement officers; the federal law enforcement officers,

24   the state law enforcement officers, the county law enforcement

25   officers who used their training, their expertise that they've

1    practiced over and over again hoping to never use, but on that

2    day they had to use it.  And they made the only decision that

3    could have been made and that was to back down and get the BLM

4    out of there safely and de-escalate the situation and deal with

5    it some other time.

6            So, again, I appreciate your time.  After the

7    defendants -- after defense counsel and Mr. Engel have an

8    opportunity to speak with you, as the Court's told you, because

9    the Government has the burden of proof, Mr. Myhre is going to

10   have an opportunity to talk with you and when he's done, he's

11   going to ask you to find all of these defendants guilty on all

12   counts because that is what the evidence has proven beyond a

13   reasonable doubt.

14           Thank you.

15           THE COURT:  Thank you, Mr. Dickinson.

16           Mr. Tanasi?

17           MR. TANASI:  Yes, Your Honor.  Thank you.

18           The Court's indulgence.

19           THE COURT:  Yes.  Of course.

20        (Brief pause in proceedings.)

21           MR. TANASI:  May it please the Court, counsel for the

22   Government, defense counsel, ladies and gentlemen of the jury,

23   good afternoon.  It's been a long, long ride.  It's been

24   approximately two months or so.  Mr. Stewart and I, we thank

25   you for all your time and all your diligence here today and all

1    your diligence for the past couple of months.

2

3          "We must all hang together, or surely we shall all

4    hang separately," Benjamin Franklin.

5          "I declare to you that woman must not depend upon the

6    protection of man, but must be taught to protect herself, and

7    there I take my stand," Susan B. Anthony.

8          Folks, as I told you when we first met, this is a

9    case about standing up for what you believe in.  Nothing more.

10   Nothing less.

11         Steven Stewart, ladies and gentlemen, he did just

12   that, in April of 2014.

13         "Headed to Nevada.  Going to stand up with my fellow

14   countrymen against a corrupt government."  That's what was in

15   his head.  Protest, folks.  Standing up for what he believed

16   in.

17         His Facebook post here, folks, shows exactly why he

18   brought his gun.  Not to commit crimes.  Not to assault federal

19   officers, but to exercise the First Amendment, his First

20   Amendment right, your First Amendment right, to protest, and he

21   did so with the Second Amendment.  His Second Amendment right.

22   Your Second Amendment right to bear arms.  He did so, folks, so

23   that he wouldn't get sprayed in the face and attacked by

24   federal officers, like this picture shows.  That's what was in

25   Steven Stewart's head when he went to Bunkerville.  That's what

1   the evidence shows in this case.

2            Now, folks, there's several jury instructions in this

3   case, and I don't plan on going over all of them with you, but

4   I do want to go over a few.  We all have jobs to do.  My job is

5   to represent Steven Stewart.  Your job, ladies and gentlemen,

6   your duty, is the oath that you swore in this case, to find the

7   facts and follow the law.

8            You'll recall that you swore an oath, an oath to do

9   that, a few months ago.  And if you do that in this case,

10  folks, apply the facts to the law, the only verdict you'll

11  return is not guilty on all counts.

12           Now, Mr. Dickinson has done a good job of kind of

13  just weaving everybody together here and throwing it at you as

14  one big conspiracy.  The reality is, as Jury Instruction No. 4

15  tells us, you are to consider -- separate considerations of

16  multiple counts for multiple defendants.  You are to consider

17  each and every count in this case as it pertains to each and

18  every defendant in this case.

19           And, folks, you must -- in order to return a guilty

20  verdict as Mr. Dickinson is asking you to do, you must be

21  convinced beyond a reasonable doubt -- a reasonable -- beyond a

22  reasonable doubt that Steven Stewart has committed each and

23  every one of the crimes that's alleged in this case.

24           How do you get there?  Well, proof beyond a

25  reasonable doubt is proof that leaves you firmly convinced that

1    Steven Stewart is guilty.  You must be firmly convinced.

2            Let's talk about the conspiracy.

3            Jury Instruction 7.1, lengthy.  What I've highlighted

4    for you here, folks, is how there's no conspiracy in this case.

5    It is not enough, however, that they, the defendants, simply

6    met, discussed matters of common interest, and similar ways or

7    perhaps even helped one another.  That's not enough to prove a

8    conspiracy.  That's not enough to demonstrate that there was a

9    agreement to commit crimes.

10           Folks, that's all the evidence has shown you.  All

11   the evidence that you've seen so far, folks, are defendants

12   discussing matters of similar interest, at most, and again,

13   when you look specifically at Steven Stewart.

14           Now, this concept is even more important and

15   discussed here in the mere presence instruction which is that

16   mere presence at the scene of a crime or mere knowledge that a

17   crime is being committed is not sufficient to establish that

18   the defendant committed the crime of conspiracy.

19           So, merely being present at the scene of a crime,

20   together with other people, merely being present, is not enough

21   to prove a conspiracy.

22           Folks, there's no crime in this case, so there's no

23   conspiracy.

24           In this case it was a protest.  A protest.  Not a

25   conspiracy.  You heard from Eric Parker, bravely got up on the

stand and he told you, there was a plan to protest.  That was
his plan.

Steven Stewart, he talked about his plan on Facebook.
There's a lot of Facebook evidence in this case.  He talked
about his plan on Facebook.  He's sick of this "S" asterisk,
asterisk, asterisk.  We all know what he's saying there.
"Heading to Nevada right now."

The response by his sister is, "Come by and say hi to
your sisters."  Does that demonstrate an exchange of somebody
who's planning ongoing to Bunkerville to commit a crime?

Why did he go?  What got him so interested in this?
What -- what made him go to Bunkerville?  What made him go and
demonstrate?  What was in his head?

Well, it's what he saw.  It's what he saw on the
Internet.  He posted it on his Facebook page.  "Enter the
rancher standoff with federal government to a search engine.
Watch the video of son rip out Taser studs."

(Exhibit published.)

THE COURT:  That's not working.  You want to play it
from the beginning.

MR. TANASI:  Losing the audio altogether.

Well, folks, I don't know if you can hear it from my
computer or not, but you can certainly see it.  You can
certainly see it.  You can see what he saw.

(Exhibit published.)

1          MR. TANASI:  That's what he saw, folks, before

2     heading to Bunkerville.  That's what he was protesting.

3          He also saw this First Amendment zone (indicating).

4     First Amendment zone, folks, in the middle of the desert, where

5     folks were being herded, like cattle, to speak their mind.

6     That's what he saw.  And he called it bullshit.  That's why he

7     went to Bunkerville.

8          He planned to be careful, folks, not to be a

9     criminal.  Look at this exchange on Facebook.

10          "Please be careful.  There's a lot of people out

11     there," his mom says.

12          "I love you, Mommy.  We will."

13          Does that sound like a guy who's ready to -- ready to

14     battle the federal law enforcement?  He's ready to threaten law

15     enforcement?  Is he ready to go up there and have a war?  No.

16     It's a guy who's going up to protest and he's telling his

17     mother, who he loves, that he's going to be careful.

18          Straight there.  Straight back.  "Guys, only went for

19     the weekend.  We helped Cliven get his cattle back.  Straight

20     there.  Straight back.  Two hours of sleep in between."

21     Straight there.  Straight back.  That's it.  Folks.

22          How did he help Cliven get his cattle back?  Through

23     protesting.  Protesting, folks.

24          And let's look at the time frame on this.  On the

25     18th is when he posts this, April 18th.

1          Mr. Dickinson, he made it kind of a big deal in his

2     closing here about this order that -- or this discussion about

3     a federal judge that Steven posted on his Facebook account.

4     Posted it on the 15th of April; right?  Okay.  That shows that

5     he didn't even know about a court order until after he got back

6     from Bunkerville, folks.  That's what that shows.

7          Why is that important?  Because the Government's

8     theory is that this case is about a guy -- a bunch of guys who

9     get together and they want to thwart the government's court

10    order that Steven Stewart doesn't even know about until he gets

11    home.

12         And, I would also point out that in this post he's

13    critical of Judge Lloyd D. George.  Well, folks, as we'll see

14    later, the judge who signed the actual order in this case, was

15    Judge Hicks (indicating).

16         "United we stand.  We, the people, will be heard in

17    Nevada.  No more government bullying."

18         Again, that's what's in Steven Stewart's head when

19    he's traveling to Bunkerville.

20         Why did he bring his gun?  Saw it in the first or

21    second slide here.  Well, because he learned that a Clark

22    County official said Bundy ranch supporters, they better have

23    funeral plans.  Bundy ranch supporters who want to come and

24    stand up for what they believe in, exercise the First

25    Amendment, if they're coming, they better have funeral plans.

1          Well, he brought his gun to deter that from happening

2    so that his family didn't have to make funeral plans for him.

3          Now, folks, let's talk about assault.  That's one of

4    the charges in this case.  Count Five.

5          Essentially, Government has to prove that the

6    defendant forcibly assaulted a federal officer.  Okay?  How do

7    we know what forcible assault is?  The jury instruction

8    describes it.  "Forcible assault is when one personal

9    intentionally threatens another, coupled with the apparent

10   ability to inflict injury on another which causes a reasonable

11   apprehension of immediate bodily harm."

12         Okay.  Now, a reasonable apprehension of immediate

13   bodily harm is determined with reference to a reasonable person

14   aware of the circumstances known to the victim.

15         Here's what's -- here's where the point I'm getting

16   to, folks.  Circumstances unknown to the victim are not

17   included.

18         Steven Stewart is a circumstance unknown to all of

19   these alleged victims that came into court and testified about

20   how scared they were.

21         In this case also the Government has to prove

22   threats, Count Eight.  And in this jury instruction here, Jury

23   Instruction 14, the first element is that the defendant made a

24   statement or did an act that constituted a threat to assault a

25   federal officer.  Interwoven.  Assault.  Fear.  Main element in

1    these two counts, folks.

