1

1                   UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )   Case No. 2:16-cr-046-GMN-PAL
5                  Plaintiff,         )
                                     )   Las Vegas, Nevada
6          vs.                        )   Thursday, April 13, 2017
                                     )   Courtroom 7C, 8:06 a.m.
7   ERIC PARKER, O. SCOTT            )
    DREXLER, RICKY LOVELIEN,         )   JURY TRIAL DAY TWENTY-NINE
8   STEVEN STEWART, TODD ENGEL       )
    and GREGORY BURLESON,            )
9                                    )
                   Defendants.        )
10  _____)   C E R T I F I E D   C O P Y

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

     BEFORE:        THE HONORABLE GLORIA M. NAVARRO,
14                  UNITED STATES DISTRICT JUDGE, CHIEF

15

16

17

18  APPEARANCES:

19           See next page

20  COURT REPORTER:

21           Heather K. Newman, RPR, CRR, CCR #774
             United States District Court
22           333 Las Vegas Boulevard South, Room 1334
             Las Vegas, Nevada  89101
23           (702) 471-0002

24

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

2

1    APPEARANCES:

2    For the Plaintiff:

3            UNITED STATES ATTORNEY'S OFFICE
             BY:  STEVEN W. MYHRE
4                 ERIN M. CREEGAN
                  NADIA JANJUA AHMED
5                 NICHOLAS D. DICKINSON
             501 Las Vegas Boulevard South, Suite 1100
6            Las Vegas, Nevada 89101
             (702) 388-6336
7
     For Defendant Parker:
8
             LAW OFFICE OF JESS R. MARCHESE
9            BY:  JESS R. MARCHESE
             601 South Las Vegas Boulevard
10           Las Vegas, NV  89101
             (702) 385-5377
11
     For Defendant Drexler:
12
             LEVENTHAL AND ASSOCIATES
13           BY:  TODD M. LEVENTHAL
             626 South Third Street
14           Las Vegas, NV  89101
             (702) 472-8686
15
     For Defendant Lovelien:
16
             LAW OFFICE OF SHAWN R. PEREZ
17           BY:  SHAWN R. PEREZ
             626 South Third Street
18           Las Vegas, NV  89101
             (702) 485-3977
19
     For Defendant Stewart:
20
             TANASI LAW OFFICES
21           RICHARD E. TANASI
             601 South Seventh Street, 2nd Floor
22           Las Vegas, NV  89101
             (702) 906-2411
23

24

25

1    APPEARANCES (Con't):

2    For Defendant Engel:

3            JOHN G. GEORGE, Standby Counsel
             600 South Eighth Street
4            Las Vegas, NV  89101
             (702) 625-1183
5
     For Defendant Burleson:
6
             LAW OFFICE OF TERRANCE M. JACKSON
7            BY:  TERRENCE M. JACKSON
             624 South Ninth Street
8            Las Vegas, NV  89101
             (702) 386-0001
9

10   Also present:

11           Gwen Wilson
             Bryan Ginn
12           Christine Abbott

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           LAS VEGAS, NEVADA; THURSDAY, APRIL 13, 2017; 8:06 A.M.

2                              --oOo--

3                   P R O C E E D I N G S

4        (Outside the presence of the jury at 8:06 a.m.:)

5           COURTROOM ADMINISTRATOR:  All rise.

6           THE COURT:  All right.  Good morning.  You may be

7    seated.

8           COURTROOM ADMINISTRATOR:  This is the time set for

9    Jury Trial Day Twenty-Nine in Case Number 2:16-cr-046-GMN-PAL,

10   United States of America vs. Eric Parker, O. Scott Drexler,

11   Ricky Lovelien, Steven Stewart, Todd Engel, and Gregory

12   Burleson.

13          Counsel, please make your appearances for the record.

14          MR. MYHRE:  Good morning, Your Honor.

15          Steve Mhyre, Erin Creegan, Nadia Ahmed, and

16   Nick Dickinson.

17          THE COURT:  Good morning.

18          MR. TANASI:  Good morning, Your Honor.

19          Rich Tanasi for Steven Stewart.  Also with us is

20   Gwen Wilson and Bryan Ginn.

21          Thank you.

22          MR. MARCHESE:  Good morning, Your Honor.

23          Jess Marchese on behalf of Eric Parker.

24          MR. LEVENTHAL:  Good morning, Your Honor.

25          Todd Leventhal on behalf of Mr. Drexler.

 1          MR. GEORGE:  Good morning.

 2          John George on behalf of Todd Engel.

 3          MR. PEREZ:  Good morning, Your Honor.

 4          Shawn Perez on behalf of Ricky Lovelien.

 5          MR. JACKSON:  Good morning, Your Honor.

 6          Terrence Jackson on behalf of Gregory Burleson.  Also

 7    with me is Christine Abbott.

 8          THE COURT:  Good morning, everyone.

 9          All right.  Well, before we begin, I do need to make

10    preliminary remarks, just to remind everyone about the conduct

11    that's expected in the courtroom.

12          This is a courtroom; it is not a sporting event.  So

13    it is never appropriate for anyone to make any expression

14    regarding your opinion.  And that expression cannot be verbal

15    or body language no matter how much you may agree or disagree

16    with what is being said, please remember there is no

17    expressions that can be made.  They will be distracting to the

18    jury and the marshals are authorized to remove anyone from the

19    courtroom that does make any kind of inappropriate body

20    language expression or verbal expression.

21          In addition, people may not speak out of turn.  The

22    defendants are represented by counsel and they will speak

23    through their attorneys.  Any defendant who makes an outburst

24    or any body language expression or any kind of distraction

25    that's an outburst of any kind will be removed from the

6

1    courtroom.  We do have the holding cell that's just right next

2    door and it does have a speaker system so that the individual

3    will continue to hear what is happening in the courtroom, but

4    they will not be permitted to stay for the remainder of the

5    day.

6           Also, please make sure to double-check that you do

7    not have a cell phone, laptop, iPad, any kind of electronic

8    device with you.  Even if it's turned off or in privacy mode,

9    or vibrate mode, it's still not permitted in federal court.

10   The attorneys and some of the defendants do have electronic

11   devices but that is so that they can review their notes and the

12   discovery evidence and to be able to present evidence here in

13   court.  No one is permitted to make an audio recording or a

14   video recording in federal court and none of those devices will

15   be used in that way.

16          All right.  So we have set up the podium so that it's

17   facing the jury.  You also have the long-neck microphones at

18   your desk so you're welcome to stay at your desk if you need

19   to, but the podium is set up.

20          Who's going to be going first today?

21          Mr. Perez?

22          MR. PEREZ:  Yes, Your Honor.

23          THE COURT:  And then who will be going second?

24          MR. JACKSON:  I will, Your Honor.

25          THE COURT:  Mr. Jackson, and then Leventhal last.

7

1          All right.  Okay.

2          All right.  So, can we go ahead and bring in the

3   jury?

4          All right.  Let's go ahead and do that.  Thank you,

5   Aaron.

6          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

7      (Brief pause in proceedings.)

8          COURTROOM ADMINISTRATOR:  All rise.

9      (Jury returned to courtroom at 8:12 a.m.)

10         THE COURT:  All right.  Everyone may be seated.

11         We're joined by the jury.  We welcome them back.

12   Thank you for coming in a little earlier this morning.  We're

13   going to begin with Mr. Perez, who's representing Mr. Lovelien.

14         Go ahead, sir.

15         MR. PEREZ:  Good morning, ladies and gentlemen,

16   Your Honor, counsel.  By now you know my name is Shawn Perez

17   and I represent Ricky Lovelien, one of the defendants in this

18   case.

19         Yesterday was the anniversary, if you will, of the

20   incident in Bunkerville.  And, you know, I had planned on

21   making this speech yesterday morning and one of the things that

22   struck me was that -- and it's in a video that we saw over and

23   over again, and Cliven Bundy said, I didn't know what I was

24   going to do until this morning, and that was on the 12th.

25   That's kind of how I feel here.  I mean, everything has been

8

1    shifting.  We've heard from numerous defense attorneys, we've

2    heard from the Government, and this case seems complicated, but

3    it's really not.  And it's really not complicated when it comes

4    to Mr. Lovelien.  And, I mean, I've been in the back most of

5    the time.  You haven't seen too much of Mr. Lovelien.  You've

6    never seen a picture of Mr. Lovelien pointing a weapon.

7         The Government, yesterday, they started out with

8    Facebook posts by Mr. Lovelien.  And, you know, I started

9    thinking, well, you know, what's going on here?  Where are we?

10   And then it reminded me of books that my kids had.  They're

11   called *Where's Waldo?*  Some of you might be familiar with

12   those.  What it is, it's a collage, a backdrop and then you've

13   got to try and find this one individual amongst this backdrop.

14   They're all dressed the same.  They all look the same, but

15   there's one fundamental difference.  And that's kind of the way

16   I feel about Mr. Lovelien here.

17        Now, there's no doubt that Mr. Lovelien was a malitia

18   member.  We -- we heard that he may have been the leader of the

19   Montana State Defense Force.  We heard Agent Sulley say that

20   it's not a crime to be a member of a militia.  Militias were

21   part of the beginning of our country.  I learned this morning

22   that militia was responsible for the Battle of Saratoga and --

23   in the American Revolution.  So, it's part of our history.

24   It's not necessarily a bad thing.

25        What does make it bad is if there's an agreement to

9

1   do something that's illegal.

2           Now, the Government, in this case, has tried to show

3   that there was a plan.  Now, I mean, Mr. Bundy didn't know what

4   the plan was until the 12th.  So, it's kind of difficult to say

5   what that plan was.

6           The objects of this conspiracy were, according to the

7   Government, to assault federal officers.  Well, we didn't see

8   Mr. Lovelien assaulting anyone.  We never saw him threaten

9   anyone.

10          Extortion?  Well, we know that on the 11th that the

11  gathering of cows was over.  It was done.  They weren't going

12  to do anything further.

13          Now, the Government made a point of saying, Well, you

14  know, Mr. Lovelien was a co-conspirator because he was running

15  security for Mr. Bundy.  And they get this "running security"

16  from a Facebook post by Mr. Lovelien's sister.  I don't know if

17  any of you have siblings, but my sister has said that I've done

18  things that I didn't do.  She's embellished things, but the

19  important thing is Mr. Lovelien didn't post that and a number

20  of those posts -- and I'm not going to bring up each and every

21  one of them -- but, when you look at the evidence and you look

22  at the PowerPoint presentations and the Facebook posts and

23  reposts, a number of those are not to Mr. Lovelien, nor are

24  they from Mr. Lovelien.  The one about the Bundy ranch had

25  nothing do with Mr. Lovelien.

1          Sure, Mr. Lovelien reposted certain things.  Now, is

2    there any harm that?

3          Well, there's one in particular.

4          Bryan, 190.

5       (Government Exhibit 190 published.)

6          Let's start with Mr. Lovelien's belief and -- and --

7    now, this is Mr. Lovelien's essentially political speech, I'll

8    say.  You know, he's complaining about politicians not doing

9    the right thing.  And if you're not going to do the right

10   thing, then we're going to -- we're going to get rid of you.

11   We're going to elect someone else.  We're going to try and

12   change things.  Certainly there's nothing illegal about it.

13   And, in fact, this "take America back," you know, if -- I think

14   what does he say in here -- "I demand our country back."

15         Well, in the last elections we heard a lot about

16   that.  Even Rand Paul said, in declaring his presidency, he

17   said, you know, "I'm going to help America take our country

18   back."

19         We heard talks of "draining the swamp."  "Take our

20   country back."

21         It's not advocating violence.  I mean, it's a message

22   that, you know, this is a government, you know, of the people

23   by the people for the people.  That's what it is.  It's what

24   it's supposed to be.

25         Now -- and it's not so much the message as the

1    ability to bring the message.  That's the First Amendment.

2            And I'm not here to argue that what they did was

3    protected by that.  That's for you to decide.  But, when it

4    comes to things like threats, well, number one, you don't -- I

5    don't think you've heard any threats from these defendants, no

6    verbal threats.  The Government would like you to believe that

7    just holding a gun, or in Mr. Lovelien's case, not even holding

8    it.  I mean, he had it on his shoulder the entire time with the

9    barrel down.  We painstakingly went through a video, almost

10   frame by frame, because we had an NHP officer say that

11   Mr. Lovelien pointed the gun over that Jersey barrier, when, in

12   fact, he never did.  That same officer said that he got the

13   sense that Mr. Lovelien was a superior, and he got that based

14   on conversation that he had with Mr. Engel and that

15   Mr. Lovelien walks up and that conversation changes, so he

16   says.  I asked him, "Well, did he say anything?"  "No, I don't

17   recall."  "Did he do anything?"  "I don't recall."  It's the

18   same guy that said Mr. Lovelien was pointing a weapon over the

19   Jersey barrier.  And when we got through the video and I said,

20   "Well, we didn't see it."  He said, "Oh, maybe it was in

21   another video."  Well, we never saw that.  Absolutely nothing.

22           Now, in order to prove conspiracy they've got to show

23   an agreement.

24           Now, well -- let me -- let me start over.

25           Let's talk about the Montana State Defense Force for

1    a second.

2              Bryan, 199.

3         (Government Exhibit 199 published.)

4              Now, there's an individual.  You've heard his name.

5    He's not a part of this case.  His name is Mr. Lardy, and he

6    seeks out Mr. Lovelien because he's looking to join a militia.

7    And he -- he doesn't make it a secret that he feels that the

8    Government is his enemy and so he's looking to join a militia.

9    So, Mr. Lovelien says, well -- he doesn't respond to that, but

10   he does say that we're a legitimate militia, you know, we --

11   we're trying to get recognized by the state, we'll -- you know,

12   the governor may call on us, we're training for things like,

13   you know, to be first responders and help out in times of, you

14   know, civil emergencies and things of that nature.

15             Now -- Bryan, 200.

16        (Government Exhibit 200 published.)

17             Now, Mr. Lardy ends up joining the militia, he ends

18   up joining Montana State Defense Force and then just before the

19   Bunkerville incident, now he wants to resign.  And in his

20   resignation, in his post to Mr. Lovelien he says that, you

21   know, it's -- you know, "No hard feelings.  It's a tactical

22   decision.  I'm off to war."  Well, that tactical decision, you

23   know, I'm -- I'll suggest that perhaps it's because

24   Mr. Lovelien wasn't off to war.

25             Now, if you look at -- Exhibit 213, Bryan.

1         (Government Exhibit 213 published.)

2              This is the same day of that post.  And this is in

3    that long -- I don't know you recall, but we went through,

4    like, 200 pages of Facebook posts that day.  Most of it

5    Mr. Lovelien didn't respond to anything, but he does say that

6    the entire point of the militia going to Bunkerville was, you

7    know, not to start violence; it was to prevent violence.  So

8    now you have -- you have a -- a fundamental difference between

9    Lardy, who is going, saying, basically, hey, I'm going to take

10   on the Government -- and he may have been the only one, I don't

11   know -- and Lovelien, who is saying, you know, that's not what

12   this is about.  I mean, that's -- so now, when you're talking

13   about agreement, it's more of a disagreement as far as

14   Mr. Lovelien's concerned.

15              Now, if it was just specific counts like assault or

16   threatening, extortion, there probably isn't enough there to

17   convict Mr. Lovelien of any of those counts.  He was never in

18   the wash.

19              In fact, Bryan, bring up Simpkins 144.

20         (Government Exhibit 144 published.)

21              Now, this is really important because we know

22   Lovelien was never in the wash.  We know he never pointed a

23   weapon, and yesterday we heard the Government say he was on the

24   bridge.  Yes, he was on the bridge, at 2:30 in the afternoon.

25              Now, when Agent Simpkins testified as to the

14

```
 1    placement of all the gunmen, he put Mr. Lovelien way over here
 2    (indicating).  That was when the skirmish line was forming.
 3    That's when the BLM said they're pointing weapons at us.  Well,
 4    obviously that wasn't Mr. Lovelien; he wasn't even there.  He
 5    was still -- I guess this is to the west, so he never made it
 6    to the bridge at that point.
 7              Now, Bryan, 145
 8         (Government Exhibit 145 published.)
 9              Now -- how do you clear this?  Have I cleared it?
10              COURTROOM ADMINISTRATOR:  Got it.
11              MR. PEREZ:  Now, this is when Dan Love is at the
12    gate.  This is, like, sort of the height of everything, think
13    they're going to be releasing the cattle or they've come to
14    some sort of an agreement.  I mean, Lovelien has no idea.  He
15    hasn't spoken to anybody and the Government can't say that
16    Lovelien met Mr. Payne or Mr. Bundy.  There's just no evidence
17    of that.
18              Mr. Lovelien is over here (indicating); the bridge is
19    here (indicating).
20              Now, if you recall from the video, with, I believe it
21    was Sergeant Serena, Lovelien walks -- you see this from the
22    Madsen's-cam, he walks slowly to the bridge or to the bridge
23    area.  He gets to about here (indicating), and what does he do?
24    He sits on the Jersey barrier and has a bottle of water.  This
25    guy never goes over the barrier, never moves from the shoulder,
```

1    doesn't really talk to anybody, doesn't do anything.  Just

2    sitting there.  Basically, you know, watching, like anyone

3    else.

4              Now, the Government has to show, in this case,

5    especially in regards to these individual counts of assault and

6    threat and extortion, that Mr. Lovelien did more than just

7    associate with these people.  They have to show that -- that

8    he, in fact, did something to help them.

9              Now, we heard from Mr. Parker.  And Mr. Parker said,

10   yeah, we jumped in some -- and this is from the video.  We

11   jumped in some guy's truck.  We didn't even know who he was.

12   Now the Government is saying, oh, Mr. Lovelien is running

13   security.  Mr. Parker is doing security.  They didn't know each

14   other?  I mean, there's no communication between them.  I mean,

15   even assuming that there was some agreement somewhere else, one

16   would assume that they would know something.  He didn't even

17   know who he was.  So they get in the truck; they go there.  And

18   that's not really enough.

19             I mean, even -- even assuming if Mr. Parker did

20   anything that is illegal -- and I'm not suggesting that he

21   did -- did Lovelien know that he was going to do that?  No.

22   There's no evidence to show that he did, or that he knew.

23   There's more evidence to show that he was going there not to

24   create a violent atmosphere, but to prevent a violent

25   atmosphere.

1           There is a bumper sticker, it's been around for

2     years.  It says, "I love my country, but I fear my government."

3     And when you look at situations like this, I mean, that bumper

4     sticker starts to make sense.  I mean, we all have certain

5     principles that we want to live by and those weren't met here.

6           Now, I think -- well, at least in my opinion, from

7     the evidence, it shows the biggest problem we had here was

8     communication.  This event on the 12th never had to happen.

9     And it wasn't the fault of these defendants or the Bundys or

10    anybody.  Because all Dan Love had to do was say, Listen, we're

11    pulling out tomorrow.  We're leaving tomorrow.  We'll be out at

12    high noon, whatever.  You think they would have had that

13    problem if they had just communicated that?

14          And -- and not only that, they didn't even

15    communicate it to the other BLM officers that were on scene.

16    One guy said -- I think it was Brunk, who said, I didn't know

17    why everybody was backing up.  Nobody knew what was going on.

18    That creates a little bit of tension.  Maybe it's what he

19    wanted.

20          Now, in this case the evidence, there was, well, 25

21    or 30 witnesses.  There were -- Agent Willis testified he spent

22    a thousand hours, a thousand hours looking at photos, looking

23    at Facebook pages.  He said that he looked at a half a million

24    Facebook posts were photos.  He was able to come up with eight

25    photos of Mr. Lovelien.  Not one is he pointing a gun.  Not one

1    is he telling anybody what to do.

