DAYLE ELIESON
United States Attorney
STEVEN W. MYHRE
NADIA J. AHMED
DANIEL R. SCHIESS
Assistant United States Attorneys
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
steven.myhre@usdoj.gov
nadia.ahmed@usdoj.gov
dan.schiess@usdoj.gov

*Representing the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 2:16-CR-00046-GMN-PAL |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| ERIC J. PARKER, | |
| Defendant. | |



I heard the words, **"I've got a clear shot at four of them,"** and to my right found one of the men pointing his weapon in the direction of the BLM.  For me, time had stopped.
- Jim Urquhart, Reuters Photographer (Exhibit A)

## I.        Summary of Argument

Through words, images and sworn testimony, Eric Parker has demonstrated again and again that on April 12, 2014, he was willing, prepared and determined to kill police officers.  Staking a position on a bridge above them, through force and violence he obstructed these officers, threatening their lives, because they had, in his view, the audacity to perform their duties and enforce federal court orders.

Eric Parker pled guilty to obstruction of court order, a misdemeanor.  Relevant conduct during the events of April 2014 through the present reflect how serious his actions were and how little he takes responsibility for them to this day.  Parker is an unrepentant danger – to law enforcement and to the community at large.

The government recommends that he be sentenced to five years of supervised probation.  This sentence is supported by each of the factors provided in Title 18, United States Code, Section 3553(a), the United States Sentencing Guidelines, and the parties' plea agreement.

## II.       Procedural Background

On March 2, 2016, a grand jury in this district returned a superseding criminal indictment against defendant Parker and eighteen others in relation to the criminal events that occurred between April 6 and 12, 2014.  On March 3, 2016, Parker was arrested in Idaho pursuant to that indictment and detained pending trial.

On February 6, 2017, jury trial commenced against Parker and five other co-defendants.  Parker testified in this trial.  The jury failed to reach a verdict as to Parker and the Court declared a mistrial.  On July 10, 2017, the retrial commenced.

Parker again took the stand to testify.  However, in violation of this Court's order and multiple admonitions, he continuously raised topics before the jury for the express purpose of nullification until his testimony was stricken and he was removed from the stand.  On August 22, 2017, the jury acquitted Parker of most of the charges against him except the assault on a federal officer and threats to federal law enforcement officers and the corresponding 924(c) counts.  Following declaration of mistrial on these counts, the Court released Parker from custody.

On October 23, 2017, defendant Parker pleaded guilty to a Superseding Criminal Information charging him with one count of Obstruction of Court Order in violation of 18 U.S.C. §§ 1509 and 2, a Class A misdemeanor, for his conduct on April 12, 2014.  Pursuant to the plea agreement, the parties each agreed to argue for a sentence of probation, Parker seeking no less than one year and the government seeking up to five years probation.

### III.    Points and Authorities

### A.    Facts

The facts of this case are well-known to the Court and recounted here only in summary form.  Evidence adduced at trial showed that between April 8 and 11, 2014, Parker had reviewed articles and videos, including Pete Santilli's video regarding the April 9 Ammon Bundy tasing and Payne's call to arms video.  Thereafter, Parker advocated for people to stand with Cliven Bundy against the BLM.  The evidence, including his own statements, showed that Parker and co-defendants Scott Drexler and Steven Stewart left Idaho on April 11 and drove 10

3

hours straight through to Bundy Ranch, bringing with them assault rifles, handguns, and ammunition.  Parker also stated that he took more weapons with him than usual.

Evidence showed that Parker arrived at Bundy Ranch in the early morning hours of April 12.  One of the Bundys asked if they wanted to camp in the "militia" camp or with the protestors.  Parker chose to be a gunman and picked the "militia" camp.  Parker, Drexler, and Stewart then went on patrol for two hours.

On April 12, Parker provided security for the Bundys at their staging area. Evidence admitted at trial included photographs and videos showing him standing at the perimeter of the staging area without his tactical vest or rifle.  Evidence also showed that after the Sheriff and Cliven spoke to the crowd, Parker followed Bundy's order to get his cattle, updating his Facebook page at 11:24 as follows: "Bundy gave the sheriff 1 hour to disarm the BLM . . . he did not reply. We are now going to free the cattle by any means. The sheriff claimed that the blm is standing down but offered no proof this is when Mr. Bundy gave him the 'do it or else.' We will not be lied to."