2            Again, Steven Stewart is a circumstance unknown to

3    the BLM and to the National Park Service, even by the

4    Government's own exhibits in this case, Exhibit 132.  It shows,

5    at 12:37 -- it shows the northbound bridge (indicating).  It

6    shows the southbound bridge (indicating).  It also shows the

7    BLM over here (indicating).  It shows this BLM truck

8    (indicating) -- just kind of drew a circle above -- driving

9    away.

10           As the Government just went through with their

11   closing argument with you, at this time the Government is

12   retreating, they said.  The point is, they're driving away;

13   right?

14           At 12:39 this is the one and only time that

15   Steven Stewart's gun is over that Jersey barrier, based on all

16   of the pictures you've seen in this case and based on what

17   happened on that day.  This right here (indicating) is the only

18   picture, two minutes later after they're retreating already.

19           Folks, credibility is key and that's for you all to

20   decide.  Credibility is what you folks decide.  And what that

21   means is, Do you believe the witnesses that came in here and

22   testified or do you not?  Right?

23           There's a list in Jury Instruction 29 that outlines

24   credibility.  It outlines the different factors.  There's

25   eight.  The ones I've highlighted here, the witness' bias or

1    prejudice, if any; the reasonableness of the witness' testimony

2    in light of all the evidence; and any other factor that bears

3    on believability in this case.

4              So, the question is, do you believe that the BLM

5    agents, the Park Service folks who came in here and said how

6    scared they were, were really that scared?  Do you believe

7    that?

8              Metro Sergeant Reader, says it's the scariest day of

9    his career.

10             Okay.  Backing up.  The day that he says is scariest

11   day of his career, he authors a report.  In that report, he

12   writes down everything that should be important to him,

13   everything that's important to the investigation.  Everything

14   that's important so that when we get to trial, he can rely on

15   that report.  Well, in that report he says nothing about it

16   being the scariest day of his career.  He meets with the U.S.

17   Attorney's Office, he meets with the FBI, he comes to court and

18   testifies, now it's the scariest day of his career.

19             Sergeant Jenkins, same thing.  Says nothing in his

20   report about anybody pointing weapons at him.  Meets with the

21   U.S. attorneys.  Meets with the FBI.  Comes to court and

22   testifies.  Everybody's pointing weapons at him.

23             MR. MYHRE:  I'm going to object, Your Honor, to this

24   line of argument.  The Court has already ruled on this

25   particular issue.

1              MR. TANASI:  Your Honor, it goes to credibility.  The

2    jury instruction is right on point.  I'm already --

3              THE COURT:  Is your objection to the use of the

4    transcript?

5              MR. MYHRE:  No, Your Honor.  It's the objection to

6    the -- to the reference to the changing of stories after

7    meeting with the U.S. Attorney's Office.

8              THE COURT:  Well, yes.  That -- that's an instruction

9    that was clear, that the Government and all the parties have a

10   right to speak to the witnesses before they take the stand and

11   the witnesses have a right to review documents before they take

12   the stand so any interference that that was improper is not

13   appropriate, but otherwise, for purposes of arguing

14   credibility, it would be relevant.

15             MR. TANASI:  Thank you, Your Honor.

16             Agent Brunk.  Agent Brunk would not, when he was

17   testifying here in court, refer to any of the armed individuals

18   as protestors.  Didn't use that word.  Wouldn't use it.  Used

19   it in his report though, folks.

20             Ranger Apley, same thing.  Would not refer to the

21   individuals on the bridge as protestors.  Comes to court and

22   calls them -- refuses to call them protestors.

23             Agent Johnson.  Agent Johnson says nothing in his

24   report being scared, frightened, or threatened.  Nothing --

25   nothing in his report about that.  But when he's in here

 1    testifying, he tells you how scared and frightened and scared

 2    he was.

 3              Folks, the video in this case speaks for itself.  You

 4    don't have to take my recitation of it; you can listen to the

 5    video yourself.  And let's hope this time you can hear it.

 6              "There are some God damn ugly women here."  That's

 7    one of the agents.  Not my words, folks.

 8         (Exhibit published.)

 9              "Agent Parker:  They're not actively assaulting us

10    yet."  He laughs.

11         (Exhibit published.)

12              Logan Briscoe decides to take a picture while he's in

13    the wash.  And -- and again, remember, Ranger Apley he calls it

14    a fatal funnel; right?  Well, how many videos and how many

15    pictures have we seen of folks just walking around right out in

16    the open in this fatal funnel?  You see a little of it here.

17         (Exhibit published.)

18              Snaps a picture and laughs it up.

19              There's a joke about impromptu church.  Impromptu

20    church time.

21         (Exhibit published.)

22              Realizing they didn't want to catch any more of that

23    on video, he turns it off real quick, folks.

24              They joke about a heavyset woman they see in the

25    crowd.

1        Joke about "I think she likes you" and then he says,

2   "That scares me and she's not my type."

3        "Do you remember saying that, sir?"

4        "Yes, I do."

5        "And that was the heavyset lady you were talking

6   about?"

7        "I believe so, yes."

8        And folks, where were Sheriff Gillespie and

9   Tom Roberts?  You didn't hear from them.  Why?

10       Tom Roberts is right down there at the gate with

11  Sergeant Reader walking around, walking and, turning his back

12  to the bridge.  You don't hear from him, why?

13       You don't hear from Sheriff Gillespie.  Why?

14       Actions in this case, folks, speak louder than words.

15  This is just a screenshot, I won't show you another video

16  because you've seen it already, of NHP walking around, not

17  arresting anyone, not scared.

18     (Exhibit published.)

19       Now, folks, let's talk about the aider and abetter

20  jury instruction in this case.  Jury Instruction 21.

21       Again, it is not enough that Steven Stewart merely

22  associated with persons committing crimes, or unknowingly or

23  unintentionally did things that were helpful to that person, or

24  was present at the scene of a crime.  The evidence must show

25  beyond a reasonable doubt that the defendant acted with the

1    knowledge and the intention to help that person commit a crime,

2    folks.

3          Well, the Government is saying that Eric Parker was

4    up on the bridge committing crimes and that Steven Stewart was

5    up there helping him.  I submit to you no crimes were

6    committed.  None.

7          And first of all, there's no spotter that's really

8    even up on the bridge; right?

9          Agent Johnson, he testifies ultimately that it's

10   possible to say what he thought was a view finder or range

11   finder of some kind, it was possible it was a video camera.

12         Folks, you don't convict people on possibilities and

13   maybes.  You must be firmly convinced.

14     (Exhibit published.)

15         And if agent spotter somehow -- or Agent Johnson

16   somehow saw a spotter, right, let's look at this picture of

17   Steven Stewart where there's nothing in his hand except for the

18   gun which is below the Jersey barrier and the person to the

19   right of him in the white shirt holding something to his face.

20         The reality is, folks, Steven Stewart, he did nothing

21   more than this guy in his blue shirt (indicating), this guy in

22   his white shirt (indicating), or this guy in his blue shirt

23   (indicating), or this guy in his blue shirt (indicating).  And

24   look at the government, his government, your government,

25   pointing weapons at him.  That's it.

1          (Exhibit published.)

2               Now the Government says that this post, this post on

3     September 16th, 2014, this post proves that Steven Stewart was

4     Eric Parker's lookout; right?

5               Folks, you heard Eric Parker.  You heard his

6     testimony.  What did he tell you?  He was trying to make Steven

7     look cool.

8               People kept calling him the Bundy Ranch Sniper.

9     Steven didn't have binoculars.  Trying to make him look cool.

10         (Exhibit published.)

11              And let's talk about this post.  Talks about a scope.

12    Sure does.  It says, "It's been a long day.  What's up?  I've

13    have a little earlier with a really high-powered scope show me

14    "F" asterisk awesome."

15              What's key there, folks?  "Show me."  Just like

16    Eric Parker told you.  When they get to the parking lot, they

17    are shown a scope.  They're shown this retractable scope.  They

18    look at it, Eric and Steve, from the parking lot -- not from

19    the bridge -- and what do they see?  Snipers.  Snipers up on

20    the mesa.  Hand the scope back to the lady.  Head for the

21    bridge.

22         (Exhibit published.)

23              The reality is, folks, if Steven Stewart was a

24    spotter or aider and abet, he's the world's worst.  Here's four

25    pictures where Steven's not even in it.  If he's Eric Parker's

1    spotter, where is he here, folks?  Well, like, Eric told you,

2    Steve was moving all over the place, not really sure where

3    Steve was.

4           The reality is, folks, as Eric told you, he was

5    spotting girls.  When he wasn't looking at his government

6    pointing weapons at him, as Eric told you, he was hitting on

7    the girls, talking to the girls.

8           Is that actions that lend themself to any kind of

9    criminal activity, the intent to assault, the intent to

10   threaten to impede, to obstruct?  No.

11          We heard Steven's video.  Mr. Dickinson played that

12   for us.  I won't play it again.  But, as Agent Draper

13   testified, at that point I asked her, he was yelling and

14   screaming and sounding angry and violent, or was he sounding

15   more like someone who was wise-cracking?  She said, "If I had

16   to choose between the two, it didn't sound like he was going to

17   commit violence, like he was violent at that time."

18          We heard the martyr statement, folks.  Again,

19   Agent Draper's testimony.  "But again, fair to say that he's

20   not threatening anybody in that statement; correct?"

21          "In that statement, at that time, on that video, I

22   did not hear him threatening someone."

23          As Steven said in that video, they couldn't gas us.

24   We were going to be martyrs if they wanted to continue this.

25          That doesn't mean he was ready to kill.  That means

183

1    that he was willing to stand up for what he believed in in the

2    face of chemicals, even it if it meant he would die.

3           Let's talk about the court order in this case, folks,

4    Exhibit 6.

5           Court order signed by Judge Larry Hicks.  Court order

6    that says, "It's further ordered that Bundy shall remove his

7    livestock from the former Bunkerville allotment within 45 days

8    of date hereof and that the United States is entitled to seize,

9    and remove to impound, any of Bundy's cattle that remain in

10   trespass after 45 days of the date hereof."  That's the order,

11   folks.  Let's break it down.