2              In fact, Bryan, bring up 318.

3        (Government Exhibit 318 published.)

4              Yesterday this particular photo sat up on the screen

5    for about 10 minutes while the Government was doing their

6    closing.  And this is pretty demonstrative of what Mr. Lovelien

7    was doing, standing there.  You know, at this time, this is a

8    photo from Mr. Gourgeon.  There were speakers going on.  And

9    Lovelien is just sitting there listening to these speakers.  I

10   mean, if he's running security, why isn't he at the rally site

11   with the other individuals that are in front of the stage?  Why

12   is there no photo of him?  Why is there no video of him?  Why

13   is there no statement?  No interview?  Nothing.

14             Now, you saw those pictures.  You saw those videos.

15   You saw those Facebook posts.  You never saw Lovelien in the

16   wash.  He never made it there.  You never saw him on the

17   bridge.  He wasn't there until 2:30.  Everybody's gone.

18             Now, going back to what I said earlier, Clive -- even

19   Cliven Bundy didn't know what he was going to do.  In fact, I

20   think that was at 9 o'clock in the morning on Saturday, the

21   12th.  He had no idea.  Now, if he had no idea, he didn't

22   communicate that idea to anyone, because he didn't know.  How

23   would Lovelien know?

24             Now, what we do know is that there was a -- I believe

25   it was a press release or a statement that came out, you know,

1    BLM is going to cease operations.  We do know that.  We know

2    that Ms. Arnett, I mean, she came in and she testified that she

3    was there listening to the -- to the speech and it doesn't

4    matter that she may have not really understood what she heard,

5    you know, or even that she heard it correctly because, I mean,

6    there's no mal intent in thinking, oh, well, they're going to

7    release the cows, I'm going to go watch.  And that's what all

8    these people did.

9         I mean, it was after that -- they go to the wash, to

10   the bridge, wherever.  Remember, Mr. Lovelien was never in the

11   wash, wasn't really on the bridge.  In fact, I believe --

12   Bryan, go back to 145.

13        (Government Exhibit 145 published.)

14        I asked, I'm not sure if it was Willis or Simpkins,

15   but you can rack your brain and see if you are this, but I

16   asked him, What was the vantage point that Mr. Lovelien had

17   from that particular area of the highway.  You know, could he

18   see what was going on back here with the BLM?  No.  He couldn't

19   see that.  They couldn't see him.  All he could see was this

20   abutment or the -- you know, the base of the bridge.  I mean,

21   his line of sight was probably, you know, marginal at best of

22   the gate.

23        So, it's kind of hard to -- to make that quantum leap

24   that he was trying to do something to bring those cows or, you

25   know, get the government to turn those cows over, or that he

1    was threatening anyone, or assaulting anyone.  The evidence is

2    just not there

3          Now, one of the things that the Government made a

4    point of was that Mr. Lovelien was a recruiter.  He sent people

5    there.  Well, Operation Mutual Aid, we don't really know much

6    about them.  There were some Facebook posts.  There were some

7    reposts.  Some of them happened when Mr. Lovelien was already

8    in Bunkerville and we heard the Government's witnesses say that

9    Mr. Lovelien didn't post anything while he was in Bunkerville.

10   And the important thing about the messages that were sent out

11   by Lovelien, it wasn't, you know, go grab your guns, let's go

12   take on the feds, it was, hey, the Bundys need help, they're

13   calling for help.  This is the guy that's coordinating it and

14   he sends -- you know, he sends out Ryan Payne's number.  Now,

15   is that enough?  I suggest to you that it's not.  Not beyond a

16   reasonable doubt.  Did he know that that's what they would do?

17   Did they know?  Not really.

18          Now, the evidence in this case against Mr. Lovelien

19   is -- is -- is not really direct evidence; it's more

20   circumstantial evidence than anything else.  And the judge is

21   going to -- or has instructed you on, you know, that type of

22   evidence basically, you know, you have to decide what to do

23   with that.  But, if, after having reviewed all the evidence in

24   this case, you have any doubt, okay, then the Government has

25   not proven its case beyond a reasonable doubt.  And if you can

1    draw two or more reasonable conclusions -- and I use the word

2    "reasonable" because you're going to see that in the

3    instructions --

4              MR. MYHRE:  Objection, Your Honor.  Misstates the

5    law.

6              THE COURT:  Sustained.

7              MR. PEREZ:  Well, your -- if you can draw two or more

8    reasonable conclusions from the evidence, one of those

9    reasonable conclusions is innocence and the other is guilt,

10   then that's not proof beyond a reasonable doubt.

11             MR. MYHRE:  Objection, Your Honor.  Misstates the

12   law.

13             THE COURT:  Sustained.

14             MR. PEREZ:  Well, you're -- if you can draw two or

15   more "reasonable" conclusions from the evidence, one of those

16   reasonable conclusions is innocence and the other is guilt,

17   then that's not proof beyond a reasonable doubt.

18             MR. MYHRE:  Objection, Your Honor.  Misstates the

19   law.

20             THE COURT:  Sustained.

21             MR. PEREZ:  It's not the law, Your Honor.

22             If you have two choices and they both are -- they

23   seem plausible to you, the Government hasn't proven its case

24   beyond a reasonable doubt because --

25             MR. MYHRE:  Objection, Your Honor.  Again, that

1   misstates the law.

2           MR. PEREZ:  That's not a statement of the law.

3           THE COURT:  The jury will have a copy of the law.  I

4   read it to you yesterday, and that's what they will follow.

5   Mr. Perez can argue how that should be interpreted, how the

6   facts in this case should be applied to those laws that are

7   already been provided to the jury and will, again, be provided

8   to the jury, not any other different law that doesn't apply to

9   the case.

10          MR. PEREZ:  Right.

11          Well, ladies and gentlemen, if you look at the -- if

12  you look at the evidence and you can say to yourself, Hey, you

13  know, maybe not, maybe not, that's not enough.  The Government

14  hasn't proven its case.  Because maybe not is . . . you have a

15  doubt.  You have reasonable doubt.  And if that's the case,

16  ladies and gentlemen, then you have to find Mr. Lovelien not

17  guilty.

18          Now, you know, at this point, you know, I'm just

19  going to ask you flat out, you know, the Government -- I'm

20  going to tell you the Government has not proven the case beyond

21  a reasonable doubt as to Mr. Lovelien and with that, I'll ask

22  you to return a verdict of not guilty on all counts.

23          Thank you.

24          THE COURT:  Thank you, Mr. Perez.

25          Mr. Jackson.

1           MR. JACKSON:  Yes.  Thank you, Your Honor.

2           Take me a minute or two to get organized here.

3           I really want to thank each and every one of you

4    jurors for being here on this very long and sometimes tedious

5    trial.  You have been wonderful.  I want to thank you.

6           Judge Navarro, I want to thank my co-counsel, who

7    have done a lot of work for me, made it a lot easier for me.  I

8    thank you for your outstanding work.

9           I hope that I'm not redundant in telling you things

10   you've already heard.  It's difficult when I only have one

11   chance to talk to you and I have to try to summarize two and a

12   half months of testimony in a few minutes.  I'd give you the

13   long version, but I don't think you want that.  I think you

14   probably would like me to summarize this as quick as possible.

15          But it is a very important day in Mr. Burleson's

16   life.  It's important for all of us.  And I'm going to tell you

17   today that I think Mr. Burleson, my client (indicating), is a

18   very lucky man.  And you may think it's strange that I say

19   that, but I think he's very lucky because he's being tried in

20   an American court where we have certain things that are

21   different from almost any other country in the world.

22          Number 1.  He has due process of law, which means

23   that during this whole long, sometimes tedious, process he had

24   the right to question witnesses, he had the right to bring on

25   witnesses, he had the right to have a fair proceeding during

23

1     the whole trial and I'm -- we're really grateful for that.

2          Secondly, he had the right, from the beginning, till

3     the end of the case, until it comes to you, ladies and

4     gentlemen, to the presumption of innocence.  Until all the

5     evidence is in, when he walked in the door, he was presumed

6     innocent, even though the Government was trying as hard as they

7     can to prove him guilty of numerous criminal charges, serious

8     charges, he was presumed innocent.  When you walked in the door

9     and you took your oath as jurors, you were to consider him

10    presumed innocent.  Not presumed guilty.  Not that he was

11    likely guilty, not what the newspapers might have said that,

12    you know, there were these guys out there involved in these

13    serious things; he was presumed innocent.  Innocent as a

14    newborn babe.  So you have to look at each piece of evidence to

15    decide whether or not the Government has met its burden on each

16    element of each count.

17         But, the other things that's related to the

18    presumption of innocence is the standard of proof we have in

19    this country.  It's not that he's probably guilty or maybe

20    guilty.  There has to be proof beyond a reasonable doubt, and

21    that's Instruction No. 3.  And I'm going to read it to you

22    because I think it's so important.  We have just a little bit

23    of -- from the last counsel spoke about it briefly, but I want

24    to read it to you directly from Instruction No. 3.  It says,

25    "Proof beyond a reasonable doubt is proof that leaves you

24

1    firmly convinced that the defendant is guilty.  It is not

2    required the Government prove guilt beyond all possible doubt."

3         Well, the Government doesn't have to prove it beyond

4    all possible doubt, but they have to prove it -- proof that

5    leaves you firmly convinced that the defendant is guilty.

6         Then it goes on to say, "A reasonable doubt is a

7    doubt based on reason and common sense and is not based purely

8    on speculation."

9         So it's a doubt based on reason.  Thinking.  Reason

10   and common sense.

11        "It may arise from a careful and" -- it -- "and

12   impartial consideration of all the evidence, or -- or from lack

13   of evidence."

14        So if there's lack of evidence, you may consider

15   that.  If there's lack of something that should be there,

16   that's something you can consider in deciding if there's

17   reasonable doubt.

18        You're finally instructed, "If after a careful and

19   impartial consideration of all" -- the totality of evidence --

20   "all the evidence, you are not convinced beyond a reasonable

21   doubt the defendant is guilty, it is your duty to find the

22   defendant not guilty.  On the other hand, if after a

23   careful" -- "a careful and impartial consideration of all the

24   evidence you are convinced beyond a reasonable doubt the

25   defendant is guilty, it's your duty to find the defendant

1    guilty."

2            Now, that's one of the fundamental principles of our

3    jurisprudence and I want you to ponder, think about that,

4    meditate.  Meditate what that means.  Just think about -- think

5    about that as we -- as we kind of reason together and talk

6    about some common sense things.

7            Prosecutor will get up and tell you they've met their

8    burden or they'll tell you that there's no reasonable doubt

9    here, but I want you to think about what that means, what it

10   means to our system.

11           But I'm going to tell you the most important thing.

12   The most important thing in our system is the fact that the

13   defendant has 12 people that are going to decide his case from

14   all walks of life.  That's you, the jury system.  That's why

15   Gregory Burleson is a lucky man today.  It's not the press.

16   It's not the prosecutor.  It's not even the judge, a learned

17   judge, who makes the decision.  We don't have trials in secret.

18   Look at all the people here.  We have open trials in this

19   country, but the decision is made by 12 people who are

20   selected, who take an oath to make a decision that is a very

21   difficult decision.  And you have sworn an oath and you all

22   said in voir dire you would have the courage, the courage to do

23   what's right.  Now, no one, none of these people here, none of

24   the defendants or none of the attorneys, none of these people

25   that are spectators can criticize your decision, whatever it

26

1    is, and I will not, and I don't think anyone here can if you

2    take this decision to heart and do what you think is right.  So

3    I ask you to do what you think is right in this case and that's

4    what I ask.  And that's what everybody here wants you to do.

5           Now, I'm going to tell you, based on th evidence that

6    I've seen, it reminds me of the novel by Franz Kafka, *The*

7    *Trial*.  Mr. -- Kafka wrote a trial by a man that woke up and he

8    was being charged with a crime he didn't even know what he was

9    charged with.  Well, that's an existentialist novel written

10   about 75 to a hundred years ago, but the facts of this case,

11   the Government suggests that a number of men went to a

12   demonstration.  They went to a demonstration, with guns.  Now,

13   it's legal in this country to carry guns.  Some of them marched

14   around in the wash.  Some of them stood on freeway overpasses.

15   Confrontation/demonstration went on for about an hour.  There

16   was yelling and hollering.  An hour later, the BLM got in their

17   cars and left.  A little bit after that, the cows were

18   released.  About a year later, after investigation, the

19   Government says BLM were threatened, they were intimidated,

20   crimes were committed, a whole bunch of crimes.

21          Now, I want to thank Mr. Dickinson.  He argued for me

22   most of my argument for Mr. Burleson that he wasn't involved in

23   a conspiracy.  Mr. Dickinson -- Mr. Dickinson properly pointed

24   out that my client wasn't even at the Bunkerville site until

25   noon.  He pointed out that my client, Mr. Burleson, wasn't with

1    the other individuals when Cliven Bundy started his rant and

2    telling everybody to go get the cows.  My client didn't arrive

3    on the scene, according to all the video evidence and

4    everything else, until approximately 11:59.  Then he tried to

5    suggest, well, maybe he was guilty of some conspiracy somehow

6    because he went down in the wash and was walking around.

7           If you read the instructions on conspiracy, read them

8    carefully.  I want you to read all the instructions the judge

9    gave you.  The judge will tell you that, you know, this is the

10   law.  The attorneys sat down with the judge beforehand and

11   tried to work out the best instructions, the fairest and most

12   accurate instructions on the law, but, you know, conspiracy

13   requires a number of things.  It requires that you have to have

14   an agreement.  It requires you have to agree not only to be

15   together -- it's not agreeing to go to a dance or a

16   demonstration -- you have to agree to go -- do a crime.  And

17   you have to have -- it's more than just an association.  You

18   have to agree to do something unlawful.

19          Now, there's no evidence whatever that my client knew

20   any of the Bundys.  There's one -- there's some evidence that a

21   couple days beforehand he had a post or at some -- media thing

22   that he knew about on 4-10, knew about that Bundy was sending

23   out requests to have people join his demonstration.  There's

24   also some indication that he left on the 11th to attend this

25   demonstration.  But there's no indication that he had ever met

1    any of the Bundys before this; father, son, any of the

2    associates of Cliven Bundy.  There's no indication that he knew

3    any of the people that are defendants -- defendants with him at

4    this table -- at this table behind me (indicating).  There's no

5    indication he communicated with any of those people before

6    4-12-2014.  But he arrives up there on 4-12-2014, about noon,

7    and there's evidence that Mr. Burleson was walking around in

8    the -- in the wash, with a gun.

9             Government has video.  They have video evidence of my

10   client in the wash with a gun.

11            The Government said, and I think some of their agents

12   combed through hundreds and hundreds of hours of video evidence

13   from many different sources, people that took video, people

14   that -- they have airplanes flying overhead, everything else,

15   so, but of all the evidence, video evidence, that got maybe a

16   dozen or so shots of my client with his gun.  They got him

17   moving around on the left side of the wash, the middle of the

18   wash, the right side of the wash.  They got -- most of the time

19   he's got his gun pointed down, in what's called the "low ready"

20   position, or they got him with his gun in a sling.  On one

21   picture they got him squatting down.  And one picture, I think,

22   they have him pointing his gun up in the air like this

23   (indicating), but they have no pictures of him pointing a gun

24   at someone like this (indicating).  Boom.  I'm going to get

25   you.  I'm going to shoot you.  But they try to suggest that,

1   oh, he's involved somehow in attempting to threaten these BLM

2   agents.

3          Well, let's look at the evidence.  Was there evidence

4   that he went there to threaten or intimidate or assault BLM

5   agents?

6          No BLM agent identified him, said he pointed a gun at

7   me, I saw him.  There's some agents that say, yeah, that's him,

8   that's a picture of him over there.  See that little dot over

9   there, that's Mr. Burleson.

10         There's some that say yeah, he got within 30 feet of

11  the gate one time, but there's no one that said Mr. Burleson

12  made any threats, any verbal threats.

13         There was one picture, which the Government may refer

14  to on their rebuttal, where Mr. Burleson was kind of walking to

15  the left and Ammon Bundy was about 12 feet away from him but he

16  was walking kind of away from Ammon Bundy.  The Government, I

17  think, was trying to suggest that he was somehow communicating

18  with Mr. Ammon Bundy to try to suggest somehow that he was

19  conspiring with Mr. Bundy.  Look at that picture.  Take a look

20  at it.  Does it look like he's talking to Mr. Ammon Bundy?  No.

21  But, of course, they had -- when -- in cross-examination they

22  could say, Well, we couldn't hear him saying anything or they

23  had no way to show that he was actually communicating with

24  Mr. Bundy.

25         Now, the evidence the Government has brought in this

30

1  case is of three or four kinds:  We've got eyewitness

2  testimony; we got video testimony; and then got we got

3  testimony from the defendant; and we got the defendant's

4  Facebook posts.  That's basically the evidence the Government

5  brought forward against my client.  I'm going to talk about

6  each one just briefly.

7          Let's talk about the eyewitness testimony, the people

8  that were actually there on 4-12.

9          They brought you BLM agents, maybe 10, 12 BLM agents.

10  You can look at Instruction No. 29 that talks about the

11  credibility of witnesses.  Every one of those BLM agents was

12  scared to death, although they didn't put it in their reports.

13  Every one of those BLM agents said it was if not the scariest

14  thing in their life, one of the most scary things that anybody

15  could ever experience, although they didn't put it in their

16  reports.  But I want you to take a look closely at the video.

17  Look at the video, and listen -- listen to the video.  And if

18  they look to you like they were really, really scared, then

19  give them the credibility that they should get.  If they don't

20  look really scared, then evaluate their testimony

21  appropriately.

22          You know, they weren't ducking down behind something

23  (indicating) while this confrontation was going on.  Most of

24  them were walking around.  A lot of them had their back to the

25  people that had -- that supposedly had guns.  A lot of them are

1    talking or making silly jokes.  Some of them kind of ridiculous

2    jokes, but we won't hold that against them.  And they said,

3    well, they were nervous or anxious or whatever.

4              We can compare those eyewitnesses with the Metro

5    cops.  The Metro cops, they see violence all the time.  A lot

6    of them probably deal with robberies, homicides, other more

7    serious charges than BLM agents who probably don't as often --

8    now, I don't know -- deal with as much serious violence, but

9    the Metro cops, if you look at the videos, do not seem quite as

10   anxious or as afraid in the videos as did the BLM agents, or at

11   least they didn't testify they were quite as anxious.  There

12   seemed to be just a little schism between the Metro cops and

13   the BLM.  I don't know why that was.  Think about it.

14             One of the things you have to consider, Instruction

15   29, credibility of witnesses, is the bias of witnesses.  You

16   can consider that in evaluating the testimony.

17             You know, a couple of the BLM agents said they were

18   really upset by what happened.  Their pride -- their pride was

19   hurt.  They had to give back these cows and they felt they had

20   let down -- they had -- they had let down the government

21   because they felt like they had given back cows that the

22   government had some interest in.  But, you know, the deal had

23   already been done.  As my co-counsel have said, this had been

24   negotiated.  This had been resolved.  There were a couple

25   people still wanted to hang on to these cows.

1            Now, most of the -- most of the protestors, or most

2    of the people that went out to the site, or the impoundment

3    site, on 4-12, around 11:30 or so, believed the deal had been

4    done, believed the cows were going to be returned, or at least

5    it was ambiguous.  The -- there was, I would submit to you, an

6    ambiguity from the people that went out to the protest site,

7    but that doesn't matter.  As far as my client goes,

8    Mr. Burleson, because he was not at the rally.  He was not at

9    the 9 o'clock rally when Cliven Bundy said go get the cows.

10   Government wants to say he's guilty of extortion or he's guilty

11   of helping Mr. Bundy get his cows back by some kind of

12   intimidation or extortion or crossing state lines to help him

13   intimidate these federal officers into giving the cows back.