Parker was captured in photo and video footage moving from the area used by the Bundy followers as a parking lot across from the ICP to the bridge overlooking the officers in the wash.  By the time he got to the ICP, Parker had donned his tactical vest and was armed with an assault rifle.  Parker was well documented standing, walking and kneeling on the bridge all with his rifle in the low ready position, and of course photo after photo showed him prone behind the

concrete barriers of the highway with his rifle aimed through the gap in the barriers toward the officers.  Photos admitted at trial and expert testimony offered during the retrial showed that Parker had placed the firearm in the firing position.  Testimonial evidence established that officers saw Parker and Drexler taking these positions and understood from their training and experience that the defendants' presented an imminent threat owing to their superior firing position and their apparent intention to assault the officers.  More than anyone else, Parker, with his distinctive black trucker hat, was spotted by the officers making tactical movements, protecting himself, and placing the officers lives and the lives of the unarmed women and children positioned in front of Parker in danger.

And evidence at trial showed Parker's immediate state of mind on the bridge on April 12 in the form of a video interview by an independent reporter.  Parker stated that people needed to "keep matching force for force" and that he believed it was good that children had been down in the Wash because that may have been the only thing that kept the crowd from getting gassed.  He enthusiastically acknowledged that things could have gotten violent and that people could have gotten hurt.  He encouraged others to go to Texas and do the same thing and show force to BLM there as well.

As the evidence showed at trial, Parker continued in the months and years after April 12, 2014, to celebrate his conduct that day, contrasting his achievements for the "movement" with those of Timothy McVeigh, using the image of him prone on the I-15 on t-shirts with the word "resist," among many other posts.  Evidence

also showed Parker participating in military-style operations after April 12 on public lands designed to keep public lands officers from doing their jobs – specifically at the Sugar Pine Mine in Oregon and Operation Big Sky in Montana.

Evidence also established that Parker knew that the BLM was in the area enforcing federal court orders, that on April 12, 2014, he heard the BLM officer's announcements that the area was closed pursuant to those court orders, heard the officer directing the crowd to leave and that he remained on the bridge, nonetheless.

### B.    Legal Standard

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and, (6) not presume that the Guidelines range is reasonable.  *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008).  This is true for a Class A misdemeanor conviction as well.  See U.S.S.G. § 1B1.9.  When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the § 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines

range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994. The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence." *Nelson v. United States*, 550 U.S. 350, 352 (2009).

**C. Argument.**

### i.   The PSR's Offense Level Computation is Correct.

The PSR correctly calculated the offense level for the Obstruction of Court Order base offense level as 14 and correctly applies a 3-level enhancement for official victim for a total of 17. The PSR is further correct that the defendant may be sentenced to up to five years of probation pursuant to 18 U.S.C. § 3561(c)(2).

### ii.   A Sentence of Five Years of Probation is Appropriate.

The PSR recommends a sentence of time served because it finds that the guideline range falls in a zone on the Sentencing Table that does not allow for probation. PSR ¶ 124. However, the Guidelines in no way prohibit the Court from imposing a sentence of probation. *See* U.S.S.G. § 5b1.1(b) (providing for three conditions which preclude a sentence of probation under the Guidelines, none of which are present here). When the Court does not impose a sentence of imprisonment, the Court may properly impose a sentence of probation, regardless of the offense level under the Guidelines. The plea agreement expressly states the parties' agreement for a sentence of probation.[1] Section 3553(a) requires the Court

---

[1] Moreover, following the recommendation in the PSR to impose a sentence of time served would likely result in an illegal sentence. *See United States v. Nichols*, No. 17-5580, 2018 WL 3614574 (6th Cir. July 30, 2018) (holding district court's corrected

to impose a sentence "sufficient but not greater than necessary to comply" with the factors articulated in subparagraph 2.   18 U.S.C. § 3553(a).   The government submits that the overall nature of the offense and the characteristics of the offender, when combined with the circumstances under which the offense was committed, justify a sentence of five years of probation for defendant Parker.

      a.      **The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense.**

The recommended Guideline sentence is reasonable when considering the seriousness of the relevant conduct at issue.   Parker committed multiple crimes of violence in concert with Cliven Bundy and his followers in order to threaten and coerce federal law enforcement officers from carrying out their lawful duties.   In so doing, he showed no respect for the law, for the rule of law, for law enforcement officers, for court orders, or for the community.   He was prepared and willing to kill law enforcement officers simply because they were enforcing court orders against Bundy.

These officers did nothing more than provide security for civilians tasked with rounding up these cattle.   They took the reasonable measures that law enforcement officers across this country undertake in any operation covering an

_____

sentence of "time served" where defendant had served twelve years but the statutory maximum was ten years was unlawful).   *See also United States v. Peters*, 470 F.3d 907 (9th Cir. 2006) (holding that the court lacked authority to grant credit of nine days of time served in imposing four month sentence because district court may not compute credit for time served, but rather "the prerogative to grant credits in the first instance rests with the Attorney General, acting through the Bureau of Prisons.")   *Id.* at 909.

area and operation of this scale. Bundy and Parker thought the BLM used too many officers to do so, so they thought it best to go about and threaten their lives by shooting them.