12          The cattle in this case, that's the government's

13   property.  The gather and the impound, that's the due

14   administration of justice in this case, the gather and the

15   impound.

16          The gather and the impound is also the law

17   enforcement duties.  This order sets it out.  This order that

18   the Government relies on, time and time again, this order sets

19   out those three components.  Why is that important?

20          Let's look at the extortion count.

21          First, the defendant induced someone to part with

22   property by the wrongful use of actual or threatened force,

23   violence, or fear; and second, the defendant acted with the

24   intent to obtain property.

25          Again, the property is listed in this instruction.

1           In the obstruction count, Jury Instruction 15 tells

2    us first the defendant influenced, obstructed, or impeded, or

3    tried to influence, obstruct, or impede the due administration

4    of justice with the intent to obstruct justice

5           The gather and the impound, that's the administration

6    of justice in this case, folks

7           Conspiracy to impede, to provoke --

8           MR. MYHRE:  I'm going to object, Your Honor, to

9    that -- also to that line of argument and that -- that's a

10   legal determination and that's arguing the law.

11          MR. TANASI:  Your Honor, I'm laying out, for the

12   jury, the Court's order in this case which is an exhibit the

13   defendants -- or the Government has laid out and that order is

14   what makes up the basis for the three counts; conspiracy,

15   obstruction, and impeding.  That order is what makes up the

16   basis for law enforcement's duties.

17          THE COURT:  You can't provide a legal interpretation

18   of the order.  We had an attorney here and if that attorney

19   didn't provide that legal interpretation, then that's not facts

20   in evidence.  It would be a legal argument that you can't make.

21          MR. TANASI:  I'll move on, Your Honor.

22          This case, folks, the point I'm trying to make, is

23   the operation was over on April 11th.  Operation was over.

24          How do we know that?  Well, Agent Stover, he

25   testified.  So let's go back to the operation in this case, the

1    operation or the goal was to transport cattle; fair?

2         Part of the operation included the transportation of

3    cattle, yes.

4         Okay.  In this case, in fact, the cattle wasn't

5    ultimately transported; correct?  Not in the incident command

6    post.

7         Okay.  One of the reasons it wasn't actually

8    transported was because of political pressure; correct?

9         That's my understanding, political pressure.

10        Political pressure in this case, folks, also came

11   from the county commissioner.  Political pressure is what ended

12   the operation in this case, folks.

13        Operation was over, on the 11th.  Special Agent Love

14   or the director of BLM, they make any decision with respect to

15   the continuation of the operations, they did.  At the end, of

16   the call they determined that we were going to conclude

17   operations and stop gathering cattle.  That's on the 11th,

18   folks.  On the 11th.  Before Steven Stewart's even in

19   Bunkerville.  They're already deciding to end the operation.

20        Agent Brunk, he came in and he testified and he told

21   us in his briefing the night before we had been told that we

22   were going to be moving out, that we were going to conclude the

23   operation, and that we were going to try to get the cattle out,

24   and then we'd all leave.

25        Agent Novotny, right here in the middle (indicating).

1          "All operations ceased on the 11th; correct?"

2          "Correct."

3          Before Steven Stewart even got there.

4          Agent Shilaikis.

5          He says, "On the 11th we were notified that we were

6     standing down.  One of the pilots, contract pilots for the

7     helicopter had a friend that had been killed in a helicopter

8     crash during that time.  There was going to be a funeral on

9     that Saturday."  So they ceased operations.

10          Ceased operations because, in part, of political

11    pressure.  Because, in part, of this helicopter tragedy.  Not

12    at all because of Steven Stewart, folks.

13          Sheriff Gillespie.

14          He gives a speech, a speech we've all heard and I

15    will not play it again, but I will quote it.

16          "I believe a press release has already been put

17    forth.  The BLM is going to cease this operation.  The Gold

18    Butte allotment will be opened to the public and they" -- the

19    BLM -- "will be removing their assets here in Clark County."

20    That's his quote.  His words.

21          Now, at this speech, folks, Steven Stewart's there.

22    He hears this speech.  He does.  What does he think when he

23    hears this speech?  What's in his head?

24          Well, he tells us on Facebook.  "First, they said

25    they were going to release everything and leave."  That's what

1    he believed.  "Then they held the gates of Gold Butte and

2    threatened us with chemicals.  Then we pushed forward and they

3    had to back off.  They're releasing the cows now.  The BLM is

4    leaving."

5            The plan, folks, as Eric Parker told us, was to watch

6    the cows come home when they got to the bridge.  That was the

7    plan.

8            Now, there are three counts with firearms.  Okay?

9    Counts Six, Count Nine, and Count Fifteen, and those are all

10   premised on one thing:  That you believe, beyond a reasonable

11   doubt, that Mr. Stewart used a firearm, brandished a firearm,

12   in relation to committing a crime.  And as I've told you folks,

13   there is not enough evidence in this case, in this world to

14   convict Steven Stewart of any crime.  Because he committed

15   none.

16           Jury Instruction 18.1, folks, that's the brandishing.

17   Same as the last one we just discussed.

18           Now, folks, you heard from Eric Parker.  He bravely

19   took the stand and he testified in this case.  And you heard

20   his Long Bow.  That sham, that lie the Government came up with

21   in order to bait him into a discussion.  And you heard

22   Scott Drexler's Long Bow as well, under that same sham, that

23   same lie, that same pretense, Long Bow.  But you didn't hear

24   one from Steven Stewart.  No, because as the agent said, he was

25   being a good dad and taking care of his kid for her birthday;

1    right?  You didn't hear that.  And you didn't hear

2    Steven Stewart testify either.  And some of you might be

3    sitting there thinking, I should have heard from Steven; I need

4    to hear from Steven.  Otherwise, I have to find him guilty.

5    Right?  This jury instruction tells you, folks, that a

6    defendant in a criminal case has a constitutional right not to

7    testify.  You cannot draw any inference of any kind from the

8    fact that the defendant did not testify in this case.

9          And so when you're back in that room deliberating, if

10   any one of you says, I should have heard from Steven, then your

11   duty is to report that to the marshal and to get that to the

12   judge, because that's in violation of this order.  That's how

13   serious it is, folks.

14         And the reality is, you have heard from Steven.

15   You've seen his Facebook.  You've heard the video.  Why would

16   he get up there and testify?  Why would he get up there and

17   expose himself to good government lawyers, wordsmiths, who

18   would take his words and twist them up and make them something

19   that they're not, just like they're trying to do with his

20   Facebook, folks.

21         "Heading to Nevada.  Going to stand up with my fellow

22   countrymen against a corrupt government."  That's what this

23   case is about.  Took his gun there, folks, so that he wouldn't

24   get bullied by the government.

25         Folks, he took his gun because he can.  He protested

1    because he can, the First and the Second Amendment.  The

2    Constitution was alive and well in Bunkerville in April and,

3    folks, show the Government that the Constitution is alive and

4    well here.

5              MR. MYHRE:  Objection, Your Honor.

6              It's a --

7              MR. TANASI:  Show the Government that the

8    Constitution is alive and well --

9              MR. MYHRE:  Objection, Your Honor, with respect to

10   arguing about the Constitution, showing the Government that

11   it's alive and well.  That's improper argument.

12             MR. TANASI:  Your Honor --

13             THE COURT:  Mr. Tanasi, the jury has been given the

14   legal instructions that apply to this case, so those are the

15   legal instructions that you can argue but not outside of those

16   provided to the jury.

17             MR. TANASI:  Understood.

18             One of those instructions, folks, is that you must be

19   firmly convinced that there is crime in this case.  Show the

20   Government, show the Government that that hasn't happened here.

21   Hang [sic] your head proudly and come back into this room --

22             MR. MYHRE:  Objection, Your Honor.  He can't argue

23   about showing the Government anything.  It's whether or not the

24   evidence meets the standard of proof.

25             THE COURT:  Sustained.  That's correct.

1              MR. TANASI:  Folks, the Government is asking you in

2    this case to find guilty verdicts because they believe that the

3    evidence meets the reasonable doubt standard.  Show them that

4    it hasn't.  Show them that it hasn't and return not guilty

5    verdicts on all counts.

6              Thank you.

7              MR. MARCHESE:  Do you want the next one, Your Honor?

8    I'm up next.

9              THE COURT:  I didn't know who was going next.

10             MR. MARCHESE:  Okay.

11             THE COURT:  All right.

12             Does the jury need a break or do you want to keep

13   going?  Raise your hand if you want -- if you need a break.

14        (No hands raised.)

15             THE COURT:  All right.  So, we're fine.

16             MR. MARCHESE:  Just -- just as a point, I might be

17   30, 40 minutes, if that's okay.

18             THE COURT:  Just a 40-minute break?  Is that what you

19   said?

20             MR. MARCHESE:  No.  I'm saying.  I'm going to be 30,

21   40 minutes.

22             THE COURT:  Okay.  I was going to deny your request

23   for a 40-minute break.

24             MR. MARCHESE:  No.  That's fine.

25             THE COURT:  Did you want to move the podium?

1          MR. MARCHESE:  Yes, please.

2          THE COURT:  Go ahead.

3      (Brief pause in proceedings.)

4          MR. MARCHESE:  May I proceed, Your Honor.

5          THE COURT:  Yes, you may.

6          MR. MARCHESE:  Thank you.

7          Counsel for the Government, thank you, counsel for

8  the defense, ladies and gentlemen, it's been a long odyssey.

9  It's been a little over two months now.  Literally I was clean

10 shaven when this trial started.  I think if you can remember

11 that far back, but this is my last opportunity to speak for you

12 or speak to you, my closing argument, and tell you why I

13 believe that you should return not guilty verdicts for

14 Eric Parker.

15         I have a confession to make.  When I first got this

16 case, one thing came to mind about Eric Parker.  Do you want to

17 know what that is?