14   He wasn't even there when Cliven said that.  Nobody even knew

15   that Cliven was going to say that day or most people didn't

16   even know that deals had been worked out or what the deal was

17   or whatever.  My client shows up around noon, at least that's

18   all the evidence we have in front of us.  He goes to the site.

19   He's wandering around with his gun.  Doesn't point it at

20   anybody, according to the evidence, and then he leaves.  And

21   the witnesses said, the Government witnesses said they don't

22   know where he went.  They didn't follow him when he left.  And

23   that's it.

24            The Government's divided this case up with -- they

25   gave you a big timeline.  They brought in an FBI agent that had

1    a timeline.  But basically there's really three parts of the

2    timeline I want you to think about.  What's the relevant

3    timeline here?  What happened before 4-12 is -- is -- is

4    important to think about.  There were three events that

5    happened before 4-12 which influenced why the protestors showed

6    up, and that's what happened to Margaret Houston and to the

7    Bundy boys, which I think outraged many of the protestors and

8    got them to come.  That's how Bundy, Mr. Cliven Bundy

9    manipulated a whole bunch of people to come out to his ranch

10   and come out to the site.  People were -- people were angry.

11   People were mad.  And they put -- like Mr. Parker testified,

12   they wouldn't have driven hundreds of miles to a protest unless

13   they were mad at something the government did.  So the

14   incidents that happened of -- in early April are relevant.

15   They came into evidence and they show what influenced those

16   people to go there.

17            But, you know, the most important -- the most

18   important is just that little bit of 4-12-14, and as far as

19   Gregory Burleson, what's relevant to him is from noon on

20   4-12-14 until about 1:30, when he left the scene.  That's --

21   that's all the evidence they have of Greg Burleson.  He was

22   there from noon and the last -- last evidence they have was him

23   leaving around 1:30 of 4-12-14.  Then he's gone.  Nothing.

24            Then the Government brings in lots of evidence after

25   that of Mr. Burleson's, both Facebook posts, and then starting

34

1     in November, more than a year later, he makes a statement to

2     the Government, the Long Bow, and then he makes another

3     statement to another FBI agent, Mr. Caputo.

4          The Government wants to blur all of these things

5     together as part of one conspiracy.  Every one of these events

6     that happened over a period of a year and a half, it's all one

7     big joint conspiracy.  That's one way of looking at it, but

8     they're all separate events.  There was basically a

9     demonstration that happened on 4-12-14.  People went there for

10    different reasons.  Then afterward, different people, different

11    individuals, made different decisions in their life.  The

12    Government began an investigation.  They focused on my client

13    and they used all their guile, all their sophistication and

14    they were able to manipulate my client into making some really

15    stupid statements.  My client did not hold up to the

16    interrogation of the United States government agents.  There is

17    an instruction that tells you that you are to consider all --

18    all of the circumstances of interrogation when you consider it.

19         What happened at Long Bow when my client was there?

20    What happened?

21         First of all, the whole charade that they had at

22    Long Bow, you need to consider that.  One of the more

23    sophisticated schemes I've seen by law enforcement.  They went

24    to a lot of trouble to set this up, but that itself may not

25    have been so bad but when they started feeding my client

1    alcohol -- and they asked each of the defendants to do that.

2    My client, unfortunately, was the only one that had the

3    weakness for alcohol.  And you can look on -- look on the tape

4    and see if you think he was under the influence.  Look at it.

5    Watch it.  Listen to it.  Listen to what he said.  Listen.  See

6    if you think that maybe he was under the influence.

7         But, what else do we know?  What else do we know?  We

8    know the Government didn't care about the fact that he was

9    suffering from a disease, epilepsy.

10        MR. MYHRE:  Objection, Your Honor.

11        THE COURT:  Sustained.

12        MR. JACKSON:  All right.  They knew that he had

13   epilepsy, but did they care about him not --

14        MR. MYHRE:  Objection, Your Honor.  Facts not in

15   evidence.

16        THE COURT:  Sustained.  There's no evidence of that.

17        MR. JACKSON:  It was in --

18        THE COURT:  No evidence has been submitted.  Where?

19        MR. JACKSON:  That he had a seizure disorder.  The

20   Government testified they knew that and that's in the -- that's

21   in the statement.

22        MR. MYHRE:  Objection, Your Honor.  There's no

23   evidence that --

24        THE COURT:  Well, I'm going to allow the jury to

25   decide to -- whether or not they remember that as happening.

1    If the jury doesn't remember it, then you don't consider it.

2              MR. JACKSON:  All right.

3              THE COURT:  If you remember it, you may consider it.

4              MR. JACKSON:  If you remember, at -- the Government

5    agent knew that he had a seizure disorder, you can consider

6    that as one of the circumstances of whether or not the

7    Government was -- may have been taking advantage of him when

8    they questioned him.  If you -- if that was one of the things

9    that was brought out in his interrogation, and that's one of

10   the things you can consider.  And I think that the evidence

11   will clearly show that; you have to listen though.  And I want

12   you to listen to every piece of evidence that you think is

13   important and you can ask that you get a chance to listen to it

14   all.  And I'm confident that if you do, you will find that that

15   is in the evidence.

16             Now . . . the tape does show that they gave my client

17   two alcoholic drinks and the Government admitted that.  Maybe

18   my memory's bad on that, but I do remember that.  And if you

19   remember that, you can consider why the officers would give

20   alcohol to a man before they interrogated him.  If they wanted

21   to get accurate information from an individual, would that be

22   the best way to do it, or would that be the way to get him to

23   make accurate or inaccurate statements?

24             But the most important thing is you have to evaluate

25   the statements my client made with the facts.  Now, this is one

1    of those paradoxical things that are hard for an attorney to

2    argue.  I have to say, you know, what my client was telling you

3    doesn't fit the facts.  And accept the video evidence as more

4    persuasive than what my client said.

5          Now, most of the time, when I have a case, and

6    there's video evidence, I tell my client you better plead

7    guilty because there's video evidence.

8          MR. MYHRE:  Objection, Your Honor, as to what he's --

9          MR. JACKSON:  I'll -- I'll withdraw -- I won't say

10   that.  But in this case, my client's a lucky man because

11   there's 500,000 images of video evidence and none of them show

12   him pointing a gun at anybody.  None of the video evidence

13   shows him committing a crime of extortion.  The video evidence

14   contradicts him committing any crime.  The video evidence

15   contradicts the Government's agents being in any great fear.

16   So my client's a lucky man.

17         He's lucky because he's in an American courtroom and

18   he's lucky because you, ladies and gentlemen of the jury, are

19   going to make the decision that will decide his fate.  And I

20   leave the case with you.  I'm happy with that.  My client is

21   happy with that.

22         I thank you for your time.  There's a lot more I

23   could say.  Mr. Myhre's going to get up after one more of my

24   co-counsel gets a chance to speak and I -- I've condensed this

25   a lot.  I could go on for five more hours, but you probably

38

1    don't want me to.  You've heard a lot.  And . . . there's a

2    whole lot I've left out.  I had about 50 pages written here,

3    but I know collectively the 12 of you probably have a much

4    better memory of what happened than I do, maybe even a better

5    memory than Mr. Myhre has, and he's got a really good memory

6    and he and the other four prosecutors are outstanding

7    prosecutors, but again, we rely on the jury to make the best

8    determination in this case, and I know you will.

9           THE COURT:  All right.  We're going to go ahead and

10   take a break.  During this break I admonish the jury that you

11   are not to discuss this case with anyone, not even your fellow

12   jurors nor permit anyone to discuss it with you.

13          Please do not read or listen to or view anything that

14   touches upon this case in any way.

15          Do not attempt to perform any independent research or

16   investigation, and do not form any opinion.

17          We'll take about 15-minute stretch break and then we

18   won't take another break until lunch, so . . . let's stand for

19   the jury, please.

20        (Jury excused from courtroom at 9:13 a.m.)

21          THE COURT:  Okay.  Go ahead and be seated.  The jury

22   has left the courtroom.  I just want to put on the record that

23   I did look up the mention of the epileptic seizure.  It is in

24   the Long Bow video and unfortunately, it's in the portion that

25   was not played.  So it comes up on the portion which is

39

1    48:23:122 and it comes up at 49:09:965, and those are portions

2    that were not played.  Just -- I --

3                    MR. MYHRE:  They weren't admitted; correct,

4    Your Honor?

5                    THE COURT:  I think -- right.  They weren't admitted

6    and they weren't played but I think we instructed the jury just

7    to let their memories guide them as to whether or not they

8    remember that.

9                    MR. JACKSON:  Your Honor, I believe the agent

10   testified that he -- yeah, Caputo testified he knew it.

11                   MR. MARCHESE:  Yeah.

12                   THE COURT:  I'm -- I'm not going to mention it to

13   them again, but if -- if you want to, for your own record, if

14   you want to find where it is that you think that the witness

15   testified to that, I'll surely let you put that on the record

16   when we come back from the break.

17                   All right.  So we'll be back in about 15 minutes.

18                   COURTROOM ADMINISTRATOR:  Off record.

19        (Recess was taken at 9:14 a.m.)

20        (Outside the presence of the jury at 9:28 a.m.:)

21                   COURTROOM ADMINISTRATOR:  All rise.

22                   THE COURT:  All right.  I think we're ready to go

23   back on the record.  Are there still -- still a few people

24   coming in.  It will take us a couple minutes to get the jury in

25   as well.

 1          Are you ready, Mr. Leventhal?  Are you all set up?

 2          MR. LEVENTHAL:  Yes, I'm ready.  Thank you,

 3   Your Honor.

 4          THE COURT:  Okay.

 5          All right.  You want to go ahead and call in the

 6   jury.

 7      (Brief pause in proceedings.)

 8          COURTROOM ADMINISTRATOR:  All rise.

 9      (Jury returned to courtroom at 9:33 a.m.)

10          THE COURT:  All right.  Everyone may be seated.

11   We're joined by the jury.

12          And now we'll be hearing from Mr. Leventhal on behalf

13   of Mr. Drexler.

14          MR. LEVENTHAL:  Thank you.

15          Good morning, ladies and gentlemen.

16          Good morning, Your Honor.

17          Good morning, counsel.

18          I -- I've thought about this and I -- one of the

19   questions I've had throughout this case is sort of what would

20   ignite the passions of thousands of people to travel to a small

21   town in Nevada from all over the country.  And I thought about

22   what would motivate a young man from Idaho to leave his family

23   and travel 10 hours to a town called Bunkerville.

24          Now, the Government seems to indicate that it was

25   over cows.  Cows.  Is that -- is that logical though?  Over

41

1    cows?  Is that -- is that -- does that resonate with you?  I

2    mean, because the Government seizes assets all the time; right?

3    It's legal for them to do that.  They do it all the time.  They

4    have tax liens, foreclosures, seizures.  It's legal.  They do

5    it.  It's never a problem.  Why this time?  Why did so many

6    people come together?

7            Mr. Drexler never cared about cows and the Government

8    has not offered you proof that he cared about cows.  There's no

9    Facebook.  There's not a shred of evidence.  There's no video

10   that he went down there to help the Bundys get their cows back.

11   Nothing.

12           Mr. Drexler, in his Long Bow video, he spoke to all

13   of you and he told you, he went down because of the federal

14   overreach and a -- what he perceived a First Amendment zone.

15   What did he mean by a federal overreach?  What did he mean by

16   that?  What did he mean by the First Amendment zone?

17           Bryan, if we could play video 1.

18      (Exhibit published.)

19           I can assure you, ladies and gentlemen, that

20   Mr. Drexler did not come down for cows.

21           That First Amendment zone, you know, if you imagine

22   there was over 575,000 acres out there.  It's in the middle of

23   the desert, and BLM decides that they're going to corner off a

24   little area, a little pen, off to the side, somewhere far away,

25   miles from anywhere, and if you exercised your First Amendment

42

1   outside of that zone, that's what happened to you.

2           MR. MYHRE:  Objection, Your Honor.  No evidence to

3   that effect, at all.  Zero.

4           THE COURT:  Sustained.

5           MR. LEVENTHAL:  You know, you'll never know what

6   hunger is until you haven't eaten and you'll never know what

7   poverty is until you have no money in your pocket and you'll

8   never know how important First Amendment is until you lose it.

9           MR. MYHRE:  Objection, Your Honor.  There's no

10  evidence of any First Amendment loss of anything.

11          THE COURT:  Sustained.

12          MR. LEVENTHAL:  Now, the judge is going to give you

13  some jury instructions and I'm going to go through a few of

14  them.  The first one is Instruction No. 2 -- you can take that

15  down, Bryan.

16          "Charge against the defendant not evidence."  And I

17  know other attorneys have spoken to you about it, I just want

18  to go through it again, just briefly.

19          "The defendants are presumed to be innocent, unless

20  and until the Government" -- the Government -- "proves the

21  defendants guilty beyond a reasonable doubt.  In addition, the

22  defendants do not have to testify or present any evidence to

23  prove innocence; the Government has the burden of proving every

24  element of every charge beyond a reasonable doubt."

25          "Reasonable Doubt-Defined."

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)471-0002

1          Starts out with proof beyond a reasonable doubt, but

2     then the next sentence actually defines reasonable doubt.

3     Probably should be backwards, but I'll start.  "A reasonable

4     doubt is a doubt based on reason and common sense and is not

5     based purely on speculation.  However, proof beyond a

6     reasonable doubt is proof that leaves you firmly convinced that

7     the defendant is guilty."

8          Now, in the law -- and you may have heard about some

9     of these levels of proof -- that's -- I want to go through them

10    with you.

11         First of all, no evidence.  Let's say the Government

12    offered you no evidence at all.  You'd have to find Mr. Drexler

13    not guilty.

14         A scintilla of evidence, that would be a small amount

15    of evidence that they brought forward, you would have to find

16    Mr. Drexler not guilty.

17         Reasonable suspicion.  We've heard all about that.

18    It's like a hunch.  You'd have to get -- find Mr. Drexler not

19    guilty.

20         Probable cause.  That's reasonable, trustworthy

21    information that a crime was committed.  Not enough.  You'd

22    have to find Mr. Drexler not guilty.

23         A preponderance of the evidence.  That's another

24    standard.  That's really like a civil standard where it's like

25    the scales of justice, they tip, just in favor of one party to

44

1    the other.  51/49 percent.  You'd have to find Mr. Drexler not

2    guilty.

3           Clear and convincing evidence.  That's evidence

4    that's highly and substantially more probable than not.  Again,

5    you'd have to find Mr. Drexler, if the Government hasn't

6    brought you that, not guilty.

7           It's not until we get to the reasonable doubt

8    standard that the judge is going to give you and then the

9    beyond a reasonable doubt standard that the judge is going to

10   give you is when the Government has proven their case.  And in

11   order for the Government to prove their case, they do it

12   through evidence:  Through witnesses, through testimony,

13   through all the things that you've sat here for the last two

14   months.  So I'd like to go through some of that evidence.

15          First of all, we've talked about Sheriff Gillespie

16   and what he said at that rally.  And the Government has

17   repeatedly replayed that speech over and over and over again.

18   This was three years ago.  But they asked the witnesses, does

19   he say -- is it over now?  They use present tense, past tense,

20   is there a verb, a noun.  I mean, you know, they decipher it

21   down, but let's put it in perspective and use our common sense

22   because we don't leave it at the courtroom door; we bring our

23   common sense in here.

24          First of all, they're listening to the sheriff.  Not

25   a deputy.  Not a Bundy.  Not a militia member.  The sheriff.

1          Second, it's at a rally.  There's hundreds of people

2     out there.  They're all yelling, screaming.  We heard the wind

3     was blowing.  People are cheering.  And the sheriff's on a

4     stage with some kind of makeshift microphone and he says what

5     he says and people hear what they hear.  And yeah, it's easy

6     three years later.  Perception/deception.  Three years later we

7     can try to get it down.  What did he say?  Is the BLM?  Was the

8     BLM?  Come on?  Common sense.

9          He says, a press release was sent out.  BLM's ceasing

10    their operations.  Gold Butte now open.  BLM removing their

11    assets -- and again, if I'm not verbatim, you will decide on

12    exactly what he says -- BLM removing their assets from Clark

13    County.  That's what he says.  That's the sheriff of Clark

14    County saying it.  The main man with the badge; right?

15         What does common sense tell you about that?

16         Well, it's uncontroverted -- what I mean is, there's

17    no evidence that it's -- that what was being said and what was

18    being heard, I think that there's clearly a discrepancy at this

19    point.

20         Mr. Drexler had just driven, as the testimony came

21    out, 10 hours.  He had just arrived a few hours before the

22    speech.  He's never, ever been in Bunkerville before.  He

23    doesn't know what an ICP was or where it is or what equipment

24    the BLM had over there or how long they needed to get out of

25    there.

46

1           Does that give you a little doubt and is that
2   reasonable?
3           Cliven Bundy then speaks.  And think about it
4   logically.  If someone walks into this courtroom right now and
5   looks at the Government and says, I want all the metal
6   detectors taken down, and I want you to disarm all the
7   marshals, and I want free food because people are hungry in the
8   cafeteria, you'd think he was crazy, a lunatic, but the
9   Government wants those words -- and those words -- to be his,
10  and they're not his.  They weren't his.  Just because he drove
11  to a rally and someone gets up and says some -- makes some
12  crazy speech doesn't make it his.  They need more.
13          Not only are they not his words, that doesn't join
14  him in a conspiracy, ladies and gentlemen.  It doesn't join him
15  in a conspiracy because he goes to a rally based upon what he
16  sees and hears and does and he drives.  It doesn't put him into
17  a conspiracy because some man makes some crazy demands.  They
18  can play it over and over.  They're not his words.
19          The facts at this moment, when that speech was made,
20  was that the Government has not given you one piece of evidence
21  that links Mr. Drexler to a conspiracy.  There's not one
22  Facebook page.  There's not one text.  Not a phone call.
23  There's no evidence of communications with the Bundys, with any
24  of the militia.  Drexler was not on the stage.  Drexler was not
25  in front of the stage wearing that camo that they keep playing

1 over and over.  He had no communications in his ears.  He was

2 at a protest at a rally listening to people.  Those weren't his

3 words; he was just there.

4          Does that give you doubt and is that reasonable?

5          So he waits around, like, as you hear, many, many

6 people do.  About an hour goes by, as we all know, and Cliven

7 makes another speech and he says something like, Alls we got to

8 do is go out there and unlock the pen, cows will be home.

9 Unlock the pen; the cows will be home.  Then he says close down

10 the freeway for safety.  Cowboys are going.

11          Now, if you're in the frame of mind or in the state

12 of mind that I've just explained to you where Mr. Drexler was,

13 not knowing anything going on, sheriff just spoke, you've got

14 Cliven just speaking, he's saying just unlock the pens, what he

15 doesn't say is, go over there, unlock the pens, oh, by the way

16 there's a bunch of BLM agents over there and when you get

17 there, we're going to need to fight for my cows.  A lot of

18 people went over there.  Probably a lot of people wouldn't have

19 gone over there had they known or thought that the BLM was

20 there.  That's logic.  That's common sense.

21          And remember, let me show you Instruction 7.1.

22          Aaron.

23          7.1.  "On the other hand, one who has no knowledge of

24 the conspiracy but happens to act in a way which furthers some

25 object or person of the conspiracy, does not thereby become a

48

1    conspirator.  Similarly, a person does not become a conspirator

2    merely by associating with one or more persons who are

3    conspirators, nor merely by knowing that the conspiracy

4    exists."

5           The mere fact that Mr. Drexler went down there, heard

6    the words, does not put him in a conspiracy without more, and

7    they've brought you nothing else.  Not a Facebook page.  Not a

8    communication with any Bundy, any militia, anybody.