These officers were sought out and provoked by Bundy and his supporters throughout the days leading to the April 12 assault. Among other things, the Bundys went so far as to ram an ATV into a dump truck in order to bring the impoundment to a halt on April 9, threatened to shut down a business owner who freely entered into a contract with the BLM to sell trespass cattle, and put out a nationwide call for militia to come to Bundy ranch to confront the BLM. Parker answered that call and arrived at Bundy Ranch on April 12, gathering with other supporters at staging area near Bundy's home.

When Parker arrived he did not find federal law enforcement officers anywhere in this area – indeed there was no federal law enforcement officer located within five miles of Parker or the staging area. No snipers were aiming at him, as he falsely quailed to his Followers. No officers were "abusing him." Parker saw nothing but the Bundys, their supporters, including the many militia members, and Sheriff Gillespie, who stood on the stage and told Bundy, Parker and hundreds of Bundy supporters and militia, that the BLM was leaving the area and the impoundment operation was over. But Parker did not then and there turn around and go home peacefully. Rather, when Cliven Bundy later told the crowd to get his cattle, Parker followed, and traveled in a stranger's vehicle five miles to the BLM compound, knowing he would confront the BLM officers there. He went to the

officers – negating any claim of provocation or self-defense – took a lethally advantageous position over the officers in the wash and then threatened them with an assault rifle in his hands.

And if that was not enough, Parker continued to threaten law enforcement and glorify his lawlessness up to the time of the Superseding Indictment in this case. Like Bundy, Parker became a law unto himself and he was determined to use force and threats of force to enforce his view of the law.

Parker's violent conduct greatly affected the victims in this case. During trial, the Court heard from 15 federal officers, who all testified about their fear on April 12, 2014, and many of whom testified to experiencing trauma after the assault. The Court also heard from five local law enforcement officials, including now Sheriff Lombardo, who similarly testified regarding their fear on April 12. In addition, the Court has detailed victim impact statements from four federal officers describing the deep trauma they suffered as a result of the April 12, assault. *See* PSR at ¶¶ 65, 66. For most of the officers in and around the wash on April 12, Eric Parker is the face and embodiment of the deadly threat leveled against them. It is Eric Parker, bobbing up and down on the I-15 with a rifle that officers remember with vivid clarity. Eric Parker, who the next day many of them realized for the first time, had taken the most perfect and deadly position, laid out, fully protected behind concrete barriers, where he could aim, shoot and kill them with no ability on the officers' part to return fire.

### b.    Parker's History and Characteristics.

Parker's actions on April 12, 2014, reflect his commitment to using force in opposition to law enforcement whenever *he* deems their actions unlawful.  The events of April 12 made Parker a hero for others who share this venal mindset.  Parker embraced that role.  Since April 12, 2014, Parker has continuously referenced Bundy Ranch on his Facebook page and routinely changes his profile picture to pictures of himself brandishing and pointing his assault rifle at law enforcement on April 12, 2014, including one with the words "BE THIS GUY" superimposed on it:

 

On April 11, 2015, Parker posted the following on Facebook in reference to Bundy Ranch:

> About one year ago, We woke up in the desert and made bacon bagel sandwich's for breakfast after arriving at about 2am we took watch on the gate from 2 till 4am our only interaction with the Militia was that morning at the HQ tent we were told we would escort the Bundies to the stage and keep an eye on the crowd

> After that the real patriots went and go the cows back while others stayed at the safety of the stage.

On June 11, 2015, Parker posted this picture:



On February 2, 2016, Parker posted this picture celebrating the assault and extortion of April 12, 2014:

Following his violent conduct at Bundy Ranch, PARKER became one of the founders of the Idaho III%.  The III% motto is "When Tyranny Becomes Law, Rebellion Becomes Duty!"

In April 2015, a year after the assault and extortion at Bundy Ranch, a dispute arose between the BLM and miners in Grants Pass, Oregon at the Sugar Pine Mine. The miners requested outside assistance, to which Idaho III% and various Bundy Ranch veterans, including Parker responded, hoping for another Bundy Ranch. The government avoided the miners and armed occupants to prevent the creation of another Bundy Ranch.

In August 2015, Parker participated in what he and others referred to as "Operation Big Sky," which was an event where III% members and others traveled to Lincoln, Montana, with firearms to intimidate the U.S. Forest Service (USFS) to cease regulation of White Hope Mine, a small mining operation. At the miner's request, Parker and others traveled to Lincoln and established an armed checkpoint on public land leading to the mine. They also maintained a military style security operation at the mine site and served a "Notice of No Trespass" on USFS, threating to arrest USFS employees and contractors if they set foot on the public land upon which the site sits. They claimed that "the immediate aim of this operation is to act as a buffer between the miners and any unlawful action by the USFS."