18         He's nuts.

19         I apologize, buddy, but that's the truth.

20         I heard about some guy from southern Idaho that jumps

21 in this truck with two of his buddies and drives down to

22 Bunkerville, someplace he's never been, to a bunch of people he

23 doesn't know, to protest.  I think to myself, what -- what is

24 going through this guy's head?  I mean, my son is five years

25 old.  If I go into the refrigerator and I'm pouring him his

1   Cocoa Puffs in the morning and I don't have any milk, I get

2   upset because I have to drive 15 minutes round trip to

3   Albertsons to get him milk, but yet this guy, and his buddies,

4   they're driving 13 hours.

5          So, but then I started getting into the case.  I

6   started looking into the discovery, I started talking with

7   Eric, and I started getting the backstory here.  And, you know,

8   you obviously heard what Eric testified to, and we're going to

9   get into that for a moment, but I started getting into the

10  backstory and I started --

11         MR. MYHRE:  I'm going to object, Your Honor, to him

12  arguing about what he did or his personalized knowledge or

13  personalized experiences.

14         THE COURT:  Sustained.

15         MR. MARCHESE:  I started looking into why Eric came.

16  And you heard him testify as to why that was.

17         Bryan.

18     (Exhibit published.)

19         One of the first things in which you heard was

20  martial law.  Martial law was declared in Bunkerville, and that

21  the government had basically shut down this small town so that

22  they could do this roundup of cattle or whatever was going on.

23  All these small town people were basically caught in their

24  little box.

25         MR. MYHRE:  Objection, Your Honor, to facts not in

1   evidence.

2            MR. MARCHESE:  Yes, it is, Your Honor.  They -- the

3   jury can go and -- off of their own memories.

4            THE COURT:  The jury's memory will -- the jury is

5   instructed to follow your own memory of the facts.

6            MR. MARCHESE:  He heard about that.

7            Bryan.

8         (Exhibit published.)

9            And then he heard about, what you saw from his

10  Facebook posts.  He saw the Dave Bundy video, and he heard

11  about what happened there, that it was Eric's belief that a man

12  was, in fact, arrested for just simply taking photos on the

13  side of the road, that they mashed his face into the ground and

14  as you can see, he was clearly injured as a result of it.

15           And he saw this meme.  This also goes along with what

16  I just provided to you.

17           And then, I'm not going to play the videos for you

18  because you just saw a little bit of it and I believe you'll

19  probably hear from some of the other counsel, or even

20  Mr. Engel, saw and heard about the Margaret and Ammon incident.

21           Now, there's something important about this.

22           Now -- and I don't know if you've made this

23  connection, but it came out through the evidence.

24  Margaret Houston is Ammon Bundy's aunt.  Now, this incident

25  started out where Margaret is in front of that convoy and the

1    Government can argue that Ms. Houston was, in fact, in front of

2    the convoy and that that was why she was thrown out of the way.

3    I would submit to you that's not what the evidence shows.

4    You'll have every opportunity to view the videos, should you

5    like, if what you see here in court is not enough for your own

6    mind.  So, as a result, Margaret gets thrown down.  She gets

7    thrown down onto the ground.  And as you can see, she's clearly

8    not in front of the convoy at this point.

9           Bryan.

10        (Exhibit published.)

11           In addition, you then see her nephew, Ammon Bundy, he

12   drives into the area, into his ATV -- the Government is going

13   to argue that he blocks this convey or whatever the case may

14   be -- but I'm going to argue what he did was what most other

15   people would do, and that is he came to the aid of his aunt

16   that just got slammed onto the ground.

17           You also see that there's a large BLM presence.

18   There's at least two dogs there.  As you can see in this

19   particular screenshot, that's when the agent is siccing the dog

20   on Ammon.  I will leave it up to your beliefs and what you

21   believe the evidence shows.  I will leave it up to you as to

22   what Mr. Ammon Bundy's threat level or whatever it was at that

23   particular time.  But these are the things that Eric Parker is

24   seeing.

25           He also saw the First Amendment zone.  And this is

1   what, as you heard the testimony, both Long Bow and up on the

2   stand, this is one of the things that really made him get

3   upset.  Because it was Eric's belief that the First Amendment

4   isn't just a little box.  No, the First Amendment isn't a box;

5   it's where your feet are, ladies and gentlemen.  People should

6   have that right to protest.  So this is the point when Eric

7   makes a decision.  He starts seeing these things about the

8   First Amendment and he makes this decision to now go down to

9   Bunkerville.

10          And you heard that he saw this statement, saw this

11  statement on Nevada.gov, from Governor Sandoval, speaking about

12  the BLM roundup and Eric read this and Eric saw the fact that

13  Mr. Sandoval said that it was most disturbing to him and as a

14  result, Eric then made the decision to come down to

15  Bunkerville.

16          And you saw Eric's Facebook posts right about the

17  time when he made that decision and he said if he is not secure

18  in his rights, then I am not secure in mine.  Ladies and

19  gentlemen, he saw all these things and he took them into

20  account and it bothered him.  It clearly bothered him that --

21  what was going on there.  So he made the decision to go down

22  and protest.

23          You heard him on the stand.  What did he say?  He

24  said, "They were hurting people.  I tell my kids that you have

25  to stand up for your neighbor and you have to be there for each

1    other."  And he said, "If I didn't do that, then I'd be a

2    hypocrite."  He felt that it was his duty.  He felt that it was

3    his obligation to go there and to show force, as the Government

4    would say, and also, Eric would say.

5            And what did he do when he came there?  Now,

6    obviously we know.  It's pretty much uncontroverted that he

7    went down with his buddies Steven and Scott, but here's nothing

8    that he saw, because there's been a big contention about the

9    fact that Eric was armed and I want to talk about that. What

10   did he see?  He saw this Tom Collins individual who said that

11   people going to protest at the Bundy ranch better bring funeral

12   money and body bags.  And based upon this, and you heard this

13   from the statements, Eric did two things; he brought his gun

14   and he brought his body armor.

15           Now, we have to remember where Eric Parker's from,

16   who he is.  You know, in a city like Las Vegas, it's probably

17   out of the ordinary to see some guy walking around with a long

18   gun, but we're talking about guys here from southern Idaho,

19   much different area and place than what we're talking about and

20   what we're used to typically.  Even when Eric was arrested,

21   what did he have on him?  He was on his way to work, ladies and

22   gentlemen.  He had no idea that the FBI were coming for him.

23   What did he have in his car -- or his truck?  Excuse me.  He

24   had a gun.  Because that's just what guys from Idaho do, ladies

25   and gentlemen.

1          You even heard Mr. Drexler in his Long Bow interview,

2     he said something very similar.

3          So, I want it to be clear, now, of course, the

4     Government and myself, we're going to argue as to how that gun

5     was or was not used, but the fact that he had a gun, ladies and

6     gentlemen, maybe it goes to his intent and what he was going to

7     do or something along those lines, but I'm going to tell you,

8     ladies and gentlemen, that's just another day at the office for

9     a good 'ole boy from southern Idaho.

10          Now, these guys are a little different.  They're a

11     little different in their background, like I said, and that's

12     what's great about America.  You go from a place like southern

13     Idaho or Bunkerville, kind of a small town and then maybe you

14     go to a place like New York City, where it's literally night

15     and day, but yet, we're in the same country, and that's the

16     beauty of it.

17          So, you see a protest in New York City and people are

18     probably going to have signs, but that's not what these guys

19     do.  Some people protest with signs, other people protest with

20     guns.  And you heard the reasons for that.  Mr. Tanasi just

21     talked about it.  Mr. Drexler also talked about it on his

22     Long Bow interview.  But that's the difference and I urge you

23     to keep that in mind, and keep an open mind, that a gun rack is

24     something that is very common most likely in southern Idaho,

25     whereas, if you see a gun rack in a major metropolitan area in

1    a pickup truck, not the same thing, ladies and gentlemen.  Same

2    country, different areas.  Different cultures, different norms.

3            Now, you heard this Long Bow interview.  I'm going to

4    play a couple clips for you.  The first one I want to play is

5    about the militia, which the special agent -- I forget his

6    name -- he asked Eric some questions about that and I want to

7    play that for you and afterwards I'm going to comment on it a

8    little because I think it's very important.

9        (Exhibit published.)

10           MR. MARCHESE:  I'm going to stop it for a second.

11           It's actually the end of the clip I wanted to show,

12   not the beginning, but regardless, you heard it and you'll have

13   the opportunity to look at it again should you wish.

14           Here's the important part.  Government has every

15   right to use undercovers.  Not a problem.  Government has every

16   right to use fake names, to use ruses, whatever they want to

17   do.  Not a problem.  Completely legal.  That's not the issue.

18   You have the jury instruction.  You're welcome to look at it.

19   Here's what's offensive to me, ladies and gentlemen.

20           MR. MYHRE:  Objection, Your Honor, as to what's

21   offensive personally.

22           MR. MARCHESE:  Here's what's offensive in general,

23   ladies and gentlemen.  That agent gets up there and he talks

24   about there was drinks and there's refreshments and things like

25   that.  Mr. Jackson did an excellent job in cross-examining him

1    about that, and I don't think that that's a huge deal.  These

2    are all adults.  To my knowledge they're all over 21, but

3    here's the issue.  He sits up there and he talks about how they

4    had the opportunity, they were all given potato chips and M&Ms

5    and all that.  How come I didn't see anyone getting offered on

6    these videos potato chips and M&Ms?  How come I didn't see

7    anyone eating potato chips and M&Ms?  He's trying to sanitize

8    what actually went on there.  But what's even more offensive,

9    or what you should find offensive, is the fact that he's up

10   there and he keeps trying to put words in everyone's mouth.  He

11   asked Eric Parker, "Are you in the militia?"  He clearly says,

12   "I'm not in the militia."  And he says, Oh, well, then don't

13   you train with the militia?  Aren't you -- don't you know some

14   of the militia?  And he does.  He admits, yes, I do know some

15   militia.  He said something about training with them.  But once

16   again, Eric, he goes ahead and he explains himself and he says,

17   "Listen, some militias are good, some militias are bad.  Some

18   militias are crazy racist guys that want to blow up the

19   government, and others ones are okay, but I'm not into getting

20   into any agendas."  So what does he do at that point?  You

21   know, Mr. I-don't-want-to-put-words-in-your-mouth, he once

22   again asks him, "Oh, so, you're like a militia of one?"  Keep

23   trying to push the narrative, ladies and gentlemen.  Trying to

24   twist the words.  I mean, he gets up there and he says, Oh, we

25   weren't trying to put words in anyone's mouth.  Listen to the

1   videos.  He constantly says it.  "I don't want to put words in

2   your mouth, but . . ."  Well, no, that's exactly what you're

3   trying do, ladies and gentlemen.