9           Now, perception/deception.  The Government has played

10   over and over the Cliven Bundy I'll-do-whatever-it-takes-to-

11   get-my-cows-back.  As a matter of fact, we had a couple agents

12   up here who tape-recorded him, or the Bundy sons, saying, Oh,

13   we'll do whatever it takes.  Again, without more, those words

14   are not Mr. Drexler's.  That does not join him in a conspiracy.

15   Just because he goes to a rally does not put him in a

16   conspiracy.  There is no proof that he heard any of those

17   audiotapes that you heard about, I'll do whatever it takes.  No

18   proof of that.

19          As a matter of fact, when you put all those speeches

20   together, the sheriff and Cliven and, you know, it's over, just

21   go get my cows, common sense says that it's over.

22          Does that give you doubt?  And is that reasonable?

23          Now, after everybody sort of, we all heard the story,

24   get it -- they all get in the car, they get into everybody's

25   car, I mean, I think we even had Mr. Lynch, who was in one of

1   the Bundy's cars, everybody sort of -- nobody really knew where

2   they were going so people just hopped into cars.  And, you

3   know, it's not really hard to imagine that people are going to

4   go see the cows.  I -- I -- I think that's -- it's somewhat

5   logical.  I mean, you know, it's not -- I think the Government

6   wants to make that out to some kind of nefarious reason to go

7   over there.  Why else go over there?

8           But, you know, I mean, I go -- I'm a -- I love

9   baseball.  I go watch baseball and I'll stay to watch baseball

10  until the 15th inning.  It doesn't matter.  My wife, she wants

11  to leave after the 3rd inning, you know, after a hotdog.  I

12  want to stay till the end.  Some people wanted to stay till the

13  end.  That should not make it, so that by them going to see the

14  cows come home, part of a conspiracy to go extort, intimidate,

15  or do anything that the Government is suggesting that all of

16  these actions are doing, without more.  And there's nothing

17  more that my client did, or that you will ever see, that the

18  Government has ever produced, that there's a communication, a

19  writing, or anything for that matter, that put him into that

20  conspiracy that they want to -- to try link him into.

21          Use your common sense.  Use your common sense.

22          The Government came up here and gave, say, one day,

23  day and a half timeline where we used, I don't know, four or

24  five different timelines.  Lynch time.  All of these other

25  timelines.  Quite confusing.  Wasn't sure where to go with all

50

1    that.  I also put a timeline together and I played it and I'll

2    play it again for you.

3              If we can have video Number 2, Bryan.

4         (Exhibit published.)

5              I want to point out a couple things about that video

6    that I saw interesting.  First of all, the prayer -- the prayer

7    itself.  The prayer itself.  They said, "So many fight for and

8    die for, we will not forget them, ever, in our lives.  We will

9    teach them to our children."

10             Are they there to gather cows?  Is that what that's

11   about?  Is that a prayer for cows?  It seems like a little bit

12   deeper than that.

13             Also, I wanted you to recognize that at that moment

14   in time, when Mr. Lynch went out into the middle and he asked

15   the BLM if they're going to shoot or they can't hear him, you

16   didn't see anybody on the bridge, you can't see anybody in camo

17   underneath.  You didn't see any of those people that they kept

18   showing you were at the rally with the patches and the badges

19   and all those camo people.  You didn't see anyone there.  Those

20   people went to go get the cows that they thought they were

21   going to go get.

22             It's logic.  It's common sense.  It's what makes

23   sense right now, at this point, at this point on the 12th.

24             Now, I know that a number of my colleagues have

25   talked to you about threats and how the BLM felt threatened,

1    felt intimidated.  Mr. Tanasi did a great job when he showed

2    you sort of what the reports were three years ago, closer in

3    time, what they mention, what they said versus how they -- how

4    they testified.  Big difference.

5            If we could have -- I want to -- I want to show you a

6    video on threats.  If we could have Video No. 3.

7        (Exhibit published.)

8            Many of them came in and gave you 7s, 8s, 9s, 10s on

9    a scale of threats.  Does that resonate with what you just saw?

10   The laughter.  They call it black humor.  A stress reliever.

11   Does that make any sense at all, that this is how you relieve

12   stress by making fun of people?

13           Stressful moments don't bring out that reaction,

14   ladies and gentlemen.  It's more in line with the attitude of

15   the BLM on that day, and the days leading up to that day, that

16   bravado that they had.

17           MR. MYHRE:  Objection, Your Honor.  No -- stating

18   facts not in evidence.  Bravado?

19           THE COURT:  It's up to the jury to decide if they

20   interpret what they see as bravado or not.

21           MR. LEVENTHAL:  Does that give you doubt?  Does that

22   give you doubt?  And is it reasonable?

23           Now, some of the evidence -- some of the evidence

24   that the Government brought to you to prove their case beyond a

25   reasonable doubt, over the last two months, I'm going to go

52

1    through some of it.

2            They talked a lot about clothing.  They talked about

3    camo.  They asked witnesses if this person's ready for war.

4    They showed patches of people in camo.  Is this person ready

5    for war?  They showed this picture to Shannon Bushman.

6        (Exhibit published.)

7            They showed that picture to Shannon Bushman and they

8    asked, "Mr. Bushman, is that man ready for war?" and

9    Mr. Bushman responded, "If he is, he's really bad at it."

10   That's what he said.  "He's really bad at it."  What?  Why?

11   He's got a hat.  He's got a t-shirt, and guess what, his hat's

12   not backwards either

13           Does that give you doubt about Mr. Drexler?  And is

14   it reasonable?

15           They spent a day on a dot program or a -- sort of a

16   putting together where guns were, a whole day of that.  We saw

17   images where all the months were.  Two months and that was the

18   finality -- the finality of it.  The Hail Mary goes up; the

19   dots come down.

20           I don't represent a crowd, ladies and gentlemen.  I

21   don't represent a dot, ladies and gentlemen.  I represent

22   Mr. Drexler.  What they've tried to do is take this thing wide.

23   And I understand, because they can't get it narrow, but I don't

24   represent a crowd.  So as -- as many dots are out there, it's

25   not up to me.  I represent one man, Mr. Drexler.  That's it.

1    And you're going to have a jury instruction that indicates

2    that, that each of these individuals here, behind me, are

3    individuals and should be treated as such.  Do not allow them

4    to lump them into the Bundys, the militia, if that's not where

5    they're at.  If they're not a militia, then say it, he's not

6    guilty, he didn't join a conspiracy.  He's not a Bundy, then

7    say it, he didn't join a conspiracy.  They want the Bundys,

8    they want the militias, they should be here.

9            Does that give you doubt and is it reasonable?

10           They brought you hats.  Remember?  Tan hat, black

11   hat, tan hat.  They never identified anybody black hat, tan

12   hat.  There's hundreds of people on the bridge.  It's very far

13   away.  Perception/deception.  They would sit a hundred yards

14   away, 200 yards away and the Government would show them a

15   picture 20 feet away.  "Is that what you saw?"  "Yes, that's

16   what I saw."  No.  It's impossible.  Perception/deception.

17   It's impossible.

18           I know you remember this little black hat, tan hat.

19       (Exhibit published.)

20           They showed the witness black hat (indicating), tan

21   hat (indicating).  Well, we've got a black hat here

22   (indicating).  We've got a tan hat here (indicating), a black

23   hat here (indicating), a tan hat here (indicating).

24           This black hat here (indicating), tan hat's getting

25   up.  Black hat's getting up.  Tan hat's looking differently.

54

1          Again, tan hat's getting up (indicating).  Black

2    hat's getting back down.  Tan hat is now moving past -- towards

3    more of the freeway zone why if you are down in this area, the

4    perception up here (indicating), going upwards, might be that

5    he's coming down; right?  That might be the perception.  A lot

6    of movement.  Black hats.  Tan hats.  Never identified anybody,

7    black hats or tan hats

8          The point is this.  In your jury instructions you're

9    going to have, under the assault and the threat that they're --

10   it's going to say -- let me just see if I have it --

11   circumstances unknown to the victim are not included.

12         The BLM, anybody who came in here and testified, did

13   not ID Mr. Drexler once.

14         The BLM could not have known what was going on behind

15   this barricade.  It's an impossibility.  They see people

16   getting up.  They see people getting down.  They're on their

17   megaphone saying black hat, tan hat.  Well, guess what?  Tan

18   hat is doing nothing but reporting.  Getting up.  Getting down.

19   Getting up.  Getting down.

20         "Circumstances unknown to the victim are not

21   included."

22         Does that give you doubt?  Does that give you doubt,

23   and is it reasonable?

24         Communications.  You've never seen Mr. Drexler with

25   any communications, anything in his -- earpiece, anything

55

1    anywhere on his body.  No communications whatsoever.  They made

2    a big deal about all this stuff.  Why?  Because they're trying

3    to build a case.  But it fails when it comes to Mr. Drexler.

4    No communications, doesn't look like he's ready for war, has no

5    attitude towards war, not on the stage, not in front of the

6    stage, not a Bundy, not in the militia, no proof he's

7    communicated with anybody.

8              Does that give you doubt and is it reasonable?

9              Let's talk about Scott Drexler himself.

10             We've been here for two months, maybe more, and I

11   think maybe it was two weeks ago, maybe three weeks ago his

12   name came up, finally.  Finally his name came up and I think it

13   was through an FBI agent who did some research online and found

14   two pages of his Facebook page that may have had anything to do

15   with the Bundys at all; one of the pages had to do with

16   articles that were written by CNN and I think the Washington

17   post, but they have not found one iota, one shred of evidence,

18   or has not given it to you, in connection with any

19   communications, like I said, with Bundys, with Ryan Payne, or a

20   lot of the people that you've heard about, Santilli, people in

21   camo, militias.  No phone records of any kind that he's been in

22   communication with anybody.  The Government must prove it to

23   you.  They have to give it to you to prove their case beyond a

24   reasonable doubt.

25             There was 875 FBI reports in this case.  There's 642

1    BLM reports in this case.

2              MR. MYHRE:  Objection.  Arguing facts not in

3    evidence, Your Honor.

4              MR. LEVENTHAL:  Your Honor -- Your Honor --

5              THE COURT:  Sustained.  There's been no testimony of

6    that.

7              MR. LEVENTHAL:  There has.  Agent Willis actually

8    indicated that that's how much he went through on direct exam.

9    I wrote it down.  That's how much he went through and how much

10   he went through with video -- I believe it was Willis -- it was

11   one of the FBI agents who indicated that that's exactly what

12   they went through in order to come here today and how they

13   prepared themselves.

14             THE COURT:  I'll leave it up to the jury to decide

15   what you recall and to use only the facts that you recall

16   having heard as testimony in this case.

17             MR. LEVENTHAL:  He indicated there were over 18,500

18   documents, and he indicated there was over 170,000 pages of

19   documents within those pages, and there were thousands of hours

20   of video.  And they decide -- Government decides, after all of

21   that, after all of that evidence, they decide to go undercover

22   again, and you're going to get a jury instruction that says

23   that that's what they can do, and they can do it.  And when I

24   say "again," it wasn't the first time.  We've heard evidence

25   that they went -- Robyn Kirkham went undercover, posed as a

1    militia, prior to the 12th, and got on the web, got on the

2    militia websites.  We heard proof that they went to the rally.

3    As a matter of fact, this is an undercover BLM agent holding a

4    sign, smirking, saying "Dave Bundy, a political prisoner."

5         (Exhibit published.)

6              Not, where are the cows, or anything like that.

7    "Political prisoner."

8              The Court has talked to you about weight of evidence.

9    What do you weigh it?  How much do you give it weight?  If I

10   had sort of a bible here and a trash can here and you've got a

11   document, do you put it here (indicating)?  Do you put it over

12   here (indicating)?  The weight of the evidence.  They've got

13   undercover FBI agents in the militia and we don't know what

14   they're saying.  How much do we know is real and not real and

15   that goes to the weight and that's for you to decide how much

16   weight to give all this evidence.

17             But even after all that evidence they still need

18   Long Bow.  They still need it.  Even their own agent testified

19   that it was unusual to go in after the fact.  He even testified

20   to that.  He said, yeah, it was unusual.  Usually we do it to

21   ferret out crime.  Because usually what happens, usually what

22   happens is what he meant by that is, you know, when they go

23   undercover, then they bring them down and they Mirandize them.

24   They say, hey, you've got a right to remain silent.  If you

25   want to give up that right, you can.  You have the right to an

58

1   attorney.  You know your *Miranda* rights.  They didn't give

2   these guys that right, did they?  They went undercover on a

3   documentary because they didn't have enough evidence.  And they

4   created that deception.  They created that deception using

5   probably -- at least we know six FBI agents that ran around the

6   United States with video cameras, lightings, vans, alcohol.

7   Alcohol?  Is that logical?  Does that make sense?

8          And they use a deceptive name.  They don't say *When

9   the Cows are Coming Home*, our documentary is going to be called

10  *When the Cows Come Home.*  No.  The deception continues when

11  they say we're going to call it *America Reloaded*, boys.  So

12  let's talk about guns.  That's what they're looking for.  They

13  want them to talk about their experiences and their guns and

14  Mr. Marchese, he said it the best, they put words in their

15  mouths.  They -- they -- they would -- he would suggest things

16  that weren't true, but even though he did this, my client still

17  sat down and interviewed, obviously not knowing.  But I guess

18  the real question of it is, is that the Government conceding

19  the fact that even after all the evidence in this case that

20  they had, all of the evidence in the case that they had, they

21  still had to go undercover because they needed more?  Is that

22  the Government conceding?  Why else would they spend the money?

23  Why else would FBI agents spend the time, spend the money, the

24  resources, to go get more?  More.  Because they didn't have

25  enough.

59

1          Does that give you doubt and is it reasonable?

2          Are they conceding just by that fact alone?

3          Well, they got Scott in his little net and they

4     played a video -- the video for you and I'm going to play it

5     again for you, just a portion of it.  You'll have it to see.

6          If, Bryan, you can play video Number 4.

7       (Exhibit published.)

8          Couple things about that video I wanted to highlight

9     for you.  First he said he went to help.  Protest.  Support.

10    Help.

11         Next he said government overreach.  What he didn't

12    say was cows.  I'm going to go get cows.  He never cared about

13    cows.  I don't think many people did except the Bundys, to be

14    honest with you.  Everybody had their own, sort of, reasons for

15    being there.  I told you there were three, probably, groups;

16    Bundys.  Militias had their reasons.  He went for his reasons.

17    And they were noble reasons.  They were reasons that we all

18    care about.

19         He said the impoundment was over.  They went to go

20    watch the cows go underneath the bridge and I think the most

21    important thing that you just heard Mr. Drexler say that when

22    he got to the bridge, they were laughing, joking, and just

23    hanging around.

24         Sound like a guy ready to go to war?  Laughing,

25    joking, and hanging around, just going down to see what was

60

1    going on.

2              And then he heard they were pointing guns at

3    civilians.

4              Does that give you doubt and is it reasonable?

5              Now, you're going to get -- you also -- well, you

6    have this, but Jury Instruction No. 3 says, "A reasonable doubt

7    is doubt based on reason and common sense and is not

8    merely based on speculation.  It may arise from a careful and

9    impartial consideration of all the evidence, or from lack of

10   evidence."

11             What does that mean?

12             You can, in your evaluation on whether or not the

13   Government has met its high burden, decide whether a lack of

14   evidence -- what they didn't bring you -- is also reasonable.

15             What haven't they brought you?

16             Well, first of all, they didn't bring you SAC Love.

17   Special agent in command.  He could have come in here and

18   explained his orders.  We've got a lot of blurriness as to when

19   the cows -- when the -- the whole thing was over with; right?

20   When was the -- when was the operation ceasing?  Sheriff said

21   it was ceasing.  There was a news press release the 11th that

22   it was ceasing.  This is all important stuff.  Why?  Because

23   you can't impede or obstruct something that which is over.  So

24   if it was over, then it's impossible to impede something that's

25   done.  It's impossible to extort something that's over.  It's

61

1    impossible to impede, obstruct, or do anything if it's done.

2    Wouldn't it be nice to have heard from SAC Love?  He could have

3    explained those things.  He could have told you what the

4    conversations he had or when things were done.

5            His threat level.  We heard from a lot of BLM agents.

6    What about the SAC?  He's the one who walked up to the gate.

7    It would have been nice to hear from him on that.

8            How about the events before the 12th, the things that

9    I showed you on the videos that you saw?  What about those?

10   Could have explained that to you.  But it's their burden.  They

11   chose not to bring him in.

12           How about Sheriff Gillespie?  Again, their burden.

13   They chose not to bring him in.

14           He could have answered a lot of questions for us

15   today.  My client is sitting here facing these charges.  The

16   Government has the burden.  We really don't know what he meant

17   when he got up on the stage; right?  It's all very confusing.

18   Could have sat there and told you exactly what he meant, what

19   he said.

20           He could have also talked about the timing of ceasing

21   operations.  He could have talked about why, and if Metro was

22   even out there before the 12th.

23           A lot of -- a lot of questions went unanswered

24   without those two, the two heads; heads of Metro, heads of the

25   BLM.  Neither of them came in for you.  You can consider that,

1    whether they've proved beyond a reasonable doubt their case.

2             You know, I disagree with Mr. Dickinson yesterday

3    when he said it's a simple case.  I think it's just the

4    opposite.  I think it's a much more complex case than that.

5             And why I say that is because of this statement from

6    Brian Sandoval.  "Due to the roundup by the BLM, my office has

7    received numerous complaints of BLM misconduct, road closures,

8    and other disturbances.  I have recently met with state

9    legislators, county officials, and concerned citizens to listen

10   to their concerns.  I expressed those concerns directly to BLM.

11   Most disturbing to me is the BLM's establishment of a First

12   Amendment area that tramples upon Nevadans' fundamental rights

13   under the U.S. Constitution.  To that end, I have advised the

14   BLM that such conduct is offensive to me and countless others

15   and that the First Amendment area should be dismantled

16   immediately.  No cow justifies the atmosphere of intimidation

17   which currently exists or the limitation of constitutional

18   rights that are sacred to all Nevadans.  The BLM needs to

19   reconsider its approach to this matter and act accordingly."

20            I think it's a much more complex case than that.

21   It's not that simple when we've got politicians issuing

22   statements.

23            Now, Mr. Myhre is going to have a chance -- or

24   someone for the Government, because they have the burden -- so

25   they have a chance to come back and talk to you.  This will be

63

1    my last chance to talk to you.  And he's going to hammer and

2    hammer away that Mr. Drexler conspired and intimidated and

3    threatened.  And I want you to think when he's talking, I want

4    you to think about it.  Prior to the 12th, the BLM had over 80

5    law enforcement officers and you've seen the videos.  You saw

6    videos of an arrest.  You saw an elderly woman taken down to

7    the ground like a rag doll.  You saw protesters getting Tased.

8    You saw lethal weapons out there.  What you didn't see were

9    protestors with guns.  You saw what was perceived as snipers.

10   Then you saw, on the 12th -- we've seen a lot of things.  You

11   saw aerial footage of a mesa that the people, protestors

12   perceived as snipers.  Drones.  Militarized men pointing guns

13   at unarmed civilians while no one was on the bridge.  Think

14   about all that while Mr. Myhre, or whoever from the Government,

15   is talking to you.

16          Also remember that Mr. Drexler went to help.  To

17   protest.  There's no proof to the contrary.  It won't be

18   produced because it's not there.  It hasn't been there.

19          What Mr. Drexler heard and understood was logical and

20   reasonable given all of the circumstances surrounding the

21   rally.  He went there like hundreds of people.  He also went to

22   go see the cows, like a lot of people, come home, that he

23   thought was happening.