Defendants Parker, Drexler and Cooper at Operation Big Sky

13

Parker has also made numerous statements advocating use of force and violence against law enforcement. On July 11, 2015, Parker posted the following picture on Facebook:



Perhaps the most chilling, are Parker's statements contrasting his achievements "within the movement" with those of Timothy McVeigh, stating: "McVeigh didn't accomplish shit . . . The only thing he accomplished was getting himself executed and attaching a stigma to the movement for a decade.  Now what did I accomplish in the past two and a half years."  Retrial Exhibit 102.  Parker went on in that lengthy Facebook post to discuss how he and his friends had begun to train and prepare for an opportunity a year and a half before the events with the Bundys, he listed his participation in the stand-off, joining Idaho 3%, and Sugar Pine Mine.  Parker noted that his group networks, recruits and trains for such encounters.

And what do they train for/  In a Facebook post dated September 24, 2015, Parker was asked "What if one/is agrees with 3%ers but works for BLM/USFS?" Parker responded in part, "I reach out to as many of the LE branches that I can especially in my local area shake their hand look them in the eye let him know I don't want to kill him and I don't want him to kill me hopefully it'll never have to get to the point it did in Nevada ever again. . . .Short answer is I wish they would just find another job".

It is clear, then, for Eric Parker, that confronting these federal law enforcement officers was not a one-off experience on April 12, 2014.  It is a movement – a way of life that involves preparing, recruiting and training with firearms for an event where he is prepared and willing to kill an officer if he determines it is necessary.

### c.   The Need for the Sentence to Promote Respect for the Law, to Afford Adequate Deterrence and Just Punishment and to Protect the Public.

The recommended sentence will promote respect for the law and afford an adequate deterrence to others.  Parker has been very public in flaunting his disrespect for the law and has long affiliated with the so-called Militia and Patriot Movements, which ascribe to the belief that the federal government is an enemy of the constitution that must be dealt with by force.  Parker has confirmed this belief system by his actions and words.

General deterrence is one of the prescribed goals of every sentencing.  18 U.S.C. § 3553(a)(2)(B); *see also United States v. Onuoha*, 820 F.3d 1049, 1055 (9th Cir. 2016 (noting that the government has "an interest in gaining a trial conviction

15

to show others that such conduct will result predictably in conviction and a serious penalty of incarceration"); *United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000) (noting one principal objective of criminal punishment is deterrence).   General deterrence is a significant factor in the present case.   Further, general deterrence depends upon the public seeing some consequence for criminal conduct - not only among potential wrongdoers who may be deterred from committing crimes, but also among law-abiding citizens who need assurance that the criminal justice system will do its utmost to protect law enforcement from harm.

Parker's conviction is grounded not only in violence and lawless acts, but also in his complete disregard for the rule of law.  Parker came to Bunkerville for the express purpose of engaging federal law enforcement officers and brought weapons and ammunition with him.

The inescapable corollary, especially in light of his subsequent statements and actions, is that Parker will do it again – whether by himself and/or by inciting and encouraging others to act. His rhetoric and his conduct relating to these charges make clear that he has not changed his mind about the federal government, federal law enforcement authorities, or the law.  As demonstrated above, Parker has essentially declared a personal war against the federal government.  No evidence was adduced during this massive investigation, or during the lengthy trials, to suggest that Parker has changed his mind about any of his actions on April 12 or about his willingness to repeat them.

Accordingly, the best way to deter Parker from engaging in future criminal conduct and to protect the public, including law enforcement officers, from such actions, is to place him on probation for five years. Parker placed numerous law enforcement and federal officials' lives in jeopardy by his armed participation in the violent confrontation orchestrated by Bundy. A period of five years probation is, therefore, reasonable under the circumstances of his misdemeanor plea.

## IV. Conclusion

**WHEREFORE**, for all the foregoing reasons, the Court should impose a sentence of five years probation.

**DATED** this 2nd day of August, 2018.

Respectfully,

DAYLE ELIESON
United States Attorney

*/s/ Nadia Ahmed*

_____
STEVEN W. MYHRE
NADIA J. AHMED
DANIEL SCHIESS
Assistant United States Attorneys

*Attorneys for the United States*

17

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am an employee of the United States Attorney's Office.  A copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was served upon counsel of record, via Electronic Case Filing (ECF).

**DATED** this 2nd day of August, 2018.


*/s/ Nadia Ahmed*
_____
NADIA AHMED
Assistant United State Attorney

18