4          I wasn't sure if this guy was an undercover agent or

5   if he was a used car salesman selling defective cars to senior

6   citizens.

7          We've also had a lot of talk about credibility and

8   perception in this case.  You saw Mr. Parker get up on the

9   stand.  Mr. Dickinson, a very worthy adversary, cross-examined

10  for an extensive period of time in reference to what he saw and

11  heard on that day.  And he brought into question Eric's

12  credibility.  He brought into question his narrative about what

13  he saw and what he heard.

14         Now, I'm not going to play you the speech of the

15  sheriff again.  We've heard it many, many times.  You all can

16  play it if you like in the back, but at this juncture you

17  probably all can go ahead and recite it verbatim if you wanted

18  to at this point, but here's the important thing.  We've had

19  numerous witnesses, some from the Government I might add, such

20  as Alex Ellis, believing what Eric Parker believed, and that is

21  that the BLM was leaving.

22         We look at the Flynn videos.  There's the one video

23  where that guy is -- I believe Mr. Dickinson played a part of

24  it -- where he's yelling and screaming at the Department of

25  Transportation and all that nonsense, but there's a lady on

1    there says, "That's not the BLM.  They left."

2            We hear Michael Flynn.  Now, we didn't hear from him

3    because unfortunately he's passed away, but we heard on his

4    video, when Michael Flynn is probably just as close, if not

5    closer, than the greater majority of the people in the wash,

6    when he's up under the bridge and he's looking, he's saying,

7    "Oh, my God, they just said they're going to use lethal force.

8    The Army guys said they're going to use lethal force."  Now,

9    I'm not going to misrepresent the record here, ladies and

10   gentlemen.  I do have a job to do, but I'm also an officer of

11   the court.  I'm not telling you that at any point in time that

12   Mr. Johnson or anyone else from the BLM, to my knowledge at

13   least, that I could see or hear --

14           MR. MYHRE:  Objection, Your Honor, as to the

15   references to his personal knowledge.

16           MR. MARCHESE:  I'm trying to say -- okay.

17           I'm cleaning up the record, Your Honor.  If he wants

18   to -- I mean, it's getting absurd at this point.

19           THE COURT:  Just refer to people in general or just

20   not yourself.

21           MR. MARCHESE:  It's fine.  I will keep going on and

22   he can keep objecting.

23           At the end of the day, no one said "lethal force."

24   That's not the point, ladies and gentlemen.  You know what the

25   point is?  Is that people perceived that.  People heard it.

1    And they attacked Eric's credibility on it and you should keep

2    that in mind, that he's not some crazy person out to lie, and

3    we know that because what he testified to is buttressed by the

4    testimony and the facts and all the evidence here.

5            Now, we also heard issues about this court order.

6    Now, we've heard varying degrees of testimony, whether people

7    were supposed to be in the wash, whether they weren't.  At the

8    end of the day, ladies and gentlemen, let's just look at the

9    big picture here.  It's windy.  They're in this tunnel.

10   There's the echo going back and forth.  It's very hard to hear.

11   You heard Mr. Dennis Michael Lynch get on the stand.  You saw

12   his video saying, "Are you going to shoot us?"  "I can't hear

13   you."  The confusion, ladies and gentlemen.  The fact that

14   Dennis Michael Lynch, Michael Flynn, Alex Ellis,

15   Shannon Bushman, all these other people were, in fact, a little

16   bit confused based upon the facts and circumstances in the

17   case, you should keep that in mind when weighing the

18   credibility of Eric Parker's testimony.

19           We also have a Facebook post from Eric Parker in

20   reference to that.  "Bundy gave the sheriff one hour to disarm

21   the BLM."

22           Well, what do we know?  It wasn't the BLM, ladies and

23   gentlemen.  He never said that.  He said the National Park

24   Service is what Mr. Bundy said.  So based on that, it just goes

25   more into my narrative about the credibility, how there was a

1    lot of confusion going on on that day and how people weren't

2    exactly sure what, in fact, was going on.

3           You know, it's kind of like when you watch a movie

4    for the first time and then you watch it maybe a few months

5    later and then suddenly you're like, Did I even see that movie?

6    When did I miss -- did I miss that part?  Was I out getting

7    popcorn or going to the restroom?  The perception now, three

8    years to the day actually, today, as we sit in court, three

9    years ago versus today.

10          The Government is trying to make this case a

11   conspiracy, and that's their job.  That's what they're supposed

12   to do.  They're supposed to prove a conspiracy beyond a

13   reasonable doubt.  Now, the Government really focused on the

14   cattle and the cows and I would submit to you that the evidence

15   is different.  The evidence is not just about cattle and cows

16   and we, my first, I don't know, hour or two of the testimony

17   with Eric going back and forth was going over all the other

18   reasons that I just talked about; First Amendment zones,

19   Margaret Houston, Dave Bundy, et cetera.  This conspiracy, the

20   Government is hanging their hat on the fact that yes, they all

21   went to the Bundy ranch and then basically, for lack of a

22   better term, Eric Parker and his buddies were parking

23   attendants.  They stood there.  They manned a gate and they

24   told people where to park.  I mean, that's really it.  Let's

25   not overcomplicate this case, okay?  It's not about cows.

1    Eric Parker's motivation was not about cows; it was all these

2    other things.

3         They also make some references to Ricky Lovelien,

4    that they happened to be standing next to each other.  They

5    show that picture at the rally where Eric is standing there.  I

6    believe there's a lady with white pants on and he's standing

7    there.  And we fully and freely admit that they have proven --

8    actually Eric testified to it -- that at some point in time

9    Eric did get in Ricky Lovelien's truck.  He didn't know this

10   man.  Had nothing to do with this man.  As a matter of fact,

11   you even hear that Eric was unable to identify who that guy

12   was.

13        (Exhibit published.)

14        Ladies and gentlemen, the video speaks for itself.  I

15   don't really need to comment on it.  Just three quick things.

16        First of all, if you notice, the agent on there, once

17   again, trying to inject the militia in thereafter Eric Parker

18   has clearly disavowed being in a militia.  As a matter of fact,

19   even the Michael Flynn video, when he's on the bridge and

20   Steven's hitting on the girls, he even says, "Are you in a

21   militia?" and he says no.  But once again, controlling the

22   narrative by the Long Bow interviewer.

23        Also, going back to my credibility and perception

24   point.  The evidence in this case does not show the two good

25   'ole boys parked their trucks across the bridge.  There was one

1    truck at one point and, in fact, that individual did move and

2    the traffic slowed down because NHP put it in one lane as

3    opposed to both lanes going forward.  So, once again, I'm not

4    saying that Eric was necessarily lying, but more that his

5    perception was a little bit off of what actually transpired on

6    that day

7              And then lastly, one of the supposed "ringleaders,"

8    Ammon Bundy stating something to the effect of, well, I can't

9    control these people.  I mean, it shows the fact it was -- to

10   use Eric's own word -- chaos.  There was no organization.

11   Ammon Bundy was not some, you know, tactical general putting

12   people up on bridges and in the corners under bridges and

13   things along those lines.  That never happened, ladies and

14   gentlemen, and the evidence and the facts do not support it.

15             We've also heard a lot of testimony and evidence

16   about the BLM being outgunned and I'm not going to go ahead and

17   show you all the exhibits and all the evidence.  You saw the --

18   the planes and helicopters, and the people on the mesa, and you

19   saw the SWAT trucks, and you saw Metro in the middle of the

20   area between northbound I-15 and southbound I-15, and you saw

21   the NHP, and you saw all the trucks and the BLM guys pointing

22   their weapons.

23             The Government is making the assumption or the

24   assertion -- excuse me -- that they were outgunned, that these

25   individuals in the wash that I would argue, yes, some of them

1    had guns, sure, the evidence does show that.  We saw the dot

2    exhibit that the -- I believe it was Agent Simpkins went

3    through.  Many of the people are just walking forward.  I would

4    argue very slowly.  I would argue peacefully.  You can make

5    that determination, ladies and gentlemen.  But I also want to

6    talk a little bit about some of the people.

7           Now, Mr. Tanasi talked about fear, manufactured fear.

8    So I don't want to be too redundant, but I do want to talk a

9    little bit about some of the individuals that came in here.

10          Let's remember the stage.  Let's remember the night

11   before, okay?  The greater majority of the BLM agents were on

12   duty for a very long time because there was this supposed

13   imminent threat that was coming their way.  And if we remember

14   correctly from the testimony, that never, in fact, transpired.

15   So these guys are already kind of hyped up, okay?  I would

16   argue, if you don't sleep, if you're not eating properly, that

17   you're not in your right frame of mind.  And they're being

18   given information that is obviously incorrect.

19          I would also argue that whatever information Trooper

20   or Sergeant Serena, from the NHP was given, was also incorrect.

21   That man was driving over a hundred miles an hour calling his

22   wife before anyone was even in the wash, ladies and gentlemen.

23   There was no one even there and whatever information this

24   individual was told, he is so hyped up and scared, allegedly,

25   that he's driving like a bat out of hell.

1          Let's stop for a second and look.  You know, I know

2     this case, it's big case, we've been here for a long time, a

3     lot of witnesses, a lot of evidence, all that stuff.  At the

4     end of the day, ladies and gentlemen, I would argue -- let's --

5     let's get a timeout here.  No one was shot.  No one was hurt.