24          He heard "lethal force."

25          Ladies and gentlemen, there's overwhelming doubt,

64

1    overwhelming doubt in this case on the guilt of Mr. Drexler.

2    Overwhelming.

3           I want you to ask yourself, does a court order, does

4    a court order to gather cows give the BLM the right to

5    indiscriminately use assault rifles?  German Shepherds?  Does a

6    court order to gather cows allow them to do that?  To attack

7    unarmed and -- intimidate people?  Does a court order to gather

8    cows, does that give the right to the BLM to suppress our First

9    Amendment right to speech, protest, and be heard?

10          MR. MYHRE:  Objection, Your Honor.

11          MR. LEVENTHAL:  Does it?

12          MR. MYHRE:  Objection, Your Honor.  This is improper

13   argument.  There are no facts in support of either using --

14          MR. LEVENTHAL:  I'll move on.

15          THE COURT:  It sounds like you're arguing a legal

16   defense that isn't included in the instructions provided to the

17   jury.

18          MR. LEVENTHAL:  I'll move on.  And I'm almost done.

19   I have just one more thing to say.

20          You know, my grandmother used to say, she said,

21   "Toddy, you know, if you don't stand for something, you'll fall

22   for anything."  And I'm asking you, don't fall for it.  Because

23   this is deception.  It's perception/deception.  Individualize

24   Mr. Drexler.  Look at what he did or didn't do.  He deserves

25   that.  Don't fall for it.

1           Thank you.

2           THE COURT:  All right.  Well, we finished a little

3    earlier than I thought we would be, so let's go ahead and take

4    another 10-minute stretch break.  You can use the restroom if

5    you need to or if not, just get your blood moving and then

6    we'll be back here . . .  Try to be back here by 10:50.

7           So, remember not to discuss this case with anyone,

8    read, or listen to, or view anything that touches upon this

9    case in any way.  Do not attempt to perform any research or any

10   independent investigation and do not form an opinion.

11          Stand for the jury, please.

12      (Jury excused from courtroom.)

13          THE COURT:  Off record.

14      (Recess was taken at 10:35 a.m.)

15      (Outside the presence of the jury at 10:56 a.m.:)

16          COURTROOM ADMINISTRATOR:  All rise.

17          THE COURT:  Thank you.  You may be seated.

18          All right.  So the good news is, we've checked and

19   double-checked and triple-checked the juror system and it's

20   working perfectly.  So all the videos have been loaded up onto

21   the system.  It's a big screen TV.  It's touch screen and the

22   jury will be able to view all of that so we won't need to come

23   back in here every time they want to watch a video.  But as

24   always, any note that comes up from the jury, we'll let you

25   know immediately and then we'll convene.

1           All right.  So, I think that was the last thing that

2     I needed to mention.  No.  There was one more thing.

3           So, Mr. Jackson, just to clarify on the record,

4     the -- it wasn't Agent Caputo who mentioned the seizure

5     epilepsy, but it was Johnson, the undercover Johnson.

6           MR. JACKSON:  It -- I just knew it was mentioned.  I

7     didn't say which agent mentioned it.

8           THE COURT:  Yes.

9           MR. JACKSON:  I just said it was mentioned and I

10    think Mr. Myhre's objection was improper because it definitely

11    was mentioned that the -- so, if I misstated the evidence, I

12    think his objection was improper.

13          THE COURT:  All right.  Well, the jury was instructed

14    that they're to permit -- they're to follow their memory and a

15    lot of them were taking notes.  So, we'll -- we'll leave it at

16    that.

17          All right.  So let's go ahead and call in the jury,

18    Aaron.

19          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

20        (Brief pause in proceedings.)

21          MR. JACKSON:  Your Honor, would the Court consider

22    instructing the jury that it was in evidence?  Because

23    Mr. Myhre made a --

24          THE COURT:  No.

25          MR. JACKSON:  No?

1          THE COURT:  No.  I can't make that -- I can't tell

2     them that.

3          (Discussion between the Court and clerk.)

4          MR. JACKSON:  For the record, Your Honor, I think it

5     does distract from my credibility in front of the jury when --

6     if the Court -- unless the Court instructs the jury that a

7     search of the record shows that there was evidence that my

8     client did have a seizure disorder that was brought up.

9          MR. MYHRE:  Your Honor, there was -- my recollection

10    of the testimony, I thought it was Caputo, but if it was

11    Johnson, I remember the question being asked of the agent and

12    the agent said no, he was unaware of that.  He said -- and it

13    was asked and -- as did you know my client had epilepsy or had

14    an epileptic issue, or seizure issue, or something along that

15    line and the answer was no.

16         Now, with respect to the portions of the video that

17    were played, it was not before the jury that -- from the UCE

18    or -- excuse me -- from the undercover that Mr. Burleson had

19    any sort of medical issues.  So it's not in evidence.

20         MR. JACKSON:  I didn't ask anything about the videos.

21    I asked about my cross-examination.  It was in evidence before

22    the jury and I think Mr. Myhre's objection was -- was wrong and

23    the Court did look it up and I think the jury should now be

24    instructed that it was there because it went directly to my

25    credibility in front of the jury.  I -- I know the jury heard

1    it, but I'd still like the Court to so instruct the jury and

2    I'll leave it with that . . . because my credibility in front

3    of the jury, I think, is important to my client.  I'm not

4    worried about my credibility, but it might affect my client's

5    chances in front of the jury and I'd like the Court to so

6    instruct them.

7             THE COURT:  Okay.  Looking at Page 25 of the rough

8    daily transcript of March 23rd, 2017:

9             "QUESTION:  Okay.  So you knew during the interview"

10   . . . okay.  So -- not so.

11            "Okay.  You knew during the interview Mr. Burleson

12   mentioned that he had a problem with epilepsy; is that

13   correct?"

14            "ANSWER:  He -- yes."

15            "QUESTION:  In fact, he had been rejected from the

16   military because he had epileptic seizures; is that right?"

17            "ANSWER:  Yes."

18            MR. MYHRE:  And that's with Johnson?

19            THE COURT:  So if I had sustained the objection, I

20   would definitely tell them that I was incorrect, but I can't

21   tell them what they should . . . what they should do with

22   argument and whether or not -- you know that's -- that's --

23   that's up to -- Mr. Myhre, if you want to clear that up in your

24   argument, that might be a better way to do it, but I don't

25   think that I can give them an instruction about what the

69

1    evidence was.  I left it up to their memory, which is what the

2    instruction says is the best way to handle it.

3         MR. MYHRE:  Well . . . I wasn't going to, in the

4    focus of my argument, go into that aspect of it.  So I'm not --

5    I'm not quite clear what the Court is asking.

6         THE COURT:  You don't have to.  I'm just saying I'm

7    not going to -- I'm not going to instruct the jury as to what

8    they should remember or not remember from testimony.

9         All right.  So let's go ahead and bring in the jury.

10        Then I'm assuming you'll be done before the lunch

11   break, and you can go into 12:30 if you need to, but, after

12   that, we'll swear in the CSO for deliberation, because it's a

13   different set of circumstances, and then I will instruct the

14   jury on the record that they need to let the CSO know how long

15   they're going to be staying until, you know, when they're

16   leaving today and what time they plan to be back, whether they

17   plan to be back tomorrow or not until Monday, so that way

18   everybody can be aware of whether you need to be in your suit

19   tomorrow and ready to come back for any notes or whether you

20   can finally start working on the other cases that you all have

21   to work on.

22        MR. LEVENTHAL:  Your Honor, did -- I apologize.  Did

23   I hear from you correctly that they're going to be able to

24   review the video back there and we're not going to have to come

25   back to court then?

 1            THE COURT:  Right.  So we won't have to come back.

 2            MR. LEVENTHAL:  Perfect.

 3            THE COURT:  They can watch everything on there.  It's

 4    a huge big screen, touch screen, and it's working fine.  The

 5    only problem we kept on having is that we can't record here in

 6    the courtroom and send it there, but because you all had

 7    everything on DVDs and other things we were able to get

 8    everything downloaded and put into the computer there.  So they

 9    have it.

10            MR. LEVENTHAL:  Okay.  Very good.  Thank you.

11        (Brief pause in proceedings.)

12            COURTROOM ADMINISTRATOR:  All rise.

13        (Jury returned to courtroom at 11:05 a.m.)

14            THE COURT:  All right.  Everyone may be seated.

15            We're joined by the jury, we're back on the record,

16    and Mr. Myhre will now provide rebuttal on behalf of the

17    Government.

18            MR. MYHRE:  Thank you, Your Honor.

19            Good morning, ladies and gentlemen.

20            At the very outset of this case, when I stood before

21    you in opening statement, more than two months ago now, I

22    stated that this was a simple case, that there would be a lot

23    of evidence, granted, and that some of it would be, from time

24    to time, rather tedious, but it was something that we would

25    have to plow through, that it was important, but that at its

71

1    base, the case really boils down to this:

2            What these six men were doing back in April -- on

3    April 12th, 2014.  What they were doing on that bridge and what

4    they were doing in the wash.  And this case is still about

5    that, and only about that.  The charges before you that you

6    will be deliberating upon very shortly all stem from what these

7    six defendants did on the 12th of April, 2014, more than three

8    years ago now, today.

9            My purpose in standing before you now is not to

10   recount for you all the evidence that's been presented.

11   Mr. Dickinson did that for you yesterday and we tried to

12   summarize for you the salient pieces of evidence that go to

13   prove the elements of the offense.  And you will have, when you

14   deliberate, all of the evidence and -- and obviously we commend

15   that to your attention.  You've been very attentive throughout

16   these proceedings and we thank you for that.  And you will rely

17   upon your memory as to what the witnesses said, what the

18   evidence was, and you will have before you the exhibits,

19   including the videos and so forth, to watch and to review.

20           My purpose now, however, is to address some of the

21   issues that were raised during the course of the closing

22   statements of the defendants.  And then, finally, to close the

23   case and then turn it over to you.

24           So, to summarize what we've heard for the last, you

25   know, last -- latter part of yesterday and today, I see sort of

72

1   several issues that all the defendants have raised.  They

2   coalesce around a number of issues, about 10 of them that I've

3   counted.

4          One is, is that, you know, there's no conspiracy

5   because my guy didn't know the other guys and everybody else

6   out there.

7          Another sort of theory or defense issue is no one saw

8   my guy pointing a weapon.  Therefore, you can't find my guy

9   guilty because no agent, officer, ranger came in here and said,

10  oh, yeah, that's the one I remember.

11         Another issue, the victims didn't feel fear.  In

12  fact, they were cavalier about it down there in the wash,

13  making jokes, saying things.

14         Long Bow put words in my mouth.  That was a deceptive

15  action.  You can't believe what you see on the videos about

16  Long Bow because there's something nefarious about that.

17         Another issue, oh, there's some ambiguity here.

18  We're not really sure whether BLM was leaving and whether they

19  were still there and whether they're coming back.

20         Another issue, 4-6.  April 6th, April 9th, the

21  Dave Bundy arrest, the Tasing of Ammon Bundy has something to

22  do with this case, but we really can't tell you what, but it's

23  something.

24         And also out there there's First Amendment zones and

25  something called government overreach and that is somehow

73

1    relevant to this case.

2            Another issue is, oh, there was a great deal of

3    confusion.  Everybody was so confused.  There was so much chaos

4    out there on the 12th of April.  You cannot possibly discern

5    what their intent was, what they were doing because everything

6    was confusing.

7            Another issue.  Oh, we were just protesting.  I'm a

8    peacemaker.  I'm helping.  I'm trying to prevent violence.

9            Another issue.  Timeline's off.  No one's on the

10   bridge at the time that this is going on.

11           Can't impede, can't obstruct because there was,

12   again, some sort of issue about whether BLM should have been

13   there or not.

14           And then, of course, the Government didn't call

15   Dan Love, didn't call Sheriff Gillespie, and Governor Sandoval,

16   and, you know, any other number of witnesses who have been

17   mentioned throughout the course of the trial.

18           So I'd like to address some of these issues, first of

19   all, to tell you why they're not issues, why they do nothing in

20   terms of raising reasonable doubt or presenting a defense in

21   this case or a justification in this case.  And after I address

22   those issues, then I would like to address individually some of

23   the things that some of the individual defendants raised.

24           So, it's important to go back to what the

25   Government's theory of this case is and what we explained early

1    on and how -- what the charges are in this case.  This case is

2    a conspiracy case, as we've explained.  And the conspiracy

3    arose when Cliven Bundy and his family members began

4    interfering with the BLM's impoundment operation.  And the

5    evidence we've shown you through the Facebook accounts that we

6    have, through Long Bow interviews shows that each of these

7    defendants, at some point, learned about Cliven Bundy's

8    interference.  Now, whether it was in the form of watching the

9    video about what was going on there or hearing, you know, three

10   levels down what was going on in Bunkerville, there was --

11   there was the word put out, a call to arms put out, somewhere

12   around the 8th and 9th of April, through Ryan Payne, through

13   OMA, that Cliven Bundy needed protection.  Calling for militia.

14   Calling for people to come down to "protect."  And that's what

15   started the sequence of events that brought people down to

16   Bunkerville.

17           So whatever the reasons, individually, these

18   gentlemen had for coming down, the evidence clearly shows it

19   was to come to Bunkerville to assist Cliven Bundy.  Now they

20   may -- when they took off in their cars and trucks and drove,

21   you know, 10, 12 hours or however many miles it took to get to

22   Bunkerville, they may not have known precisely at that point in

23   time they'd be standing on a bridge on April the 12th.  They

24   may not have known precisely they'd be in the wash on April the

25   12th, or that they'd be confronting BLM in the wash on April

1    the 12th, but they knew that they were here to support

2    Cliven Bundy.  And what was Cliven Bundy and his family up to?

3    They were trying to disrupt, interfere, impede a lawful

4    impoundment operation that had been court-ordered.

5           And you heard Agent Stover's testimony about -- and

6    we went through this yesterday -- about how, after the 6th --

7    excuse me -- as early as the end of March, when Cliven Bundy

8    and his family members tried to block the first convoys coming

9    in in order to set up the ICP, all way up through the 9th,

10   there were various points of interference.  And after each

11   point of interference, the rhetoric, the Internet chatter

12   racheted up and more and more people started coming to

13   Bunkerville so that by the time of the 11th, the numbers had

14   gotten so great and the potential for violent intention had

15   become so palpable, that the BLM decided that they were going

16   to cease operations.  Not move the -- not release the cattle.

17   Not, you know, just run away from the ICP; they were going to

18   cease operations and then plan going forward as to how they

19   were going to get the cattle out of there, how they were going

20   to get their equipment out of there and so forth.  So that is

21   where matters stood on April -- on the morning of April the

22   12th.

23          So addressing this issue of ambiguity, there is no

24   evidence to show that there was any ambiguity, that there was

25   some -- some sort of confusion as to what BLM was doing, why

1    they were doing it, or where they were supposed to be.  The --

2    all the evidence shows that it was because of the potential for

3    violence that BLM decided to cease operations.  And it came to

4    the point where the sheriff went out to Bunkerville and he made

5    his announcement that he was going to keep an emotional issue

6    safe.

7           So whatever these defendants now say, three years

8    later, that they heard or thought they heard, or what

9    potentially they thought was going to happen, it's clear that

10   when the sheriff gets there, on April the 12th, in the morning,

11   he says, "I'm here to keep an emotional issue safe."  And, you

12   know, everybody -- the crowd sort of died down and so forth.

13   And Eric Parker had stated in his interview that, you know, oh,

14   what we came for, just -- you know, just dissolved, just went

15   away.

16          So, after then the sheriff has his interchange with

17   Cliven Bundy where he tells him to go, you know, disarm the BLM

18   and so forth, after that hour passes, and the sheriff doesn't

19   come back, Cliven Bundy gives his speech to say go get the

20   cattle.  And everybody takes off and heads to the I-15 area and

21   to the ICP.  And when they get there, they see Metro, in the

22   skirmish line, and they see all these people with guns.  And at

23   that point, ladies and gentlemen, there can be no ambiguity.

24   No matter what the issue is with respect to, you know, what

25   they say now that they thought, clearly when they went up

77

1    there, after Cliven Bundy said get the cattle, whether they

2    thought he said the cattle are gone or release the cattle or

3    whatever, when they get there, they know the cattle are there

4    because Metro is there.

5              MR. LEVENTHAL:  Objection, Your Honor.  There's no

6    proof.  Facts not in evidence as to Mr. Drexler.

7              MR. MARCHESE:  Parker joins.

8              MR. TANASI:  Stewart joins.

9              MR. PEREZ:  Lovelien joins.

10             MR. JACKSON:  Burleson joins.

11             MR. MYHRE:  It's a fair comment on the evidence,

12   Your Honor, arguing inferences.

13             THE COURT:  Overruled.  He can argue inferences.

14             MR. MYHRE:  There's no doubt, ladies and gentlemen,

15   these defendants are on that bridge or they're in that area on

16   the morning of April the 12th.  We've established --

17             MR. JACKSON:  I'm going to object as to my client.

18   He said he was not on the bridge.  There's no evidence of that.

19   When he says "these defendants," he -- he should separate

20   defendants from whose is and who isn't.

21             MR. MYHRE:  Well, Burleson is in the wash and the

22   other defendants are on the bridge.

23             My point is, is that with respect to those who say

24   that there was some issue, some ambiguity, the ambiguity is

25   over and -- at all events, once they're up there.  Each one of

1    these defendants -- with respect to Mr. Burleson, Mr. Burleson

2    clearly knows that the cattle are there.  We heard in his UCE

3    interview --

4         MR. JACKSON:  I'm going to object to him making

5    assumptions of --

6         MR. MYHRE:  We heard --

7         MR. JACKSON:  -- his personal opinion.  The

8    prosecutor is not allowed to state his personal opinion.  He

9    can state evidence.

10        THE COURT:  Mr. Jackson, the prosecutor is allowed.

11   All the parties are allowed to ask the jury to draw proper

12   inferences from the facts and apply them to the law.

13        The objection's overruled.

14        MR. MYHRE:  In his undercover interview, Mr. Burleson

15   clearly says, when he's down in the wash and he's moving,

16   making his flanking movement, he says, We boxed them in.  We

17   boxed them in.  We knew we had them boxed in.  We had them

18   up -- we had people up on the skirt, on the southbound, on the

19   west side, and the east side -- or the west side and the east

20   side and BLM had no choice but to back down so that we could

21   get Mr. Bundy's cattle.  That's what he says.  So he knew.

22   There was no doubt in his mind about that.

23        There was no doubt, there was no confusion, there was

24   no ambiguity in the mind of Ammon Bundy.  We saw the video that

25   Mr. Lynch took with Ammon Bundy moving from the staging area up

1   to the ICP where Ammon Bundy -- when he's -- when Lynch asks

2   him, Well, what are you -- what are we going to do?  We're

3   going to get our cattle.  We're going to get the cattle.

4   That's what Ammon said.

5         There was no confusion from Dave Bundy.  We heard

6   testimony from Sheriff Lombardo that he saw -- when he walked

7   across the interstate highway to meet -- to try to find someone

8   to negotiate with, he met with Dave Bundy.  Dave Bundy said --

9   or Sheriff Gillespie asked, Well, what's your intentions?

10   Dave Bundy said, Give me the cattle.  We want the cattle.

11   You've got an hour.  Sheriff Lombardo said, We need more time

12   than that, but Dave Bundy said, you got an hour.

13         There was no ambiguity from Ryan Bundy.  Ryan Bundy

14   was up there and met with Sergeant Jenkins.

15         So, the only people who appear to be confused are the

16   defendants, now, when they raise these issues.  But the facts,

17   the circumstances show there was no confusion.