6     No one was injured.  It's much to do about nothing.  It's a lot

7     of confusion on both sides.  At the end of the day,

8     fortunately, no one was hurt, and that's the important thing

9     here, ladies and gentlemen.

10          Now, of course, I have to address the pictures, as

11     you know, because we've seen them and I'm sure Mr. Myhre, when

12     he does his rebuttal argument to me, is probably going to

13     reference them just as Mr. Dickinson did, and that's what they

14     should do to prove their case

15          Let's talk about that bridge.  We've seen all the

16     pictures.  It's about 150 yards away or so I think the

17     testimony of Mr. Simpkins was.  I mean, it's going to depend on

18     the vantage point in the wash.  But that's -- 150 yards, that's

19     a long ways.  Fortunately -- I was going to go over my

20     screenshots that we've shown you.  I did it with Eric and then

21     I believe we did it with Agent Shilaikis as well, but I would

22     argue that the Government has conceded that Eric did not, in

23     fact, point his weapon at the BLM at the time when they said

24     that he did over the Jersey barrier, okay?  He was just

25     standing there.  Was he up and down?  Yes.  I'll own that.  The

1    Shilaikis videos show that.  There's some pictures that show it

2    as well.  We own that.  We own that Eric was up and down.  You

3    heard his testimony as to why he was up and down.  You can

4    determine your credibility.  You can look at it however you

5    like.

6              But, at the end of the day, let's look at a few

7    things.  Let's look at the viral nature of those photos.  A

8    greater majority of the reports in this case were written after

9    the fact, okay?  Two, three days, depending on who.  As we

10   know, Eric's picture went viral.  He testified to it.  I

11   believe there might have even been some testimony from some of

12   the other people, the guy with the trucker hat, the black

13   insignia and all that.

14             Now, yes, there was a little bit of radio traffic

15   about the guy with the trucker hat and the white insignia, but

16   there was no radio traffic on Exhibit 157 that said that he was

17   pointing his weapon at anyone.  He said he had it, a long gun.

18   Said he had a flack jacket.  We own that; we concede it.  But

19   there was nothing about him pointing his weapon.  He's just

20   simply standing, 150 or so yards away, on a bridge, holding his

21   weapon.  Sometimes kneeling.  Sometimes not kneeling.

22             And if we go to Exhibit 129, Bryan.

23        (Government Exhibit 129 published.)

24             And there is one of the pictures.

25             If we can go to the next one.

1          (Exhibit published.)

2              There's another picture.  We own it.  We're not going

3     to insult you.  That is Eric Parker.  He is on that bridge.  It

4     was Bunkerville.  It was three years ago today.

5              However, I get how those pictures look.  Okay?  I

6     understand.  But just bear with me for a moment.

7              Can we get the next one, Bryan.

8          (Exhibit published.)

9              First of all, this is -- I mean, it's not all the

10    BLM's vantage points, but it's some of their vantage points.

11    And this would be the general vicinity, somewhere along here

12    (indicating).  I think that's a crack right there.  That might

13    have been where Eric Parker was or somewhere around here.  One

14    of these two places on the screen, the general vicinity.

15             What's important from this picture is, is that you

16    can't see Eric Parker from there.  You can't see Eric Parker's

17    gun from there.  The testimony from Eric was that the Jersey

18    barrier is kind of thick.  Therefore, the barrel of his gun

19    would not protrude from that Jersey barrier, from that little

20    crack there.  And why is that important?

21             Can we get the next one, please, Bryan.

22             The instruction.

23         (Exhibit published.)

24             You're going to get this instruction.  And I believe

25    Mr. Dickinson even -- even alluded to a little bit and that is,

1    "A reasonable apprehension of immediate bodily harm is

2    determined with reference to a reasonable person aware of the

3    circumstances known to the victim.  Circumstances unknown to

4    the victim are not included."

5            Well, what does all that legal gobbledygook mean?

6            The best way I can explain it to you is give you an

7    example.  Remember when I called my client nuts at the start?

8    Let's say he hears that.  And let's say he gets up from his

9    chair.  And he's -- he's irritated and he's getting ready to

10   hit me in the back of the head and just before he does it, just

11   as he clocks back, he stops because he heard the rest of my

12   statement.  He's like, oh, okay.  I'm okay with that.

13           Now, when that was going on, I'm talking to you, I'm

14   making my argument to you.  I never saw it.  I never heard it.

15   I was completely unaware of it.  I make my argument.  I sit

16   down.  And then Tanasi goes to me and he goes, Hey, do you know

17   what just happened?  He was going to punch you in the back of

18   the head and he almost did and then he stopped.

19           Same thing here, ladies and gentlemen.  It's a

20   horrible way to describe it, but it's the truth.  No harm, no

21   foul.  If the agents don't perceive it, if they aren't

22   personally aware of it -- just as that jury instruction tells

23   you -- then there is no crime.  And I understand how morally,

24   how ethically you might look at that, those pictures, and be

25   extremely, maybe even offended, annoyed, whatever the case

1    maybe.  But, I must warn you and remind you of your duties as

2    jurors, and that's just very simple, to follow the law that

3    Her Honor instructed on you earlier this morning.  And I would

4    argue to you that based on this jury instruction, based on the

5    facts and circumstances and the example that I gave to you,

6    that those pictures are by and large irrelevant.  All it does

7    is inflame your prejudices to a crime that never actually

8    happened because those BLM agents didn't see him.

9         Hugh Gourgeon, I think there was somebody from -- one

10   of them was from -- somebody from Reuters, the FBI agents,

11   those people, those individuals are not the intended, or the

12   alleged -- excuse me -- victims in this case.  Therefore, I

13   would ask that you set those pictures aside and not consider

14   them in reference to a crime.

15        Now, I'm almost done.  I promise.  But I want to -- I

16   want to play another excerpt of Eric's Long Bow video.

17        (Exhibit published.)

18        Ladies and gentlemen, for once, Mr. Dickinson and I

19   agree on one thing and that is that this is, in fact, a simple

20   case.  I mean, you've heard Eric's words.  I mean, there's a

21   lot of evidence, but it's probably one of the more important

22   things for you to look at.  I mean, look at it all.  You know,

23   we -- I have no -- I'm not hiding anything, okay?

24        At the end of the day, you know, I'm a very simple

25   man.  These cases usually just come down to what you think.  I

1    mean, don't -- don't let the suits fool you.  I just like to

2    get right to it and the simple honest truth here.

3              So you're going to go back and your going to

4    deliberate.  You'll have the opportunity to look at the jury

5    instructions.  You'll have the opportunity to look at your

6    notes.  I see a lot of you have been taking diligent notes

7    throughout the trial and we thank you for paying attention and

8    doing that.  But, it's really going to just come down to, you

9    know, whether you think that Eric Parker acted reasonably or

10   not.

11             Now, of course, you need to follow the law.  I'm not

12   saying that.  It's not -- I'm not asking for you to go outside

13   the law.  Follow the law.  But that's really what it's going to

14   come down to, ladies and gentlemen

15             Now, originally I -- I told you -- you know, I gave

16   you that quote from Eric and I'm just going to leave you with

17   one last quote before I go and it's the last you'll hear from

18   me, and that is, "To believe in something and not to live it,

19   is to be dishonest."  And that quote sounds a lot like what

20   Eric Parker said when he testified on the stand.  However, that

21   quote's not from him.  That quote is from Mahatma Gandhi.

22             Thank you.  I'm confident you will do the right thing

23   and you will find Eric Parker not guilty.

24             Thank you very much.

25             THE COURT:  All right.  Would the jury like a break?

1    It's 4 o'clock.  We usually leave here at 4:30 or -- raise your

2    hand if you want a break?  We can take a break if you need one.

3            All right.  So let's go ahead and let the jury take a

4    break and we'll take a 10-, 15-minute break as well.

5            I do remind you that you're not to discuss this case

6    with anyone nor permit anyone to discuss it with you.

7            Do not read or listen to or view anything that

8    touches upon this case in any way and do not attempt to perform

9    any research or any independent investigation, and do not form

10   any opinion.

11           Go ahead and stand for the jury and we'll welcome

12   them back in about 10, 15 minutes, as soon as they're ready.

13       (Jury excused from courtroom.)

14           THE COURT:  All right.  Off record.

15       (Recess was taken at 4:00 p.m.)

16           COURTROOM ADMINISTRATOR:  All rise.

17       (Jury returned to courtroom at 4:19 p.m.)

18           THE COURT:  All right.  Everyone may be seated.

19           We're joined by the jury.

20           Mr. Engel, you can go ahead and start whenever you're

21   ready, sir.  You'll have to move the microphone.

22           PRO SE ENGEL:  Thank you, Your Honor.

23           THE COURT:  Because Mr. Marchese bent it the other

24   way.

25           Do you want us to turn that podium, too, so that it's

1    facing the jury?

2           PRO SE ENGEL:  It will be fine.  I appreciate it

3    though.

4           THE COURT:  Okay.

5           And then there's the button where your right hand is.

6    There's a button that makes the podium go up and down, wherever

7    you find it more comfortable.

8           PRO SE ENGEL:  I appreciate it.  Thank you.

9           Good afternoon, ladies and gentlemen of the jury.

10   It's good to be back up here talking with you again.  Forgive

11   me because I'm extremely nervous and a little bit terrified to

12   kind of go with that nervousness.

13          On the morning of the 12th, my friend and I, we

14   pulled into Mesquite at about 8:00 a.m. and we went to a

15   breakfast buffet --

16          MR. MYHRE:  Objection, Your Honor.

17          PRO SE ENGEL:  -- because we had nowhere -- we had no

18   idea --

19          THE COURT:  Just a minute, Mr. Engel.  There's an

20   objection so you need --

21          PRO SE ENGEL:  Sorry.

22          THE COURT:  -- to stop so I can address it, please.

23          MR. MYHRE:  He's arguing facts not in evidence.

24          THE COURT:  That's true.  There's no evidence that

25   you stopped and had breakfast and so forth.  So please keep it

1   to the evidence that's actually been admitted in court.