18         And certainly by the time these defendants are on the

19   bridge and they see the skirmish line lined up in the -- in the

20   middle of the wash, you could hear -- clearly hear, "Open the

21   gate."  "Open the gate."  "Give us the cattle."  "Give us the

22   cattle."  That was what was being shouted there.  So, to the

23   extent that this is at all an issue -- and we contend it's

24   not -- they knew, ladies and gentlemen, back at the staging

25   area precisely what the sheriff said.  It's very clear.  They

1    know precisely what Cliven Bundy said.  But if, to the extent

2    that this is at all an issue, which it shouldn't be, it

3    certainly was cleared up for them by the time they got on the

4    positions in the wash and on the bridge.

5            And we also have defendant Engel's Facebook posting,

6    "Going to shut down the freeway by force of arms," that he

7    posted at 11:17.

8            So they knew.  Certainly Engel was not confused as to

9    what the purpose was for going up there or what Cliven Bundy

10   had sent them for.

11           I want to address the issue also of 4-6 and 4-9.

12   Mr. Leventhal and others have raised this issue as to whether

13   this is . . . somehow brought people here, or whether this was

14   an example of federal overreach, if you will.

15           There is no evidence, ladies and gentlemen, none,

16   none has been presented in this trial that there was any

17   misconduct on the part of any BLM officers on either the 6th or

18   the 9th.  There is no evidence here that First Amendment --

19   First Amendment zones were somehow improper.  Agent Stover

20   talked about all that.  He explained the reasons for the First

21   Amendment zones and Mr. Dickinson touched on it yesterday.

22           If the theory from the defense is, is that they came

23   down on this -- because of something that occurred that they

24   saw on the Internet on the 6th or the 9th, that doesn't make

25   them noble, as I think Mr. Leventhal had characterized it; it

1    makes them into vigilantes.  It makes them into people who are

2    taking the law into their own hands.

3          Recall, they came down with guns, with tactical vests

4    and plates, and ammunition.  And if they are coming for the

5    purposes of revenge, then that makes them vigilantes.  And as

6    you see in the instructions -- with the jury instructions --

7    excuse me -- that "To 'retaliate' means to return for like, to

8    act in reprisal, or to act for some past act," and that's in

9    connection with threat to a federal officer and I'll be going

10   into that in a greater detail in a few moments.

11         The issue with respect to Long Bow, that somehow

12   Long Bow -- you can't believe what's on the Long Bow videos

13   because somehow this was an operation that was deceitful or was

14   designed to trick.  Well, you've seen all of the videos and

15   you'll have the video back there again.  Yes, it's true that

16   the undercover agent said we were a documentary film producers

17   when they weren't, but as the Court has instructed and as

18   you'll see when you read the instruction, the Government may,

19   in order to undercover criminal activity or develop evidence of

20   criminal activity, use deceit and deception for that purpose.

21   But here, when you think about it, the fact that the agents

22   were not, in fact, film producers, really would have had no

23   impact whatsoever on the statements or the admissions that were

24   made by these defendants.  They were told, and you heard from

25   Agent Johnson, they were told that, Hey, here's your chance to

1   tell your story.  And we've seen evidence how, after this

2   event, the various defendants glorified what they were doing in

3   their Facebook postings and elsewhere.  And so, this was their

4   chance.  They were told this was going to be a documentary that

5   would have been published, circulated to the public.  So they

6   knew, when they went in there, that what they said was likely

7   to be put out into the public domain, for anyone to view,

8   including law enforcement.  So there's nothing about the fact

9   that these are law enforcement officers that would have changed

10  or altered what they said because what they said they already

11  thought was going to be going out to the public.  They are

12  boasting.  They are bragging.  They are trying to muster more

13  and more support for what they view as their cause.  They saw

14  this as a means to that end.  So there's -- there was nothing

15  there that they -- excuse me -- they were going to accomplish

16  what they wanted to by trying to get their -- their words out

17  into the public.

18          Now, with respect to the alcohol and so forth, you

19  have -- you will see the demeanor of all of the defendants, and

20  you've seen it when we played those videos.  There is nothing

21  that suggests that any of them were impaired or otherwise

22  confused.

23          And in terms of the questioning, I think it was

24  Mr. Jackson who referred to it as interrogation.  Well, all of

25  the questions were softball questions, and the questions, when

83

1    you listen to it, remember, Agent Johnson prefaced always, he

2    said, Don't let me put words in your mouth.  You know, I may

3    challenge you on some things, but this is your story.  I want

4    you to tell your story.  And, in fact, Agent Johnson didn't

5    have much background at all.  He wasn't involved in the

6    investigation.  He wasn't a case agent on the investigation.

7    This was an after-the-fact investigation.  He was just asking

8    the questions.  Granted, he was gathering information, but it's

9    not like he was questioning him, Now, where were you on the

10   12th of April at 11:15?  Did you talk to Drexler?  Did you talk

11   to Burleson?  Did you talk -- no.  Tell me, what did you bring

12   with you?  How long were you planning to stay?  Why were you

13   going down there?  Those were the types of questions.  Hardly

14   interrogation questions.  Open-ended interrogations.

15          Mr. Leventhal seemed to make a big issue out of the,

16   well, you know, the Government has done this huge

17   investigation; why are they doing this operation?  It's the

18   Government's obligation, ladies and gentlemen, to do all it can

19   to ferret out and to gather the evidence in the case, and this

20   is an investigative tool that's available.  It's a lawful tool.

21   It's a tool that the law recognizes and it's a tool in this

22   case that was very effective.

23          So, Mr. Leventhal wants the -- to fault the

24   Government for being thorough in the investigation and then

25   fault the Government for not calling Sheriff Gillespie.  You

1    can't have it both ways.

2           Now, with respect to calling Sheriff Gillespie and

3    Dan Love, Mr. Leventhal said, well, you know, we would have

4    liked to have heard from Love because he could have told us

5    about when the operation was ending and Sheriff Gillespie about

6    what he said.  Ladies and gentlemen, you have what Sheriff

7    Gillespie said.  There's nothing more that could be added or

8    subtracted from that.  And with respect to Agent Love, we have

9    the video of what Agent Love said and did on the 12th, the

10   Lynch video.  You saw him in the wash.

11          We brought or we presented to you the witnesses who

12   were the decision-makers out there, with Sheriff Lombardo, who

13   had to make the ultimate decision based on him -- his

14   assessment of the overall situation, the security situation,

15   and we brought you the witnesses who experienced the fear, who

16   saw the guns, who could point to where the gunmen were.  Those

17   are the witnesses that we brought and presented to you.

18          Now, with respect to Governor Sandoval's statement,

19   that statement was from the 8th of April, 2014.  And again,

20   that's four days before the events that are before you

21   happened.  It addresses the First Amendment zones, which were

22   gone by that time, were not in use.  But again, there was

23   nothing unlawful about the First Amendment zones.

24          These are distractions, ladies and gentlemen.  These

25   are issues and things that are designed to take your eye off of

85

1   what is really going on here.  Governor Sandoval is not

2   involved in this trial.  He has a right to say what he said,

3   but it has nothing to do with what they did.

4          Another issue was that if the impoundment action was

5   over, you can't impede, and this goes to the various -- the

6   court orders in this case.

7          Mr. Petri testified during this trial and he

8   explained what the court orders said and that there was

9   something called a permanent injunction that permanently

10  enjoined or permanently required Mr. Bundy from ever putting

11  his cattle out on the federal public lands.  The court orders

12  themselves not only affirmed that injunction, or prohibited him

13  from ever trespassing on the land, but it also orders that

14  Bundy shall remove his stock from the -- from the trespassed

15  lands within 45 days and that the United States is entitled to

16  seize and remove to impound any of Bundy's cattle that remain

17  in trespass after 45 days thereafter.  Seize and remove.

18  Remove the cattle.

19         Those cattle were put back out on the land.  That's

20  obstructing the justice -- that's obstructing justice.  That's

21  obstructing the court order.  That's impeding the law

22  enforcement officers from accomplishing their job, which was to

23  remove the cattle.  It makes no sense to say, well, if we

24  put -- if BLM says they're not gathering any longer, then they

25  possibly cannot be impeded, when their mission, their job, was

1    to remove the cattle.  They could not complete that job because

2    of the events of April 12, and the cattle went back out on the

3    land.

4         I think Mr. Tanasi had -- there was an issue by

5    Mr. Tanasi raised yesterday with respect to the court orders

6    saying that, well, you know, yes, Steven Stewart, he didn't

7    know about the court orders because, you know, the reference to

8    his Facebook page is with regard to Judge George, but

9    Judge Hicks signed the order so therefore he couldn't possibly

10   have been researching the court orders that applied.  Well,

11   ladies and gentlemen, as you know from the evidence, there are

12   two court orders; one that was signed by Judge Hicks and the

13   second one, that I've just read from, which is Exhibit 5, which

14   applies to the new trespass lands, was signed by Judge George.

15   So, the Stewart Facebook posting most certainly shows knowledge

16   of the court orders, research into the court orders.

17        And just to refresh your recollection on the court

18   orders, remember, the first court order applied to what they

19   called the Bunkerville allotment or the old trespass lands and

20   the second court order, the one signed by Judge George, applied

21   to the Lake Mead National Recreation Area, where the cattle had

22   spread to.

23        Now I'd like to address the timeline.  And I want to

24   talk about it, first of all, in the context of Mr. Leventhal's

25   argument that by the time that the BLM was pointing weapons

1    before anybody ever got onto the bridge.  That's just not borne

2    out by the timeline, ladies and gentlemen.  It's not borne out

3    in a couple of ways.

4           Parker and Engel are on the bridge at 11:53.  We know

5    that from the Flynn video at Exhibit 76.  That's the one where

6    the individual is shouting, "Your court orders don't mean

7    anything."  Remember how we showed that to you yesterday?

8           As you recall from Exhibit 76, when he pans down to

9    the wash, you see Dennis Michael Lynch, the man in the blue

10   shirt with the camera, up at the front gate.  So, we know that

11   there are people on the bridge when Lynch is at that gate.

12          So, when -- not only are there people on the bridge

13   because we see people, we know specifically Engel and Parker

14   are on the bridge.

15          Mr. Leventhal showed you the picture of the stack,

16   where the -- then the Park Service officers come out alongside

17   the truck and they stack in a position to prevent any entry

18   over that gate or through that gate.  That stack doesn't occur

19   until 11:58, five minutes after Parker and Engel are on that

20   bridge that we know from the video footage.

21          The stack doesn't come out until those horses push

22   through.  The horses push through the gate at 11:57 and they

23   take up that position in the middle of the wash around 11:58.

24   That's when the stack comes out.  So to the extent

25   Mr. Leventhal's arguing that, oh, well, we can show people were

88

1    pointing guns before that, that just doesn't -- just does not

2    comport with the evidence.

3         And you will have Exhibit 457 with you back there,

4    and I'm going to cover it in a little bit more detail a little

5    bit later, but 457 -- and we went through it, took us a couple

6    of days to get through it as, I'm sure, you recall -- that

7    provides the road map for you through all the video evidence

8    that you have from the Lynch and the Ellis/Flynn video as well

9    as Shilaikis and the other photographic evidence that was taken

10   out there.  This provides the road map, synchronizes the times,

11   shows you the sequence of events of where these defendants were

12   at various times throughout those events down in the wash.

13        But regardless of whether the BLM was raising weapons

14   or not before, you know, 11:58, we know that down in the prayer

15   circle area there was already a gun.  We showed the individual

16   with the -- with the long gun with the German Shepherd.  And

17   the fact of the matter is, ladies and gentlemen, is that law

18   enforcement officers have a right to protect themselves, have a

19   right to protect the area that they're -- they're charged with

20   securing and raising a weapon, when someone else has a weapon,

21   after they're told to disperse, and leave, there's nothing

22   wrong with that.  And the -- and throughout the sequence, we've

23   shown you, repeatedly, through the -- through the Greg Johnson

24   video, through the Sones video, how these officers were

25   constantly telling the crowd, Back away.  Disperse.  We see you

1    have guns.  Back up.  You're in violation of a court order.

2    And what they see in front of them is a crowd that continues to

3    gather and eventually pushes out into the wash toward their

4    position.

5              But in any event, Your Honor -- or -- excuse me --

6    ladies and gentlemen, in any event, the first evidence we have

7    of the stack at is 11:58 when it -- when it -- when the

8    horse -- the skirmish line forms.

9              Now I'd like to talk a little bit about the issue of

10   "no one saw my guy pointing a weapon at anybody," and Nicole,

11   could we have 129, please.

12        (Government Exhibit 129 published.)

13             Okay.  This is obviously the Eric Parker prone

14   position.  We've seen it many times.  Mr. Marchese went through

15   it yesterday with you.  And he was making the point that if

16   you're behind the barrier and BLM can't see you, it cannot be

17   an assault.  Cannot be an assault -- it cannot be an assault

18   because the officers cannot apprehend fear.

19             Well, ladies and gentlemen, with respect to that

20   issue, we know, through Agent Swanson's testimony, Agent

21   Whitworth's testimony, and through other testimony that this

22   individual was seen by those officers; black hat, white

23   insignia.

24             We know he was up above that barrier because we see

25   it in Exhibit 111 that he was brandishing at one point.

1    Remember, Agent Swanson testified that he saw him come up and

2    that's what caused Agent Swanson to go up and sight in and

3    actually start to take the slack out of the trigger, because he

4    saw Parker, black hat, white insignia, pointing a weapon at

5    him.  And the reason he didn't pull -- squeeze the trigger

6    completely is because he saw a van behind -- or pass behind

7    Parker that had a soccer ball on the rear window and he saw

8    children in that car and he knew that -- then, he could not

9    take the shot and he released the slack off the trigger and put

10   it on safety and he was asked the question, What could you do?

11   And he said nothing.  Nothing.  Waiting for him, himself, to be

12   shot.

13          And then we see through the Apley video, 109,

14   Exhibit 109, where Ranger Apley is up next to Swanson and we

15   can see Swanson from the other point of view, from down in the

16   wash, where he is bracing with his long gun and he's trying to

17   sight in.  And he says, in referring to black hat, white

18   insignia, "He's turning his cap."

19          His cap is turned (indicating).

20          The early sequence is his hat, and we went

21   through this -- Mr. Dickinson went through this on

22   cross-examination, his hat's forward.  He's turned it.  We know

23   from that evidence -- and that's incontrovertible, the video

24   says what it says -- excuse me -- the body cam says what it

25   says.  He had to have seen him, otherwise he would not have

1    known that that cap was turned around.

2            Now, can he see him here (indicating)?  Probably not,

3    because he's down.  He's below the barrier.  He has his weapon

4    between a gap.  Probably can't be seen from where Swanson is,

5    but he doesn't need to see him in this position.  He knows --

6    he knows that he's taking a position where he will be

7    assaulted, and that's all that's necessary.  He has seen him

8    with his weapon up.  He sees him go down.  He comes up and he

9    goes down.  He turns his cap and he goes down.

10           We talked about this with respect to -- during the

11   cross-examination of Mr. Parker.  He said yes, I changed my

12   position.

13           So to the extent that someone says, well, no one saw

14   my guy pointing, we know they saw Parker point.  But we don't

15   have to prove pointing.  We don't have to prove that Parker was

16   aimed in on any particular agent for assault on a federal

17   officer, or for a 924(c).  All we need to show is that with

18   assault on a federal officer, that he created fear through the

19   use of a deadly weapon.  Showing that weapon, under these

20   circumstances, creates fear, ladies and gentlemen.  Creates

21   fear, especially under these circumstances where you have a

22   crowd gathering, demanding the cattle.  And you have other

23   gunmen moving about.

24           So we have Parker sighted.  We have him identified.

25           Now what about the others?  What about Lovelien's

92

1    argument that I was down here in this part of the bridge, or

2    Engel's argument, that I -- I moved from -- you know, more in

3    the middle of the bridge down forward the end toward where the

4    state trooper is, or Mr. Leventhal's argument, well, no one --

5    no one pointed to Drexler, they had pointed to some tan hat or

6    whatever.  This is a conspiracy case, ladies and gentlemen.

7    And when you enter into a conspiracy, you're responsible for

8    the acts of every co-conspirator.  Everybody out there is

9    working together.  When they get to the ICP, to that area where

10   Post 1 and then move to -- over to Post 2 and they see the

11   horses, and they see the events unfold before them, they know

12   exactly what is going on.  They can see.  Their goal is to back

13   down the BLM, to show force.  As Parker said, we're there to

14   show force.  The only way they can show force, show force

15   sufficient to back off the BLM, is if they have the numbers.

16   And the only way they have the numbers is if they all work

17   together.

18          Now, does Parker need to know Engel, does Engel need

19   to know Parker, does he need to know Lovelien?  They don't need

20   to know who they are; all they need to know is that they need

21   each other and they can work together

22          You heard Burleson's testimony -- or -- excuse me --

23   his statements during the undercover.  He said, Well, I get

24   down there and I look around and I see, I've got to get these

25   people, you know, moving together.  So, I've got people up

1    there on the west -- on the north side and I've got them on the

2    south side -- he's meaning the west and the east side -- and we

3    move up and we start to flank and I've got -- I get up on the

4    bank and I've got someone above me and I'm giving him signals.

5    He doesn't have to know who that is to be in a conspiracy with

6    him.

7            All that's required to find a conspiracy, "It's not

8    necessary that the conspirators made a formal agreement or that

9    they agreed on every detail of the conspiracy.  It is not

10   enough, however, that they simply met, discussed matters of

11   common interest, acted in similar ways, or perhaps helped one

12   another.  You must find that there was a plan to commit at

13   least one of the crimes as I just listed as an object of the

14   conspiracy, with all of you agreeing as to a particular crime

15   the conspirators agreed to commit."

16           They understood what the plan was.  Cliven Bundy said

17   go get the cattle.  "Cowboys, go git 'er done."

18           The five, with the exception of Mr. Burleson, were at

19   that stage, staging area.  They saw the cowboys, the 40 horses.

20   They saw the 40 horses go up on the hillside.  They saw people

21   get in their cars and their trucks, with their guns, and head

22   to the ICP.  Any reasonable person would know, any person of

23   common sense would know what the plan was at that point, was to

24   get the cattle.

25           They get up there, when by the time they get on that

1   bridge, what do they see, ultimately, at 11:57?  They see the

2   horses push through.  They see the horses.  They see them line

3   up in the bottom of that wash.  The same horses that were back

4   at the staging area, the same horses that Cliven Bundy said,

5   "Git 'er done."  They hear the people in the wash yelling,

6   "BLM, go home."  "BLM, open the gate."  "Open the gate."  "Give

7   us the cattle."  "Give us the cattle."  They're on the bridge.

8   They see the horses and the people with them, about 270 in a

9   line, move forward at about 12:13 they start forward, 12:15.

10  They hear the commands.  "Back away."  "Back away."  "Back

11  away."  All those circumstances, ladies and gentlemen, you can

12  infer that there was a plan.  There had to have been a plan.

13  These people did not just, by coincidence, all gather in the

14  Toquop Wash where Cliven Bundy said to go.  It's not an

15  accident.  They just didn't land there.

16          So once they see the plan, once there's a plan and

17  they join it, they're responsible for everything that's

18  naturally -- that's a natural and probable consequence of that

19  crime.  The crime, get the cattle.  The cattle don't belong to

20  Cliven Bundy.  The cattle have been impounded by court order.

21  That's the crime.  The plan, get them by show of force.

22          MR. LEVENTHAL:  Objection.  Facts not in evidence.

23          MR. MYHRE:  That action --

24          THE COURT:  What was the objection?

25          MR. LEVENTHAL:  Facts not in evidence to "the plan"

1    or to the "by force" or that my client knew anything about a

2    plan.  There's no evidence of that.  If there's a plan, there

3    wasn't any evidence that my client knew about it.