2          PRO SE ENGEL:  Sorry, Your Honor.

3          At 8:00 a.m. on April 12th, 2014, I -- my friend and

4   I had no idea where we were going to go.  At about 8:30 we

5   finally got ahold of somebody and they told us where we were

6   going.

7          MR. MYHRE:  Objection, Your Honor.  Again, arguing

8   facts not in evidence.

9          THE COURT:  Mr. Engel, please.  You need to keep to

10  the facts that are actually admitted in evidence.

11         PRO SE ENGEL:  Okay.  Well, we arrived at the Bundy

12  ranch approximately 8:45, about 15 minutes before this rally

13  started.  We had to park a long way across the bridge and we

14  walked across.  We got there 10 or 15 minutes before Cliven and

15  Ammon and those guys started to speak.

16         As you've seen, it was pretty difficult to hear.

17  There was a lot of wind that day.  Cliven is not the best

18  speaker.  But the Government is trying to say that I entered

19  into some kind of a conspiracy prior to the 12th.  They've

20  showed you that I quoted Patrick Henry.  I cut and pasted

21  Patrick Henry, a portion of his speech, onto a website or a

22  Facebook page.  What they've not shown you, prior to the 12th,

23  is that I had any contact with anybody involved in this case.

24  None of these gentleman back here (indicating), none of the

25  Bundys.  They've not shown you one single phone call, one

1    single text message, one single instant message, or one single

2    e-mail in which I talked to any other co-defendants or any of

3    the Bundys prior to the 12th.

4            My entire reason for coming down there, as my

5    Facebook said, is I saw a woman, a grandmother, get

6    body-slammed, and I saw a guy get Tased and an attack dog

7    released on him and I saw this meme of snipers up on a hill.

8    And I saw a First Amendment area sign.  I saw these people

9    getting abused because they weren't in their little -- the

10   little box.

11           MR. MYHRE:  Objection, Your Honor.  Again --

12           THE COURT:  There's no evidence of people getting

13   abused.  Are you talking about the grandmother and the man?

14           PRO SE ENGEL:  Yes, ma'am.

15           THE COURT:  Okay.

16           PRO SE ENGEL:  And at that point I told my buddy,

17   "Hey, you know, I don't know what's going on down there, but

18   let's go take a peek.  Let's go look."

19           So we loaded up our truck with camping gear, threw a

20   couple guns in, threw our golf clubs in, and headed down to

21   Bunkerville to see what was going on and get some warm weather.

22   It's a lot warmer down here than it is in north Idaho in April.

23           Prior to the 12th you've not seen where I've

24   discussed anything about cattle, anything about a BLM compound,

25   anything about a court order.  There's not been one shred of

1   evidence that I conspired with anybody about cattle.

2           On the 12th we could hear where we were -- where my

3   buddy and I were standing, we could hear Cliven and Ammon and

4   the sheriff talk and like you've heard from a lot of the other

5   guys, it wasn't clear.  It's just --

6           MR. MYHRE:  Objection, Your Honor.  He's --

7           PRO SE ENGEL:  I'm sorry.  I'll move on.

8           The sheriff, what he said, it sounded like it was

9   over to us, to me and my friend.  Thought it was over.  The

10  sheriff didn't tell us --

11          MR. MYHRE:  Objection as to what he's -- testifying

12  as to what he thought at the time.

13          THE COURT:  Mr. Engel, here's the problem.  Even if I

14  were to let you testify about things that are not in evidence,

15  the jury cannot consider them because the jury can only

16  consider the facts that have been provided as evidence before

17  today.  So, it has to either have come from someone sitting on

18  the witness stand or some of the documents or videos and things

19  that we saw and heard.  So it doesn't necessarily help you to

20  try to provide more information now than what's already been

21  provided because the jury won't be able to consider it.

22          PRO SE ENGEL:  Yes, Your Honor.

23          THE COURT:  So, please try to only argue the facts

24  that have been admitted and how they should apply to the law in

25  the case so that the jury can reach a fair verdict.

 1          PRO SE ENGEL:  Well, you folks heard the sheriff say
 2  what he said from the stage.  As Mr. Tanasi says, you can watch
 3  a movie today and watch it tomorrow and you hear different
 4  things in the movie that you didn't pick up the first time that
 5  you watched the movie.  And now that we watched these videos,
 6  obviously it's very simple to see exactly what the sheriff
 7  said, but that day, in my perception, I thought it was over.
 8          MR. MYHRE:  Objection, Your Honor.
 9          PRO SE ENGEL:  I'm sorry.
10          THE COURT:  Sustained.  And that sentence is stricken
11  and the jury is advised to disregard it.
12          PRO SE ENGEL:  Ladies and gentlemen, you heard
13  Cliven Bundy tell the cattles -- tell the cowboys to go get the
14  cows.  "Git 'er done."  "Let's go git 'er done."  You heard him
15  say, "Alls we got to do is open the gate and let the cows out
16  and they're going to be home."  It sounded pretty interesting.
17  Let's go watch the cows go home.  So we got in my truck and we
18  headed that direction with a big giant crowd of people.
19          When we got there, there was already a big old giant
20  traffic jam.  As you've seen, I got out, I pulled my truck over
21  to the side and my buddy and I, we could see an Army over there
22  (indicating).  I threw my vest on, threw my rifle on, and got
23  out of my truck, pulled it out of the way.  I didn't cause this
24  traffic jam.
25          MR. MYHRE:  Objection, Your Honor.  He's -- he's

219

1    testifying as to what he was doing at the time, not what the

2    evidence has shown.

3            THE COURT:  Sustained.

4            PRO SE ENGEL:  The evidence has shown that I pulled

5    my truck over and got out of my truck.  You saw -- everybody

6    has seen that on video.  And the evidence has shown, during

7    testimony, that I didn't go towards the BLM; I went out and

8    stood out in the parking area way out in the dirt field.  I

9    wasn't next to Dave Bundy when he was talking to

10   Sheriff Lombardo about giving him an hour.  I wasn't talking to

11   any of these gentlemen (indicating), and I wasn't talking to

12   any of the Bundys standing out in the middle of that parking

13   area.  I was standing as far away as I could get and still kind

14   of see what was going on.  I didn't want to be a threat to the

15   BLM.  They couldn't even see me standing way out there.

16           MR. MYHRE:  Objection, Your Honor, as again, he's

17   testifying to what he saw or what he perceived in the parking

18   area.

19           THE COURT:  Overruled.  I think he can argue that.

20   It's fine.

21           PRO SE ENGEL:  It shows -- the evidence shows that I

22   showed up at 11:29 that morning and stood in the parking area.

23   For almost 25 minutes I did nothing but stand in the parking

24   area.

25           MR. MYHRE:  Objection, Your Honor.

1          PRO SE ENGEL:  Your Honor, that's exactly what the

2     evidence shows.

3          MR. MYHRE:  No, that's -- he can say the evidence

4     shows that.  He's saying I stood there and did nothing for 25

5     minutes.  There's no evidence of that, Your Honor.

6          PRO SE ENGEL:  There's video of it, Your Honor.  Me

7     standing in the parking area.

8          THE COURT:  I'm going to allow him to argue that, but

9     it's up to the jury to remember the facts and if they hear any

10    facts that are different than what they recall, they are to

11    follow the facts as they recall them.

12         PRO SE ENGEL:  Thank you.

13         You have heard multiple people testify that we heard

14    a lady say, "They're pointing guns at people underneath the

15    bridge."  I said it in my Facebook.  You heard Alex Ellis say

16    it.  It's what we heard.  It's what I heard.  And we go down

17    the freeway to see what the heck's going on.  I run down the

18    freeway.  And I get down the freeway and I am, I'm standing on

19    the bridge.  And you have seen the picture of me standing on

20    the bridge.  What was I doing standing on the bridge?  I had my

21    camera up.  I was videoing.  And I couldn't believe they were

22    right.  I see BLM agents over there.

23         MR. MYHRE:  Objection, Your Honor.  What he saw.

24         THE COURT:  Is it something -- so, Mr. Engel, if it's

25    something that's in one of the Facebook posts or something like

1    that where you're saying I was there and I saw this and this

2    and this, then obviously you conclude that in the closing

3    argument, but otherwise, if there's no evidence of it anywhere,

4    then you cannot argue it and again, even if you did, the jury

5    cannot consider it so it's not helpful.

6              PRO SE ENGEL:  Yes, Your Honor.

7         Folks, you saw me standing there with my camera

(indicating) and I pan over.  It's in Michael Flynn's video

8    

9    when Eric Parkers's walking behind me.  I don't have my hands

10   on my rifle; I'm filming.

11        At that point the Government has shown you guys where

12   the BLM were saying we have a court order.  I heard that.  It

13   was hard to hear, but I heard it.  They said -- I think I heard

14   "disperse."  But I also heard "we're going to shoot," as I said

15   in my Facebook post.  I stood there for literally a few minutes

16   and I left the area.

17        You have seen, from airplane video and from

18   Agent Shilaikis' video across the freeway, me literally running

19   the opposite direction.  I went as far away as I could get to

20   where I could still see what was happening in the wash and I

21   stayed there to watch what was going on.

22        Will you pull up Exhibit 415, please.

23      (Government Exhibit 415 published.)

24        Ladies and gentlemen, that's where I spent the rest

25   of the day, with those law enforcement officers (indicating).

222

1    You've seen --

2            MR. MYHRE:  Objection, Your Honor.  Again, he's

3    testifying as to what he was doing there at that day, not what

4    the evidence shows.

5            PRO SE ENGEL:  The evidence shows that when the law

6    enforcement officers arrived on the scene, I was standing there

7    and I approached them directly.

8            The evidence shows that I walked up to them and that

9    they walked back in front of their vehicle with me.