4              THE COURT:  All right.  He's -- he's been explaining

5    how -- how there is a plan.  So, objection overruled.

6              MR. MYHRE:  So the plan is Cliven Bundy stated get

7    the cattle.  They see it unfold.  They understand.  And if you

8    recall Mr. Parker's interview with Long Bow, they said, Well,

9    you know, did you know where to go or did you head -- was there

10   a plan?  He said, "It was understood."  It was understood.  And

11   that's what everybody understood out there.  That's what the

12   evidence shows the understanding was.

13             There is no reason, ladies and gentlemen, for

14   these -- for these -- for the five defendants that are on the

15   bridge, for them to remain on that bridge, except to show

16   force.  No reason.

17             They had plenty -- at some point -- we've heard the

18   argument that, well, you know, I heard shots fired or -- no.  I

19   heard someone was going to be shot, so I ran down there and

20   when I got there, what?  No shots were fired.  No one was shot.

21             Parker said, At some point I heard lethal.  There was

22   no mention of lethal or non-lethal over the loud speakers until

23   those horses and everybody had pushed up to the gate.  So from

24   the time they're on that bridge till the time they come off,

25   there is no reason to stay there, except to show force.  If

96

1   they're there for an innocent purpose, there's none shown by

2   the evidence.

3          So once they understand the plan and once they

4   understand what their role is in the plan -- and as we said,

5   they need the numbers to make this work -- they're responsible

6   for any crimes that were committed that could have been

7   foreseen to be a necessary or a natural consequence of the

8   unlawful agreement.

9          So was it foreseeable to Drexler that someone like

10  Parker would be seen by a federal law enforcement officer

11  brandishing his weapon and that that law enforcement officer

12  would be put in fear or would be intimidated?  Absolutely.

13  They all came down together.  They all went from the ICP up to

14  the bridge together in Lovelien's truck, with Lovelien.

15         Was it foreseeable for Engel to see whether Parker,

16  someone like Parker, would have been on that bridge?  Of

17  course.  He said they're going up there to take the freeway by

18  force of arms.  Well, if they're going to go up there to take

19  force of arms, it's pretty likely that someone is going to use

20  a firearm.

21         Is it foreseeable that someone like a Lovelien would

22  know a Parker would be seen?  Absolutely.  He drove him up

23  there, as I said.

24         So, under theory -- under the law of conspiracy, you

25  don't have to worry about whether the special agent or law

1    enforcement officer or ranger pointed out any one of these

2    defendants.  We know Parker was pointed out.  And as

3    co-conspirators, they're liable for the fear that Parker

4    instilled into the officers who saw him.

5         What's more, if you look at the charge under Section

6    115 of Title 18, and specifically Count Eight, none of the

7    elements of threatening a federal law enforcement officer

8    requires that the law enforcement officer actually see the

9    person.

10        The elements are that the defendant made a statement

11   or did an act that constituted a threat to assault a federal

12   law enforcement officer; the defendant intended the statement

13   or act to be a threat, or made the statement or did the act

14   knowing the word or actions would be viewed as a threat; third,

15   that a reasonable person making the statement or doing the act

16   would foresee the statement or act would be interpreted by

17   those to whom the maker communicated the statement as a serious

18   threat.  A reasonable person.

19        So, ladies and gentlemen, as you're deliberating as

20   to whether someone needed to see a Parker, or a Drexler, or a

21   Lovelien, or an Engel, or a Stewart in order to find them

22   guilty of 115, the answer is no; it's whether a --

23        MR. LEVENTHAL:  I'm going to object as to giving the

24   law.  The law is what exactly what it is.  It says what it is

25   and the Court is -- is the one who gives the law.

1              MR. TANASI:  Stewart joins.

2              THE COURT:  I think he just read it.

3              MR. LEVENTHAL:  Well, no, he's interpreting now and

4    he's talking about what -- what needs to be done and he's going

5    beyond that because the word "threat" --

6              THE COURT:  He's applying --

7              MR. LEVENTHAL:  -- assault is in the threat.

8              THE COURT:  He's applying the facts to the law.  The

9    jury will have a copy of the legal instructions and their

10   memory of the facts and how they could be applied to the law is

11   the inference that -- is the argument that the parties are

12   allowed to make.  Not facts which are not in evidence, not laws

13   which are not provided.  So long as we stick to the law that's

14   provided and the facts that have been presented in trial, then

15   that's what the attorneys do is argue how they should be

16   applied, how the facts should be applied to the instructions.

17             MR. MYHRE:  Thank you, Your Honor.

18             So with respect to the threat count, under Section

19   115, the question's asked, Do we have to show that someone

20   actually saw any of these six defendants?  The answer is no.

21   You can look at -- at the videos.  You can look at 457, each of

22   the shots, the photographs, the videos that show these

23   defendants, either in low ready, or weapons brandished, hands

24   on the weapons, under these circumstances, and you can find

25   that a reasonable person, seeing this, would view this as a

1    threat.  And it's hard to think of a circumstance where it

2    wouldn't be viewed as a threat for all of the reasons I just

3    stated.  They're there to get cattle.  The BLM has the cattle.

4    These guys have guns.  Magazines are in.  Hand are on the

5    weapons.  They're -- weapons are being openly carried, used,

6    brandished.  They're being used to intimidate.  They're part of

7    a show of force.

8            So even under 115, there's no requirement that any of

9    the officers had to have actually seen it, as long as you

10   determine that a reasonable person making the statement or

11   doing the act would foresee that that statement or act would be

12   interpreted by those to whom the maker communicated that

13   statement as a serious threat.

14           The fourth element is that "the threat was made with

15   the intent to impede, intimidate, or interfere with a federal

16   law enforcement officer or to retaliate for the performance of

17   his or her official duties."

18           We've already touched on that, but under these

19   circumstances, as the evidence shows, there's only one reason

20   why they're there, and that's to get the cattle, which impedes

21   and interferes, and intimidates the officers.

22           Now, there's also another legal means by which these

23   defendants may be found guilty with respect to the assault on a

24   federal officer charge as well, or the threat charge, and

25   that's aiding and abetting.  We believe the evidence is

1    overwhelming that there's a conspiracy, for all the reasons I

2    just stated, but even if, for some reason, there was some

3    question as to whether or not everybody got together and

4    agreed, you can be similarly liable as an aider and abetter.

5         And as an aider and abetter you're liable if "the

6    crime was committed by someone; the defendant aided, counseled,

7    commanded, induced, or procured the person with respect to at

8    least one element of the crime; that the defendant acted with

9    the intent to facilitate the crime; and the defendant acted

10   before the crime was completed."

11        Now, in this -- if I could have that back up again,

12   please.  Sorry.

13        Now, with 129, for example, we know that Stewart is

14   to the right of Parker in this particular view and we know from

15   Parker's testimony that Stewart gave him the backpack that he's

16   resting his elbow on.  By assisting Parker, by helping him

17   improve his position, by helping him become more comfortable in

18   his position, he has aided and abetted.  He has assisted.

19        Now, we believe the evidence shows Stewart's equally

20   a co-conspirator, but if -- that's one example of aiding and

21   abetting.  And as I talked before, that everybody was down

22   there working together, they're all aiding and abetting one

23   another.  They're all assisting each other.  They're assisting

24   each other by encouraging one another.  How are they

25   encouraging one another?  By their very presence.  By their

1    numbers.

2          BLM is not just going to leave.  Those -- those

3    officers are -- their job is to protect that area.  Their job

4    is to hold Post 2.  They're not just going to walk away because

5    people call them names or stand in front of them yelling at

6    them.  If you recall, Agent Carpenter's body cam video, he said

7    it's the weapons, it's the firearms that are the game changer.

8    So the game changer are the people with the firearms and by

9    being present, they are aiding, encouraging, helping the people

10   in the wash who are advancing toward the gate.  They're

11   encouraging, helping one another on the bridge, by their

12   presence.  Burleson's presence in the wash is helping, aiding

13   and assisting those he's working with and those who are moving

14   toward the gate to get the cattle, to commit the extortion.  So

15   they were all aiding and abetting one another.

16          So just -- just to reenforce that point.  We talked

17   about how the presence of the weapons is not going to -- or --

18   excuse me -- that the presence of those people standing there

19   yelling or calling them names or screaming at them is not going

20   to make the BLM back away.  Similarly, even without the people

21   in the wash, one person on that bridge probably is not going to

22   move the BLM, or one person in the wash with a gun, or one

23   person on the bridge with a gun is going to force the BLM to

24   back away.  They have between 25 and 30 officers.  So they need

25   the numbers and it takes more than just one gun.  It's going to

1  take several guns and it's going to take the positions that

2  those guns take.  And the positions that these guns take are on

3  the high ground, tactically superior positions.  The guns are

4  moving throughout the crowd.

5          So you can see, ladies and gentlemen, that this

6  cannot happen without each other and that's the theory of

7  aiding and abetting and conspiracy as well.

8          Now I'd like to just touch upon some of the -- with

9  respect to each of the individual defendants -- what they had

10  raised during their closing statements and then we'll sort of

11  wrap this up.

12          First of all, with respect to defendant Lovelien, he

13  says that, well, he couldn't have been in his line of sight of

14  any of the agents because he was down on the bridge.

15          If I could have 364, please.

16     (Government Exhibit 364 published.)

17          This was the photograph taken by Agent Briscoe down

18  in the wash.  As you recall, he was behind the truck and moved

19  out to take a photograph.

20          (Indicating) that's in the line of sight.

21          You know from Agent -- excuse me -- Officer Madsen's

22  dash cam, which was brought in through Officer Serena, where

23  Engel is by the -- when he is up in that area where the NHP

24  officers are.  He's looking over the barrier and he's pointing

25  at something.  Well, he's pointing, as he says, he's pointing

at BLM positions where they're aiming weapons at him.  Well, if
he can see the BLM, they can certainly see him.  And if they
could see him, they can see Lovelien who is right in the same
area.

So again, to the extent that that's an issue,
Lovelien was clearly in a position where he could show his
weapon and brandish it and be seen, but again, as we've stated,
it doesn't matter whether they specifically saw Lovelien
because Lovelien was there to support all of the others, and
Lovelien aided and abetted because he drove Parker, Drexler,
and Stewart up there.

Lovelien's Facebook accounts, ladies and gentlemen,
clearly make him out to be a recruiter.  He's calling others to
come to Bundy ranch.  He's connected with Ryan Payne through
OMA.  Mr. Perez said, well, you know, the posting of -- some of
them was with his sister.  Well, his sister was also a member
of the Montana Defense Force.  And we also see where the
objectives of OMA are published on that particular e-mail
through -- or with respect to Cheyenne Miller, the sister of
Lovelien.  So Lovelien's aware of OMA.  There's communication
with Ryan Payne.  He's aware of the objectives that have been
published by OMA, which include to get Cliven Bundy's cattle.
So you can infer from that that when Lovelien goes down to
Bundy ranch, he knows one of the goals is, one of the three
objectives, is to get Cliven Bundy's cattle.

1          He said he went to -- Mr. Perez, said well, he went

2    to prevent violence.  What exactly does that mean?  In other

3    Facebook postings that he has, he's told -- and I believe it's

4    at -- I even wrote it down correctly -- Exhibit 213, there's a

5    series of posts where he's told if you go down there, you're

6    going to -- you might provoke something.  You might provoke

7    violence.  He says I'm going to go anyway.

8          When any of these defendants, either in their

9    Facebook postings or in their testimony, or in their interviews

10   from -- with Long Bow say, I -- we wanted to be peace makers,

11   what they're saying is peace on our terms, and that's what

12   . . . Lovelien means as well.  Means, yeah, we -- we -- we're

13   coming with guns and with ammunition.  We want peace, but we

14   want it on our terms.  We want BLM to be gone and we want the

15   cattle back.

16         Mr. Perez said, well, BLM should have left.  If they

17   had just left, none of this would have happened.  Well, the

18   same can be said about Cliven Bundy; right?  Well, if he had

19   taken his cattle off the land, none of this would have happened

20   either.  BLM would not have had to be there in the first place

21   if he had removed his cattle.

22         So what's the point?

23         The point is, is that when Lovelien went down there,

24   he had the intent to somehow have a confrontation with the BLM.

25   He didn't know precisely what it would be.  He went to protect,

1   according to some of his Facebook posts.  We know he became the

2   head of the militia camp.  We know that Parker, Stewart, and

3   Drexler went to the militia camp.  What do you think they

4   talked about in that militia camp?  Could they have talked

5   about Ryan Payne?  Could they have talked about OMA?  Could

6   they have talked about the objectives?  Absolutely.

7   Absolutely.

8           MR. JACKSON:  I'm going to object.  There's no

9   evidence of what they talked about.  It's mere speculation by

10  the prosecutor at this stage.

11          MR. TANASI:  Stewart joins, Your Honor.

12          MR. MARCHESE:  Parker joins.

13          MR. LEVENTHAL:  Drexler joins.

14          PRO SE ENGEL:  Engel joins.

15          MR. PEREZ:  There's also no evidence, Your Honor,

16  that Mr. Lovelien was in charge of the militia.

17          THE COURT:  All right.  Mr. Myhre didn't say there

18  was evidence and he didn't say that the evidence showed that or

19  that there -- we had -- that was presented.  It's an inference

20  that he's asking the jury to draw from the -- from the facts

21  that have been admitted.  So it's permissible.

22          The objection is overruled.

23          MR. MYHRE:  Mr. Perez said something to the effect of

24  . . . you need to decide or you should decide whether the . . .

25  whether Mr. Lovelien was going down to exercise First Amendment

1    rights.  There is no -- ladies and gentlemen, there is no

2    First Amendment defense.  First Amendment is not -- this case

3    is not about the First Amendment nor is it about the

4    Second Amendment.  Everybody has a Second Amendment right to

5    own a gun, to have a gun, to carry a gun.  There is no Second

6    Amendment right to threaten someone with a gun.  Nor is there a

7    First Amendment right to threaten somebody.  And there's

8    certainly no First Amendment right to threaten a law

9    enforcement officer.  Nor is there a Second Amendment right to

10   carry a weapon to threaten a law enforcement officer.  It's not

11   the carrying, ladies and gentlemen; it's the intent behind the

12   carrying.  That's what you need to decide.  What was their

13   intent when they're on the bridge?  Whether they're armed --

14   whether their weapon is slung over their shoulder or whether

15   it's at the low ready, or whether it's in some other position.

16   If they're carrying that weapon, with the intent to extort,

17   with the intent to threaten, to show force, then they violated

18   the law and there's nothing about the Second Amendment that

19   even enters into it.

20          It's the same with the First Amendment and this

21   notion about protesting.  Everybody has -- one of the dearest

22   rights we hold in this country is the First Amendment.

23   Everybody has a right, as an American citizen, to speak their

24   mind and say what's on their mind.  But that's not what this is

25   about.  You can say what's on your mind, but you can't level a

1    threat at somebody.

2           You can't, as part of your First Amendment right,

3    say, go get my cattle, when me getting the cattle means you

4    have to extort the BLM to get it.

5           So, if, during deliberation says -- someone says,

6    well, this is about the First Amendment or the Second

7    Amendment, no, it's not.  There's nothing about the First

8    Amendment or Second Amendment that immunizes the conduct here.

9    We're talking about criminal activity, criminal state of mind.

10   What were they doing?  Why were they doing it?

11          Mr. Perez said, well, the Government's advanced no

12   evidence that Mr. Lovelien had met Mr. Bundy or met Mr. Payne.

13   Again, for conspiracy, we don't need to show that people met.

14   We don't need to show that they talked to one another, that

15   they made phone calls.  What we have demonstrated in this case

16   and what we have shown beyond a reasonable doubt is working

17   together, concert of action, each understanding, based on what

18   they see what the other is doing.  So whether Lovelien met or

19   didn't meet Payne really is irrelevant.

20          MR. JACKSON:  I'm going to object to that,

21   Your Honor.  That's a misstate of the law.  I think . . .

22          THE COURT:  I don't think concert of action is -- is

23   stated in the legal instruction.

24          You want to rephrase that, Mr. Myhre?

25          MR. MYHRE:  With respect to -- to demonstrate a

1   conspiracy or to prove a conspiracy, we do not have to

2   demonstrate that people met with one another or show -- it's

3   enough for us to show that they are working together, and we

4   call that concert of action, where people are -- going back to

5   the Parker statement, it was understood.  They understand based

6   on what they see.  So whether Mr. Payne actually met with

7   Mr. Lovelien is irrelevant.  We know they talked to one another

8   on Facebook.  And we know that Payne is at the stage on

9   April the 12th when Cliven Bundy says go get my cattle because

10   we saw the video, the Lynch video, where's he's on the stage

11   and all the militia members with their guns are walking by him

12   and he puts his thumbs up, like this (indicating), and he

13   kneels down and he speaks with another militia member, right

14   after the command is to go get my cattle.  Clearly evidence of

15   a leadership role by Payne.

16        Nor is it necessary for him to meet with Mr. Bundy

17   under the same -- same theory.

18        Same thing with Mr. Burleson.  He didn't know the

19   defendant.  There was no communication.  Or, excuse me.  He

20   didn't know Mr. Bundy, there was no communication with

21   Mr. Bundy.  Well, we know from his Facebook postings that

22   before he even left Arizona he indicated what he was going to

23   do.  He was going to face off with federal agents.  We know

24   from his undercover interview, the Long Bow interview, that he

25   said, I went to Bundy ranch with the intent to kill federal

1    agents.  He described them as rogue federal agents.  He -- we

2    know that he had communication with militia because he said in

3    his undercover interview that they had a militia council, that

4    this whole issue involving the Bundy family was discussed and

5    decisions were made by the council that they were going to go.

6    And you have the Burleson interview.  I'm not going to recite

7    all of it again, and Mr. Dickinson played a great portion of it

8    yesterday.  But we know his intent directly from what he has --

9    what he said in the Long Bow interview.  So whether he met with

10   Mr. Bundy or knew Mr. Bundy is completely irrelevant.  He knew

11   what he was doing --

12            MR. JACKSON:  I'm going to object.  Whether it's

13   relevant or not is for the jury to determine and the

14   prosecutors's personal opinion on whether it's relevant is

15   irrelevant.  The jury can determine that.  It's not the law and

16   his personal opinion --

17            THE COURT:  Objection's overruled.

18            MR. MYHRE:  Your Honor -- thank you.

19            Mr. Burleson, as well, was not just walking in the

20   wash.  He was flanking.  He said it in his Long Bow interview

21   that he was flanking.  He was flanking to the BLM's right,

22   which would be his left as you look toward the gate area.  And

23   it's borne out and corroborated by Exhibit 457.  And when you

24   go through there, and we went through in court, as you review

25   it again, you'll see, sequentially how he moves up the left and

1    gets up to the west side of the northbound -- or southbound

2    lane, up to that ramp area where the -- what we've been calling

3    sort of the ramp.

4            So to the extent, ladies and gentlemen, you have any

5    question in your mind as to whether Mr. Burleson may have had

6    too much to drink or maybe wasn't feeling well when he gave

7    that interview, well, we submit the video doesn't show that.

8    The video shows him alert, his thought process very clear, very

9    good recall, but what he said is corroborated by the physical

10   evidence in this case, by the photographs and by the videos and

11   by the sequence as revealed in Exhibit 457.  He says he's

12   moving to the left on the BLM's right flank.  So he's moving up

13   the left side of that wash.  He says when he gets there, he has

14   someone above him, he's giving arm signals to.  He says he

15   sights in, and, remember this (indicating) -- sights in to

16   the -- to the mercer -- to the contractor who's up in the

17   front -- meaning Dan Love -- "He's mine."  "He's mine."  I'm

18   going up there, "I'm going to chop his head off," is what he

19   said.