10           I stated in my testimony -- in my Facebook that they

11   began to help me.  You see me in the video pointing and them

12   pointing and then him getting on the phone, because I am trying

13   to de-escalate the situation as much as I possibly can.

14           The evidence shows in that video that they walk

15   around me.  We're conversing constantly.

16           The evidence also shows Ricky Lovelien come across

17   the freeway.  That's the first time I've met this guy, and you

18   know what I tell him?  "Don't go down there."

19           MR. MYHRE:  Objection, Your Honor, as to what he --

20   objection.  Facts not in evidence.

21           THE COURT:  Sustained.

22           PRO SE ENGEL:  He was not my superior officer.

23           MR. MYHRE:  Objection, Your Honor.  Facts not in

24   evidence and he's testifying.

25           THE COURT:  Sustained.  Jury will disregard.

1          PRO SE ENGEL:  The evidence has shown that I was with

2    Nevada Highway Patrol from 12:18 on his dash cam until 1:20

3    when I walked by them and stayed goodbye and he patted me on

4    the back.  It also shows where I came and got them and they

5    walked down the freeway with me, side by side, with Nevada

6    Highway Patrol.  We've all seen that.

7          I wasn't assaulting anybody.  I wasn't threatening

8    anybody.  I wasn't brandishing a rifle.  You've seen it in the

9    video.  I was standing with highway patrol side by side.

10          On none of the video have you seen any evidence where

11   I have communicated with anybody involved in this case.  You've

12   not seen a phone call with any of the Bundys or any of these

13   gentlemen, an e-mail, a text, an instant message.  You've not

14   even seen me standing around them having a conversation,

15   because it didn't exist.  I didn't enter into any conspiracy to

16   do any of these crimes here.

17          It's true, I was carrying a rifle that day.  But as

18   Major Tom Jackson, who stood up there and testified, when I

19   asked him, "How come you don't arrest people that are openly

20   carrying weapons in your state?"  He said, "Because they have a

21   right to carry guns."  That's what he said.  We have a right to

22   carry guns.

23          When it was over, I walked back to my truck, said

24   goodbye to the officers, they patted me on the back.

25   Sergeant Serena testified that I was helpful.  He said it from

224

```
 1   the stand, ladies and gentlemen, that I was helpful.  What more
 2   could I do not to be a threat?  I was helpful.
 3          You heard Major Tom Jackson with the highway patrol,
 4   when I asked him, "Did it end peaceful?"  He said, "Yeah, it
 5   ended peaceful."  And I like to think that I had a part in
 6   that, helping it end peaceful.
 7          I got back to the parking area and I took off my vest
 8   and I put my rifle in my truck.
 9          MR. MYHRE:  Objection, Your Honor.  Arguing facts not
10   in testified.  Testifying.
11          THE COURT:  Sustained.
12          PRO SE ENGEL:  And when the BLM was leaving, you saw
13   a video of me.  I was extremely upset.  Extremely upset.  They
14   had pointed rifles at me for over an hour.
15          MR. MYHRE:  Objection, Your Honor.  Again, facts not
16   in evidence.
17          THE COURT:  Sustained.
18          PRO SE ENGEL:  As I left, I joined with the crowd.  I
19   don't know how many were out there, but we were all yelling and
20   screaming and cussing at them.  Not one of my proudest moments.
21          Ladies and gentlemen, a conspiracy to commit offense
22   against the United States.  They've not proven beyond a
23   reasonable doubt that I had an agreement with two or more
24   persons to commit one of these crimes.  They've not proven that
25   I became a member of a conspiracy knowing of at least one of
```

225

1    its objects.

2            Cliven Bundy said, Cowboys, go get the cows.  He

3    said, "Alls we got do is open up the gate and they'll be home,"

4    and we went to watch.

5            I didn't conspire to impede or injure an officer.

6            I didn't prevent by force, intimidation, or threats

7    federal law enforcement from discharging their duties in any

8    way, shape or form.  I never talked to a BLM officer.  Never

9    got close to a BLM officer.  You saw me run away, run away when

10   I saw what was happening down there and I saw them pointing

11   weapons, and saying "court order" --

12           MR. MYHRE:  Objection, Your Honor.

13           PRO SE ENGEL:  -- you saw me run away.

14           MR. MYHRE:  Objection, Your Honor.  Move to strike

15   with respect to what he saw when he was on the bridge.

16           THE COURT:  Sustained.

17           PRO SE ENGEL:  Ladies and gentlemen, I didn't induce

18   by force, intimidation, or threats anybody.  The evidence has

19   shown I stood with law enforcement, Nevada Highway Patrol to be

20   specific.

21           On Count Five, the Government's saying that I

22   forcibly assaulted a federal officer.  The evidence shows I did

23   everything I could to make sure this thing ended peaceful.  The

24   evidence shows I stood with Nevada Highway Patrol and tried to

25   ensure that.

1          This Count Six of 924(c).  It's a crime of violence.

2     They've provided absolutely no evidence that I committed a

3     crime of violence.

4          And Count Eight, they say I intended to impede,

5     intimidate, or interfere with people.  The evidence showed me

6     go down the freeway, stand there, take pictures.  The evidence

7     showed me run the other direction when I saw what was

8     happening.  They said "court order," they said "disperse," and

9     I did, and I went as far away as I could get.  And law

10    enforcement pulled up on the scene and I asked for help.

11    That's what I did.

12         They say I obstructed the due administration of

13    justice.  I influenced, obstructed, or impeded or tried to

14    influence, obstruct, or impede the due administration of

15    justice.  It's just the opposite.  The evidence has shown

16    exactly what I've stated.  I tried to end this thing as

17    peacefully as possible with law enforcement that day.  We've

18    all seen me pointing them, them pointing and them getting on

19    the phone on my behalf.  On my behalf.  I don't know what more

20    I could have done to make sure that ended peacefully.

21         They're saying that I interfered with interstate

22    commerce with extortion -- by extortion.  I don't know.  I

23    didn't cause the traffic jam; I got caught in it.  Pulled over

24    to the side as the evidence has shown.  You saw me pulled over

25    to the side and I got out of my truck.  I didn't cause the

1   traffic jam.  I didn't stop in the middle of the road, and the

2   evidence has shown that.

3           I didn't induce someone to part with property by

4   wrongful use or actual or threatened force, violence, or fear.

5   I didn't act with intent to obtain property.  I didn't want any

6   cows.  I'm not a cowboy or -- what am I going to do with cows?

7   I don't -- I'm not obtaining these cows.

8           Ladies and gentlemen, you saw me there in front of

9   the stage the next day.  We stayed the night, slept on the hood

10  of my truck.  The next day there was a rally and we were all

11  very upset still.  I was very upset still, having guns pointed

12  at me.  After that, the Government says I didn't go to

13  Mesquite.  I laid by the pool.  That's exactly what I did.

14          MR. MYHRE:  Objection, Your Honor.

15          THE COURT:  Sustained.

16          PRO SE ENGEL:  Ladies and gentlemen, you've seen me

17  on camera, from almost the time I've been there.  I was never

18  on camera at the stage.  From the time I arrived at the parking

19  area you saw me get out of my truck on camera.  You saw me

20  standing in the middle of the field on camera.  You saw me go

21  down the freeway in a snapshot on camera.  You saw me standing

22  over the wash taking pictures.  That's in evidence.  You saw me

23  run away.  One of the -- one of the -- one of the witnesses

24  testified I was running, and you have seen it.  You saw me work

25  with law enforcement, standing there, in front of their

1    vehicles.  You saw them pat me on the back and you saw him

2    testify that I was helpful.

3              Ladies and gentlemen, I went there for a peaceful

4    protest and I made sure that it stayed that way.  That's what I

5    did that day, and the evidence has shown it.

6              I ask you folks, when you deliberate, to please come

7    back with a not guilty verdict on all of these charges, because

8    I am not guilty of these things.

9              Thank you so much for your time and putting up with

10   me battling up here and making so many mistakes.  I really

11   appreciate it.  I've tried my best.

12             It's been an honor.

13             THE COURT:  All right.  We're going to take our

14   overnight break.  We're going to try to start a little bit

15   earlier tomorrow.  Instead of 8:30, with we're going to try to

16   start at 8:00.  It still takes time to get everybody in the

17   courtroom, I know, but we're going to try to start at 8:00 and

18   plan for a shorter lunch tomorrow, so not a full one-hour

19   lunch.  The jury has their lunch, but I do advise the attorneys

20   maybe bring a bag lunch or power bars or whatever you need to

21   just to have some snacking in between so that we can keep

22   things moving.

23             So, as to the jury, please remember that you are not

24   to discuss this case with anyone, not even with your fellow

25   jurors and if anyone should attempt to speak to you about the

1    case or if you inadvertently hear something about the case,

2    remember you are to let the Court know right away.

3           Also, you are not to read, or listen to, or view

4    anything that touches upon the case in any way nor attempt to

5    perform any research or any independent investigation about any

6    of the issues related to the case.

7           And do not form any opinion until after we have

8    finished with our closing arguments and then I will excuse you

9    to begin the deliberation process.  So we're not there yet.

10          We thank you for your patience and we'll welcome you

11   back at 8:00 a.m. tomorrow morning.

12          Please stand for the jury.

13      (Jury excused from courtroom.)

14          THE COURT:  All right.  Off record.

15          COURTROOM ADMINISTRATOR:  Off record.

16      (Recess was taken at 4:49 p.m.)

17

18                          --oOo--

19                COURT REPORTER'S CERTIFICATE

20          I, Heather K. Newman, Official Court Reporter, United
     States District Court, District of Nevada, Las Vegas, Nevada,
21   do hereby certify that pursuant to Section 753, Title 28,
     United States Code, the foregoing is a true, complete, and
22   correct transcript of the proceedings had in connection with
     the above-entitled matter.
23
     DATED:  5-21-2017        /s/ Heather K. Newman
24                          Heather K. Newman, CCR #774
                            OFFICIAL FEDERAL REPORTER
25