20           He also said that -- you know, Mr. Jackson made the

21   point of saying, well, you know, he never pointed his weapon.

22   Well, we've already been through that, but nevertheless,

23   Burleson says in his undercover, "I sighted in and I brought it

24   down low ready so that if I had to, I could go right up again."

25   He says the same thing to Agent Caputo, that he pointed his

1    weapon at the agents.  He tells Agent Caputo how he -- what

2    he's taking with him that day.  He says the same thing in the

3    Long Bow interview.  The same equipment he describes in the

4    Long Bow interview is visible in the photographs and the video.

5    It all lines up.  It all reenforces the other pieces.

6             There was no impairment.  There was no confusion by

7    Burleson during his undercover.  It's fully corroborated by the

8    evidence.

9             Mr. Jackson also raised the point about, well, there

10   seems to be some sort of schism between Metro and the BLM.  I'm

11   not sure what that meant or what it was intended to mean, but

12   ladies and gentlemen, you saw the evidence of the BLM officers.

13   You saw the evidence of the NHP and the Metro officers that

14   were out there.  They're all consistently saying the same

15   thing, that what they saw, they had never seen before.  That

16   what they saw gave them great fear because you had an angry mob

17   intermixed with guns.  That's a recipe for disaster.

18            Mr. Jackson also talked about no fear, now I will

19   return to that at the end here.

20            Mr. Leventhal, with respect to Mr. Drexler, again,

21   going to Long Bow, suggesting that there's something nefarious

22   about it, we've already discussed that.  But he said there's

23   really nothing connecting his client to this conspiracy.

24            Ladies and gentlemen, his -- we -- we've shown you

25   the photograph of him on the bridge proned.  He is proned with

1    his weapon in a gap between the Jersey barriers.  When you look
2    at that photograph, up to the very right you see three Arizona
3    State Militia people on the west -- east side of the southbound
4    lanes.  He can see what's going on underneath the wash and for
5    all the reasons we discussed before, the same applies to
6    Drexler.  He's helping, he's assisting, he's aiding and
7    abetting by his very presence, but not only by his presence,
8    but by what he is doing there.  He is aiming his weapon.  He is
9    using his weapon to threaten.
10           Implicit in Mr. Leventhal's argument is that there's
11   something about April the 6th and April the 9th that was giving
12   some sort of reason for what Drexler did.  Again, there is -- a
13   federal officer -- let me read from the jury instruction
14   itself.  "A federal officer acting in the good faith
15   performance of their duties may not" -- "may not be forcibly
16   resisted."
17           There is no excuse or justification for resisting a
18   federal law enforcement officer.  There may be some -- if
19   there's a disagreement about what a federal law enforcement
20   officer is doing, there are other means to address it.  You can
21   sue them.  Sue the department.  Remember Agent Swanson said,
22   when he was going through the whole sequence of engaging
23   Parker, he said we're accountable for every round that we ever
24   fire.  Law enforcement officers have -- they're accountable to
25   an organization and they're accountable under the law civilly

1   for any actions they take, but with respect to the performance

2   of their duties, they have the right not to be assaulted.  If

3   they are acting in the good faith performance of their duties

4   they may not be forcibly resisted by another.  And all of the

5   evidence shows they were in the very much the good faith

6   performance of their duties.  They were acting pursuant to

7   court orders.

8          So if someone says well, maybe there's some excuse or

9   reason for all of this, there's none revealed by this evidence.

10  There is no self-defense.  There's no defense of another.

11  There is no justification, and that's pointed out in the jury

12  instructions, the law as the Court has given it to you.

13         Mr. Stewart I believe we covered.  We talked about

14  the Judge -- Judge George order.  Again, he says he's not in a

15  conspiracy.  He's just -- he was just there.  His -- his weapon

16  was below the Jersey barrier.  All the reasons we discussed

17  before, they're all working with each other.  And ladies and

18  gentlemen, as a matter of common sense, you see the sequence in

19  457.  He's like this (indicating) below the barrier, just the

20  barrel of his weapon is above the Jersey barrier.  He didn't

21  stay in that position the whole time.  We know from 129 he

22  moved down the bridge.  He had to have gotten up.  And

23  remember, those officers are looking at that bridge, through

24  optics and so when he got up, his weapon was brandished.

25  Either way, whether it's as part of the conspiracy, or as a

114

1    threat to a federal officer, the way he was holding his weapon

2    on that bridge is a threat.  Could be reasonably interpreted to

3    be a threat.

4         Mr. Parker we've addressed about they didn't see him

5    prone, he's behind the Jersey barrier.  They put words in my

6    mouth, at the Long Bow.  We've discussed that.

7         We discussed the issue with court orders and

8    Mr. Marchese raised of the order, whether they could hear the

9    court orders or not.  Ladies and gentlemen, as part of the

10   conspiracy, the violation or the interference with those court

11   orders, the obstruction of justice as members of those -- that

12   conspiracy, they're liable, they're guilty of that count

13   regardless of whether they actually read the orders or saw the

14   orders.  It was reasonably foreseeable when they went down

15   there and BLM's gathering of the cattle, there're probably

16   court orders.  But if there's any doubt, we've heard the

17   Johnson video and the number of times those warnings were

18   given.

19        Mr. Marchese talked about the chaos.  We've talked

20   about that.  There was no confusion.  Certainly not by the

21   Bundy brothers, Ammon, Ryan and Dave.  Certainly not by any of

22   the law enforcement officers who saw what was going on.  They

23   saw exactly what was going on.

24        Mr. Engel said, "I was there to protest.  I was there

25   to keep the peace."  Again, keep the peace?  On what terms?

1  His terms.

2          He says, I went over to the . . . and I'll probably

3  wrap up, Judge, in about 20 minutes.  I don't know if you want

4  to go that far.

5          THE COURT:  Okay.

6          MR. MYHRE:  Engel said, reading from Exhibit 297,

7  that he went over and he -- he met with the NHP and that they

8  made the phone call and he talked about, during his closing

9  argument, that I was there with NHP.  Well, NHP doesn't

10 immunize Engel's conduct.  First of all, if you recall Officer

11 Serena's testimony, Engel didn't even say who he was; he said

12 I'm a citizen of Nevada.  Okay?  And not only that, but what is

13 he saying he's doing?  He's -- he's -- he's using NHP to try to

14 take down a "sniper position" from BLM, to have the BLM

15 officers in the wash lower their weapons.  He's trying to

16 enlist the help of NHP to weaken BLM's position, to help them

17 force them away.  So there's nothing about NHP or his

18 involvement with NHP that at all excuses or justifies his

19 conduct.  Again, he's there, he's on the bridge, he's

20 reenforcing, he's helping.  He's actively trying to get BLM to

21 take down a position.

22          What did he say on 4-13?  Did he say he was trying to

23 keep the peace the very next day at the conference?  No.  He

24 said -- when -- when Cliven Bundy asked, What did I say he

25 said, "Disarm the Park Service so we can bury them -- bury

1      those weapons.  Cowboys, get your guns.  We're going to get our

2      cows.  40 cowboys.  300 vehicles loaded up with all their

3      people and their weapons and hauled butt in that direction to

4      support them."  "To support them."  That's what he said on the

5      13th.  Not to make peace.  Not to protest.  Not to stand

6      around, but to support the people on the horses, the 40

7      horsemen to get the cattle.  And he said 300 people loaded up

8      in their trucks and their cars with their weapons and went

9      there.  So, he knew exactly what was going on.

10             Ladies and gentlemen, there's an old saying that when

11     people show you who they are, believe them.  And Engel has

12     shown who he is.  He's shown who he is in the video evidence we

13     have of him, tacked out on that -- on that freeway, running to

14     the northbound bridge, toward the northbound bridge, getting on

15     that bridge, staying there.  We have -- we know what he says in

16     the immediate aftermath when there's no reason for him to say

17     anything other than what actually, in his mind, went on, and we

18     know he said support those people going to the bridge -- or

19     going to get the cattle.  We know from Exhibit 303 on the 10th

20     of January of 2016 he says that Bundy ranch is a blueprint, a

21     blueprint for the future.  His intent is to do it again.

22             He stood before you and said it was an honor.  What

23     honor is there in this?  In what occurred on the 12th?

24             He said, on the March 3rd, 2016, when we see in

25     Exhibit 209, he said, "The feds are making a purge.  They're

1    going to cut the head off the resistance."  Does that sound

2    like someone who wants to make peace?  Who wants to make things

3    non-violent?

4              "There may be a gun battle between patriots and

5    feds."

6              That's who Mr. Engel is.  You see it in the video.

7    You see it in the photographs.  You can't be two people at

8    once.  You can't be someone who stands in court and says, "I'm

9    humble" and then gets on a video and says, "There may be a gun

10   battle between patriots and feds."

11             Now, ladies and gentlemen, I'm sure there may be some

12   things I missed, some evidence I -- I didn't cover.

13   Mr. Dickinson went over with you in the 924(c)'s the

14   brandishing and the carrying and we commend those instructions

15   to you carefully.  Brandishing is just showing the weapon with

16   the intent to impede or intimidate or threaten.

17             The same thing with carrying, and we've talked about

18   that.

19             The last point I want to touch with you is the "no

20   fear" and then the case will be yours.

21             Mr. Leventhal used the word "noble" -- "noble" -- to

22   describe what happened on April the 12th.

23             MR. LEVENTHAL:  Objection.  That's misstates the

24   argument.

25             MR. MYHRE:  You will recall what the argument was.

1           There was nothing noble about this.

2           Many of the defendants said, well, maybe the BLM

3     officers weren't afraid.  Because they said a joke or they said

4     something that, you know, in the friendly confines of the

5     courtroom in a very nice room where everything is well and

6     orderly might not seem appropriate.  But ladies and gentlemen,

7     while we don't have to prove actual fear, we only have to prove

8     that they were afraid under the -- a reasonable person or a

9     reasonable officer in those circumstances would be afraid, and

10    you'll see that in the instruction, so you can determine

11    whether or not, given all the circumstances they were faced

12    with, whether someone would be afraid, a reasonable officer

13    would be afraid.  But we've shown actual fear.  You've heard

14    from each of the witnesses, the BLM officers, the Park Service

15    officers.  You heard from Metro and NHP.  You heard what they

16    saw.  You heard how they felt.

17          They were outnumbered down there.  According to

18    Agent Simpkins, he counted 410 people on the bridges and in the

19    wash against 25 to 30 officers -- 25 to 29 officers, between

20    the time the skirmish line formed to the time they pushed up.

21    You've seen countless video about how that occurred.  These

22    officers were in the fatal funnel.  There were people on the

23    high ground.  There were people on the bridges.  There were

24    gunmen moving in and out of the crowd.  There were gunmen

25    moving up onto the high ground, onto the slopes of the bridges.

1    They were moving on the bridges themselves, the northbound.

2    They had people in the southbound literally right over the top

3    of them, screaming -- and you heard it.  You heard it in the

4    Johnson video, you heard it in the Sones dash cam -- screaming

5    at them, calling them every name in the book, throwing things.

6    And really?  Faced with that, they're going to sit here and say

7    now, oh, they should have not said that.  Oh, why did they say

8    that?

9          Ladies and gentlemen, anybody -- as the Court has

10   said, reasonable doubt is based on common sense.  And you know

11   from your common sense and your life experiences that anybody

12   faced with that amount of stress, in those conditions, one of

13   the ways to relieve that -- anybody who's been in war or is in

14   combat or in a combat zone knows, that one of the things you do

15   is to try to make light of the situation.  It relieves the

16   stress.  But more importantly, it keeps them under control.

17   They're law enforcement officers.  They thought they were going

18   to die, but, their training kicked in.  Their training kicked

19   in, and they were able to keep their cool.  And because of

20   that, there was no violence, there was no death -- there was

21   violence.  There was no death.  There was no injury.

22          So when Mr. Marchese says no harm, no foul, there was

23   a severe foul.  The fact that no one was hurt doesn't mean that

24   nothing was taken that day, taken from those officers.

25          First of all, they got the cattle, so that's one

1    thing that they got.  But they also left those officers with a

2    memory . . . they may never be able to erase.

3              There was nothing noble.  There was nothing

4    honorable.

5              You remember Agent Swanson's testimony when he was

6    asked, after the encounter with Parker and he says, well, did

7    you have -- how did you deal with the fear.  He said, I looked

8    down, I said a prayer, and I asked God to take care of my wife

9    and children if I didn't make it out.  Then I said an Our

10   Father and I went back to work.  That's the mindset of a

11   professional.  That's the mindset of a law -- trained law

12   enforcement officer.  Take a time-out, make my peace, and get

13   back to work.  I asked every single -- most of the officers we

14   asked, I asked a number of officers, Why didn't you just leave?

15   Leave?  Why would I leave?  I'm told to hold the post.  I'm

16   told to hold Post 2.  That's my job.  That's my job.  And these

17   guys (indicating) jumped them.  They got a gang of thugs

18   together, they got their guns and their magazines, no --

19   Swanson's accountable.

20             They're accountable to no one, and they don't want to

21   be accountable today either.  They jumped them.  And they put

22   the fear of God into them.  For what?  For some cattle?  For

23   someone who hasn't paid grazing fees for 20 years?  Or to maybe

24   feel like they're somebody for a moment in time.

25             No harm, no foul?  Absolutely there was a foul.

1          We've heard quotes and I'm not going to hit you with

2     another, I'm going to hit you with a brief quote, but we've

3     heard about Gandhi and a number of others.  The quote that

4     comes to mind most for me is from John Adams, one of the

5     founding fathers of our country, the successor to

6     George Washington, the second president of the United States.

7          He famously said, "We are a nation of laws, not men."

8     And by that he meant, is that we order our society, we order

9     our daily lives, not by the gun, but by the law.

10         And these people (indicating), these people took the

11    law into their own hands and used guns to get something that

12    didn't belong to them for someone they didn't even know.

13         That day, they won, according to Engel.  But today,

14    ladies and gentlemen, today we are not in a stage -- on a

15    stage.  We're not in a wash.  And we're not on a bridge.  We're

16    in a courtroom.  In this room things are not decided by the

17    power of the gun, but by the power of the law.  Things are not

18    decided by the strength of the number of people you can pull

19    together for a short time to get your way; things are decided

20    with the strength of the evidence.  And if things in this room

21    ever stop being that way, if things are no longer decided by

22    the evidence and the law, then we've truly lost our way.

23         Being a juror is a difficult assignment.  It's a high

24    responsibility.  Nobody likes to sit in judgment of another

25    human being.  We're all flawed.  We all have our strengths; we

1    all have our weaknesses, but your job and your oath is not to

2    sit in judgment of a human being, but to sit in judgment of the

3    evidence in this case.  And when you look at the evidence in

4    this case, it leads to one place.  One place.  And it's right

5    over there (indicating).  Defendant Parker, Defendant Stewart,

6    Defendant Engel, Defendant Drexler, Defendant Lovelien, and

7    Defendant Burleson.

8              Ladies and gentlemen, we thank you for your time.

9    Most importantly, we thank you for your attention and your

10   service.  We ask that you return a verdict of guilty on all

11   counts as to each of those defendants because the evidence has

12   shown it beyond reasonable doubt.

13             Thank you.

14             THE COURT:  All right.  Before we recess, I'm going

15   to have Aaron swear in our Court Security Officer so that he

16   can take the jury back to begin deliberation during lunch.

17   Lunch is there.

18             COURTROOM ADMINISTRATOR:  "You do solemnly swear to

19   keep this jury together in some private and convenient place,

20   that you will not permit any person to speak to or communicate

21   with them nor do so yourself unless by order of the court or to

22   ask them whether they have agreed upon a verdict and that you

23   will return them into court when they have agreed -- when they

24   have so agreed or when ordered by the Court, so help you God?

25             THE CSO:  I will.

1          THE COURT:  All right.  So the jurors in this case

2    will be Jurors Number 1 through 13, that's all eight people on

3    the top and then the four on the bottom that are closest to --

4    to Mike, to the CSO.  That means that Jurors No. 14, 15, and

5    16, the other three, you are the alternates, but you are not

6    excused; you're still on call.  So if anything were to happen,

7    if any of the jurors get sick or any other kind of accident and

8    they're not available to continue with deliberation, then

9    you'll be called in and deliberations will start over again

10   with you participating in that deliberation.

11         So we're going to have Jurors 1 through 13 -- because

12   remember, we excused Number 12, that's why it's 13 if you're

13   looking at me funny about I can't count, but it is -- it's 12

14   jurors total, but we don't have Number 12, so Number 13 is on

15   the jury -- you can all follow Mike and go into the

16   deliberation room to begin your deliberation and then the other

17   three jurors are welcome to also have lunch, or take it with

18   you, whatever you would like in -- in the conference room, but

19   I do need to make sure that the three alternates provide Aaron

20   with all of your contact information so that if we do need to

21   call you to come in to begin deliberation, we can contact you

22   right away.

23         Also, if you are not used for deliberation but you

24   would like to be here if there is a verdict, you can also let

25   Aaron know and we'll call you so that you can come in for that

1    if you're interested.

2            All right.

3            Oh.  Also -- so there was a question that I have as

4    to the deliberation.  So, if -- when you get back there, as you

5    remember from the instructions, the first thing you do is you

6    choose a foreperson and then discuss what your schedule will

7    be.  I give a lot more latitude to my jury and I treat you as

8    adults and I know that you all have lives.  So, I let you set

9    your hours for deliberation, but you can't begin deliberation

10   any sooner than 8:00 a.m. and you should not try to deliberate

11   any later than 4:30.  But if, on a particular day, someone has

12   something going on and needs to start deliberation a little

13   later or leave a little earlier, that's all right.  You all can

14   decide to do that, but you always have to be together when you

15   deliberate.  So you're free to stay here, you're welcome to

16   stay until 4:30 today and then it will up to you if you want to

17   come back tomorrow because I'll be here with other things that

18   I'm doing so I'm available.  If you want to deliberate

19   tomorrow, the room is available and everything is available

20   here for you from 8:00 to 4:30 if you'd like to.  If you choose

21   not to, because on our schedule we didn't anticipate that you

22   would need to be here on Friday, so if you can't be here on

23   Friday and you all decide not to deliberate on Friday, just let

24   us know so that we have a clear understanding of what your

25   schedule will be.  So if you're not going to be deliberating

1    tomorrow, let us know when, on Monday, you're going to come

2    back and all the communication can go ahead and either be

3    written in a note or you can tell Mike just as far as the

4    scheduling for your calendar goes.

5            All right.  So, members of the jury, Number 1 through

6    13, if you'll please stand and follow Mike and then the other

7    three will be going back into the same room where you were

8    before, the conference room.

9            Oh, you're going to take them all because they all

10   have all their items in the conference room.  Okay.  That's a

11   good idea.

12           But the food's already been separated; right?

13           COURTROOM ADMINISTRATOR:  I believe he's going to do

14   that as well.

15           THE COURT:  Okay.

16           As for the attorneys, I do have court in here

17   tomorrow morning so you are going to have to take everything

18   off of the tables.

19       (Jury retired to the jury room to begin its deliberations

20       at 12:49 p.m.)

21           THE COURT:  All right.  The jury has left the

22   courtroom and we're off record.

23       (Recess was taken at 12:49 p.m.)

24   ///

25   ///

1                              -oOo--

2                    COURT REPORTER'S CERTIFICATE

3

4          I, Heather K. Newman, Official Court Reporter, United

5    States District Court, District of Nevada, Las Vegas, Nevada,

6    do hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true, complete, and

8    correct transcript of the proceedings had in connection with

9    the above-entitled matter.

10

11   DATED:   _____       ____ /s/ Heather K. Newman ____
                             Heather K. Newman, CCR #774
12                           OFFICIAL FEDERAL REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25